IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――

JASON R. WHITE,

                      Plaintiff,        Civil Action No.

      -v.-                             9:09-CV-0240 (DNH/DEP)

BRIAN FISCHER, THERESA A. KNAPP-DAVID,
and R. WOODS,

                      Defendants.

―――――――――――――――――――――――――――

APPEARANCES:

FOR PLAINTIFF:

JASON R. WHITE, *Pro Se*
96-B-1280
Elmira Correctional Facility
P.O. Box 500
Elmira, NY  14902

FOR DEFENDANTS:

HON. ANDREW M. CUOMO     BRIAN J. O'DONNELL, ESQ.
Attorney General of            Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

    Plaintiff Jason R. White, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  In his complaint, plaintiff asserts that his transfer into special housing unit ("SHU") disciplinary confinement at the Upstate Correctional Facility, to serve what was originally intended to be a three-month disciplinary sentence of less restrictive keeplock confinement imposed while at another facility, represented a deprivation of a liberty interest without the requisite procedural due process.  As relief for the violation, plaintiff's complaint seeks an award of compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have moved seeking its dismissal for failure to state a cause of action upon which relief may be granted.  In their motion, defendants argue that plaintiff's allegations do not demonstrate the existence of a meritorious due process claim since, at best, it implicates a failure of prison officials to comply with governing regulations regarding transfers into an SHU unit, a matter not of constitutional concern, noting further that plaintiff has no constitutional right to be designated to a particular correctional facility or to a desired security classification.  Defendants also seek dismissal of plaintiff's claims

2

against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims.  I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp-David and Woods nonetheless should be granted qualified immunity from suit in this instance.

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS").  *See*

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964). I have also considered the exhibits attached to plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint.  *See Donhauser v. Goord*, 314 F. Supp.2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

*generally* Complaint (Dkt. No. 1).  At the times relevant to his claims

plaintiff was designated first to the Auburn Correctional Facility ("Auburn"),

located in Auburn, New York, and later to the Upstate Correctional Facility

("Upstate"), located in Malone, New York.  *Id.,* § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found

guilty following a Tier III disciplinary hearing of engaging in violent conduct

and refusing a direct order, in violation of disciplinary rules 104.11 and

106.10, respectively.[2]  *See* Plaintiff's Memorandum (Dkt. No. 1-1) Exh. A.[3]

As a result of that determination plaintiff was sentenced to serve three

months of keeplock confinement, with a corresponding loss of package,

commissary, and telephone privileges.  *See id.*

---

[2]      The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

[3]      Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint.  "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss.  However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his . . .  memorandum."  *Rivera v. Selsky*, No. 9:05-CV-0967, 2007 WL 956998, at *1 n.2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord*, 96 Civ. 7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997)).

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007.  Complaint (Dkt. No. 1) § 6.  At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence.[4]  *Id.*

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU at Upstate was not authorized by DOCS directives.  Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1-1) Exh. C.  The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC").  Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1-1) Exh. D.  Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007.  Complaint (Dkt. No. 1) § 6 at p. 4B.  Plaintiff's Memorandum

---

[4]      Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

(Dkt. No. 1-1) Exh. D.  Plaintiff's further appeal of the matter to the DOCS

Central Office Review Committee ("CORC") was likewise unsuccessful.

*Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS

Commissioner Brian Fischer, complaining of the SHU designation.

Plaintiff's Memorandum (Dkt. No. 1-1) Exh. F.  That letter was referred by

Commissioner Fischer to defendant Theresa A. Knapp-David, the DOCS

Director of Classification and Movement.  Complaint (Dkt. No. 1) § 6 at pp.

4B-4C.  In response, defendant Knapp-David wrote to the plaintiff on May

7, 2007, advising that his SHU assignment was in accordance with

established DOCS procedures.  Plaintiff's Memorandum at (Dkt. No. 1.1)

Exh. G.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on February 27, 2009, and was

thereafter granted leave to proceed *in forma pauperis*.  Dkt. Nos. 1, 4.

Named as defendants in plaintiff's complaint are Commissioner Fischer;

Director Knapp-David; and Upstate Superintendent R. Woods.  Complaint

(Dkt. No. 1) § 3.  Plaintiff's complaint asserts a single cause of action for

deprivation of procedural due process.  *Id.*, § 7.

Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought.  Dkt. No. 10.  In their motion defendants argue, *inter alia*, that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity.[5]  Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more

---

[5]    Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion.  Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

7

than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft,* ___ U.S. ___, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S.

at 570 127 S. Ct. at 1974). When assessing the sufficiency of a complaint

against this backdrop, particular deference should be afforded to a *pro se*

litigant whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson* v.

*Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) ("'[A] *pro se*

complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers'") (quoting *Estelle v.*

*Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations

omitted)).

### B.    Procedural Due Process

In their motion, defendants assert that because plaintiff's due

process claim rests on alleged violations of DOCS regulations, his

complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial

of procedural due process arising out of a disciplinary hearing, a plaintiff

must show that he or she 1) possessed an actual liberty interest, and 2)

was deprived of that interest without being afforded sufficient procedural

safeguards.  *See Tellier v. Fields*, 260 F.3d 69, 79-80 (2d Cir. 2000)

(citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d

9

349, 351-52 (2d Cir. 1996).  Inmates' liberty interests may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation.  *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners.  *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983).  Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in . . . an unexpected manner."  *Arce*, 139 F.3d at 333 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction.  Instead, he argues that his due process rights were abridged

10

after the sanction was imposed when, in violation of DOCS Directive No.

4933,[6] he was transferred from keeplock confinement at Auburn to an

SHU cell at Upstate, and as a result required to endure a more restrictive

confinement.  Unfortunately for plaintiff, neither the Due Process Clause

nor state statute or regulation give rise to a liberty interest in these

circumstances.

Preliminarily, it is well recognized that an inmate has no

constitutional right to be incarcerated at a particular correctional facility,

"and transfers among facilities do not need to be proceeded by any

particular due process procedure."  *Halloway v. Goord*, No. 9:03-CV-

01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and

_____

[6]      Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined
in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for
various reasons, which can include confinement pursuant to a Tier II or III hearing
disposition.  Plaintiff asserts that because he was transferred from Auburn, a
maximum security facility, into an SHU unit, that section does not apply.  Interestingly,
a prior version of DOCS Directive No. 4933 provided, in relevant part, that

> [a]n inmate who is assigned to keeplock status and who is
> transferred to a maximum security facility shall not be
> assigned to the special housing unit at the receiving facility.
> Such inmate shall be assigned to keeplock within general
> population and shall have the same rights and
> responsibilities as other keeplock inmate in that facility.

*Lee v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998) (quoting prior version of 7
NYCRR § 301.6(h)).

Treece, J.)[7] (citing *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005)) (other citation omitted); *see also*, *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitutional rights sufficient to give rise to a due process claim. *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)); *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg*, No. 9:06-CV-1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court

---

[7]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest.  *McEachin v. Goord*, No. 9:06-CV-1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway*, 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility)*; Carlisle v. Goord*, No. 9:03-CV-296, 2007 WL 2769566, at *2 n.1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding the conversion."); and, *Chavis v. Kienert*, 9:03-CV-0039, 2005 WL 2452150, at *9-10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest).  *See also*, *Holmes v. Grant*, No. 03-Civ. 3426, 2006 WL 851753, at *18-19 (S.D.N.Y. mar. 31, 2006 (dismissing claim

plaintiff's claim that disciplinary sentence was improperly converted from keeplock sentence to SHU).  These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS . . . possesses sole discretion to determine 'where a [state] inmate will be housed.'" *Halloway*, 2007 WL 2789499, at *5 (quoting *Grullon v. Reid*, No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted).  These cases are indistinguishable from the case presently before the court.

Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities . . .."  *McEachin*, 2008 WL 1788440, at *4; *see also, Halloway*, 2007 WL 278499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same . . . limitations.") and *Holmes*, 2006 WL 851753, at * 19 ("Section 301.6 . . .

14

relat[es] to keeplock admissions and authorizes placement of inmates in

SHU 'at a medium  or minimum security correctional facility or *Upstate*

*Correctional Facility* . . . for confinement pursuant to disposition of a

disciplinary (Tier II) or superintendent's (Tier II hearing.'") (emphasis in

original).

In view of the foregoing, it is clear that plaintiff's transfer from

Auburn, where he was keeplocked, to SHU confinement at Upstate does

not implicate a liberty interest arising out of either Due Process Clause, or

state statute or regulation.  According to plaintiff's complaint, he was

sentenced to keeplock after a Tier III disciplinary hearing; he does not

allege that he was denied due process in connection with that hearing.

The Tier III hearing that he was provided was all that was required by the

constitution before he was sentenced to disciplinary confinement.

*Holmes*, 2006 WL 851753, at *19.  Plaintiff was entitled to no further

procedure at the time of transfer to Upstate, and therefore cannot show

that he was deprived of a protected liberty interest without due process of

law.[8]  *Id.*  Accordingly, I recommend that plaintiff's complaint be dismissed

---

[8]     Plaintiff alleges a litany of differences between the conditions
experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for
example, that with regard to visits, he was required to travel to and from them in
handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not

for failure to state a cause of action.

C.    Personal Involvement

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged.  Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d

---

permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt. 1-1) at pp. 11-12.  As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life".  *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300.  "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated. . . .'"  *Halloway*, 2007 WL 2789499, at * 7 (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976).  Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation.  *Carlisle*, 2007 WL 2769566, at * 3.

Cir. 1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim . . . [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct;

2) after learning of the violation through a report or appeal, has failed to

remedy the wrong; 3) created or allowed to continue a policy or custom

under which unconstitutional practices occurred; 4) was grossly negligent

in managing the subordinates who caused the unlawful event; or 5) failed

to act on information indicating that unconstitutional acts were occurring.

*Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other*

*grounds, sub nom., Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937.; *see*

*also Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v.*

*Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

### 1.   Commissioner Fischer

Aside from allegations centering upon his role as the DOCS

Commissioner, which are clearly insufficient in and of themselves to

establish his liability, plaintiff's claims against defendant Fischer appear to

revolve around the letter written by him to the Commissioner on or about

April 23, 2007, complaining of his SHU confinement at Upstate.  That

letter, it appears from the limited materials now before the court, was

referred to defendant Knapp-David for response.  It is well established that

when the Commissioner receives a letter and forwards it on to another

individual for investigation and a response, his or her involvement in the

constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *Rivera v. Fischer*, No. 08-CV-6505L, 2009 WL 2981876, at * 2 (W.D.N.Y. Sept. 18, 2009).  I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

### 2.   Superintendent Woods

Plaintiff's claims against Superintendent Woods stand on slightly different footing.  It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences.  His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation.  On that basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion.  *See Charles v. New York State Dept. of Corr. Services*, No. 9:07-CV-1274, 2009 WL 890548, at *5-9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J.).

### 3.   Director Knapp-David

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp-David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp-David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp-David and her personal involvement in the constitutional deprivations alleged.

###    D.    Qualified Immunity

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly

20

established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson*, 555 U.S. ___, 129 S. Ct. at 816.  The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[9] *Kelsey*, 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577

---

[9]     If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey*, 567 F.3d at 61 (quoting *Saucier*).

21

F.3d 415, 430 n.9 (citing *Saucier*).[10]  Expressly recognizing that the

purpose of the qualified immunity doctrine is to ensure that insubstantial

claims are resolved prior to discovery, the Supreme Court recently

concluded in *Pearson* that because "[t]he judges of the district courts and

courts of appeals are in the best position to determine the order of

decisionmaking [that] will best facilitate the fair and efficient disposition of

each case", those decision makers "should be permitted to exercise their

sound discretion in deciding which of the . . . prongs of the qualified

immunity analysis should be addressed first in light of the circumstances

of the particular case at hand."[11]  *Pearson*, 555 U.S. ___, 129 S.Ct. at

818, 821.  In other words, as recently emphasized by the Second Circuit,

the courts "are no longer *required* to make a 'threshold inquiry' as to the

violation of a constitutional right in a qualified immunity context, but we are

---

[10]     In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433 n.11 (citation omitted).

[11]     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, ___ U.S. ___, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

free to do so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith*, 21 F.3d 496, 500 (2d Cir. 1994) (quoting *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993)).  The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)).  "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity."  *Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation.  Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp-David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate

represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer.  Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp-David be granted qualified immunity from suit.

IV.   SUMMARY AND RECOMMENDATION

At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate.  Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted.  While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp-David and R. Woods.  Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10)

25

be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      January 25, 2010
            Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

⚐  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Carlos RIVERA, Plaintiff,
v.
Donald SELSKY, Director of Special Housing and
Inmate Disciplinary Programs, NYS DOCS; Kenneth S.
Perlman, Superintendent, Mid-State Correctional
Facility; G. Lawrence, Housing Lieutenant, Mid-State
Correctional Facility; T. Hart, Tier III Hearing Officer,
Mid-State Correctional Facility, Defendants.
**No. 9:05-CV-0967 (TJM/GHL).**

Jan. 5, 2007.

Carlos Rivera, Marcy, NY, Plaintiff, Pro Se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Senta B. Siuda, Esq., Assistant Attorney
General, of counsel, Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This action has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to Local
Rule 72.3(c) and 28 U.S.C. § 636(b).

In August of 2005, Carlos Rivera ("Plaintiff"), an inmate
at Marcy Correctional Facility ("Marcy C.F."),
commenced this action *pro se* against four employees of
the New York State Department of Correctional Services
("DOCS"), pursuant to 42 U.S.C. § 1983. (Dkt. No. 1.)
Those four employees are (1) Donald Selsky, the Director
of DOCS' Special Housing and Inmate Disciplinary

Programs, (2) Kenneth S. Perlman, the Superintendent of
Mid-State Correctional Facility ("Mid-State C.F."), (3)
Greg Lawrence, a lieutenant at Mid-State C.F., and (4)
Tom Hart, a vocational supervisor and Tier III hearing
officer at Mid-State C.F. (collectively "Defendants"). (*Id.*)
Generally, Plaintiff alleges that Defendants violated his
rights under the First, Fifth, Eighth and Fourteenth
Amendments as well as various state rules and regulations,
and/or were negligent in connection with a disciplinary
hearing held at Mid-State C.F. in March of 2005. (*Id.*)

Currently pending before the Court are (1) Defendants'
motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), [FN1]
and (2) Plaintiff's cross-motion for summary judgment.
(Dkt.Nos.13, 28.) For the reasons that follow, I
recommend that Defendants' motion be granted and that
Plaintiff's cross-motion be denied.

> FN1. I note that, while Defendants' motion was
> initially made by Defendant Selsky in January of
> 2006, it was subsequently joined in by
> Defendants Perlman, Lawrence and Hart in May
> of 2006, after they had been served with
> Plaintiff's Complaint in March of 2006.
> (*Compare* Dkt. No. 13 *with* Dkt. No. 25.)

### I. BACKGROUND

### A. Plaintiff's Complaint

Before I summarize the allegations and claims of
Plaintiff's Complaint, an initial point bears mentioning. I
have, in construing Plaintiff's Complaint, treated that
Complaint as effectively amended by certain factual
assertions presented in the document that Plaintiff entitles
"Cross-Motion for Summary Judgment." I have done this
for three reasons: (1) Plaintiff is proceeding *pro se* in this
civil rights matter and thus is entitled to have his pleadings
and papers liberally construed,[FN2] (2) the factual assertions
in Plaintiff's "Cross-Motion for Summary Judgment" were
offered by Plaintiff not just in support of his cross-motion
for summary judgment but *in opposition to Defendants'
motion to dismiss,*[FN3] and (3) the factual assertions in

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

Plaintiff's "Cross-Motion for Summary Judgment" are consistent with the allegations of Plaintiff's Complaint.[FN4]

> FN2. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gill v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ); *see also Burgess v. Goord,* 98-CV-2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") [internal quotation marks and citations omitted].

> FN3. (*See, e.g.,* Dkt. No. 28, Decl. in Opp., ¶ 1, referring to his "cross-motion" also as an "opposition to defendants ... [motion] to dismiss"].)

> FN4. "[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

Turning now to Plaintiff's Complaint, that Complaint, liberally construed, alleges as follows. On March 15, 2005, while incarcerated at Mid-State C.F., Plaintiff gave to his correctional counselor (Mr. Zick) two "disbursement forms," in order to send money to his family.[FN5] One of the forms was for the disbursement of $550, and the other was for the disbursement of $100.[FN6] Mr. Zick then gave the forms to Defendant Lawrence.[FN7] However, Defendant Lawrence did not process the forms.[FN8] On March 22, 2005, Plaintiff filed a grievance (Grievance No. MS-14374-05) against Defendant Lawrence, complaining that Defendant Lawrence was "not doing his job."[FN9] Similarly, on March 28, 2005, Plaintiff sent a letter to Captain M. Relf at Mid-State C.F., making the same complaint about Defendant Lawrence.[FN10]

> FN5. (Dkt. No. 1, ¶ 8 [Plf.'s Compl.]; Dkt. No. 28, Ex. 1 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, incorporated by reference into Plf.'s Compl.].)

> FN6. (Dkt. No. 28, Ex. 1 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, incorporated by reference into Plf.'s Compl.].)

> FN7. (Dkt. No. 1, ¶ 8 [Plf.'s Compl.]; Dkt. No. 28, Ex. 1 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, incorporated by reference into Plf.'s Compl.].)

> FN8. (Dkt. No. 28, Ex. 1 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, incorporated by reference into Plf.'s Compl.]; *see* also Dkt. No. 1, ¶¶ 8-10 [Plf.'s Compl., making this allegation by implication].)

> FN9. (Dkt. No. 1, ¶ 9 [Plf.'s Compl.]; Dkt. No. 28, Ex. 1 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, incorporated by reference into Plf.'s Compl.].)

> FN10. (Dkt. No. 1, ¶ 9 [Plf.'s Compl.]; Dkt. No. 28, Ex. 2 [Plf.'s Cross-Motion, attaching letter to Capt. M. Relf dated 3/28/05, incorporated by reference into Plf.'s Compl.].)

**\*2** On March 30, 2005, Defendant Lawrence was making his rounds on the cell block in which Plaintiff was housed, when Plaintiff initiated a conversation with Defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

Lawrence.[FN11] Plaintiff asked Defendant Lawrence why he had disapproved of Plaintiff sending money home.[FN12] Defendant Lawrence responded that "it's a security matter." [FN13] In addition, Defendant Lawrence became angry at Plaintiff for having filed a grievance and letter of complaint against Defendant Lawrence.[FN14] Undeterred, Plaintiff told Defendant Lawrence that he had to give Plaintiff a better reason for the denial than saying that "it's a security matter." [FN15] Defendant Lawrence then threatened Plaintiff with incarceration in the facility's "box" or Special Housing Unit ("SHU") for talking back to him.[FN16] Approximately fifteen to twenty minutes later, Plaintiff was summoned to a sergeant's office where he was informed that "Lt. Lawracne [sic] called me and said that you dissed him and wants you in the box." [FN17] Shortly after that, Plaintiff was removed from the facility's general population and placed in the SHU to await formal disciplinary proceedings.[FN18]

FN11. (Dkt. No. 1, ¶ 10 [Plf.'s Compl.]; Dkt. No. 28, Plf.'s Rule 7.1 Statement, ¶ 4.)

FN12. (Id.)

FN13. (Id.)

FN14. (Id.)

FN15. (Id. at ¶ 11.)

FN16. (Id.)

FN17. (Id. at ¶ 12.)

FN18. (Id.)

On March 31, 2005, Plaintiff was served with a Tier III misbehavior report, charging him with one count of violating DOCS Rule 107.11, regarding harassment.[FN19] In that misbehavior report, Defendant Lawrence described the underlying incident as follows:

FN19. (Id. at ¶ 14.) Specifically, DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee or any other person including a person subject of an order of protection with the inmate or who is on the inmate's negative correspondence list." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii).

On the above date and approximate time [3/30/05 at 1:30 p.m.], I ... was exiting housing unit 21-3 when Inmate Rivera ... stopped me and began questioning me about disbursement forms submitted by Inmate Rivera for large sums of money that after investigation were disapproved by me. During the course of the conversation, Inmate Rivera became argumentative and insolent, demanding that I answer his questions as to why the disbursements were denied. After telling Inmate Rivera that he would not be given specific reasons, Rivera continued his [illegible] that I have to answer to him.[FN20]

FN20. (Dkt. No. 28, Ex. 3 [Plf.'s Cross-Motion, attaching Inmate Misbehavior Report dated 3/30/05, incorporated by reference in Plf.'s Compl.].)

Later that day, Plaintiff requested, was assigned, and met with an employee assistant.[FN21] During this meeting, Plaintiff requested, among other forms of documentary evidence, a copy of the grievance that he had filed against Defendant Lawrence on March 22, 2005 (Grievance No. MS-14374-05) and a copy of DOCS Directive 4932 (which provides that "[d]isciplinary measures should not be overly severe" and that "[d]isciplinary action must never be arbitrary or capricious, or administered for the purpose of retaliation or revenge").[FN22]

FN21. (Dkt. No. 1, ¶¶ 15-16 [Plf.'s Compl.].)

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

FN22. (*Id.* at ¶ 16; Dkt. No. 28, Ex. 4 [Plf.'s Cross-Motion, attaching DOCS Directive 4932, dated 5/12/04, incorporated by reference in Plf.'s Compl.].)

On March 31, 2005, at 9:40 a.m., Defendant Hart commenced Plaintiff's disciplinary hearing.[FN23] At the hearing, Plaintiff requested five (5) witnesses.[FN24] However, Defendant Hart denied Plaintiff's request on the ground that "[the] witnesses [were] not there during the incident." [FN25] Plaintiff then offered into evidence (1) a copy of the grievance he had filed against Defendant Lawrence on March 22, 2005 (Grievance No. MS-14374-05), and (2) a copy of the complaint letter that Plaintiff had sent to a captain at Mid-State C.F. on March 28, 2005.[FN26] Again, Defendant Hart denied Plaintiff's request to introduce the documents into the record.[FN27] Plaintiff objected to Defendant Hart's denial of both requests, arguing that the evidence was relevant to Plaintiff's defense, which was that the disciplinary charges against Plaintiff were merely a form of retaliation against Plaintiff for having exercised a constitutionally protected right [i.e., filing a grievance against Defendant Lawrence).[FN28] In response, Defendant Hart stated, "[W]e do thing[s] different ... at Midstate Correctional Facility." [FN29]

FN23. (Dkt. No. 1, ¶ 17 [Plf.'s Compl., erroneously stating the hearing commenced on "April 31, 2005"]; Dkt. No. 28, Ex. 4 [Plf.'s Cross-Motion, attaching Superintendent Hearing Disposition 4/5/05, incorporated by reference in Plf.'s Compl.].)

FN24. (Dkt. No. 1, ¶ 17 [Plf.'s Compl.].)

FN25. (*Id;* Dkt. No. 28, Ex. 5 [Plf.'s Cross-Motion, attaching Witness Interview Notices dated 4/5/05, incorporated by reference in Plf.'s Compl.]; *but see* Dkt. No. 28, Statement of Material Facts, ¶ 11 [appearing to assert that Defendant Hart permitted Plaintiff to call one of the witnesses].)

FN26. (Dkt. No. 1, ¶¶ 19-20 [Plf.'s Compl.].)

FN27. (*Id.* at ¶ 20.)

FN28. (*Id.* at ¶ 21.)

FN29. (*Id.*)

**\*3** At 10:45 a.m., Defendant Hart concluded Plaintiff's hearing.[FN30] Defendant Hart found Plaintiff guilty as charged.[FN31] In the written Superintendent Hearing Disposition, Defendant Hart stated that the evidence he relied on, in reaching this determination of guilt, consisted of (1) the hearing testimony of Defendant Lawrence (as well as the misbehavior report), and (2) the hearing testimony of Corrections Officer R. Tedesco (the relevant Housing Unit officer).[FN32] Defendant Hart sentenced Plaintiff to thirty (30) days "[k]eeplock" confinement "in the Special Housing Unit," as well as thirty (30) days loss of packages, telephone, recreation and commissary privileges.[FN33] (I take note of the ambiguity present in this allegation-namely, that Plaintiff was sentenced to "keeplock" confinement *and* confinement in the "Special Housing Unit.") [FN34] For a reason that is unclear from the pleadings and motion papers, it appears that Plaintiff eventually served only twenty-four (24) of the aforementioned thirty (30) day sentence.[FN35]

FN30. (Dkt. No. 28, Ex. 4 [Plf.'s Cross-Motion, attaching Superintendent Hearing Disposition dated 4/5/05, incorporated by reference in Plf.'s Compl.].)

FN31. (Dkt. No. 1, ¶ 24 [Plf.'s Compl.].)

FN32. (Dkt. No. 28, Ex. 4 [Plf.'s Cross-Motion, attaching Superintendent Hearing Disposition dated 4/5/05, incorporated by reference in Plf.'s Compl.].)

FN33. (Dkt. No. 1, ¶ 25 [Plf.'s Compl.].)

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

**FN34.** For a discussion of the difference between "keeplock" confinement and confinement in a "Special Housing Unit," see *Silva v. Sanford,* 91-CV-1776, 1998 U.S. Dist. LEXIS 5905, at *17 & n. 7 (S.D.N.Y. Apr. 24, 1998).

**FN35.** (*Id.* at ¶ 35.B. [i].)

On April 5, 2005, Plaintiff appealed his disciplinary hearing conviction to Defendant Selsky.[FN36] In addition, on April 6, 2005, Plaintiff petitioned Defendant Perlman for discretionary review of his disciplinary hearing conviction, sending Defendant Perlman a follow-up letter regarding his petition for discretionary review on April 19, 2005.[FN37] However, Defendant Perlman did not respond to Plaintiff's petition.[FN38] In addition, on May 24, 2005, Defendant Selsky affirmed the conviction after review.[FN39]

**FN36.** (*Id.* at ¶ 26; Dkt. No. 28, Ex. 8 [Plf.'s Cross-Motion, attaching Appeal Form to Commissioner, dated 4/7/05, incorporated by reference in Plf.'s Compl.].)

**FN37.** (Dkt. No. 1, ¶¶ 29-30 [Plf.'s Compl.]; Dkt. No. 28, Exs. 9-10 [Plf.'s Cross-Motion, attaching Plf.'s letters to Def. Perlman dated 4/6/05 and 4/19/05, incorporated by reference in Plf.'s Compl.].)

**FN38.** (Dkt. No. 1, ¶ 30 [Plf.'s Compl.].)

**FN39.** (*Id.* at ¶ 31; Dkt. No. 28, Ex. 11 [Plf.'s Cross-Motion, attaching Def. Selsky's Review of Superintendent's Hearing, dated 5/5/05, incorporated by reference in Plf.'s Compl.].)

Based on the above factual allegations, Plaintiff's Complaint (again, liberally construed) asserts **four** causes of action. First, Plaintiff asserts a cause of action against **Defendant Selsky,** alleging that he was **negligent** by (1) "fail[ing] to properly train, instruct and/or supervise Defendant Kenneth S. Perlman, and the Disciplinary Program at Midstate Correctional Facility" and (2)

"fail[ing] to ensure that all rules, regulations, policies and procedures governing the operation of the ... [DOCS] Inmate Disciplinary Program ... were strictly followed by and/or enforced by Midstate Correctional Facility ... [with respect to] the determination rendered on [March] 31, 2005 by Defendant Hearing Officer T. Hart."[FN40]

**FN40.** (Dkt. No. 1, ¶ 32 [labeled "First Cause of Action"].)

Second, Plaintiff asserts a cause of action against **Defendant Perlman,** alleging that he **recklessly** (1) "**failed to properly train and/or supervise ...** [Defendants Lawrence and Hart], or failed to ensure that said defendants were properly trained and/or supervised by others under his charge and control" and (2) "**permitted said Defendants ... to disregard the rules,** regulations, policies and procedures governing the operation of the [DOCS] Inmate Disciplinary Program...."[FN41] Plaintiff also alleges that Defendant Perlman **intentionally** (1) "**refused to** exercise the authority conveyed to him under ... [New York State regulations] ... to **immediately order the plaintiff released from his prehearing confinement** in the ... [SHU] ... upon the ground that the plaintiff's alleged misbehavior could not reasonably be said to have constituted an immediate threat to ... [anyone]," and (2) "refused to exercise his authority ... to order the plaintiff so released, despite knowing that the plaintiff['s] misbehavior report could not stand the charge of harassment."[FN42]

**FN41.** (Dkt. No. 1, ¶ 32 [labeled "Second Cause of Action"].)

**FN42.** (*Id.*)

**\*4** Third, Plaintiff asserts a cause of action against **Defendant Hart,** alleging that he recklessly or intentionally violated Plaintiff's **due process rights** under the **Fifth and Fourteenth Amendments** during Plaintiff's disciplinary hearing by "refus[ing] to allow the plaintiff to introduce as evidence on his own behalf the exculpatory and relevant Grievance complaint dated March 22, 2005 and complaint letter to the captain dated March 28, 2005...."[FN43] In addition, Plaintiff alleges that Defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

Hart violated Plaintiff's right to not be subjected to **cruel and unusual punishment** under the **Eighth Amendment,** when he caused Plaintiff to be confined without justification for twenty-four (24) days in the SHU, with a corresponding loss of privileges.[FN44]

> **FN43.** (Dkt. No. 1, ¶ 33 [labeled "Third Cause of Action"].)

> **FN44.** (*Id.* at ¶ 35.)

Fourth, Plaintiff asserts a cause of action against **Defendant Lawrence,** alleging that he violated Plaintiff's **First Amendment** rights by intentionally filing a false misbehavior report against Plaintiff in **retaliation** against Plaintiff for exercising his constitutionally protected right to file a grievance against Defendant Lawrence.[FN45] In addition, Plaintiff alleges that Defendant Lawrence recklessly or **negligently** "failed to conduct himself as a lieutenant at the Midstate Correctional Facility...."[FN46]

> **FN45.** (*Id.* at ¶ 34 [labeled "Fourth Cause of Action"].)

> **FN46.** (*Id.*)

**B. Defendants' Motion to Dismiss and Plaintiff's Response**

On January 5, 2006, Defendant Selsky moved to dismiss Plaintiff's Complaint on the ground that Plaintiff failed to state a claim upon which relief may be granted.[FN47] On May 12, 2006, Defendants Perlman, Lawrence and Hart were permitted to join in the motion, based on the fact that-after the filing of the motion-they had been served with Plaintiff's Complaint.[FN48]

> **FN47.** (Dkt. No. 13, Part 2 [Defs.' Mem. of Law].)

> **FN48.** (Dkt. No. 25 [Order Granting Letter

Request].)

More specifically, Defendants' motion is based on two grounds. First, Defendants argue that Plaintiff's Fourteenth Amendment claim should be dismissed because Plaintiff does not allege a due process liberty interest of which he was deprived.[FN49] Specifically, argue Defendants, the penalty that was assessed against Plaintiff-namely, thirty (30) days of confinement in SHU with a corresponding loss of privileges-did not impose on Plaintiff an "atypical and significant hardship in relation to the ordinary incidents of prison life" sufficient to create a liberty interest implicating the due process protections of the Fourteenth Amendment.[FN50] Second, Defendants argue, all of Plaintiff's claims should be dismissed since Defendants are, as a matter of law, protected by qualified immunity.[FN51]

> **FN49.** (Dkt. No. 13, Part 2 at 3-6 [Defs.' Mem. of Law].)

> **FN50.** (*Id.*)

> **FN51.** (*Id.* at 6-9.)

In response to Defendants' motion, Plaintiff filed a two-page affidavit that did not address the merits of these two arguments but merely opposed dismissal on the ground that Plaintiff has not yet had the benefit of conducting discovery in the case.[FN52] Specifically, Plaintiff's affidavit stated as follows:

> **FN52.** (Dkt. No. 16, ¶ 2 [Plf.'s Opp. Aff.].)

Carlos Rivera, being duly sworn, deposes and says:

1. That on January 5, 2006 respondent Senta B. Siuda[,] Counsel for the defendant Donald Selsky had moved for dismissal [of] plaintiff['s] Fourteenth Amendment claim.

**\*5** 2. That pursuant to Rule 56(f), Fed.R.Civ.P., the

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

plaintiff ask[s] this court to hereby deny the respondent's ... [motion] to dismiss ..., because plaintiff has not yet been afforded the opportunity to begin discovery on Defendant Selsky to properly put forth discoverable facts and evidence ... before this Court[.] See *Salahuddin v. Coughlin,* 993 F.2d 306, 309-10 (2d Cir.1993); *Klingele v. Eikenberry,* 849 F.2d 409, 412-413 (9th Cir.1988); *WSBTV v. Lee,* 842 1266, 1269 (11th Cir.1988); also see *Villante v. Dept. of Corrections of New York,* 786 F.2d 516, 521-23 (2d Cir.1986).

**WHEREFORE,** Plaintiff respectfully ask[s] this court to not grant the respondent Defendant Selsky's motion to dismiss.[FN53]

FN53. (Dkt. No. 16 [emphasis in original].)

Subsequently, Defendants filed a reply detailing the deficiencies of Plaintiff's response papers, including the fact that Rule 56's summary judgment analysis is inappropriate when deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6).[FN54] Rather than moving to file a sur-reply, Plaintiff filed a document that he characterized as a "cross-motion for summary judgment."[FN55] As stated above, Plaintiff's "cross-motion for summary judgment" did not merely request the entry of summary judgment in Plaintiff's favor but also sought to "oppos[e] ... defendants['] ... [motion] to dismis[s]."[FN56] Specifically, Plaintiff responded, albeit briefly, to Defendants' two arguments in support of their motion to dismiss. First, Plaintiff argued that *Sandlin v. Connor* in fact stands for the proposition that Plaintiff had a protected liberty interest in remaining free from disciplinary segregation for twenty-four (24) days.[FN57] Second, Plaintiff argued that Defendants Hart, Lawrence, Perlman and Selsky are not entitled to qualified immunity.[FN58]

FN54. (Dkt. No. 17.)

FN55. (*Compare* Dkt. No. 17 [Defs.' Reply filed 2/2/06] *with* Dkt. No. 28 [Plf.'s Cross-Motion dated 7/26/06].)

FN56. (*See, e.g.,* Dkt. No. 28, Decl. in Opp., ¶¶ 1, 4.)

FN57. (Dkt. No. 28, Plf.'s Mem. of Law, at 9-10; *see also* Dkt. No. 28, Plf.'s Mem. of Law, at 4, 7 [stating, "When prison officials subject inmate[s] to serious punishments like punitive segregation, they must observe the safeguards of due process"].)

FN58. (Dkt. No. 28, Plf.'s Mem. of Law, at 7-10.)

I find that it is proper to consider Plaintiff's July 2006 "cross-motion for summary judgment" as effectively amending his January 2006 response to Defendants' motion to dismiss, since (1) as a *pro se* civil rights litigant, Plaintiff is entitled to have his motion papers liberally construed,[FN59] (2) Plaintiff had a right to file further opposition papers due to the fact that the Court had, in May of 2006, granted the request of Defendants Perlman, Lawrence and Hart to join in Defendant Selsky's motion to dismiss,[FN60] and (3) Defendants had an opportunity to respond, and did in fact respond, to the arguments in Plaintiff's motion papers.[FN61]

FN59. *See, supra,* note 2 of this Report-Recommendation.

FN60. (Dkt. No. 25 [Order of 5/12/06].)

FN61. (Dkt. No. 29, Part 1 [Defs.' Response Papers].)

**II. RELEVANT LEGAL STANDARD**

A defendant may move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To prevail on a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," a defendant must show "beyond doubt that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief," [FN62] or the defendant must show that the plaintiff's claim "fails as a matter of law." [FN63] Thus, a defendant may base a Rule 12(b)(6) motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN64] or (2) a challenge to the legal cognizability of the claim. [FN65]

FN62. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) [citations omitted]; *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") [internal quotations and citation omitted].

FN63. *Phelps v. Kapnolis,* 308 F.3d 180, 187 (2d Cir.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 108, n. 16 [1976].)

FN64. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN65. *See Swierkiewicz* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon

which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim.") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01 Civ. 4430, 2002 U.S. Dist. LEXIS 1658, *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

**\*6** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case, [FN66] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN67] The purpose of this rule is to "facilitate a proper decision on the merits." [FN68] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

[plaintiff's] claims." [FN69]

FN66.*See Swierkiewicz, 534 U.S. at 511-512, 515*.

FN67.*Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1634 (2005)* (holding that the complaint failed to meet this test) (quoting *Conley, 355 U.S. at 47);see also Swierkiewicz, 534 U.S. at 512* (quoting *Conley, 355 U.S. at 47);Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U .S. 163, 168 (1993)* (quoting *Conley, 355 U.S. at 47).*

FN68.*See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002)* (quoting *Conley, 355 U.S. at 48).*

FN69.*Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y.1996)* (McAvoy, J.), *aff'd,113 F.3d 1229 (2d Cir.1997)* (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003)* (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co., 104 F.3d 355* [2d Cir.1996] ).

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-514 (2002)* (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits." [FN70]

FN70. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharmaceuticals, 125 S.Ct. at 1634-1635* (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Christopher v. Harbury, 536 U.S. 403, 416-422 (2002), Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234-235 (2d Cir .2004), Gmurzynska v. Hutton, 355 F.3d 206, 208-209 (2d Cir.2004)*. Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N. Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see*Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003)* (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS, 244 F.3d 81* [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr, 533 U.S. 289* [2001] ).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." [FN71] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN72] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN73]

FN71.*Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994)* (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994).*

FN72.*Hernandez, 18 F.3d at 136* [citation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

omitted]; *see also Deravin v. Kerik,* 335 F.3d
195, 200 (2d Cir.2003) [citations omitted]; *Vital
v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d
Cir.1999) [citation omitted].

**FN73.***Cruz v. Gomez,* 202 F.3d 593, 597 (2d
Cir.2000) (finding that plaintiff's conclusory
allegations of a due process violation were
insufficient) (internal quotation and citation
omitted).

Moreover, when addressing a *pro se* complaint, generally
a district court "should not dismiss without granting leave
to amend at least once when a liberal reading of the
complaint gives any indication that a valid claim might be
stated." [FN74] However, "all normal rules of pleading are not
absolutely suspended." [FN75] For example, an opportunity to
amend should be denied where "the problem with
[plaintiff's] causes of action is substantive" such that
"[b]etter pleading will not cure it." [FN76]

**FN74.***Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d
Cir.2000) (internal quotation and citation
omitted); *see also* Fed.R.Civ.P. 15(a) (leave to
amend "shall be freely given when justice so
requires"). Of course, granting a *pro se* plaintiff
an opportunity to amend is not required where
the plaintiff has already been given a chance to
amend his pleading.

**FN75.***Stinson v. Sheriff's Dep't of Sullivan Cty.,*
499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980)
(citations omitted), *accord, Gil v. Vogilano,* 131
F.Supp.2d 486, 491 (S.D.N.Y.2001).

**FN76.***Cuoco, 222 F.3d at 112* (finding that
repleading would be futile) (citation omitted);
*see also Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 48 (2d Cir.1991) ("Of course,
where a plaintiff is unable to allege any fact
sufficient to support its claim, a complaint should
be dismissed with prejudice.") (affirming, in part,
dismissal of claim with prejudice) (citation
omitted).

Finally, I note that "there are circumstances where an
overly litigious inmate, who is quite familiar with the legal
system and with pleading requirements, may not be
afforded [the] special solicitude" or status that is normally
afforded *pro se* litigants. [FN77] The rationale for this
revocation of special status (at least in the Second Circuit)
is not that the *pro se* litigant should be punished but that
his excessive litigiousness demonstrates his *experience,*
the lack of which is the reason for conferring the special
status upon *pro se* litigants in the first place. [FN78] Here, I
have discovered that, before filing the current action,
Plaintiff filed four other actions, three of which terminated
in his favor (and the fourth of which is currently
pending). [FN79] Moreover, I note that Plaintiff's Complaint
and motion papers in the current action appear fairly
good-being typed, being accompanied by affidavits, and
containing legal memoranda, exhibits, etc. [FN80] Generally,
such facts militate in favor of finding that Plaintiff has,
through litigating his other actions, become so experienced
that he no longer is in need of the special status normally
afforded *pro se* litigants. [FN81] As a result, the current
circumstances present a close question regarding whether
or not the Court should revoke Plaintiff's special status as
a *pro se* litigant. However, after carefully considering the
matter, I find that it is not appropriate at this time to
revoke Plaintiff's special status as a *pro se* litigant,
primarily due to the relatively small number of actions he
has filed. [FN82] Plaintiff is cautioned, however, that he is fast
becoming more a pro litigant than a *pro se* litigant.

**FN77.***Smith v. Burge,* 03-CV-0955, 2006 WL
2805242, at *3 & n. 3 (N.D.N.Y. Sept. 28, 2006)
(Kahn, J., adopting report-recommendation of
Lowe, M.J.) [citations omitted].

**FN78.***See, e.g., Johnson v. Eggersdorf,* 8 Fed.
Appx. 140 (2d Cir.2001) (unpublished opinion),
*aff'g,* 97-CV-0938, Decision and Order
(N.D.N.Y. May 28, 1999) (Kahn, J.), *adopting,*
Report-Recommendation, at 1, n. 1 (N.D.N.Y.
Apr. 28, 1999) (Smith, M .J.); *Johnson v. C.
Gummerson,* 201 F.3d 431, *2 (2d Cir.1999)
(unpublished opinion), *aff'g,* 97-CV-1727,
Decision and Order (N.D.N.Y. June 11, 1999)
(M c A v o y ,     J . ) ,     a d o p t i n g ,
Report-Recommendation (N.D.N.Y. April 28,
1999) (Smith, M.J.); *Gill v. Pidylpchak,*
02-CV-1460, 2006 WL 3751340, at *2

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

(N.D.N.Y. Dec. 19, 2006) (Scullin, J., adopting report-recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct. 18, 2006) (Hurd, M.J., adopting report-recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept. 29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11, 1991).

FN79. These four cases are as follows:

(1) *Rivera v. Goord,* 761 N.Y.S.2d 541, 541-542 (3d Dept.2003) (granting Plaintiff's Article 78 petition, annulling Plaintiff's prison disciplinary hearing determination, and directing DOCS' Commissioner to expunge all references to the instant matter from Plaintiff's institutional record)l

(2) *Rivera v. N.Y. City Police Dept.,* 03-CV-7277 (S.D.N.Y.) (civil rights action, dismissed pursuant to stipulation filed 12/2/04, under which defendants agreed to pay Plaintiff $6,000);

(3) *Rivera v. Selsky,* 03-CV-1098 (N.D.N.Y.) (prisoner civil rights action, dismissed pursuant to stipulation filed 5/11/05, under which defendants agreed to pay Plaintiff $2,0000); and

(4) *Rivera v. Goord,* 05-CV-1379 (N.D.N.Y.) (prisoner civil rights action, currently pending).

FN80. (*See, e.g.,* Dkt. Nos. 1 [Plf.'s Compl.], 16 [Plf.'s Opp. Aff.], 28 [Plf.'s Cross-Motion for Summ. Judg.].)

FN81. *See, e.g., Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct. 18, 2006) (Hurd, J.) (adopting report-recommendation of Lowe, M.J., which considered, in deciding whether *pro se* plaintiff should be denied special solicitude, the fact that "two of [plaintiff's previous] actions were successful inasmuch that [he] recovered $25,000 in exchange for his agreement to voluntarily dismiss the actions," the fact that "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc." and the fact that "[a]s a result, some of [p]laintiff's motions have been granted"); *Sekendur,* 2004 WL 2434220, at *5 (considering, in deciding whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

FN82. *See, e.g., Burge,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of five other lawsuits, after considering issue); *Abbas v. Senkowski,* 03-CV-0476, 2005 WL 2179426, at *2, n. 4 (N.D.N.Y. Sept. 9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed three other federal actions since 1997); *Loren v. Feerick,* 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N.Y. Aug. 6, 1997) (continuing to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

afford special status to *pro se* litigant despite his litigation experience due to his having filed three previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

## III. ANALYSIS

### A. Fourteenth Amendment Claim

#### 1. Failure to State a Claim

**\*7** In 1995, the Supreme Court held in *Sandlin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandlin v. Connor,* 515 U.S. 472, 483-484 (1995).

Here, Plaintiff alleges that the result of the improperly conducted disciplinary hearing was the imposition of a disciplinary sentence of thirty (30) days "[k]eeplock" confinement "in the Special Housing Unit," as well as thirty (30) days loss of packages, telephone, recreation and commissary privileges.[FN83] Conspicuously missing from Plaintiff's detailed Complaint are any allegations that, while in keeplock confinement or SHU confinement, he was denied food, clothing, bedding, heat, running water, showers, toiletries, medicine, visitors, books, an opportunity to exercise, etc.[FN84] In addition, Plaintiff acknowledges that he eventually served only twenty-four (24) days of the aforementioned thirty (30) day sentence.[FN85]

FN83. (Dkt. No. 1, ¶ 25 [Plf.'s Compl.].)

FN84. (*Id.* at ¶¶ 25-31, 35.B.[i]-[ii].)

FN85. (*Id.* at ¶ 35.B. [i].)

Simply stated, I find that Plaintiff has not alleged facts indicating that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment. In this regard, I agree with the legal arguments, and legal authorities, set forth by Defendants in their memorandum of law.[FN86] As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claim for failure to state a claim upon which relief may be granted.

FN86. (Dkt. No. 13, at 3-6 [Defs.' Mem. of Law].)

#### 2. Qualified Immunity from Liability with Regard to Plaintiff's Due Process Claims Concerning His Disciplinary Hearing

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN87] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN87.*Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.[FN88]

FN88.*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,*503 U.S. 962 (1992); *see also Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" <u>FN89</u> test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." <u>FN90</u> As the Supreme Court explained,

> FN89.*See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819);*Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN90.*Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N . Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized. <u>FN91</u>

> FN91.*Malley,* 475 U.S. at 341.

**\*8** Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." <u>FN92</u>

> FN92.*Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, on May 24, 2005, it was not clearly established that Plaintiff possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment. <u>FN93</u> I also agree with Defendants that, at the very least, officers of reasonable competence could have disagreed on the legality of Defendants' actions with regard to Plaintiff's disciplinary hearing. <u>FN94</u> As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's Fourteenth Amendment due process claim based on qualified immunity.

> FN93. (Dkt. No. 13, at 6-9 [Defs.' Mem. of Law].)

> FN94. (*Id.*)

**B. Other Claims**

I interpret Defendants' memorandum of law as addressing only Plaintiff's Fourteenth Amendment due process claim. <u>FN95</u> However, under the circumstances, the Court is able to address the pleading sufficiency and the evidentiary sufficiency of Plaintiff's other claims *sua sponte.* This authority is derived from three sources: (1) 28 U.S.C. § 1915(e)(2), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; (2) Fed.R.Civ.P. 12(h)(3), which provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"; and (3) the Supreme Court's decision in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), wherein it held that a district court may, on its own initiative, grant summary judgment against a party if the party had adequate notice of the possibility that the case might be disposed of by summary judgment. <u>FN96</u>

> FN95. (*See, e.g., id.* at 8 [arguing that "[i]n light of the entire record, the ongoing developments in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

the case law surrounding *due process rights* implicated by prison disciplinary hearings and disciplinary confinement, as detailed *supra,* and all reasonable inferences drawn in favor of the non-moving plaintiff, it was objectively reasonable for defendant Selsky to believe that his actions did not violate the Constitutional rights of the plaintiff"] [emphasis added].

FN96.*See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) ( "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") [citations omitted].

## 1. First Amendment Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment.[FN97] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN98] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[FN99] As the Second Circuit has noted,

FN97.*See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

FN98.*See Gill,* 389 F.3d at 381-383.

FN99.*See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so

because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

\*9*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A., 534 U.S. 506 (2002).*

To prevail on a First Amendment claim of retaliation under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence the following: (1) that the speech or conduct at issue was "protected"; (2) that the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) that there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN100] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN101]

FN100.*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

FN101.*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Here, as stated above, Plaintiff alleges that Defendant Lawrence intentionally filed a false misbehavior report against Plaintiff on March 30, 2005, wrongfully charging him with violating DOCS Rule 107 .11, in retaliation against Plaintiff for exercising his constitutionally protected right to file a grievance against Defendant Lawrence on March 22, 2005, and March 28, 2005.[FN102] However, even liberally construing Plaintiff's Complaint, I can find no factual allegations indicating that there was a *causal connection* between the protected speech and the adverse action in question. In other words, conspicuously missing from Plaintiff's detailed Complaint is any factual allegation indicating that Plaintiff would not have been

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

issued a misbehavior report based on Plaintiff's conversation with Defendant Lawrence on March 30, 2005, alone.

> FN102. (Dkt. No. 1, ¶¶ 9, 21, 34 [Plf.'s Compl.]; Dkt. No. 28, Exs. 1-2 [Plf.'s Cross-Motion, attaching Grievance No. MS-14374-05, and letter to Capt. M. Relf dated 3/28/05, each incorporated by reference into Plf.'s Compl.].)

The disciplinary rule that Plaintiff was charged with violating, DOCS Rule 107.11, provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee or any other person including a person subject of an order of protection with the inmate or who is on the inmate's negative correspondence list." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). Plaintiff does not allege that he did not become insolent through his admittedly persistent questioning of Defendant Lawrence on March 30, 2005 (during a conversation that Plaintiff acknowledges he himself initiated).[FN103] This omission is conspicuous considering that, according to Plaintiff's allegations, (1) Plaintiff initiated this repetitive line of questioning of Defendant Lawrence after Plaintiff had already filed two grievances, which were still pending and thus were available avenues through which to obtain the relief Plaintiff requested, (2) Defendant Lawrence described Plaintiff's insolence as the reason for the charge,[FN104] (3) at no time, was Defendant Lawrence's misbehavior report found to have been false.[FN105]

> FN103. (Dkt. No. 1, ¶¶ 10-11 [Plf.'s Compl.]; Dkt. No. 28, Plf.'s Rule 7.1 Statement, ¶ 4; see also Dkt. No. 28, Ex. 8 [Plf.'s Cross-Motion, attaching Appeal Form to Commissioners, in which he alleges, "[I] only ask[ed] [Defendant Lawrence] 3 questions.... I never was loud or use[d] any profanity on him [sic]," incorporated by reference in Plf.'s Compl.]; Dkt. No. 28, Ex. 9 [Plf.'s Cross-Motion, attaching Document entitled "Appeal to disciplinary Superintendent hearing," in which he alleges, "[T]he only thing ... [that] this [misbehavior report] show[s] is that

I asked Lt. Lawrence a question and would have like[d] to receive[ ] a [n] answer to the question," incorporated by reference in Plf.'s Compl.].)

> FN104. (Dkt. No. 28, Ex. 3 [Plf.'s Cross-Motion, attaching Inmate Misbehavior Report dated 3/30/05, incorporated by reference in Plf.'s Compl.].)

> FN105. (Dkt. No. 1, ¶¶ 26-31 [Plf.'s Compl.].)

**10** Furthermore, Plaintiff's allegation that his previously filed complaints were the *sole* factor motivating Defendant Lawrence's misbehavior report is wholly conclusory. Setting aside the aforementioned fact that (as alleged) Plaintiff's conversation with Defendant Lawrence on March 30, 2005, could have constituted a sufficient ground for the misbehavior report, Plaintiff alleges that Defendant Lawrence filed the misbehavior report *eight days* after Plaintiff filed his first complaint and *two days* after Plaintiff filed his second complaint. Such a temporal proximity between a complaint and misbehavior report ordinarily might be sufficient to state a claim of retaliation. However, here, Plaintiff also alleges that Defendant Lawrence used his conversation with Plaintiff on March 30, 2005, as a pretext for the misbehavior report. If this was indeed the pretext for the misbehavior report, then why did not Defendant Lawrence instigate such an altercation earlier? Defendant Lawrence certainly had the opportunity to do so (since Plaintiff alleges that Defendant Lawrence regularly made rounds on Plaintiff's cellblock).[FN106] His delay further supports my finding that no rational fact-finder could conclude that Plaintiff's two prior complaints played *any* role (let alone a "substantial or motivating" role) in Defendant Lawrence's decision to take action against Plaintiff.

> FN106. (Dkt. No. 1, ¶ 10 [Plf's Compl.].)

As a result, I recommend that the Court dismiss Plaintiff's retaliation claim under the First Amendment against Defendant Lawrence for failure to state a claim upon which relief may be granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

**2. Fifth Amendment Claim**

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall be ... in any criminal case ... deprived of life, liberty, or property, without due process of law." [FN107] Here, as explained above, Plaintiff alleges that Defendant Hart violated Plaintiff's due process rights under the Fifth Amendment during Plaintiff's disciplinary hearing by "refus[ing] to allow the plaintiff to introduce as evidence on his own behalf the exculpatory and relevant Grievance complaint dated March 22, 2005 and complaint letter to the captain dated March 28, 2005...." [FN108]

FN107.U.S. Const. amend V.

FN108. (Dkt. No. 1, ¶ 33 [labeled "Third Cause of Action"].)

A fatal problem exists with this claim. No independent Fifth Amendment claim exists with respect to due process violations allegedly occurring at a prison disciplinary proceeding (other than a possible claim concerning the privilege against self-incrimination), for two reasons: (1) such a proceeding is not a "criminal" proceeding under the Fifth Amendment; [FN109] and (2) "[t]he Due Process Clause of the Fifth Amendment is plainly inapplicable to ... state actors" [FN110] such as those named in Plaintiff's Complaint. [FN111] Rather, it is the Fourteenth Amendment that applies to such due process violations allegedly occurring at Plaintiff's prison disciplinary hearing. [FN112] With respect to the Fourteenth Amendment due process claim that Plaintiff is asserting in this action, I have already analyzed that claim and found it to be insufficient. [FN113]

FN109.See U.S. Const. amend V ("No person shall be ... in any criminal case ... deprived of life, liberty, or property, without due process of law.") [emphasis added]; Baxter v. Palmigiano, 425 U.S. 308, 316 (1975) ("Prison disciplinary hearings are not criminal proceedings ...."); cf. Lisbon v. Goord, 02-CV-3567, 2003 U.S. Dist. LEXIS 7135, at *6 (S.D.N.Y. Apr. 28, 2003) ("[T]he double jeopardy clause [of the Fifth Amendment] is limited to criminal proceedings and thus it does not pertain to prison disciplinary hearings.") [internal quotations and citations omitted].

FN110.McCarthy v. Yost, 01-CV-9590, 2003 U.S. Dist. LEXIS 3307, at *8, n. 4 (S.D.N.Y. Feb. 14, 2003) (citing Bartkus v. Illinois, 359 U.S. 121, 124 [1959] );see also Shabazz v. Scully, 91-CV-6319, 1994 U.S. Dist. LEXIS 6630, at *9 (S.D.N.Y. May 19, 1994) ("[T]he Fifth Amendment Due Process provision is inapplicable to state officials....").

FN111. (Dkt. No. 1, ¶¶ 4-7 [Plf.'s Compl.].)

FN112.See, e.g., Robinson v. Vaughn, 92-CV-7048, 1993 U.S. Dist. LEXIS 15566, at *17 (E.D.Pa. Nov. 1, 1993) ("The rights secured to individuals by the Fifth Amendment are generally applicable against the states only through the Fourteenth Amendment. The court's consideration of [the prisoner plaintiff's] allegations that the defendants' actions toward him [in the prison disciplinary hearing] violated due process is subsumed within its Fourteenth Amendment analysis of his claims.").

FN113.See, supra, Part III.A.1. of this Report-Recommendation.

**\*11** As a result, I recommend that the Court dismiss Plaintiff's Fifth Amendment claim against Defendant Hart for failure to state a claim upon which relief may be granted.

**3. Eighth Amendment Claim**

Generally, to prevail on such a claim, Plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that Defendant acted with *deliberate indifference* to Plaintiff's health or safety. [FN114]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

FN114.*Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Davidson v.. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " FN115 "As recognized by the Supreme Court ..., 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " FN116

FN115.*Davidson,* 371 F.Supp.2d at 370 (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ).

FN116.*Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

Specifically, a prisoner must prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." FN117 If, however, the condition is not sufficiently prolonged or severe, it does not rise to the level of an Eighth Amendment violation. FN118

FN117.*Wilson v. Seiter,* 501 U.S. 294, 304 (1991).

FN118.*Trammel v. Keane,* 338 F.3d 155, 164-65 (2d. Cir.2003).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." FN119 "[D] eliberate indifference describes a state of mind more blameworthy than negligence." FN120 "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." FN121 In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." FN122

FN119.*Farmer,* 511 U.S. at 834.

FN120.*Id.* at 835.

FN121.*Id.* at 837.

FN122.*Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841).

Here, as explained above, Plaintiff alleges that Defendant Hart violated Plaintiff's right to not be subjected to cruel and unusual punishment under the Eighth Amendment, when he caused Plaintiff to be confined without justification for twenty-four (24) days in the SHU, with a corresponding loss of privileges. FN123 As also explained above, conspicuously missing from Plaintiff's detailed Complaint are any allegations that, while in keeplock confinement or SHU confinement, he was denied food, clothing, bedding, heat, running water, showers, toiletries, medicine, visitors, books, an opportunity to exercise, etc.; and Plaintiff acknowledges that he eventually served only twenty-four (24) days of the aforementioned thirty (30) day sentence. FN124 Based on a liberal construction of Plaintiff's Complaint, I conclude that, as a matter of law, Plaintiff has failed to allege conditions of confinement resulting in a deprivation that was *sufficiently serious* for purposes of the Eighth Amendment. FN125 Alternatively, I conclude that, as a matter of law, Defendant Hart did not act with *deliberate indifference* to Plaintiff's health or safety.

FN123. (Dkt. No. 1, ¶ 35 [Plf.'s Compl.].)

FN124.*See, supra,* Part III.A.1. of this Report-Recommendation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

FN125.*See* *Scot v. Merola,* 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken, and temperature dropped below fifty degrees); *cf. Trammel,* 338 F.3d at 158-159, 164 (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough).

**\*12** As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defendant Hart for failure to state a claim upon which relief may be granted.

**4. Negligence**

"[M]ere negligence will not support a section 1983 claim." FN126 As a result, I recommend that the Court dismiss Plaintiff's claims of negligence against Defendants Selsky, Perlman, and Lawrence for failure to state a claim upon which relief may be granted.

FN126.*Burgess v. County of Rensselaer,* 03-CV-0652, 2006 U.S. Dist. LEXIS 91521, at *26 (N.D.N.Y. Dec. 14, 2006) (McCurn, J.) [citation omitted]; *see also* *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience.' ... [T]he Fourteenth Amendment is not a 'font of tort law.' ... It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.... '[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.' ") [citations omitted].

**5. Alleged Violations of State Rules, Regulations, Policies or Procedures**

Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. FN127 A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. FN128 Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; FN129 this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. FN130

FN127.*See* *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970) ( "The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States.* ") (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States.*")

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

[emphasis added].

FN128. *See* *Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted; *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept. 7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN129. *See* *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN130. *See* *Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates. *Hewitt v. Helms,* 459 U.S. 460, 466-472 (1983). However, that rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandlin v. Connor,* 515 U.S. 472, 477-484 (1995). As a result, the Supreme Court changed the rule, shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation. *Sandlin, 515 U.S. at 483-484.*FN131 The result of this shift of focus is the current "atypical and significant hardship" analysis discussed, and applied, above in Part III.A. of this Report-Recommendation.

FN131. *See also* *Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir .2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N.Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Simply stated, even liberally construing Plaintiff's Complaint, I do not find any factual allegations indicating that there was a violation of any state rules, regulations, policies or procedures that created an "atypical and significant hardship" sufficient to constitute a violation of the United States Constitution. As a result, I recommend that the Court dismiss Plaintiff's claim of regulatory violations against Defendants Selksy, Perlman, Hart and Lawrence for failure to state a claim upon which relief may be granted.

**D. Plaintiff's Cross-Motion for Summary Judgment**

**\*13** I recommend that Plaintiff's cross-motion should be denied as moot, without merit, and procedurally insufficient (since there is no proper Rule 7.1 Statement).FN132

FN132. (Dkt. No. 28 [Plf.'s Cross-Motion].)

**ACCORDINGLY,** for the reasons stated above, it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)
(Cite as: 2007 WL 956998 (N.D.N.Y.))

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 13) be ***GRANTED;*** and it is further

**RECOMMENDED** that the remaining claims asserted in Plaintiff's Complaint be *sua sponte* ***DISMISSED*** based on the pleading insufficiencies and evidentiary insufficiencies described above in this Report-Recommendation, as authorized by 28 U.S.C. § 1915(e)(2), Fed.R.Civ.P. 12(h)(3), and *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and it is further

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 28) be ***DENIED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Rivera v. Selsky
Not Reported in F.Supp.2d, 2007 WL 956998 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Anthony GADSON, Plaintiff,
v.
Glenn S. GOORD, Philip Coombe, Artuz, L. Zwillinger,
D. Stevens, J. Manion, G. Schneider, D. Connelly, B.
Pease, C.O. Rassman, D. Zaken, C. Bennett,
Defendants.
**No. 96 Civ. 7544(SS).**

Nov. 17, 1997.

Anthony Gadson, pro se, Terrace Health Care Center,
Bronx, NY, for plaintiff.
Dennis C. Vacco, Attorney General of the State of New
York New York, NY, of counsel: Constantine A. Speres,
Assistant Attorney General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

**\*1** *Pro se* plaintiff, Anthony Gadson, formerly incarcerated
at Green Haven Correctional Facility, brings this 42
U.S.C. § 1983 action, alleging that defendants violated his
constitutional rights by (1) failing to provide him with an
appropriate and medically necessary wheelchair; (2)
harassing him; and (3) failing to return plaintiff's property.
The twelve named defendants are or were Department of
Correctional Services administrators and Green Haven
security or medical staff.[FN1] Plaintiff seeks an order from
the Court directing defendants to: (1) provide plaintiff
with proper medical care (*e.g.,* an appropriate wheelchair)
and a proper living environment; and (2) stop mistreating
plaintiff. Additionally, plaintiff seeks compensatory
damages and punitive damages.

FN1. Defendants Goord and Coombe are named

as Department of Corrections administrators;
defendants Artuz, Schneider, Connelly, Pease,
Rassman, and Zaken are named as Green Haven
security personnel; and defendants Zwillinger,
Stevens, and Manion are named as Green Haven
medical personnel.

Defendants move to dismiss the Complaint pursuant to
Fed.R.Civ.P. 12(b)(6) for failure to state a claim. For the
reasons discussed, defendants' motion to dismiss is
**granted** in part and **denied** in part.

**BACKGROUND**[FN2]

FN2. The following information is set forth in
plaintiff's Complaint, accompanying exhibits and
memorandum entitled, "Opposition Against
Defendants [sic] Motion to Dismiss" ("Opp'n
Mem.") Generally, a court may not look outside
the pleadings when reviewing a Rule 12(b)(6)
motion to dismiss. However, the mandate to read
the papers of *pro se* litigants generously makes it
appropriate to consider plaintiff's additional
materials, such as his opposition memorandum.
*See Gil v. Mooney,* 824 F.2d 192, 195 (2d
Cir.1987) (in reviewing district court's dismissal
of *pro se* plaintiffs § 1983 claim, Second Circuit
considered plaintiff's affidavit submitted in
opposition to defendant's motion to dismiss);
*Donahue v. United States Dep't of Justice,* 751
F.Supp. 45, 49 (S.D.N.Y.1990) ("The policy
reasons favoring liberal construction of *pro se*
pleadings warrant the Court's consideration of
the allegations contained in plaintiffs'
memorandum of law, at least where those
allegations are consistent with the allegations in
the complaint ..."); *Lucas v. New York City,* 842
F.Supp. 101, 104 & n. 2 (S.D.N.Y.1994)
(considering *pro se* plaintiffs opposition papers).

Plaintiff is currently on parole status living at the Kings
Terrace Nursing Home in Bronx, New York. During the
events in question, plaintiff was incarcerated at Green
Haven Correctional Facility ("Green Haven") located in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

Stormville, New York.

Plaintiff alleges that he is paralyzed and requires a customized "medical wheelchair." (Complaint ¶¶ 1,7.) Plaintiff claims that on January 28, 1994, prior to his transfer to Green Haven from another correctional facility, he was "medically fitted" for a wheelchair by a physical therapist at Helen Hayes Hospital. (Complaint ¶ 1; Exhibit ("Ex.") A to Complaint.) [FN3] For reasons not explained, plaintiff received a second evaluation for a wheelchair by a physical therapist employed at Green Haven on March 9, 1994. (Complaint ¶ 2.) Unlike the original wheelchair prescribed at Helen Hayes, this second wheelchair recommendation, according to plaintiff, was "not for my Physical Condition." (Complaint ¶ 2; Ex. B.)

FN3. All exhibits referenced are annexed to the Complaint.

On July 26, 1994, plaintiff claims he received a "defective wheelchair" from the Green Haven Physical Therapy Department. (Complaint ¶ 3; Ex. C-3.) He alleges that unlike the chair recommended by Helen Hayes, the delivered wheelchair was not fitted with a self-recliner nor was it suitable for plaintiff's weight or legs. (Ex. C-1; C-3.) Plaintiff maintains that he rejected the chair because it lacked these medically necessary features. (Complaint ¶ 1; Ex. C-3.)

On September 7, 1994, plaintiff filed a grievance against Green Haven personnel complaining that he was in a "great deal of pain" and seeking an "adequate heavy duty wheelchair equipped with self-recliner for his proper medical treatment." (Ex. C-1.) On December 14, 1994, the Central Office Review Committee for the State of New York Inmate Grievance Program ("C.O.R.C.") unanimously approved plaintiff's request and indicated that a new reclining wheelchair, "as prescribed," was then on order. (Ex. C-4.)

*2 Plaintiff received a second wheelchair on or about March 15, 1995. (Ex. D-1.) Plaintiff deemed this second wheelchair also "improper" and refused to accept it. Id. Specifically, plaintiff claimed the second wheelchair was improper because: (1) the reclining handles were not

within his reach; (2) the adjustable foot pieces were not accessible; (3) the leg rests were not "swing detachable;" (4) the brakes had no extensions and were hard to reach; and (5) that without a buckle, the seat belt was not strong enough. (Ex. D-1.) On March 20, 1995, Plaintiff filed a second grievance, again requesting a "proper made wheelchair" for his medical condition. (Ex. D-1.) This second grievance further requested that prison officials "stop causing me more pain and suffering by having me lie in bed for over a year." Id.

The C.O.R.C. denied plaintiff's second grievance on June 14, 1995, concluding that an "investigation reveals that the wheelchair in question was a custom made reclining wheelchair. The wheelchair was recommended and ordered by the physical therapy department and meets the medical needs of grievant per physical therapy." (Ex. D-4.) The C.O.R.C. based its determination on statements and an investigation by defendant Zwillinger, the Green Haven Regional Health Services Administrator. Id.

Plaintiff filed a third grievance requesting a wheelchair in August 1995 and again on October 18, 1995.[FN4] (Complaint ¶ 5; Ex. E-1.) Plaintiff notes that by this time he had been waiting almost two years for a special made wheelchair for my medical condition." (Complaint ¶ 5.) His grievance states that "it appears that the medical department has determine [sic] that they are not going to order me a wheelchair at all for my medical condition." (Ex. E-1 .) Eight days after filing the grievance, plaintiff was transferred to another correctional facility. (Ex. E-3.) Thereafter, on January 17, 1996, the C.O.R.C. denied plaintiff's third grievance, reiterating its previous finding that a proper wheelchair had been ordered which plaintiff had refused and suggesting that plaintiff "address the issue of his wheelchair with the health staff at his new facility." (Complaint ¶ 5; Ex. E-3.)

FN4. Apparently, plaintiff's August grievance was misplaced or not received by Green Haven personnel. By his own account, plaintiff refiled the same grievance on October 18, 1995.

Plaintiff claims that as a result of Green Haven's failure to provide him with an appropriate wheelchair, he spent two and a half years "bed-ridden, in constant pain, feet

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

degenerations, and emotional distress. (Opp'n Mem. ¶ 10; Ex. D-1.) Plaintiff further claims that the Green Haven Medical Department "play[ed] word games" with his grievances and attempted to deprive him of a proper wheelchair by using the second chair recommendation which was "wrong ... from the start." (Complaint ¶ 5.) Plaintiff insists he cannot use any wheelchair other than the "self recliner" chair he requested and which the C.O.R.C. approved in response to his first grievance. (Ex. K-1.) Finally, plaintiff contends that defendants "deliberately after knowing that the first wheelchair was not for Plaintiff medical condition kept on ordering the same type of wheelchair repeatedly knowing that the Plaintiff would not accept it do [sic] to the time it takes to get a wheelchair for his medical condition." (Opp'n Mem. ¶ 10.)

*The Retaliation Claims*

**\*3** Plaintiff further alleges that while waiting for a proper wheelchair, he experienced "a great deal of harassment" by Green Haven prison officials. *See* (Complaint ¶¶ 7-9.) Specifically, plaintiff alleges: (1) that defendant Connelly ordered the "illegal" search of his cell, during which time his medical and legal documents were taken from him and not returned (Complaint ¶¶ 7 & 8; Ex. G-1-G-4 & I-1-I-4); (2) that defendants Pease, Zaken, and Bennett created false misbehavior reports to keep him "on some kind of restriction" or keeplock "24 hours a day" (Complaint ¶ 7; Opp'n Mem. ¶ 17); (3) that defendant Rassman, under the direction of defendant Pease, harassed him by preventing other inmates from socializing with plaintiff while on keeplock (Complaint ¶ 9; Ex. K-2); and (4) that defendants transferred him to another correctional facility on October 26, 1995, to "further delay my getting a wheelchair ... and to prolong my stay in prison." (Complaint ¶ 10, Ex. E-2). Although plaintiff has not directly alleged that these acts of harassment were committed in retaliation for his filing of grievances, his pleadings suggest this to be his claim.[FN5]

FN5. Any claim for retaliation plaintiff may make is based solely on a permissive reading of the pleadings, interpreting them to "raise the strongest arguments that they suggest." *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir.1995).

Defendants have filed a motion to dismiss urging dismissal of the Complaint in its entirety for failure to state a claim. In particular, defendants contend that: (1) plaintiff has pled insufficient facts to support a claim of deliberate indifference to his medical needs; (2) plaintiff's claim of deprivation of property is not actionable in federal court and plaintiff does not allege any facts to demonstrate actual deprivation of access to court; (3) as against defendants Goord, Coombe, Artuz, Schneider, Zaken and Bennett, the claims must be dismissed because these defendants had no personal involvement or supervisory liability for the alleged constitutional deprivations; (4) the Eleventh Amendment protects defendants from suit in their official capacities; and (5) plaintiff's prayer for injunctive relief is moot because he is no longer incarcerated at Green Haven.

In response to defendants' motion, plaintiff provided supplemental facts addressing, *inter alia,* his claim of deliberate indifference and the personal involvement of defendant's Zaken and Bennett. For the reasons addressed in note 2, *supra,* the Court will consider these factual allegations in evaluating defendants' motion.

**DISCUSSION**

**I. *Mootness***

Because plaintiff is no longer incarcerated and under the supervision of any of the named defendants, the Court rejects plaintiff's request for injunctive relief "directing defendants to provide medical care," "preventing defendants from mistreating pltf [sic]", and "directing defendant's [sic] to provide proper living environment for pltf." (Complaint at 5.) Plaintiff's claims for injunctive relief are moot and the Court lacks jurisdiction to consider them. *See Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983); *see generally Courts v. Coombe,* 95 Civ. 2350(DC), 1996 WL 312357, at 2 (S.D.N.Y. June 11, 1996) (citing *Armstrong v. Ward,* 529 F.2d 1132, 1135 (2d Cir.1976)) ("The mere possibility that [plaintiff] may be returned to [the correctional facility where the incidents at issue arose] at some point in the future does not present a sufficient case or controversy that the court can presently adjudicate."). Accordingly, the Court reviews plaintiff's claims only to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

## II. *Motion to Dismiss Standard*

**\*4** In considering defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must "assess the legal feasibility of the Complaint," *Smith v. O'Connor,* 901 F.Supp. 644, 646 (S.D.N.Y.1994), accepting as true the factual allegations in the Complaint and construing all reasonable inferences in plaintiff's favor. *See generally Leatherman v. Tarrant County Narcotics Intelligence & Coord. Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). The Court may properly dismiss a claim only if, after viewing all allegations in the light most favorable to the plaintiff, it determines "beyond doubt that the plaintiff can prove no set of facts in support of [plaintiff's] claims which would entitle [plaintiff] to relief." *Hernandez,* 18 F.3d at 136 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Moreover, where a plaintiff proceeds *pro se,* as here, the Court must " 'read his [or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.' " *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)); *Hernandez,* 18 F.3d at 136. In so doing, the Court must hold plaintiff to a pleading standard which is "less stringent ... than formal pleadings drafted by lawyers." *Haines v. Kemer,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curium).

## III. *Liability Under 42 U.S.C. § 1983*

In a § 1983 action, the plaintiff must establish that a person acting under color of state law deprived him or her of a federal constitutional right. 42 U.S.C. § 1983; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Section 1983 does not create any federal rights on its own, but rather enforces rights established under the Constitution, laws, or treaties of the United States. *Sykes,* 13 F.3d at 519.

Nowhere in his Complaint does plaintiff specifically allege

constitutional violations, however, liberally construed, plaintiff claims that defendants denied him adequate medical care in violation of the Eighth Amendment and retaliated against him for filing grievances in violation of the First Amendment. Furthermore, plaintiff's claim that defendants deprived him of his property may be construed as alleging a violation of the Fourteenth Amendment.

## IV. *Plaintiff's Eighth Amendment Claim*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on prisoners. In *Estelle v. Gamble,* the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eight Amendment." 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh'g denied,* 429 U.S. 1066 (1977)). To state a claim of deliberate indifference, plaintiff must show that prison officials intentionally denied, delayed access to, or interfered with prescribed treatment. *Estelle,* 429 U.S. at 104-05. The inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference. *Id.* at 105.

**\*5** To sustain a claim of deliberate indifference to medical needs, plaintiff must plead facts sufficient to satisfy both the objective and subjective components of the applicable standard, *i.e.,* that the alleged deprivation was sufficiently serious and that the prison officials acted with a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 834-35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("Deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' ") (citing *Estelle,* 429 U.S. at 103-104); *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (an Eighth Amendment claim requires "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment").

Accepting the accuracy of plaintiff's allegations for purposes of defendants' motion to dismiss, the Court can not conclude that plaintiff can show no set of facts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

sufficient to meet the deliberate indifference standard in this case. Plaintiff asserts he suffered serious injury because of the delays in his receiving a proper wheelchair, *e.g.,* that he was forced to remain bed-ridden and suffered "a great deal of pain," as well as "feet degenerations, and emotional distress" for a period of two and a half years. (Opp'n Mem. ¶ 10; Ex. D-1 & C-1.) Moreover, he alleges that defendants intentionally failed to provide him with an appropriate wheelchair despite his frequent notification to the Green Haven medical staff that he was in pain, his three grievances requesting a proper wheelchair, and the C.O.R.C.'s unanimous determination in response to his first grievance that plaintiff was entitled to a self-reclining wheelchair. Certainly, plaintiff's refusal to accept the second wheelchair offered to him, which purportedly was self-reclining, casts doubt on plaintiff's claim that defendants were purposely indifferent.[FN6] However, at this early pleading stage, without the benefit of any information on the nature of plaintiff's actual medical condition or the medical appropriateness of the wheelchairs offered to plaintiff, this Court can not conclusively say that plaintiff's Complaint fails to allege that he suffered serious injury from lack of a wheelchair. Nor can the Court, at this point, reject plaintiff's claim that defendants acted with a culpable state of mind by their intentional delay in providing him with a wheelchair customized to his particular medical needs.

FN6. Plaintiff explains his rejection of both chairs by stating that he "can not utilize any other kind of wheelchair" than the "self recliner" chair requested and approved by the C.O.R.C. (Ex. K-1.) Defendants do not dispute this allegation. While plaintiff does not explain the precise nature of his medical condition and this Court knows of no medical condition requiring use of a self-reclining wheelchair exclusively, in the absence of dispositive information to the contrary, the Court must accept these facts as true for purposes of a motion to dismiss. It is well established that claims based on a difference of opinion over matters of medical judgment do not give rise to an Eighth Amendment violation. *See Estelle,* 429 U.S. at 106-07; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway III"). Nevertheless, given plaintiff's stated medical need for a specific type of wheelchair, without more information, the Court can not say that his allegation is based in mere

disagreement with medical opinions.

Significantly, the Second Circuit has repeatedly held that allegations of delay in providing medical treatment to a prisoner, even in the absence of physical pain, can state a claim for deliberate indifference sufficient to survive a motion to dismiss. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("Hathaway II") (allegations that prison doctor delayed prisoner's surgery for over two years although he knew prisoner had two broken pins in his hip, was sufficient to meet both components of deliberate indifference claim and to withstand a motion to dismiss); *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (if prison officials did delay "medical aid-even for 'only' five hours-in order to make [the prisoner] suffer, surely a claim would be stated under *Estelle* "); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (deprivation of prescriptive eye glasses constitutes denial of serious medical need and satisfies objective component; although deprivation did not cause pain, it prolonged plaintiffs suffering). *See also Candelaria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at 7-8 (S.D.N.Y.1996) (denying cross-motions for summary judgment because the parties disputed whether plaintiffs claims of medical injury based on failure to provide proper wheelchair were "serious").

**\*6** Here, plaintiff alleges delay as well as pain. Plaintiff alleges he waited in bed for six and a half months before the arrival of the first "defective" wheelchair and another eight months before the delivery of the second chair. Furthermore, plaintiff contends that, after the C.O.R.C. approved the wheelchair request in his first grievance, defendants simply reordered the same chair, knowing full well that plaintiff would reject it. Defendants have not disputed these allegations and appear to agree that at least the first wheelchair was inappropriate for plaintiffs medical needs. (Ex. C-4; Def's Mot. Dismiss at 7.) Accordingly, although some question exists as to the viability of plaintiff's claim, the Court nevertheless finds that, as alleged, and in the absence of any medical documentation dispositively evincing that the second wheelchair offered to defendant was appropriate for his medical needs, plaintiff's claim is sufficient to withstand a motion to dismiss.

**V. *Retaliation Claims***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

Plaintiff also alleges that prison officials subjected him to a "great deal of harassment" while he waited for an appropriate wheelchair. Plaintiff insinuates that by this harassment, prison officials retaliated against him for filing grievances. Plaintiff claims this harassment to have included an illegal cell search, confiscation of legal materials he needed for court, false misbehavior reports, curtailed socializing, and a forced transfer to another correctional facility.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). These rights include a prisoner's constitutional right to file grievances seeking administrative redress. *Franco,* 854 F.2d at 589. Nevertheless, "because we recognized ... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." *Colon,* 58 F.3d at 871 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Given the possibilities for such abuse, the Second Circuit requires a "higher level of detail in pleading [retaliation claims]." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *In Mount Healthy Sch. Dist. V. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In order for a plaintiff to maintain a retaliation claim, the plaintiff must prove that the alleged wrongful action would not have been taken but for the exercise of his constitutional rights. *See Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976). Action that is taken for both valid and invalid reasons will not be deemed unconstitutional if the action would have been taken in any event for the constitutionally valid reason. *See Graham,* 89 F.3d at 79.

**\*7** Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and substantive safeguards available to other litigants. *See Colon,* 58 F.3d at 872. "[A] retaliation claim supported by

specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a Complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13;*accord Colon,* 58 F.3d at 872.

A. *The Cell Search*

Plaintiff's cell search allegation is dismissed in its entirety because the Supreme Court has held that searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature. *See Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). *See also Payne v. Axelrod,* 871 F.Supp. 1551, 1555 (N.D.N.Y.1995); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1996).

B. *Denied Access to the Courts and Deprivation of Legal Property*

Any claim plaintiff may be making for the deprivation of his legal documents and medical records must also be dismissed. A claim for deprivation of property does not lie in federal court if state courts provide an adequate remedy for the deprivation of that property. *Hudson,* 468 U.S. at 533;*Parratt v. Taylor,* 451 U.S. 527, 542-543, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds,*474 U.S. 327, 330-331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Marino v. Ameruso,* 837 F.2d 45, 47 (2d Cir.1988). New York provides such a remedy in § 9 of the New York Court of Claims Act, which permits an inmate to pursue a claim for deprivation of property against the State of New York in the New York Court of Claims. *See Demaio,* 877 F.Supp. at 95. Therefore, plaintiff may not pursue his deprivation of property claim in this Court.

Nor has plaintiff stated a constitutional claim that confiscation of his legal materials deprived him of reasonable access to court. While confiscation of an inmate's legal materials can be actionable as a constitutional violation, *see Tyler v. "Ron" Deputy Sheriff,* 574 F.2d 427,429 (8th Cir.1978) (citing *Sigafus v. Brown,* 416 F.2d 105 (7th Cir.1969)); *see also Tyler v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

*Woodson,* 597 F.2d 643 (8th Cir.1979), to prevail on such a claim, a plaintiff must establish actual injury. *See Monsky v. Moraghan,* 127 F.3d 243, 1997 WL 606487 (2d Cir. Oct 2, 1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)) ("[A] plaintiff must demonstrate that a defendant caused 'actual injury,' i.e., took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ").

Here, the only allegation plaintiff makes suggesting actual injury is that, following the search of his cell in 1995, he did not receive back all of his medical records and legal papers relevant to a then pending legal matter. [FN7] (Ex. G-4.) However, plaintiff has not alleged anything to indicate that the confiscation in fact interfered with his court access in that legal action. Moreover, the exhibits to plaintiff's Complaint indicate that plaintiff's property has been returned to him. [FN8] In short, these allegations are insufficient to establish any violation of a constitutional nature. At best they provide support for a claim of deprivation of personal property, which, as mentioned above, is not properly before this Court.

> FN7. Apparently, plaintiff had filed or was intending to file a legal action in a different matter.

> FN8. The exhibits to plaintiff's Complaint reflects that plaintiff filed a grievance with the C.O.R.C. on January 9, 1995, and again on March 17, 1995, requesting that his legal documents and other property be returned. (Ex. G-1 & I-1.) On March 22, 1995, the C.O.R.C. found that all confiscated property has been returned to the plaintiff on January 12, 1995. (Ex. G-6.) On August 30, 1995, the C.O.R.C. again determined that: (1) plaintiff's property was returned on January 12, 1995; (2) plaintiff refused to sign for his property; and (3) plaintiff's refusal to sign was noted in the hospital log book. (*See* Complaint ¶ 8; Ex. I-4.)

C. *Retaliatory False Misbehavior Reports and Curtailed Socializing*

*8 Construed liberally, plaintiff alleges that defendants fabricated false misbehavior reports against him and limited his socializing in retaliation for initiating prison grievances. Plaintiff's sole allegations in this respect are that he was "accused of sex charges that never happened" and was "constantly found guilty of charges" to keep him on "some kind of restriction ... or locked up in a room 24 hours a day." Plaintiff further alleges that defendant Rassman harassed him by preventing inmates from socializing with plaintiff.

The Second Circuit has held that " '[a]lthough the filing of unfounded charges d[oes] not give rise to a per se constitutional violation action under section 1983,' ... a § 1983 claim may stand when the false charges are allegedly brought in retaliation for an inmate's exercise of his substantive due process rights." *Rodgriquez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (quoting *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986)). However, as noted above, claims of retaliation must be examined with skepticism and care, *Flaherty,* 713 F.2d at 13, and a "higher level of detail in pleading" is required. *Gill,* 824 F.2d at 194.

With respect to plaintiff's allegations of false misbehavior reports and curtailed socializing, the Court finds that plaintiff has failed to allege the "higher level of detail" required to sustain these claims against a motion to dismiss. *See Gill,* 824 F.2d at 194. Even viewed under liberal *pro se* pleading considerations, *Haines,* 404 U.S. at 520-21, plaintiff's allegations as to these claims are so conclusory and lacking of any detail whatsoever that the Court can not find them legally feasible. Consequently, plaintiff's claims of retaliatory false misbehavior reports and curtailed socializing are hereby dismissed.

D. *Retaliatory Transfer*

Liberally construing plaintiff's pleadings, his last claim of retaliation concerns his transfer from Green Haven to another correctional facility on October 26, 1995, eight days after plaintiff's third wheelchair grievance. Plaintiff claims he was transferred to "further delay my getting a wheelchair ... and to prolong my stay in prison."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

While there is no right to be placed in a particular facility, *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), an inmate can not be transferred solely in retaliation for the exercise of his constitutional rights. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989); *see also Lowrance v. Coughlin,* 862 F.Supp. 1090, 1099 (S.D.N.Y.1994). The filing of prison grievances is a constitutionally protected right. *Franco v. Kelly,* 854 F.2d at 589.

The temporal proximity between the grievance filing and the transfer does provide circumstantial evidence suggesting that the transfer may have been in retaliation for plaintiff's grievance. Circumstantial facts in a retaliation claim can suggest an improper motive sufficient to withstand a motion to dismiss. *See Gagliardi v. Village of Pawling,* 18 F.3d 188 (2d Cir.1994) (denying motion to dismiss where retaliation claim alleged a chronology of events from which retaliatory intent could be inferred); *see also Murphy v. Lane,* 833 F.2d 106, 108-09 (7th Cir.1987) ("Chronology of events from which retaliatory animus on part of the defendants could be inferred" sufficient to overcome motion to dismiss).[FN9] Because this is a motion to dismiss and not a motion for summary judgment, the defendants properly have not provided the Court with any dispositive records or information indicating that the transfer was not retaliatory in nature. Under these circumstances, however, the Court finds that plaintiff does allege a sequence of events which may be read as providing some support for an inference of retaliation sufficient to withstand a motion to dismiss.

FN9. In contrast, circumstantial evidence of retaliatory animus is not sufficient to withstand a motion for summary judgment. *See Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir.1995) (mere temporal proximity of events may "fuel ... suspicions" but will not withstand a motion for summary judgment); *Dietz v. Damas,* 948 F.Supp. 198 (E.D.N.Y.1996).

**\*9** Nevertheless, the Court must dismiss plaintiff's retaliatory transfer claim because he has not alleged the personal involvement of any of the named defendants in the transfer decision. It is well established that as a prerequisite to a damage award under 42 U.S.C. § 1983, a plaintiff must allege the defendant's direct or personal

involvement in the alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Plaintiff has not done so with respect to his transfer claim and accordingly the claim must be dismissed. The Court grants plaintiff permission, however, to amend his Complaint within thirty days of this order, reasserting claims against or adding any defendants whom he can plead with particularity had personal involvement in his retaliatory transfer claim.

## VI. *Personal Involvement*

As stated above, plaintiff must allege a defendant's direct personal involvement in a constitutional deprivation in order to receive a damage award under § 1983. *See Wright,* 21 F.3d at 501. Because the Court has dismissed the plaintiff's retaliation claims, the retaliation claims against Schneider, Connelly, Pease, Rassman, Zaken, and Bennett are dismissed.

Concerning the plaintiff's allegation of deliberate indifference to plaintiff's medical needs against defendants Zwillinger, Stevens, and Manion, plaintiff has alleged facts of their direct involvement, knowledge, and responsibility sufficient to withstand a motion to dismiss.

Plaintiff makes no claims of direct involvement by defendants Goord (Department of Correctional Services Acting Commissioner), Coombe (Former Commissioner), and Artuz (Green Haven Superintendent) in any constitutional violation. Liability for damages in a § 1983 action may not be based in respondent superior or vicarious liability doctrines. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Absent allegations of personal involvement, all claims against Goord, Coombe, and Artuz are hereby dismissed.

## VII. *Eleventh Amendment Immunity*

Finally, defendants assert that the instant Complaint is barred by the Eleventh Amendment because defendants were acting in their official capacities with regard to the claims alleged and thus are immune from suit. It is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

unclear, however, whether plaintiff is suing defendants in their official or in their individual capacities. In a case such as this, where doubt exists as to whether an official is sued in his individual or official capacity, the course of the proceedings will generally resolve the ambiguity by revealing the nature of the liability sought to be imposed. *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 4, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citing *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). It is improper at an early stage in the proceedings automatically to construe a Complaint as focusing on one capacity and not the other. *See Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.). Accordingly, the Court assumes for the purposes of this motion that plaintiffs claims are asserted against defendants in both their individual and their official capacities.

**\*10** To the extent that plaintiff asserts claims for monetary damages against the defendants in their official capacities, these claims must be dismissed. A claim against an employee of the New York State Department of Corrections for actions taken in his or her official capacity is, in effect, a suit against the State. Absent the State's waiver or consent, neither of which have been given here, the Eleventh Amendment bars from federal court all § 1983 suits for legal or equitable relief brought by citizens against the State and its agencies. *See Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)* (per curiam); Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *See also Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (reaffirming Edelman holding that § 1983 does not override the immunity granted to States under the Eleventh Amendment). Thus, plaintiffs claims for monetary damages from defendants in their official capacities are dismissed as barred under the Eleventh Amendment. *See generally Dube v. State Univ. of New York,* 900 F.2d 587, 594-95 (2d Cir.1990). However, plaintiff may maintain his claims against defendants in their individual capacities. *See generally Hafer v. Melo,* 502 U.S. 21, 30-31, 112 S.Ct. 358, 116 L.Ed.2d 301(1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under sec.1983.") (citation omitted).

### CONCLUSION

Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED in part and DENIED in part. The Court denies the motions of defendants Zwillinger, Stevens, and Manion to dismiss plaintiff's claim against them of deliberate indifference to plaintiff's medical needs. The Court grants the motions of defendants Goord, Coombe, Artuz, Schneider, Connelly, Pease, Rassman, Zaken, and Bennett to dismiss the retaliation and other claims against them in their entirety. As noted herein, plaintiff has thirty days from the date of this Order to amend his Complaint to allege the personal involvement of defendants in his retaliatory transfer claim. If plaintiff adds new defendants, he must effect service upon them. **The Court schedules a conference for 1/16/98, at 2:00 pm, at which time defendants will advise the Court of the status of discovery. Attached is a Pro Se Conference notice that explains to the plaintiff how he may participate in the conference.**

### SO ORDERED

S.D.N.Y.,1997.
Gadson v. Goord
Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
No. 01CIV.8235(AGS).

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the
Green Haven Correctional Facility,[FN1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to be 180 days in keeplock and 180 days' loss of
packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as per
his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for
twenty-three hours per day. On the basis of the allegedly
unlawful sanctions to which he was subjected, Samuels
has filed the instant action pursuant to 42 U.S.C. § 1983
alleging violations of, *inter alia*, his First Amendment and
due process rights, and seeks equitable relief and damages.
Defendants have filed a motion to dismiss the action

pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

> FN1. Defendants repeatedly state that the events
> giving rise to this action arose while Samuels
> was incarcerated at the Great Meadow
> Correctional Facility. Samuels states that the
> events in question happened at the Green Haven
> Correctional Facility. Moreover, Samuels'
> evidence, including the Inmate Disciplinary
> Report (Exhibit H), the Disciplinary Hearing
> Record Sheet (Exhibit O), and the
> Superintendent Hearing Disposition Report
> (Exhibit P) all note the Green Haven
> Correctional Facility. In light of the above, the
> Court determines that defendants' position that
> the events occurred at Great Meadow is
> incorrect. The Green Haven Correctional Facility
> is located in Dutchess County in the Southern
> District, while Great Meadow is located in
> Washington County in the Northern District.
> Defendants make no argument regarding the
> Court's jurisdiction with respect to the location of
> the events in question.

II. Factual Background [FN2]

> FN2. Unless otherwise indicated, the facts set
> forth below are gleaned from Samuels'
> submissions, because on a FED. R. CIV. P.
> 12(b)(1) or (6) motion, the adjudicating court
> must assume as true factual allegations made in
> the complaint. Defendants concede this fact. *See*
> Defendants' Memorandum of Law in Support of
> their Motion to Dismiss the Complaint, at 4. It
> should also be noted that Samuels brings this
> action *pro se.* As such, it is sometimes difficult to
> understand fully his contentions. Accordingly,
> the Court reads the (sometimes confusing)
> factual allegations in the light most favorable to
> Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

*2 a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7.*See*N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

*4 The "Tier III" disciplinary hearing was held on October 27, 1999. [FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-based and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13]*See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

**III. Legal Standard**

**A.** *Pro Se* **Complaints**

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the

plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146;*Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

**B. Motions to Dismiss Pursuant to** FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

**IV. Legal Analysis**

**A. Exhaustion of Administrative Remedies**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). See *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. See Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled 'Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky*, 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry*, Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry*, the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit,

*inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.'" *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to him through the NYTS program with the authorization of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] ¶ 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation.[FN20] Dismissal is therefore inappropriate.

FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

*13 Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the "limited" assistance to which Samuels is entitled.[FN21] Such

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated. The search took place on October 20, 1999, and the

hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. *See*

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> **FN22.** Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

### 3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

### 4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

### 5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

### 6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

### 7. Jeffery McKoy

*16 Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not

personally involved in the matter and all claims against him are dismissed.

### 8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

### E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Dashon [FN1] HALLOWAY, Plaintiff,

FN1. Upon information and belief, the correct spelling of Plaintiff's name is "Deshon" as reflected in both his Complaint, Dkt. No. 1, and the Department of Correctional Services' Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny .us.

v.
Glenn S. GOORD, et al, Defendants.
**No. 9:03-CV-1524 (LEK/RFT).**

Sept. 24, 2007.

Deshon Holloway, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, New York State Department of Law, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 87). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the

objections by Plaintiff Deshon Halloway, which were filed on September 14, 2007. Objection (Dkt. No. 88).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that the defendants motion for summary judgment (Dkt. No. 80) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED;** it is further **ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Deshon Holloway brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging the above named Defendants violated his due process rights pursuant to the Fourteenth Amendment when he was transferred from Elmira Correctional Facility to Upstate Correctional Facility without first receiving a hearing. According to Plaintiff, when he was housed at Elmira, he was serving a keeplock disciplinary sentence in his cell, whereas upon

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

his transfer to Upstate, he served the remainder of that sentence in a Special Housing Unit (SHU). *See generally* Dkt. No. 1, Compl.

Presently before the Court is Defendants' Motion for Summary Judgment, to which, despite being granted multiple extensions of time, Plaintiff has failed to respond. Dkt. No. 80, Defs.' Mot. Summ. J., filed on Jan. 17, 2007; 81, Order, dated June 5, 2007 (*sua sponte* extending Plaintiff's time to respond to July 9, 2007); 83, Order, dated July 3, 2007 (granting Plaintiff's request and extending his response time to July 31, 2007).

Instead of submitting opposition to the Motion, Plaintiff filed a letter, dated July 15, 2007, seeking permission to withdraw his action. Dkt. No. 84. Court staff inquired whether Defendants would consent to Plaintiff's voluntary withdrawal, to which Defendants tendered consent only upon the proviso that such dismissal be with prejudice. Dkt. Nos. 85, Notice to Defs.' Counsel, dated July 20, 2007; 86, Defs.' Resp., dated Aug. 21, 2007. In light of the ample passage of time since the initiation of this lawsuit and the filing of Defendants' Motion, and in light of the Defendants' posture to withhold any consent to discontinue lest it be on the merits, the Court finds it prudent to address Defendants' Motion on the merits.

## I. FACTS

### A. Effect of Plaintiff's Failure to Respond

**\*2** Defendants filed their Motion for Summary Judgment on January 17, 2007, setting Plaintiff's response deadline for February 12, 2007. Dkt. No. 80. In accordance with the Local Rules of Practice for the Northern District of New York, Defendants provided Plaintiff with notice of the consequences that may befall him should he elect not to respond to such Motion.[FN2] Dkt. No. 80; N.D.N.Y.L.R. 56.2. Approximately six months later, on June 5, 2007, this Court, in view of the fact that Plaintiff had not filed a response, *sua sponte* extended his time to respond and further emphasized the consequences of his failure to do so.[FN3]

[FN2]. Specifically, Defendants included in their Notice of Motion the following warning:

PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in the moving parties' affidavits will be accepted by the Magistrate-Judge as being true unless you submit affidavits or other documentary evidence contradicting defendants' assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

Dkt. No. 80 (emphasis in original).

[FN3]. Specifically, the Court issued an Order stating:

***Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.*** *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). ***Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which there will be no trial.*** *See* N.D .N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

as the case may be, unless good cause is
shown.").

Dkt. No. 81 at pp. 1-2 (emphasis in original).

Pursuant to this District's Local Rules, "[w]here a properly
filed motion is unopposed and the Court determines that
the moving party has met its burden to demonstrate
entitlement to the relief requested therein, the non-moving
party's failure to file to serve any papers ... shall be
deemed as consent to the granting or denial of the motion,
as the case may be, unless good cause is shown ."
N.D.N.Y.L.R. 7.1(b)(3); *see also Douglas v. New York
State Div. of Parole,* 1998 WL 59459, at *1 (N.D.N.Y.
Feb. 10, 1998) (noting that plaintiff's failure to oppose
defendants' dispositive motion, and his failure to show
good cause for the omission, may alone justify granting
the motion). "The fact that there has been no response to
a summary judgment motion does not, of course, mean
that the motion is to be granted automatically." *Champion
v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the
absence of a response, Defendants are entitled to summary
judgment only if the material facts demonstrate their
entitlement to judgment as a matter of law. *Id.;* FED. R.
CIV. P. 56(c); N.D.N.Y.L.R. 7.1(b)(3). Because Plaintiff
has failed to raise any question of material fact, the Court
will accept the facts as set forth in Defendants' Rule 7.1
Statement of Facts, supplemented by Plaintiffs' verified
Complaint, as true. *See* Dkt. Nos. 1, Compl.; 80-9, Defs.'
7.1 Statement; *see also Lopez v. Reynolds,* 998 F.Supp.
252, 256 (W.D.N.Y.1997).

**B. Uncontested Facts**

At all times relevant to the Complaint, Plaintiff was an
inmate in the custody of the New York State Department
of Correctional Services (DOCS). On January 5, 2001,
Holloway was transferred from Elmira Correctional
Facility, a maximum security prison, to Upstate
Correctional Facility, a maximum security prison. Defs.'
7.1 Statement at ¶ 2; Dkt. No. 80-2, Donald Selsky Decl.,
dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History). This
transfer is the subject of his civil rights claims.

As indicated on Holloway's Transfer History Report, the

reason for Plaintiff's transfer was his "unsuitable
behavior." Selsky Decl., Ex. B. This is not the first time
Plaintiff was transferred to another facility due to his
unsuitable behavior.[FN4] In fact, Plaintiff's transfer to
Elmira from Southport Correctional Facility was also due
to his unsuitable behavior. *Id.* (Transfer, dated November
28, 2000). Upon his arrival at Elmira, Plaintiff had an
aggregate disciplinary keeplock sentence of approximately
270 days, stemming from six Disciplinary Hearings
Plaintiff previously received during a span of six months.
Defs.' 7.1 Statement at ¶ 6. These disciplinary sentences
were based on various Misbehavior Reports Plaintiff
received while incarcerated at Marcy Correctional Facility
and Mid-State Correctional Facility. *Id.* at ¶¶ 7-10. For
each of the six Misbehavior Reports issued, Plaintiff
received a separate Disciplinary Hearing resulting in six
separate guilty determinations, each with its own separate
sentence. *Id.* Plaintiff only filed appeals in three of these
Hearings, all of which were affirmed. *Id.* at ¶¶ 8 & 11-12.
[FN5] Plaintiff makes no allegations as to the inadequacy of
any of these Hearings and none of the Hearing Officers
who presided over the six Disciplinary Hearings is named
as a Defendant.

FN4. In reviewing Plaintiff's Transfer History, we
note at least four transfers due to his
"unsuitable behavior" between May 1998 and
December 2000. Dkt. No. 80-2, Donald Selsky
Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer
History).

FN5. Indeed Plaintiff's Disciplinary History is
startling and certainly is not confined to the six
instances noted above. Focusing only on the
disciplinary sentences to be served upon his
arrival at Upstate, we offer the following
synopsis. Two of the sentences stem from
Misbehavior Reports Plaintiff was issued while
at Marcy, dated April 15, 1999, and May 14,
1999. Defs.' 7.1 Statement at ¶ 7; Selsky Decl.,
Ex. A (Holloway Disciplinary History). The
Hearing determinations for these two Reports,
which included, *inter alia,* an aggregate keeplock
sentence of 180 days, were affirmed on appeal.
Defs.' 7.1 Statement at ¶ 8. While at Mid-State,
and again as relevant to the aggregate sentence to
be served at Upstate, Plaintiff received four
separate Misbehavior Reports on August 15,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

1999, September 2, 1999, October 12, 1999, and October 22, 1999. *Id.* at ¶ 9. On each, he was provided a Hearing, found guilty, and received a sentence of, *inter alia,* thirty days keeplock (per infraction); he only appealed the Hearing determination regarding the October 12th Misbehavior Report, and such was affirmed on appeal. *Id.* at ¶¶ 10-12.

**\*3** Prior to his transfer to Upstate, Holloway was held in long-term keeplock at Elmira for approximately one month and eight days. *Id* . at ¶ 14. The cell Plaintiff was confined in could also be used for a general population inmate or an inmate transitioning to general population from SHU. Dkt. No. 80-5, Dan Kress Decl., dated Jan. 11, 2007, at ¶ 2. Under the keeplock confinement, Plaintiff was locked in his cell for twenty-three hours a day. Dkt. No. 80-6, James Thompson Decl., dated Jan. 10, 2007, at ¶ 3. A cell-confined inmate in this circumstance requires additional services by prison staff such as meal delivery and cell visitation by medical staff. *Id.* Though use of a general population cell for such restricted confinement is feasible on a short-term basis, "[a]s a long-term proposition, ... it [is] an inefficient use of the department's resources[.]" *Id.* On the other hand, Upstate is a prison specially designed to handle cell-confined inmates and, given the length of Plaintiff's keeplock sentence of approximately 240 days, it was more practical for Plaintiff to be transferred to Upstate to serve out the remainder of that keeplock sentence. *Id.* at ¶ 4. For these reasons, on December 27, 2000, Defendant Dan Kress, Corrections Counselor at Elmira, recommended that Holloway be transferred to Upstate to serve his 240-day keeplock sentence. Defs. 7.1 Statement at ¶ 16. This recommendation was approved by Defendant James Thompson, Senior Counselor at Elmira and by John Carvill <sup>FN6</sup> in DOCS' Office of Classification and Movement, who issued the order that Plaintiff be transferred to Upstate from Elmira; as aforementioned, such transfer took place on January 5, 2001. *Id.* at ¶ 17. Defendants Glenn Goord, then-Commissioner of DOCS, Floyd Bennett, then-Superintendent of Elmira, Thomas Ricks, then-Superintendent of Upstate, and John Glasheen, then-Assistant Director of the Office of Classification and Movement, were not involved in the decision to transfer Plaintiff to Upstate. *Id.* at ¶ 33.

FN6. John Carvill is not a Defendant in this action.

While serving his sentence at Upstate, Plaintiff was treated the same as any other inmate sentenced to keeplock confinement at Upstate. *Id.* at ¶ 27. After his arrival at Upstate, Plaintiff incurred, in just four months, over a year's worth of additional keeplock for disciplinary violations. *Id.* at ¶ 18. He also accumulated seventy-four months of SHU time for more serious violations involving violent conduct on staff and an unhygienic act. *Id.* at ¶ 19. Pursuant to Department Regulations, Plaintiff began serving all of this additional SHU time at Upstate on May 5, 2001. *Id.* at ¶ 20.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000) (quoting FED. R. CIV. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**\*4** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

More specifically, this District's Local Rules provide that *"[a]ny facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 2002 WL 368534, at \*2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 2001 WL 237218, at \*1 (N.D.N.Y. Mar. 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on

that basis. *Id.* at 470-71.

In this case, as previously discussed, Holloway did not file a response to the Defendants' Motion for Summary Judgment. Consequently, this Court has accepted the properly supported facts contained in the Defendants' 7.1 Statement as true for purposes of this Motion. With this standard in mind, the Court now addresses the sufficiency of Holloway's claims.

## B. Due Process and Plaintiff's Intrastate Prison Transfer

Holloway asserts he should have received a hearing prior to his transfer to Upstate and in the absence of such hearing, his due process rights were violated. Defendants Kress and Thompson were directly involved in the decision to transfer Plaintiff, thus we consider Plaintiff's due process claim to be asserted against them. Plaintiff's claim, however, is wholly without merit.

**\*5** To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

It is well-settled that an inmate has no right under the Due Process clause to be incarcerated in any particular correctional facility, and transfers among facilities do not need to be preceded by any particular due process procedure. *See* *Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 224-25 (1976)) (noting that the Constitution does not "guarantee that [a] convicted prisoner will be placed in any particular prison" nor does "the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[ ]"); *see also* *Fox v. Brown,* 2007 WL 586724, at *9-10 (N.D.N.Y. Feb. 21, 2007).* Though Holloway complains that his restrictions at Upstate were much greater than that experienced at Elmira, the fact that "life in one prison is much more disagreeable than in another does not itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano,* 427 U.S. at 225;*see also* *Olim v. Wakinekona,* 461 U.S. 238, 244-45 (1983) (citing, *inter alia, Meachum v. Fano,* 427 U.S. 215 (1976) & *Monyanye v. Haymes,* 427 U.S. 236 (1976) for the proposition that inmates have no constitutional right to be housed in a particular prison or a particular dormitory within a prison). Thus, the Due Process Clause itself clearly does not afford Holloway the protection sought.

Our inquiry does not end there, however, since liberty interests may also arise under state statutes and regulations. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U .S. at 460). To assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Connor,* 515 U.S. at 484,*and* (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regardless of whether Plaintiff can establish that he was subjected to an atypical and significant hardship, it is patently clear that New York has **not** created, by regulation or statute, any liberty interest in remaining at one particular prison. Indeed, it is the DOCS who possesses sole discretion to determine "where a [state] inmate will be housed." *Grullon v. Reid,* 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999) (citing *United States v. Williams,* 65 F.3d 301,

307 (2d Cir.1995)); *see also* *Smolen v. Lanier,* 2007 WL 2027841, at *2 (W.D.N.Y. July 11, 2007).* Furthermore, not only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same property, visiting, package, commissary, telephone, and correspondence limitations typically experienced in SHU confinement. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2.

**\*6** Thus, regardless of whether Plaintiff alleges his due process rights were violated when he was transferred to another institution or when he was forced to serve his keeplock sentence in SHU, since Holloway had no liberty interest in remaining at one specific facility to serve his keeplock sentence or to remain in cell confinement to serve such sentence, there was no need to provide him with a hearing prior to his transfer to another prison and into SHU. Accordingly, this Court recommends **granting** Defendants' Motion for Summary Judgment and **dismissing** Defendants Kress and Thompson from this action.

### B. Personal Involvement

As to the remaining Defendants, Plaintiff alleges that 1) Defendant Goord failed to stop Plaintiff's transfer to Upstate and knew of or should have known of his subordinates' acts, yet failed to take action, Compl. at ¶¶ 48-50; 2) Defendant Glasheen approved the transfer and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 51-53; 3) Defendant Bennett failed to stop Plaintiff's transfer to Upstate and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 54-57; and 4) Defendant Ricks failed to transfer Plaintiff from Upstate back to Elmira and failed to provide Plaintiff with a hearing prior to keeping him confined at Upstate, Compl. at ¶¶ 58-60.

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

658 (1978)); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

Despite Plaintiff's allegations to the contrary, and in light of his failure to oppose Defendants' Motion, it is uncontested that Defendants Goord, Glasheen, Bennett, and Ricks played no part in the decision to transfer Plaintiff. To the extent Plaintiff seeks to hold any one of these Defendants liable on the basis of supervisory liability,[FN7] such claim similarly fails since, as explained above, Plaintiff's transfer to Upstate without a hearing did not violate his due process rights. Therefore, this Court recommends **dismissing** these Defendants as well.

> FN7. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 80) be **GRANTED** and the entire Complaint **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.****Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Halloway v. Goord
Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Natch BLACK, Plaintiff,
v.
C. **LANSBERG**, Corr. Sergeant, Great Meadow C.F.;
R. Atkinson, Program Comm. Chairman, Great Meadow
C.F.; D. Carpenter, Deputy Superintendent for
Programs, Great Meadow C.F.; and Glenn S. Goord,
NYS DOCS Commissioner, Defendants.
**No. 9:06-CV-1243 (GTS/GHL).**

Sept. 29, 2009.

West KeySummary
**Constitutional Law 92 ☞    4826**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)11 Imprisonment and Incidents
Thereof
                92k4826 k. Segregation. Most Cited Cases

**Prisons 310 ☞    230**

310 Prisons
    310II Prisoners and Inmates
        310II(E) Place or Mode of Confinement
                310k229 Punitive, Disciplinary, or
Administrative Confinement
                310k230 k. In General. Most Cited Cases
Keeping a prisoner in the Special Housing Unit (SHU) for
53 days for refusing assignment to the mess hall as
prisoner had allergies did not violate any due process
liberty interest. The confinement was either normal or less
severe than normal. It was not an atypical and significant
hardship. U.S.C.A. Const.Amend. 14.

Natch Black, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Assistant Attorney
General, of Counsel, Albany, New York, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action filed by Natch Black ("Plaintiff") against four
employees of the New York State Department of
Correctional Services ("Defendants") are (1) Defendants'
motion for summary judgment (Dkt. No. 17), (2) Plaintiff's
cross-motion for summary judgment (Dkt. No. 19), (3)
United States Magistrate Judge George H. Lowe's
Report-Recommendation recommending that Defendants'
motion be granted and that Plaintiff's cross-motion be
denied (Dkt. No. 31), and (4) Plaintiff's Objections thereto
(Dkt. No. 33). For the reasons set forth below, Plaintiff's
Objections are rejected; Magistrate Judge Lowe's
Report-Recommendation is accepted and adopted in its
entirety; Defendants' motion for summary judgment is
granted; Plaintiff's cross-motion is denied; and Plaintiff's
Complaint is dismissed.

**I. RELEVANT BACKGROUND**

In his Report-Recommendation, Magistrate Judge Lowe
accurately and thoroughly recited both the allegations of
Plaintiff's Complaint and the parties' arguments on
Defendants' motion for summary judgment. (Dkt. No. 31,
at 2-6.) As a result, that recitation is incorporated by
reference herein. In addition, familiarity with the analysis
offered in Magistrate Judge Lowe's
Report-Recommendation is assumed in this Decision and
Order. (Dkt. No. 17-22.)

After Magistrate Judge Lowe filed his
Report-Recommendation on March 30, 2009, Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

afforded an extension of time to file his Objections, which he did on May 21, 2009. (*See* Text Order dated 4/6/09; Dkt. No. 33.) Liberally construed, Plaintiff's Objections advance the following three arguments: (1) Magistrate Judge Lowe erred by failing to understand that Plaintiff enjoyed a procedural due process right under the Fourteenth Amendment in having Defendants' follow the Department of Correctional Services' "Policy, Procedure and Standard for Programing Inmates" (attached at Dkt. No. 19, Part 4, Ex. C); (2) Magistrate Judge Lowe also erred by failing to recognize the several pieces of record evidence establishing that Defendants (admittedly) violated the aforementioned policy, and that they did so without affording him the process he was due before placing him in punitive confinement; and (3) Plaintiff did not consent to having his case be heard by Magistrate Judge Lowe. (*See generally* Dkt. No. 33.)

Defendants filed a response to Plaintiff's Objections on May 26, 2009. (Dkt. No. 34.) Generally, in their response, Defendants advanced the following five arguments: (1) Plaintiff has failed to cite case law contradicting Defendants' argument that the law is that Plaintiff did not enjoy a protected liberty interest, under the procedural Due Process Clause of Fourteenth Amendment, in remaining free from the type of confinement he experienced for only fifty-three days; (2) Plaintiff has adduced no admissible record evidence that he accepted any programs other than two academic programs, nor has he adduced record evidence disputing that he refused to accept the mess hall and utility crew programs; (3) the medical excuse issued by Dr. Albert Paolano was issued in 2005, not 2004, and in any event the medical testing of Plaintiff subsequently conducted revealed that he has no detectable medical allergy to fish or eggs; (4) the response to Plaintiff's Grievance No. GM-40863-06 did not agree with his claim that he had been placed on Limited Privileges Status wrongfully; and (5) Plaintiff has adduced no admissible record evidence that he received back pay for the fifty-two days he spent on Limited Privileges Status (rather, he received back pay for something else). (*See generally id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

**\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN1] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN1. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN2.*See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standards Governing Motion for Summary Judgment and Motion to Dismiss**

Magistrate Judge Lowe correctly recited the legal standard governing a motion for summary judgment and motion to dismiss. (Dkt. No. 31, at 6-17.) As a result, those legal standards are incorporated by reference herein.

**III. ANALYSIS**

As indicated above in Part I of this Decision and Order, Plaintiff's Objections, even when construed with the utmost of liberality, fail to assert any specific challenge to Magistrate Judge Lowe's recommendations regarding (1) the timeliness of Defendants' motion for summary judgment, (2) Plaintiff's substantive due process claim under the Fourteenth Amendment, (3) his conditions-of-confinement claim under the Eighth Amendment, and (4) his retaliation claim under the First Amendment. (*Compare* Dkt. No. 31 at 17, 19-21 [Report-Recommendation] *with* Dkt. No. 33 [Plf.'s Objections].) Thus, the Court reviews those portions of the Report-Recommendation for only clear error. *See, supra,* Part II .A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Complaint, the referenced portions of the Magistrate Judge Lowe's Report-Recommendation, and the admissible record evidence), the Court concludes that the referenced portions of the Report-Recommendation are well-reasoned and not clearly erroneous. Indeed, the Court concludes that these portions of the Report-Recommendation would survive even a *de novo* review. As a result, the Court accepts and adopts these portions of the Report-Recommendation for the reasons stated therein.[FN3]

FN3. The Court notes that, even if Plaintiff possessed a medical excuse during the time in question, that fact would not confer on Plaintiff a right of substantive due process under the Fourteenth Amendment. *See Barnes v. Craft,* 04-CV-1269, 2008 WL 3884369, at *5 & n. 39 (N.D.N.Y. Aug.18, 2008) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.) ("Even if I were to so construe Plaintiff's Amended Complaint, I would have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a court order) created such a right of substantive due process.") (citations omitted).

With regard to the one portion of Magistrate Judge Lowe's Report-Recommendation to which Plaintiff's Objections do specifically challenge-i.e., Magistrate Judge Lowe's recommendation regarding Plaintiff's procedural due process claim under the Fourteenth Amendment-a *de novo* review is appropriate. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Complaint, the referenced portion of the Magistrate Judge Lowe's Report-Recommendation, the admissible record evidence, Plaintiff's Objections, and Defendants' response), the Court concludes that the referenced portion of the Report-Recommendation is correct in all respects. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court also accepts and adopts this portion of the Report-Recommendation for the reasons stated therein. The Court would add only two points.

**\*3** First, Plaintiff has no right to not have his case assigned to a magistrate judge for a report-recommendation, under the circumstances. *See Dixon v. Leonardo,* 886 F.Supp. 987, 988-89 (N.D.N.Y.1995) (McAvoy, C.J.) (citations omitted).

Second, the crux of Plaintiff's Objections is his belief that he enjoyed a procedural due process right under the Fourteenth Amendment in having Defendants' follow the Department of Correctional Services' "Policy, Procedure and Standard for Programing Inmates." This belief is mistaken.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

This is because Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to United States Constitution and *federal* laws.[FN4] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN5] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN6] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN7]

> FN4.*Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 & n. 137 (N.D.N.Y.2009) (Suddaby, J., adopting Report-Recommendation of Lowe, M.J., on *de novo* review) (collecting cases).

> FN5.*Cusamano,* 604 F.Supp.2d at 482 & n. 138 (collecting cases).

> FN6.*See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

> FN7.*See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Of course, it is true that a state may, under certain circumstances, create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates. *Hewitt v. Helms,* 459 U.S. 460, 466-472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, that rule created a perverse incentive (1)

for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandin v. Connor,* 515 U.S. 472, 477-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, the Supreme Court changed the rule, shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation. *Sandin,* 515 U.S. at 483-484.[FN8] Specifically, in 1995, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-484.[FN9]

> FN8.*See also Cusamano,* 604 F.Supp.2d at 482 & n. 139 (collecting cases).

> FN9. The Court notes that the possession of a medical excuse also does not create a protected liberty interest under the procedural due process clause of the Fourteenth Amendment. *See Barnes,* 2008 WL 3884369, at *5 & n. 35 (finding that "the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a procedural due process claim.").

**\*4** This is the point of law that Magistrate Judge Lowe was reciting on pages 18 and 19 of his Report-Recommendation, and that Plaintiff glossed over in his Objections. Simply stated, Defendants may or may not have violated the Department of Correctional Services' "Policy, Procedure and Standard for Programing Inmates." But that question is immaterial. Rather, what matters (for purposes of Plaintiff's procedural due process claim) is that he served only fifty three days in the Great Meadow Correctional Facility's Special Housing Unit ("SHU") under what were either normal SHU conditions or less-severe-than-normal SHU conditions. As a result, he was "due" no process of which he could have been

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

deprived, under the Fourteenth Amendment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 31) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 17) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 19) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED.***

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Natch Black alleges that four employees of the New York State Department of Correctional Services ("DOCS")-Ronald W. Atkinson, C. **Lansberg**, D. Carpenter, and Glenn S. Goord, Commissioner of DOCS-violated his constitutional rights when they confined him to the Special Housing Unit ("SHU") for 53 days without a hearing after he refused to accept a program placement. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 17.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Plaintiff's complaint (Dkt. No. 1) alleges that:

On May 31, 2006, Plaintiff was on the waiting list for a GED class and an electrical class at Great Meadow Correctional Facility. (Dkt. No. 1 at 8, ¶ 1 [FN1].) Defendant Atkinson, the Program Committee Chairman, suggested that Plaintiff take a program assignment while he waited for his educational opportunities to become available. Plaintiff chose a porter assignment. Defendant Sgt. **Lansberg** suggested that Plaintiff instead take mess hall duty. (Dkt. No. 1 at 8, ¶ 2.) Plaintiff refused due to his food allergies. (Dkt. No. 1 at 8, ¶ 3.) He was also fearful of working in the mess hall due to the frequent stabbings that occurred there. (Dkt. No. 1 at 10, ¶¶ 12-13.) Defendant **Lansberg** cussed at Plaintiff and told him that if he did not take the mess hall assignment, he would be sent to the Special Housing Unit ("SHU"). (Dkt. No. 1 at 8, ¶ 4.)

> FN1. The page numbers for Plaintiff's complaint refer to those assigned by the ECF system.

*5 On June 1, 2006, Plaintiff was moved from the general population to the SHU, where he remained for 53 days. (Dkt. No. 1 at 8, ¶ 5.) Plaintiff was not given a hearing before being placed in the SHU. *Id.*

Plaintiff wrote to Defendant Carpenter, the Deputy Superintendent for Programs, and informed him that he was eager for his educational opportunities but was willing to take any program other than the mess hall. (Dkt. No. 1 at 8-9, ¶ 6.) In response, Plaintiff received a memorandum from Defendant Atkinson informing him that he had been placed on Limited Privilege Status. (Dkt. No. 1 at 9, ¶ 7 .) This status restricted Plaintiff's yard, television, movies, commissary, pay, telephone, regular library, evening program, and packages privileges. Under this status, Plaintiff was not allowed to visit the law library or the inmate grievance resolution office. (Dkt. No. 1, Ex. A.) This placement was a result of a DOCS policy mandating that inmates who refuse programs be placed on Limited Privilege Status. (Dkt. No. 1 at 10, ¶ 14.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

On July 10, 2006, Plaintiff was scheduled to meet with the program committee. However, the meeting was cancelled because he had been put on keep-lock status while in the SHU. (Dkt. No. 1 at 9, ¶ 9.)

On July 19, 2006, Plaintiff met with the program committee. As he entered the room, Defendant **Lansberg** said "Nothing changed, you take the mess hall or drag your ass back to [the SHU]." Plaintiff renewed his objections to the mess hall placement and requested that the committee contact the medical staff. Defendant **Lansberg** got on the telephone. Plaintiff heard him say "Right, right, only if he digests it, right. Anything that he can't be around?" (Dkt. No. 1 at 9, ¶ 10.)

After Defendant **Lansberg** got off the telephone, Plaintiff was brought to the infirmary, where a doctor instructed that Plaintiff not be placed in the mess hall. (Dkt. No. 1 at 9-10, ¶ 11.)

Plaintiff was released from the SHU on July 22, 2006. (Dkt. No. 1 at 9-10, ¶ 11.)

Plaintiff requests $25,000 in compensatory damages and $15,000 in punitive damages. (Dkt. No. 1 at 14.)

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) Plaintiff's procedural due process rights were not violated when he was confined without a hearing for refusing a program assignment; (2) Plaintiff's placement on Limited Privileges Status does not state an Eighth Amendment conditions of confinement claim; (3) Plaintiff's complaint fails to state a substantive due process claim; (4) Plaintiff's complaint does not state a retaliation claim; (5) Plaintiff's complaint fails to allege facts plausibly suggesting that Defendants Goord or Carpenter were personally involved in any of the constitutional violations alleged; and (6) Defendants are protected by the doctrine of qualified immunity. (Dkt. No. 17-14.)

**C. Summary of Plaintiff's Response to Defendants' Arguments**

Plaintiff opposes Defendants' motion for summary judgment and cross-moves for summary judgment in his favor. (Dkt. No. 19.) He argues that: (1) Defendants are not entitled to qualified immunity; (2) Defendants violated a direct medical order, dated July 24, 2005, stating that Plaintiff should not work in the mess hall; (3) Defendants violated DOCS directives and 7NYCRR 301.1-301.7 when they placed Plaintiff on Limited Privileges Status in the SHU, failing to consider less restrictive alternatives than confinement, thus violating Plaintiff's due process rights; (4) Defendants' placed Plaintiff on Limited Privileges Status wrongfully, as evidenced by the Inmate Grievance Program Committees ("IRGC") decision to award back pay to Plaintiff for the time he was "wrongfully placed on limited privileges"; (5) Defendants were deliberately indifferent and possessed the requisite culpable mental state to support Plaintiff's Eighth Amendment claims; (6) Defendants Goord and Carpenter had sufficient personal involvement to warrant inclusion in this action: Defendant Goord created the DOCS Limited Privileges Status policy and Defendant Carpenter failed to implement and enforce the policy; and (7) Defendants' motion for summary judgment was filed March 31, 2008 instead of the March 30, 2008 date that was set for motions to be filed, thereby making it untimely.

**D. Summary of Defendants' Reply**

**\*6** In reply, Defendants argue that: (1) Plaintiff was rightfully placed on limited privileges status because he denied any and all program assignments offered to him, including a position on the utility crew; and he did not have a food allergy of which Defendants were aware; (2) Plaintiff has not stated a conditions of confinement or medical indifference claim under the Eighth Amendment, because Plaintiff cannot medically establish a serious need, as the record shows that Plaintiff does not have food allergies; (3) Defendant Atkinson did not violate any identifiable DOCS policy or procedure when he assigned Plaintiff to Limited Privileges Status; (4) The IRGC's recommendation was not accepted by the superintendent or CORC and in any case does not assist in determining the occurrence of a constitutional violation; and (5)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

Defendants' motion for summary judgment was timely pursuant to Federal Rule of Civil Procedure 6. (Dkt. No. 21-18.)

**E. Summary of Plaintiff's Sur-Reply**

In response to Defendants' reply, Plaintiff argues that: (1) Plaintiff was not offered any alternate programs, including a utility crew assignment, and refused only programs that would affect his health; (2) the records show that Plaintiff has a serious food allergy; (3) Plaintiff received back pay for the time he was on Limited Privileges Status, supporting his claim that he was wrongfully placed on Limited Privileges Status; and (4) Defendants failed to follow the proper guidelines when they placed him on Limited Privileges Status in the SHU. (Dkt. No. 23.)

**F. Summary of Defendants' Sur-sur Reply**

In response to the Plaintiff's sur-reply, Defendants argue that Plaintiff received back pay for a different time period than the period at issue in this case. (Dkt. No. 26.)

**G. Summary of Plaintiff's Sur-sur-sur Reply**

In response to the Defendants' sur-sur reply, Plaintiff argues that he was compensated back pay for the time period at issue in this case. (Dkt. No. 28.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Legal Standard Governing Motions for Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material

FN2 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.FN3

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN3.*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

If the moving party meets its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN5.*Matsushita,* 475 U.S. at 585-86;*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also*Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff]

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

FN6.*Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

**B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim**

**\*7** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[FN7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN7. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN8] or (2) a challenge to the legal cognizability of the claim.[FN9]

FN8.*See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN9.*See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.

... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN10] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN12]

FN10.*Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also* *Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN11.*Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN12.*Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,*113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,* Hudson v. Artuz, 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

requirement.[FN13] However, it is well established that even this liberal notice pleading standard "has its limits." [FN14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN15]

FN13.*See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN14. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN15.*See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635,*Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see*Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929[FN16] (2007).[FN17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN16. All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

FN17. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

**\*8** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

[citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN18]

> [FN18.*See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." ) [emphasis in original].

The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN19]

> [FN19.*See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se

action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN20] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

> [FN20. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material

facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor.[FN21] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN21.*Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN22.*Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*9** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[FN24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.[FN25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN27]

> FN23. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

*Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,*317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN24.*Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN25.*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also*Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN26.*Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN27.*Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN28] it does not completely relieve a *pro se* plaintiff of the duty to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

satisfy the pleading standards set forth in Rules 8, 10 and 12.FN29 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even pro se civil rights plaintiffs must follow.FN30 Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended."

FN28.*Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN29.*See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN30.*See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and

substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

## III. ANALYSIS

### A. Timeliness of Defendants' Motion

Plaintiff argues that Defendants' motion is untimely because it was filed on March 31, 2008, one day after the dispositive motion deadline expired. (Dkt. No. 19 at 13-14.) Plaintiff is incorrect. The dispositive motion deadline in this case was March 30, 2008, which was a Sunday. (Dkt. No. 14.) When the last day of a period for filing papers is a Sunday, the party's time to act is extended to the next day that is not a Saturday, Sunday, or legal holiday. Fed.R.Civ.P. 6(a)(3). Defendants filed their motion on Monday, March 31, 2008, which was before the end of the next day that was not a Saturday, Sunday, or legal holiday. Therefore, their motion was timely pursuant to Federal Rule of Civil Procedure 6(a).

### B. Procedural Due Process

The complaint asserts that Defendants violated Plaintiff's procedural due process rights by limiting his privileges and placing him in the SHU when he refused a work assignment in the mess hall. (Dkt. No. 1 at 13.) Defendants argue that (1) Plaintiff was not entitled to procedural due process because he was confined for only 53 days; and (2) even if Plaintiff was entitled to procedural due process, he received all of the process that was due. (Dkt. No. 17-14 at 1-3.) Defendants are correct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

**\*10** In order to state a claim for violation of his procedural due process rights, Plaintiff must show that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's confinement in the SHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether confinement in the SHU constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the ... segregation differ from other routine prison conditions and the duration of the ... segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN31]." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration–between 101 and 305 days–development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64-65. Segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

[FN31.] "Normal" SHU conditions include being

kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, Plaintiff served 53 days in the SHU. Accordingly, a protected liberty interest is implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. The conditions of the Limited Privilege Program, as described in Exhibit A to Plaintiff's verified complaint, are not more severe than normal SHU conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff was not deprived of a protected liberty interest and I recommend that Defendants' motion for summary judgment of Plaintiff's procedural due process claim be granted.

**C. Substantive Due Process**

**\*11** The complaint asserts that Defendants violated Plaintiff's right to substantive due process. (Dkt. No. 1 at 13.) Defendants argue that this claim must be dismissed because (1) Plaintiff has not asserted a cognizable liberty interest; and (2) there is no genuine issue of material fact that Defendants' actions were arbitrary, conscience-shocking, or oppressive. (Dkt. No. 17-14 at 5-6.) Defendants are correct.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer from prison to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin,* 515 U.S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a prisoner from disciplinary confinement may violate the prisoner's right to substantive due process. *Johnson v. Coughlin,* No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

Here, as discussed above, Plaintiff has not asserted a cognizable liberty interest. Moreover, Plaintiff has not alleged and the evidence does not raise a genuine issue that Defendants' conduct was sufficiently arbitrary, conscience-shocking, or oppressive to implicate substantive due process. Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's substantive due process claim.

**D. Conditions of Confinement**

The complaint alleges that Defendants violated Plaintiff's Eighth Amendment right to adequate prison conditions by limiting his privileges and placing him in the SHU when he refused a work assignment in the mess hall. (Dkt. No. 1 at 11-12, ¶¶ 18-27.) Defendants argue that placement on Limited Privileges Status is not sufficiently serious to provide a basis for an Eighth Amendment conditions of confinement claim. (Dkt. No. 17-14 at 3-4.) Defendants are correct.

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). The Second Circuit

has held that the restrictions that come with being placed on Limited Privilege Status are not in themselves "sufficiently serious to provide a basis for an Eighth Amendment claim." *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995). Therefore, I recommend that the Court grant Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment conditions of confinement claim.

**E. Retaliation**

**\*12** The complaint alleges that Defendants placed Plaintiff on Limited Privileges Status for "retaliatory reasons." (Dkt. No. 1 at 11, ¶ 21.) Defendants argue that the complaint fails to state a claim for retaliation. (Dkt. No. 17-14 at 6-7.) Defendants are correct.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the plaintiff engaged in constitutionally protected speech or conduct; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Here, Plaintiff has not alleged that he engaged in any constitutionally protected speech or conduct, such as filing a grievance. His complaint does not list retaliation as one of his causes of action and his opposition papers do not discuss retaliation. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of any retaliation claim.

**F. Personal Involvement and Qualified Immunity**

Defendants argue that the undisputed facts show that Defendants Goord and Carpenter were not personally involved in any alleged constitutional violations and that all Defendants are entitled to qualified immunity. (Dkt. No. 17-14 at 8-10.) In light of my finding that Defendants are entitled to summary judgment dismissing each of Plaintiff's claims on the merits, I decline to address these arguments.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3181111 (N.D.N.Y.)
(Cite as: 2009 WL 3181111 (N.D.N.Y.))

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 17) be **GRANTED;** and it is

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 19) be **DENIED.**

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).**See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN32]

    FN32.*See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim

before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.**Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Black v. Lansberg
Slip Copy, 2009 WL 3181111 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Guy McEACHIN, Plaintiff,
v.
Glenn S. GOORD, Commissioner of DOCS; Donald
Selsky, Director of SHU; Roy A. Girdich,
Superintendent of Upstate Correctional Facility; White,
Facility Nurse; Sgt. Snyder; and B. Poupore,[FN1]
Correction Officer, Defendants.

FN1. It appears, based on Defendants'
submissions, that the correct spelling of
Defendant Pouperi's name is "Poupore." We will
hereinafter use Defendants' spelling.

No. 9:06-CV-1192.

April 17, 2008.

Guy McEachin, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Risa L. Viglucci, Esq., Roger W. Kinsey, Esq.,
Asst. Attorney General, of Counsel, Albany, NY, for
Defendants.

*ORDER*

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff, Guy McEachin, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated February 8, 2008, the Honorable
Randolph F. Treece, United States Magistrate Judge,
recommended that defendants' motion to dismiss be
granted and that plaintiff's complaint be dismissed as to
defendants Goord, Selsky, Girdich, and White. Objections
to the Report Recommendation have been filed by the
plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED;

2. Plaintiff's complaint is DISMISSED in all respects as to
defendants Glenn S. Goord, Donald Selsky, Roy A.
Girdich, and White;

3. The Clerk is directed to enter judgment as to defendants
Glenn S. Goord, Donald Selsky, Roy A. Girdich, and
White.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Guy McEachin brings this civil rights
claim asserting that his constitutional rights under the
First, Fifth, Eighth, and Fourteenth Amendments were
violated by the named Defendants and seeking
compensatory and punitive damages, as well as injunctive
relief, under 42 U.S.C. § 1983. Dkt. No. 1, Compl.
Defendants Goord, Selsky, White, and Girdich now seek

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

to dismiss the Complaint for failure to state a claim upon which relief can be granted under Rule 12 of the Federal Rules of Civil Procedure. Dkt. Nos. 23 & 29, Defs.' Mot. to Dismiss.[FN2] Plaintiff opposes the Motion. Dkt. No. 35, Pl.'s Opp. to Defs.' Mot. to Dismiss. For the reasons that follow, we recommend that Defendants' Motion to Dismiss be **granted**.

> FN2. It appears that there were two separate Motions to Dismiss filed, one on behalf of Defendants Goord, Selsky, and White (Dkt. No. 23), and one on behalf of Defendant Girdich (Dkt. No. 29). Plaintiff has filed a single response to both Motions. Dkt. No. 35, Pl.'s Opp. to Defs.' Mot. to Dismiss. Because the legal arguments in these briefs are nearly identical, we will hereinafter refer to them singularly as the Defendants' Motion to Dismiss. Defendants Snyder and Poupore have separately answered the Complaint and have not moved for dismissal. *See* Dkt. No. 22, Ans.

## I. BACKGROUND

The Plaintiff's claims are as follows:[FN3] 1.) Defendants Goord, Selsky, and Girdich promulgated a policy that allowed superintendents to designate "DOCS subordinates" (counselors, captains, lieutenants) as hearing officers to preside over disciplinary hearings in violation of Plaintiff's and others' due process rights, Compl. at ¶¶ 16-24; 2.) Plaintiff's due process rights were violated during his many disciplinary hearings, resulting in atypical and significant hardship, *id.* at ¶¶ 25-34; 3.) Plaintiff was unlawfully transferred from keeplock to SHU while serving a disciplinary sentence, *id.* at ¶¶ 35-41; 4.) On October 9, 2003, Defendant White gave Plaintiff illegal medication at the direction of Lieutenant (Lt.) O'Donnell[FN4] and then wrote a fabricated report on Plaintiff's Ambulatory Health Record (AHR), *id.* at ¶ 65; and 5.) Defendants Snyder and Poupore violated Plaintiff's First and Eighth Amendment rights when they assaulted him in retaliation for filing complaints against the staff at Upstate Correctional Facility, *id.* at ¶¶ 67-73. Because Defendants Snyder and Poupore have not joined the Motion to Dismiss, we will not consider Plaintiff's claims against them.

> FN3. Plaintiff makes several vague and conslusory claims against persons who are not named Defendants in this action. *See generally* Compl. We will not consider the merit of these claims.

> FN4. Lt. O'Donnell is not a named Defendant in this action.

## II. DISCUSSION

### A. Standard of Review

**\*2** A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B. T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). Additionally, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green v. New York State Dep't of Corr. Servs.,* 2003 WL 22169779, at *1 (N.D.N.Y. Aug. 27, 2003) (internal quotation marks and citations omitted) (alterations in original).

Pleadings submitted by *pro se* litigants "should be 'construed liberally,' *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (per curiam)," and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations[,]' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (quoting *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997)). A "dismissal on the pleadings is never warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Phillips v. Girdich,* 408 F.3d at 128.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

**B. Due Process Claims**

1. *Hearing Officers*

Plaintiff asserts that his due process rights were repeatedly violated when Defendants Goord, Selsky, and Girdich promulgated a policy allowing counselors, captains, and lieutenants to preside as hearing officers over Tier III disciplinary proceedings. Compl. at ¶ 17. As Plaintiff recognizes, Title 7 of the New York Codes Rules and Regulations § 253.1 (7 N.Y.C.R.R. § 253.1) gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings, Compl. at ¶ 21, however, Plaintiff argues that said regulation violates New York Civil Service Law § 61,[FN5] as well as the contract between New York State and the Public Employees Federation [FN6] because it constitutes "out-of-title work" for those state employees, *id.* at ¶ 22.

FN5. New York Civil Service Law § 61(2) states

> [n]o person shall be appointed, promoted or employed under any title not appropriate to the duties to be performed and, except upon assignment by proper authority during the continuance of a temporary emergency situation, no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position in accordance with the provisions of this chapter and the rules prescribed thereunder.

FN6. The Public Employees Federation is a union representing 53,000 professional, scientific, and technical state employees. Information *available at* www.pef.org.

To the extent that Plaintiff's claims are based on an alleged breach of a contract to which he is not a party, Plaintiff does not have standing to bring such a claim. "The Constitution limits the jurisdiction of Article III courts to matters that present actual cases or controversies." *Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 69 (2d Cir.2001). In order to have standing to pursue a claim in federal court a plaintiff must allege "an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical [.]" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). Plaintiff does not have any interest in a contract between a third party and New York State and therefore lacks standing to bring this claim based on an alleged breach of that contract.

**\*3** Plaintiff's argument that Defendants violated New York Civil Service Law § 61 is similarly erroneous. A plaintiff making a claim pursuant to 42 U.S.C. § 1983 must allege a violation of federal constitutional rights; § 1983 is not a vehicle to redress alleged violations of state laws. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) ("In order to prevail on a section 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right."). Thus, Plaintiff's allegation that the Defendants violated state law is unavailing.

Assuming Plaintiff meant to challenge 7 N.Y.C.R.R. § 253.1 as violative of the Due Process Clause of the Fourteenth Amendment on its face, that argument must also fail. The Due Process Clause does not require that any specific individual preside over disciplinary hearings within prison walls, only that the hearing officer is impartial and not prejudge the evidence. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Wolff v. McDonnell,* 418 U . S. 539, 570-71 (1974).

2. *Disciplinary Hearings*

Plaintiff asserts that his due process rights were violated during a slew of Disciplinary Hearings because they were presided over by "unqualified hearing officers." Compl. at ¶ 26. Although Plaintiff specifies that he was denied the right to a fair and impartial fact finder, the right to be heard and to present a defense, the right to present documentary evidence, the right to call witnesses on his behalf, and the right to be present when his witnesses testified, he does not plead any facts alleging how or in which proceedings these rights were violated. *Id.* at p. 6.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

In that respect, it appears Plaintiff is arguing that because he was denied "qualified" hearing officers, all of his aforementioned due process rights were tainted merely because of the participation of those officers. *See id.* at ¶ 26 (stating his due process rights "were made a mockery of when the defendants allowed unqualified hearing officers to conduct and convict plaintiff at these hearings"). As stated above, Plaintiff does not have a viable due process claim with respect to the qualifications of hearing officers, and therefore this claim must fail as well.

To the extent Plaintiff is asserting that all of the above due process rights were violated by the presiding Hearing Officer in each of his Disciplinary Hearings, he has failed to plead sufficient facts that would enable the Defendants to respond to that claim and the Court to assess its plausibility on its face. Such a conclusory claim is not one upon which relief can be granted. *See Bell. Atl. Corp. v. Twombly,* 127 S.Ct. at 1958-9 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). Although it is incumbent upon this Court to construe this *pro se* Plaintiff's Complaint in the light most favorable to him, we cannot interject allegations or facts that have not been plead. *Jemzura v. Pub. Serv. Com'n,* 961 F.Supp. 406, 413 (N.D.N.Y.1997) (citing *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987) for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotation marks omitted).

**\*4** We therefore recommend that the Defendants' Motion to Dismiss be **granted** on these claims.

### 3. 7 N.Y.C.R.R. § 301.6

Plaintiff claims that his due process rights were violated and he suffered severe psychological and physical injuries when he was forced to serve his keeplock confinement under SHU restrictions. Compl. at ¶¶ 35-40. In order to state a valid due process claim under § 1983, Plaintiff must establish he had a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests may be derived from the Due

Process Clause itself or from state statutes and regulations. *Id.* at 334. The State of New York has explicitly permitted keeplock sentences to be served in SHU and subject to the same restrictions on amenities such as visitation, commissary, telephone, etc. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2. Thus, there is no state-created liberty interest upon which a valid due process claim might be based. *See Halloway v. Goord,* 2007 WL 2789499, at *5-6 (N.D.N.Y. Sept. 24, 2007) (holding inmate had no constitutional nor state-created liberty interest when forced to serve his keeplock sentence in SHU).

As per liberty interests arising out of the Due Process Clause itself, the Supreme Court has narrowly circumscribed the scope of the Due Process clause "to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

In this case, Plaintiff's transfer from keeplock to SHU after being sentenced to a period of time [FN7] to be served in keeplock at a Disciplinary Hearing was not so "unexpected," *Sandin v. Conner,* 515 U.S. at 484, nor "qualitatively different from the punishment characteristically suffered by a person convicted of crime," *Vitek v. Jones,* 445 U.S. 480,493 (1980) as to implicate a liberty interest arising out of the Due Process Clause itself. *Carlisle v. Goord,* 2007 WL 2769566, at *12-13 (N.D.N.Y. Sept. 27, 2007) (holding that involuntary transfer from keeplock confinement to SHU does not constitute a due process violation; *see also Chavis v. Kienert,* 2005 WL 2452150, at *9-10 (N.D.N.Y. Sept. 30, 2005).

FN7. It is not clear for what infraction Plaintiff was sentenced, nor the length of the sentence in question, although it was apparently over five months in keeplock. *See* Compl. at ¶ 48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

Because no liberty interest has been implicated, it is recommended that this due process claim be **dismissed** for failure to state a claim upon which relief can be granted.

### 4. *Fabricated AHR*

Plaintiff's claim that Defendant White fabricated a report in Plaintiff's AHR that Plaintiff had pulled the smoke detector off of the ceiling does not constitute a constitutional violation. Even assuming that the report was false, prisoners have "no general constitutional right to be free from being falsely accused[.]" *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar. 31, 2005). While inmates may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff has not established nor alleged that he was engaged in constitutionally protected conduct.

**\*5** Therefore, it is recommended that this claim be **dismissed.**

### C. Eighth Amendment Claim

Plaintiff alleges that on October 9, 2003, he was unlawfully given a medicated needle by Defendant White upon orders from Defendant Lt. O'Donnell which were based on false information. Compl. at ¶ 65. We have liberally construed this allegation as an Eighth Amendment claim.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting

*Hathaway v. Coughlin* ("*Hathaway I*" ), 37 F.3d 63, 66 (2d Cir.1994)). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting Hathaway v. *Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

In this case, Plaintiff has alleged only that he was "illegally" injected by Defendant White by order of Defendant Lt. O'Donnell. Compl. at ¶ 65. Plaintiff has failed to identify any serious existing or resulting medical condition under the objective prong of the deliberate indifference test. Absent such a claim, Plaintiff's conclusory allegation that he was wrongly injected does not constitute an Eighth Amendment claim upon which relief can be granted. *See Bell. Atl. Corp. v. Twombly,* 127 S.Ct. at 1958-59 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In addition, according to Plaintiff's own submissions, Defendant White injected Plaintiff at the direction of Lt. O'Donnell and based on false information. Compl. at ¶ 65. Plaintiff does not assert that Defendant White had any intent to harm him, nor that White was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)
(Cite as: 2008 WL 1788440 (N.D.N.Y.))

reckless or even negligent in any way. Thus, Plaintiff's claim fails under both prongs of the deliberate indifference standard.

**\*6** For these reasons, it is recommended that these claims be **dismissed**.

### D. Qualified Immunity

Defendants plead the affirmative defense of qualified immunity. However, because we are recommending dismissal of Plaintiff's claims for failure to state a claim upon which relief can be granted, we need not address this defense.[FN8] *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries regarding qualified immunity.").

> FN8. Similarly, we will not consider Plaintiff's request for injunctive relief.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. Nos. 23 & 29) be **granted;** and it is further

**RECCOMENDED,** that Plaintiff's Complaint (Dkt. No. 1) be **dismissed** as to Defendants Goord, Selsky, Girdich, and White; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS*

*REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.
McEachin v. Goord
Not Reported in F.Supp.2d, 2008 WL 1788440 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

---

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Antwane CARLISLE, Plaintiff,
v.
Glen GOORD, Commissioner; Theresa A.
Knapp-David, Dir. Classification/ Movement; A.
Tousignant, Nurse Administrator; J. Bouyea, Correction
Officer; and L. Leclaire, Deputy Commissioner,
Defendants.
**No. 9:03-CV-296 (FJS/GHL).**

Sept. 21, 2007.

Antwane Carlisle, Auburn, NY, pro se.

Office of the New York, State Attorney General, Patrick
F. Macrae, Aag, of Counsel, Syracuse, NY, for
Defendants.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, Patrick F. Macrae, Esq., Assistant Attorney
General, of Counsel, Syracuse, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

**I. INTRODUCTION**

*1 Currently before the Court are Magistrate Judge Lowe's
July 13, 2006 Report-Recommendation and Plaintiff's
objections thereto.

**II. BACKGROUND**

On September 12, 2002, Plaintiff was sentenced to 120
days of keeplock confinement after a disciplinary hearing
at Attica Correctional Facility. On November 6, 2002,
Plaintiff was transferred to Upstate Correctional Facility,
where Defendants converted his sentence to confinement
in a Special Housing Unit ("SHU").

Plaintiff filed his civil rights complaint on March 11,
2003. In that complaint, Plaintiff asserted three causes of
action. First, he alleged that Defendants Goord, LeClaire
and Knapp-David violated his Fifth and/or Fourteenth
Amendment rights to due process when they (a) knowingly
or recklessly permitted him to be transferred to Upstate
Correctional Facility on November 6, 2002, following the
imposition of his disciplinary sentence at Attica
Correctional Facility on September 12, 2002, and then (b)
knowingly or recklessly enforced an unlawful "SHU
conversion policy" that subjected him to SHU
confinement at Upstate Correctional Facility. Second, he
contended that Defendant Tousignant violated his Eighth
Amendment rights to be free from cruel and unusual
punishment when she was deliberately indifferent to his
serious medical needs. Finally, he claimed that Defendant
Bouyea violated his First, Fourth, Fifth and/or Fourteenth
Amendment rights by unlawfully searching his cell
without reasonable suspicion of the existence of
contraband, by unlawfully confiscating fifty pages of his
legal papers, which deprived him of his right to redress
various violations, and by issuing him a false misbehavior
report.

On July 13, 2006, Magistrate Judge Lowe issued a
Report-Recommendation in which he recommended that
this Court grant Defendants' motion for summary
judgment. Plaintiff timely filed objections to this
recommendation.

**III. DISCUSSION**

**A. Standard of review**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

When a party objects to a magistrate judge's recommendations, a district court must review *de novo* those findings and recommendations. *See* 28 U.S.C. § 636(b)(1); *Bester v. Dixion,* No. 9:03-CV-1041, 2007 WL 951558, *2 (N.D.N.Y. Mar. 27, 2007).* Once the court has completed its *de novo* review, it may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of any genuine issue of material fact. Once the moving party has met this burden, the nonmoving party must establish "specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

**B. Plaintiff's due process claim against Defendants Goord, LeClaire and Knapp-David**

**\*2** The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In the prison setting, to be afforded Due Process protection, a liberty interest "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 484 (1995) (internal citations omitted). Thus to prevail on a due process claim, an inmate must show that he has a liberty interest [FN1] and that the defendants violated either his substantive or procedural due process rights with respect to that interest.

> FN1. As Magistrate Judge Lowe noted in his Report-Recommendation, this Court has held that an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving

a hearing regarding the conversion. *See* Report-Recommendation at 17 (citing *Chavis v. Kienert,* 03-CV-0039, 2005 WL 2452150, at *9-10 (N.D.N.Y. Sept. 30, 2005))* (other citation and footnote omitted). Nonetheless, for purposes of discussion, the Court will assume that Plaintiff has stated a protectable liberty interest.

*1. Substantive due process claim*

Assuming that the plaintiff has identified the constitutional right that the defendants have violated, to state a substantive due process claim, he must still show that the defendants' actions were wrongful even if the procedures they used to implement them were fair. *See Smith v. Burge,* No. 9:03-CV-0955, 2006 WL 2805242, *8 (N.D.N.Y. Sept. 28, 2006)* (citing *Zinernon,* 494 U.S. at 125). In other words, he must show that the actions about which he complains are " 'arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... [and] ... not [merely] incorrect or ill-advised.' " *Id.* (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994)).

Magistrate Judge Lowe found that there were two problems with Plaintiff's substantive due process claim. First, Plaintiff had not presented any evidence to support his argument that SHU confinement at Upstate Correctional Facility was more restrictive than keeplock confinement. *See* Report-Recommendation at 15. Furthermore, Magistrate Judge Lowe concluded that Plaintiff's allegation that the conditions of confinement at Upstate Correctional Facility were more restrictive than those in keeplock confinement was not sufficient to create a dispute of fact because he had not presented any evidence that SHU's conditions of confinement were "so much more restrictive as to impose 'an atypical and significant hardship on the inmate.' " *See id.* Finally, Magistrate Judge Lowe concluded that Plaintiff had not shown that Defendants' actions were arbitrary in the constitutional sense; in fact, Plaintiff's sentence appeared to be in accordance with the existing regulatory scheme. *See id.*

Plaintiff objects to Magistrate Judge Lowe's conclusions, arguing, among other things, that he has a right to have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

judgment from his disciplinary hearing, i.e., the sentence of keeplock confinement, instead of SHU confinement, enforced and that the jury should determine whether the conversion policy upon which Defendants rely to justify their actions, actually existed. *See* Objections at 1-4.

Plaintiff's arguments are without merit. Plaintiff has not produced any evidence that Defendants' conversion of his sentence was arbitrary, in the constitutional sense or otherwise. To the contrary, the record establishes that Defendants' conversion of his sentence was in accordance with N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6(a)(2), which allows prison officials to house an inmate "in a special housing unit ... for confinement pursuant to a disposition of a disciplinary (Tier II) or superintendent's (Tier III) hearing ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6(a)(2). Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and dismisses Plaintiff's substantive due process claim.

**2. Plaintiff's procedural due process claim**

**\*3** When reviewing a procedural due process claim, the court " 'first asks whether there exists a liberty or property interest which has been interfered with by the State[;][s]econd, [the court will determine] whether the procedures attendant upon that deprivation were constitutionally sufficient....' " Smith, 2006 WL 2805242, at \*9 (quoting Kentucky Dept. of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).

As the court noted in Holmes v. Grant, No. 03 Civ. 3426, 2006 WL 851753 (S.D.N.Y. Mar. 31, 2006), "it is 'firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement,' Ciaprazi, 2005 WL 3531464, at \*11 ...." Id. at \* 19. However, a plaintiff "may only sustain a cause of action to vindicate the infringement of that liberty interest where he has been deprived of due process, Ortiz, 380 F.3d at 655." Id.

In Holmes, the defendants converted the inmate's keeplock sentence, which he was serving in one facility, to SHU confinement when they transferred him to Upstate Correctional Facility. The plaintiff claimed that he was

"entitled to *additional* due process before the keeplock sentence he received at the Sing Sing hearing [could] be properly converted into an SHU sentence, since SHU conditions entail harsher deprivations than keeplock." Id. at \* 18 (citation omitted). The court disagreed, noting that the plaintiff was "afforded a full evidentiary hearing on the misconduct underlying the time spent in Sing Sing keeplock and Upstate SHU, [and he] cannot point to any regulation entitling him to an additional hearing prior to his transfer to Upstate ...." Id. at \* 19. Therefore, the court concluded that the plaintiff could not "show that he ha[d] been deprived of a protected liberty interest without due process." Id. (citation omitted).

This case is indistinguishable from Holmes. Plaintiff's initial keeplock confinement resulted from a disciplinary hearing, at which he was provided with all the due process to which he was entitled. There is absolutely no legal support for Plaintiff's assertion that he was entitled to a second disciplinary hearing prior to the conversion of his sentence after his transfer to Upstate Correctional Facility. Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and dismisses Plaintiff's procedural due process claim.

**C. Plaintiff's Eighth Amendment claim against Defendant Tousignant**

To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Thus, a plaintiff must first show that he has a sufficiently serious medical need and, second, that the defendant acted with a "sufficiently culpable state of mind," i.e., that he was aware of an "excessive risk" to the plaintiff's health or safety and disregarded the risk. Irby v. Frisnia, 119 F.Supp.2d 130, 132 (N.D.N.Y.2000) (citations omitted).

**\*4** A medical condition is "sufficiently serious" when it may cause "death, degeneration, or extreme pain." Moody v. Pickles, No. 9:03-CV-850, 2006 WL 2645124, \*6 (N.D.N.Y. Sept. 13, 2006) (citations omitted). Although an asthma condition alone may not be serious enough to constitute a sufficient medical condition, an asthma attack,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

depending on its severity, may be sufficient. *See Scott v. DelSignore,* No. 02-CV-029F, 2005 WL 425473, *9 (W.D.N.Y. Feb. 18, 2005) (citing *Patterson v. Lilley,* 2003 WL 21507345, *3-4 (S.D.N.Y. June 30, 2003)); *Bost v. Bockelmann,* No. 9:04-CV-0246, 2007 WL 527320, *9 (N.D.N.Y. Feb. 20, 2007) (citations omitted).

In his Report-Recommendation, Magistrate Judge Lowe found that no reasonable fact-finder could conclude that Plaintiff's asthma condition was serous enough to form the basis of an Eighth Amendment claim. *See* Report-Recommendation at 21-22. First, he noted that Plaintiff's medical records showed that he was not receiving treatment at the time that Defendants transferred him to Upstate Correctional Facility. *See id.* at 21. Additionally, Magistrate Judge Lowe concluded that, even if Plaintiff's asthma condition constituted a serious medical need, Plaintiff had not offered any evidence to support his claim that Defendant Tousignant was deliberately indifferent to that need. *See id.* at 23. Rather, Magistrate Judge Lowe found that, at best, the evidence showed that Plaintiff disagreed with Upstate Correctional Facility's medical staff about medical treatment that he required and that such a disagreement was insufficient to establish an Eighth Amendment claim. *See id.*

Plaintiff objects to Magistrate Judge Lowe's findings, arguing that he has established that his asthmatic condition constitutes a serious medical need because he has been repeatedly hospitalized for this condition and Defendant Tousignant noted that the condition was chronic. *See* Objections at 6. Plaintiff also asserts that his albuteral inhaler was not "outdated" but simply in need of a refill and that his medical records from Attica Correctional Facility would support his argument. *See id.* Plaintiff also disagrees with Magistrate Judge Lowe's finding that the term "no meds" written in his medical records when he was transferred to Upstate Correctional Facility indicates that he was not at that time taking any medication. Rather, Plaintiff argues that this simply meant that Defendants had not given him any medication to take on his trip to Upstate Correctional Facility and that, although the prescription may have expired, Plaintiff only needed to request a renewal. *See id.* at 7.

Plaintiff also claims that Defendant Tousignant was deliberately indifferent to his serous medical need and

demonstrated gross negligence when she did not promptly respond to his complaint regarding the nursing staff at sick call. *See id.* at 9. Specifically, Plaintiff asserts that Defendant Tousignant should have taken corrective measures against her subordinates when they failed to provide him with, what Plaintiff argues, is medically necessary treatment, i.e., issuing him an albuteral inhaler, and that her failure to do so was reckless. *See id.* at 11.

**\*5** Plaintiff has not offered any evidence, other than "unidentified medical records," to establish the severity of his asthma condition or whether he suffered from or the frequency with which he suffered from asthma attacks. Moreover, the record shows that, at the time of his transfer, Plaintiff was not receiving any treatment or medication for his asthma.

Alternatively, even if the Court were to assume that Plaintiff had demonstrated that his asthmatic condition was sufficiently severe, he would still have to show that Defendant Tousignant was deliberately indifferent to that condition. Plaintiff offers no evidence that Defendant Tousignant was aware that his asthma presented an "excessive risk" to his overall health or that she disregarded any such risk. Although Plaintiff obviously disagrees with the medical staff's assessment of the treatment he needed and/or received when they saw him at sick call, such a disagreement is insufficient to establish deliberate indifference. *See Shomo v. N.Y.S. Dep't of Corr. Servs.,* No. 9:04-CV-0910, 2007 WL 2580509, * 12 (N.D.N.Y. Sept. 4, 2007) (holding that "a prisoner's disagreement with a DOCS employee regarding the treatment that he should properly receive is insufficient to state a claim under the Eighth Amendment" (footnote omitted)). Moreover, the staff did, in fact, address Plaintiff's complaints at sick call and treated his symptoms as they deemed necessary. Finally, the Court notes that, in addition to the treatment Plaintiff received at sick call, he also received a response to his inhaler request from Defendant Tousignant, in which she indicated that she had reviewed the medical records and had determined that an inhaler was not medically necessary at that time.

Accordingly, because Plaintiff has failed to come forward with any evidence to support either prong of his Eighth Amendment deliberate indifference claim, the Court adopts Magistrate Judge Lowe's recommendation and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

grants Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment claim.

**D. Plaintiff's claim against Defendant Bouyea for searching his cell, seizing his legal papers and issuing him a misbehavior report**

With respect to Plaintiff's claim against Defendant Bouyea for searching his cell, Magistrate Judge Lowe noted that the Fourth Amendment's protection against unreasonable searches does not apply to a prison cell. *See* Report-Recommendation at 28. Therefore, although Defendants did not address this claim, Magistrate Judge Lowe dismissed it *sua sponte. See id.*

Magistrate Judge Lowe also found that Plaintiff's complaint did not meet the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure because his "First Amendment denial-of-access-to-the-courts claim does not plead sufficient facts to give Defendants fair notice of what Plaintiff's claim is and the grounds upon which it rests." *See id.* at 28-29. Alternatively, Magistrate Judge Lowe found that Plaintiff had failed to provide any evidence about how Defendant Bouyea's conduct "alleged[ly] deprive[d him] of legal materials [and] actually caused him any harm." *See id.* at 30.

**\*6** Finally, with regard to Plaintiff's allegation that Defendant Bouyea had issued a false misbehavior report against him, Magistrate Judge Lowe noted that, "in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report." *See id.* at 31 (footnote omitted). Moreover, Magistrate Judge Lowe found that, based on the record, the misbehavior report was not false and there were no aggravating factors that might afford Plaintiff a right not to be issued that report. *See id.*

Although Plaintiff states that he objects to Magistrate Judge Lowe's Report-Recommendation in its entirety, he does not offer any specific objection to Magistrate Judge Lowe's recommendation that the Court dismiss his claim against Defendant Bouyea. Since Plaintiff does not offer any specific objections to these recommendations, the Court reviews them for clear error. *See Gill v. Smith,* 283

F.Supp.2d 763, 766 (N.D.N.Y.2003) (citing *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990)) (other citation omitted). After reviewing Magistrate Judge Lowe's recommendations and the applicable law, the Court finds no error and, therefore, adopts his recommendation and grants Defendants' motion for summary judgment dismissing Plaintiff's third cause of action against Defendant Bouyea.

**E. Plaintiff's request to stay consideration of Defendants' motion for summary judgment pending completion of further discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure**

Rule 56(f) of the Federal Rules of Civil Procedure provides that,

[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

As a preliminary matter, Magistrate Judge Lowe noted that, despite Plaintiff's claim that he had filed a Rule 56(f) motion on or about July 1, 2005, there was no indication on the docket that he had done so. *See* Report-Recommendation at 37. In addition, Magistrate Judge Lowe concluded that there were three problems with Plaintiff's attempt to show cause for a stay of Defendants' motion for summary judgment and a reopening of discovery under Rule 56(f). *See id.* at 38. First, Plaintiff did not offer any evidence that he either requested information from Defendants relevant to his three causes of action, or, if he did request such information, that Defendants wrongfully denied it to him. *See id.* at 38-39.

Second, Magistrate Judge Lowe questioned whether some

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

of the information, notably the medical records from Attica Correctional Facility, that Plaintiff requested was relevant and that, if it were relevant, whether it would create an issue of fact as to whether Plaintiff was suffering from a severe medical condition while at Upstate Correctional Facility. *See id.* at 39-40. Finally, Magistrate Judge Lowe noted that it was unclear whether Plaintiff had previously raised the current discovery issues in his previous motions to compel discovery, which this Court resolved in its March 9, 2005 Order. *See id.* For all of these reasons, Magistrate Judge Lowe recommended that this Court deny Plaintiff's request to stay consideration of Defendants' summary judgment motion.

**\*7** Plaintiff objects to Magistrate Judge Lowe's finding that he did not file a response to Defendants' summary judgment motion, arguing that he mailed his response, in the form of a Rule 56(f) motion, to both the Court and Defendants in July 2005. *See* Objections at 12-13.[FN2]

> FN2. Plaintiff mischaracterizes Magistrate Judge Lowe's conclusion with regard to this issue. Magistrate Judge Lowe did not state that Plaintiff failed to file a response to Defendants' summary judgment motion. In fact, he noted that Plaintiff opposed Defendants' motion. *See* Report-Recommendation at 2. What Magistrate Judge Lowe did say was that there was no indication on the Court's Docket that Plaintiff had filed a Rule 56(f) motion on or about July 1, 2005. *See id.* at 37. A review of the Court's Docket demonstrates that Magistrate Judge Lowe's statement is accurate-there is no entry on the Docket to indicate that Plaintiff filed such a motion.

Plaintiff also objects to Magistrate Judge Lowe's finding that the Court had previously resolved his discovery requests. Rather, he contends that his current request for additional discovery relates to new matters, specifically his medical treatment prior to his arrival at Upstate Correctional Facility and the disciplinary records that relate to his due process claim. *See id.* at 11-12. Finally, Plaintiff contends that Defendant Tousignant had access to the requested medical records and could have easily provided these records to him. *See id.* at 12.

Although, as noted, there is nothing on the Court's Docket to indicate that Plaintiff filed a Rule 56(f) motion in July 2005, he did attach a copy of such a motion to his papers in opposition to Defendants' summary judgment motion. *See* Dkt. No. 72. Therefore, the Court has reviewed Plaintiff's "Rule 56(f) motion." After carefully reviewing this request, the Court finds that there is no evidence that Plaintiff previously requested the information that he seeks from Defendants or that the information, if obtained, would be relevant to his claims or would be capable of creating an issue of fact sufficient to withstand summary judgment. Finally, despite Plaintiff's assertion that the material he seeks in discovery concerns new matters, he has failed to show that the requested materials actually contain new information that the Court has not previously addressed. Finally, the Court notes that the discovery deadline expired in December 2004, *see* Dkt. No. 71, and Plaintiff has had adequate time to collect the materials that he requests. Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and denies Plaintiff's request to stay consideration of Defendants' motion for summary judgment pursuant to Rule 56(f).

## IV. CONCLUSION

Accordingly, after carefully reviewing Magistrate Judge Lowe's Report-Recommendation and Plaintiff's objections thereto, the Court hereby

**ORDERS** that Magistrate Judge Lowe's July 13, 2006 Report-Recommendation is **ACCEPTED IN ITS ENTIRETY;** and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion to stay consideration of Defendants' motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court enter judgment in favor of Defendants and close this case.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

**IT IS SO ORDERED.**

**_REPORT-RECOMMENDATION_**

GEORGE H. LOWE, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). This is a _pro se_ civil rights action brought under 42 U.S.C. § 1983 by Inmate Antwane Carlisle ("Plaintiff") against five employees of the New York State Department of Correctional Services ("DOCS")-DOCS Commissioner Glenn Goord, DOCS Deputy Commissioner L. LeClaire, DOCS Director of Classification/Movement Theresa A. Knapp-David, Upstate Correctional Facility Nurse Administrator A. Tousignant, and Upstate Correctional Facility Correction Officer J. Bouyea ("Defendants"). Generally, Plaintiff alleges that Defendants violated his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments by being deliberately indifferent to his serious medical needs and by depriving him of various rights (including the right to due process), between September of 2002 and May of 2003, while he was incarcerated at Attica Correctional Facility ("Attica C.F.") and Upstate Correctional Facility ("Upstate C.F."). (Dkt. No. 1.) Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 67), which Plaintiff has opposed (Dkt. No. 72). For the reasons discussed below, I recommend that Defendants' motion for summary judgment be granted.

**I. BACKGROUND**

**\*8** Plaintiff's Verified Complaint asserts **three** causes of action:

**(1)** That Defendants **Goord, LeClaire** and **Knapp-David** violated Plaintiff's **Fifth** and/or **Fourteenth Amendment** rights to **due process** when they (a) knowingly or recklessly permitted him to be transferred to Upstate C.F. on November 6, 2002, following the imposition of his disciplinary hearing sentence at Attica C.F. on September

12, 2002 of 120 days in _keeplock confinement_ (not confinement in a Special Housing Unit or "SHU") and then (b) knowingly or recklessly enforced an unlawful "SHU conversion policy," which subjected Plaintiff to _SHU confinement_ at Upstate C.F., under conditions that were more restrictive than the conditions of keeplock confinement to which he was sentenced at his disciplinary hearing, thus impermissibly enhancing his sentence;

**(2)** That Defendant **Tousignant** violated Plaintiff's **Eighth Amendment** right to be free of cruel and unusual punishment when she was **deliberately indifferent to Plaintiff's serious medical need** (consisting of an asthma condition) through her failure to respond to his complaints about her medical staff's refusal to return his confiscated asthma pump and/or manage his asthma condition, during the unlawful SHU confinement that he was forced to serve at Upstate C.F.; and

**(3)** That Defendant **Bouyea** violated Plaintiff's **First, Fourth, Fifth** and/or **Fourteenth Amendment** rights by **unlawfully searching his cell** without reasonable suspicion of the existence of contraband and **unlawfully confiscating fifty pages of his legal papers** (which deprived him of his **right to redress various violations),** and then issuing him a **false misbehavior report** (which resulted in a disciplinary conviction and sentence of an additional ninety days confinement in the SHU at Upstate C.F.). (Dkt. No. 1, ¶¶ 6, 7.)

Generally, Defendants' motion for summary judgment (and Plaintiff's opposition thereto) raise the following **four** issues:

**(1)** Whether Plaintiff's **first cause of action** (alleging that Defendants Goord, LeClaire and Knapp-David denied Plaintiff due process during the conversion of his disciplinary sentence from one of keeplock confinement to one of SHU confinement) should be dismissed because Plaintiff was not deprived of due process and/or Defendants Goord, LeClaire and Knapp-David are protected by qualified immunity;

**(2)** Whether Plaintiff's **second cause of action** (alleging that Defendant Tousignant was deliberately indifferent to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

Plaintiff's serious medical needs) should be dismissed because Plaintiff has not shown that his medical need was sufficiently serious, nor has he shown that Defendant Tousignant acted with deliberate indifference, nor has he shown that Defendant Tousigant (a supervisor) was personally involved in the alleged constitutional deprivation;

**(3)** Whether Plaintiff's **third cause of action** (alleging that Defendant Bouyea violated various of Plaintiff's constitutional rights by unlawfully searching his cell, seizing his legal papers, and issuing him a misbehavior report) should be dismissed because Plaintiff has not shown that he successfully challenged the charges contained in the misbehavior report at issue, Plaintiff has no constitutional right to not receive a false misbehavior report, Plaintiff has not shown that he suffered any deprivation of liberty as the result of the misbehavior report filed by Defendant Bouyea, and Plaintiff's claim that he was deprived of his right to redress various violations lacks sufficient factual specificity; and

**\*9(4)** Whether Plaintiff has shown cause, under **Fed.R.Civ.P. 56(f),** for a stay of consideration of Defendants' motion for summary judgment pending completion of further discovery to enable Plaintiff to oppose Defendants' motion. (Dkt. No. 67, Part 5 [Defs.' Mem. of Law]; Dkt. No. 72, Part 2 [Plf.'s Mem. of Law].)

**II. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> **FN1.** A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> **FN2.** *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[FN3] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [FN4] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> **FN3.** *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

> **FN4.** *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

> **FN5.** *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court generally views a *pro se* plaintiff's pleadings and papers, and a civil rights plaintiff's pleadings and papers.[FN6] For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, generally the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.[FN7]

> **FN6.** *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

(S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

FN7.*See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." FN8 Moreover, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded such special solicitude." FN9 I note that, in such cases, the overly litigious inmate is not being denied this special solicitude or status as a form of punishment for his litigiousness but as a form of recognition of his obvious litigation experience (and the lack of need for special solicitude).FN10

FN8.*Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S .D.N.Y. Dec. 5, 1994).

FN9.*Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 & n. 2 (N.D.N.Y. June 22, 2006) (McAvoy, J; Lowe, M.J.) (plaintiff had filed at least 20 actions in Northern District of New York and five other actions in Southern District of New York); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *19 & n. 10

(N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 actions in the Northern District of New York alone); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 actions in Northern District alone of New York); *see also Johnson v. Eggersdorf,* 8 Fed. Appx. 140, 143 (2d Cir. May 17, 2001) (unpublished opinion) (plaintiff at one point had 12 simultaneously pending lawsuits in Northern District alone), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. May 28, 1999) (Kahn, J.), *adopting,* 97-CV-0938, Report-Recommendation, at 1, n. 1 (N.D.N.Y. Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431 (2d Cir.1999) (plaintiff at one point had 12 simultaneously pending lawsuits in Northern District alone), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. June 11, 1999) (McAvoy, J.), *adopting,* 97-CV-1727, Report-Recommendation (N.D.N.Y. April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (plaintiff at one time had at least 30 simultaneously pending lawsuits); *Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (plaintiff at one point had 30 simultaneous pending suits); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (plaintiff had 10 suits pending in district); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2, 8-10 (S.D.N.Y. March 29, 1999) (court found 79 reported decisions of cases that plaintiff had filed during previous 43 years); *Brown v. McClellan,* 93-CV-0901, 1996 U.S. Dist. LEXIS 8164, at *3-4, & n. 3, 1996 WL 328209 (W.D.N.Y.1996) (plaintiff had filed seven previous lawsuits against prison officials); *Brown v. Selsky,* 93-CV-0268, 1995 U.S. Dist. LEXIS 213, at *2, n. 1, 1995 WL 13263 (W.D.N.Y. Jan. 10, 1995) (plaintiff had seven cases pending in district).

FN10.*See, supra,* note 9 (citing cases discussing rationale for denying special status to overly litigious *pro se* litigants).

Here, after carefully considering the matter,FN11 I conclude that Plaintiff's litigation experience warrants denying him the special solicitude or status normally afforded *pro se*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

civil rights litigants. In addition to the current action, Plaintiff has previously filed at least 13 actions or appeals. [FN12] Furthermore, these actions or appeals have not been altogether unsuccessful. [FN13] Finally, with regard to the current action, I note that the motion papers that Plaintiff has submitted over the past several years have generally been fairly good-being typed, being accompanied by affidavits, containing legal and record citations, etc. [FN14]

> **FN11.** I acknowledge that, more than two years ago, I decided to afford Plaintiff the sort of special solicitude generally due to *pro se* litigants; however, I made that decision based on only a *brief* review of the case and out of an abundance of caution. (Dkt. No. 33 at 6 [Order filed 4/15/04].)

> **FN12.** Specifically, he has filed the following six actions: (1) No. 02-CV-6662 in Western District; (2) No. 01-CV-11392 in Southern District; (3) 99-CV-6643 in Southern District; (4) No. 94-CV-2945 in Southern District; (5) No. 90-CV-0406 in Southern District; and (6) No. 90-CV-0093 in Southern District. In addition, he has filed the following seven appeals, among others: (1) No. 03-6253 in United States Supreme Court; (2) No. 96-2356 in Second Circuit; (3) No. 1054 in New York State Court of Appeals; (4) No. 822 in New York State Court of Appeals; (5) No. 03-01904 in Fourth Department; (6) No. 00-02560 in Fourth Department; and (7) No. 98-09428 in Second Department.

> **FN13.** *See, e.g., Carlisle v. City of Yonkers,* 96-2356, 1996 U.S. Dist. LEXIS 30973 (2d Cir. Nov. 29, 1996) (vacating and remanding in part district court's grant of summary judgment to defendants in plaintiff's civil rights action).

> **FN14.** (*See, e.g.,* Dkt. No. 25 [Plf.'s Motion for Default Judgment], Dkt. Nos. 47-48, 51, 55, 59 [Plf.'s Motion to Compel, Affidavits and Replies], Dkt. No. 61 [Plf.'s *Ex Parte* Application for Expert Services], Dkt. No. 62 [Plf.'s Notice of Appeal re: Order on Motion to

Compel], Dkt. No. 72, Part 2 [Plf.'s Response Mem. of Law].)

## III. STATEMENT OF MATERIAL FACTS

**\*10** Generally, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN15] and are not specifically controverted by the non-movant. [FN16] Thus, where the non-movant fails to respond to the movant's Rule 7.1 Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [FN17]

> **FN15.** *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a) (3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

> **FN16.** *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

> **FN17.** *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

Here, Plaintiff has not responded to Defendants' Rule 7.1 Statement. (Dkt. No. 67, Part 3.) The closest he comes to responding to Defendants' Rule 7.1 Statement is through his submission of a document entitled "Affidavit in Opposition." (Dkt. No. 72, Part 1 .) The trouble is that this document does not "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs," as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court.[FN18] (*Compare* Dkt. No. 67, Part 3 *with* Dkt. No. 72, Part 1.) Nor does the document "set forth a specific citation to the record where the factual issue arises," as also required by Local Rule 7.1(a)(3). (*See, e.g.,* Dkt. No. 72, Part 1, ¶¶ 12, 17, 19, 20, 23-25 [containing no record citations]. In addition, the document contains impermissible legal argument in violation of Local Rule 7.1(a)(3), which provides that the Rule 7.1 Response shall contain facts only.[FN19] (*See, e.g.,* Dkt. No. 72, Part 1, ¶¶ 23-25.)

FN18. Specifically, the document does not "affirm" or "deny" any of Defendants' factual assertions; nor do the document's paragraphs match Defendants' paragraphs.

FN19.*See also* N.D.N.Y. L.R. 7.1(a)(2) ("An affidavit must not contain legal arguments ....").

I find that these deficiencies in Plaintiff's response papers are inexcusable considering (1) his significant litigation experience, which includes experience responding to motions for summary judgment,[FN20] (2) the fact that previously I specifically informed Plaintiff that he needed to file a Rule 7.1 Response, and that if he failed to do so I would "be heavily influenced by Defendants' versions of the facts" and "all material facts set forth in [Defendants' Rule 7.1] Statement [would] be deemed admitted"; [FN21] and (3) the fact that Defendants similarly notified Plaintiff of the consequences of his failure to properly contradict the facts asserted by Defendants' in their motion.[FN22]

FN20.*See, e.g., Carlisle v. City of Yonkers,* 96-2356, 1996 U.S. Dist. LEXIS 30973 (2d Cir. Nov. 29, 1996) (vacating and remanding in part district court's grant of summary judgment to defendants in plaintiff's civil rights action).

FN21. (Dkt. No. 69 at 2 & n. 2-3 [Order filed 3/9/06].)

FN22. (Dkt. No. 67, Part 4 [Defs.' Rule 56.2 Notice filed 6/20/05].)

Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute-although I will take notice of such a factual dispute if I discover such proof during my necessary review of the record (e.g., my review of the record to confirm that Defendants' factual assertions in their Rule 7.1 Statement are supported by the record). To the extent that I discover any proof of factual disputes during my necessary review of the record, I will, of course, treat Plaintiff's Verified Complaint (Dkt. No. 1 at 6) as an "affidavit." [FN23]

FN23.*See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,*536

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact ....").

However, I note that, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN24] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [FN25] In addition, such an affidavit (or verified complaint) must not be conclusory. [FN26] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general. [FN27] Moreover, "[a]n affidavit must not present legal arguments." [FN28]

FN24.Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.*, 516 U.S. 806 (1995).

FN25.*See Patterson*, 375 F.3d at 219 ("[Rule 56(e)]'s requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief .... Because there is no way to ascertain which portions of [Defendant's] affidavit were

based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*,995 F.2d 1147 (2d Cir.1993).

FN26.*See*Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN27.*See, e.g., Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied*,474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

trial.").

FN28. N.D.N.Y. L.R. 7.1(a)(2).

**\*11** Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN29

FN29.*See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at \*3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v.*

*Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,*136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**IV. ANALYSIS**

**A. Whether Plaintiff's First Cause of Action (Alleging that Defendants Goord, LeClaire and Knapp-David Denied Plaintiff Due Process During the Conversion of His Disciplinary Sentence from Keeplock Confinement to SHU Confinement) Should Be Dismissed**

Generally, I agree with the arguments made by Defendants in their memorandum of law (Dkt. No. 67, Part 5 at 5-13 [Defs.' Mem. of Law] ), and I reject the arguments made by Plaintiff in his memorandum of law (Dkt. No. 72, Part 2 at 7-17 [Plf.'s Mem. of Law] ).

As a threshold matter, I note that a prisoner has no due process right not to be transferred to another prison.FN30 Granted, a prisoner has a First Amendment right not to be transferred in retaliation for exercising a constitutional right; however, here, Plaintiff has neither adduced, nor even alleged, any facts that would support such a claim.FN31 The question, rather, has to do with whether there was a violation of due process through the enhancement or "conversion" of Plaintiff's disciplinary sentence from one of keeplock confinement to one of SHU confinement.

FN30.*Meachum v. Fano,* 427 U.S. 215, 224-225 (1976) ("The initial inquiry is whether the transfer of respondents from Norfolk [Correctional Institution] to Walpole [Correctional Institution] and Bridgewater [Correctional Institution] infringed or implicated a 'liberty' interest of respondents within the meaning of the Due Process Clause. Contrary to the Court of Appeals, we hold that it did not."), *accord, Montayne v. Haymes,* 427 U.S. 236,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

241-242 & n. 4 (1976) (reversing Second Circuit decision cited by Plaintiff on page 12 of his memorandum of law); *Meriwether v. Coughlin, 879 F .2d 1037, 1047 (2d Cir.1989)* ("It is well established that the transfer of a prisoner from one institution to another does not invoke the protection of the Due Process Clause."), *accord, Burke v. McCoy, 96-CV-0984, 1997 WL 610650, at *5 (N.D.N.Y. Oct. 1, 1997)* (Pooler, J.); *Kalwasinski v. Morse, 96-CV-6475, 2005 WL 318817, at *1 (W.D.N.Y. Feb. 9, 2005); Dunley v. Rodwell, 01-CV-2007, 2004 WL 2106595, at *5 (D.Conn. Sept. 17, 2004); Majid v. Malone, 95-CV-2545, 1996 WL 134756, at *4 (S.D.N.Y. March 26, 1996); see also Murphy v. Bradley,* 03-CV-714, 2004 U.S. Dist. LEXIS 1074, at *6-7 (D.Conn. Jan. 16, 2004) ("A prisoner has no constitutional right to be incarcerated in a particular institution; he may be transferred for any reason or for no reason at all"-even where conditions in one prison are "more disagreeable" or the prison has "more severe rules.").

FN31.*Majid v. Malone, 95-CV-2545, 1996 WL 134756, at *4 (S.D.N.Y. March 26, 1996)* (reaching same conclusion); *see also, infra,* Part IV.C.4. (discussing elements of First Amendment retaliation claim).

The Due Process Clause contains both a substantive component and a procedural component.[FN32] The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." [FN33] The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law.* "[FN34] One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question).[FN35]

FN32.*Zinernon v. Burch, 494 U.S. 113, 125 (1990).*

FN33.*Zinernon, 494 U.S. at 125* [internal quotations marks and citation omitted].

FN34.*Id.* at 125-126 [internal quotations marks and citations omitted; emphasis in original].

FN35.*Id.*

Here, because it is unclear under which theory Plaintiff is asserting his due process claim (as Defendants correctly observe, *see* Dkt. No. 67, Part 5 at 9), and because Plaintiff argues that he is alleging his due process claim under both theories (*see* Dkt. No. 72, Part 2, Plf.'s Mem. of Law at 9), I will analyze Plaintiff's due process claim under both theories in the interest of thoroughness.

**1. Substantive Due Process Claim**

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." [FN36]

FN36.*Lowrence v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994)* [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

**\*12** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. The second step is to consider whether the state action was arbitrary in the constitutional sense and therefore violative of substantive due process.

Here, Plaintiff is alleging that, once he was sentenced (on September 10 and 12, 2002, at Attica C.F.) to serve 180

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

days of keeplock confinement as a result of two disciplinary convictions, he had a constitutional right to (even if transferred to another correctional facility) *remain* in keeplock confinement, and not be placed in SHU confinement, which Plaintiff alleges was "more restrictive." [FN37]

> FN37. (Dkt. No. 1, ¶ 7, "First Cause of Action," ¶ 6, "Statement of Facts" [Plf.'s Compl.].)

The first problem with Plaintiff's substantive due process claim is that Plaintiff does not adduce any evidence in support of his allegation that SHU confinement in Upstate C.F. was in fact more restrictive than keeplock confinement. Rather, all that Plaintiff offers is *argument,* which is (of course) insufficient to defeat a motion for summary judgment.[FN38] I note that Plaintiff's sworn allegation in his Verified Complaint that his confinement in the Upstate C.F. SHU was "more restrictive" than keeplock confinement [FN39] is too conclusory to constitute evidence sufficient to create an issue of fact for purposes of Rule 56.[FN40]

> FN38. See *Chavis v. Kienert,* 03-CV-0039, 2005 WL 2452150, at *7 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) ("[I]t is well established that arguments in legal memoranda may not in themselves serve to create a triable issue of material fact when unsupported by accompanying affidavits, pleadings, depositions, or stipulations.") [internal quotation marks and citation omitted]. (*Compare* Dkt. No. 72, Part 2 at 8, 14 [Plf.'s Mem. of Law, arguing that SHU confinement at Upstate C.F. was more restrictive than keeplock confinement] *with* Dkt. No. 1, ¶ 7, "First Cause of Action," ¶ 6, "Statement of Facts" [Plf.'s Verified Compl., not offering specifics of how Upstate C.F. SHU was more restrictive than keeplock confinement] *and* Dkt. No. 72 [Plf.'s "Affidavit in Opposition," not offering specifics of how Upstate C.F. SHU was more restrictive than keeplock confinement].)

> FN39. (Dkt. No. 1, ¶ 7, "First Cause of Action" [Plf.'s Compl.].)

> FN40. *See, supra,* Part III of this Report-Recommendation (discussing conclusory assertions in affidavits).

The second problem with Plaintiff's substantive due process claim is that, even if the conditions of confinement in the Upstate C.F. SHU were "more restrictive" than conditions in keeplock confinement, that evidence alone would not create a dispute of material fact with respect to Defendants' due process argument. Rather, to create a liberty interest protected by the Due Process Clause, the conditions of such confinement must be so much more restrictive as to impose "an atypical and significant hardship on the inmate." [FN41] Again, Plaintiff has not adduced any *evidence* (only argument) in support of such a hardship.[FN42]

> FN41. *Sandlin v. Connor,* 515 U.S. 472, 483-484 (1995) (to create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

> FN42. I note that, even if Plaintiff had been transferred from the *general inmate population* to a "normal" SHU, that change on confinement would generally not constitute a protected liberty interest unless the SHU confinement lasted for more than 101 days. *See Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999). The Second Circuit, without delineating the full scope of what constitutes "normal" SHU conditions, has stated that conditions in which prisoners "are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week" are considered "normal" SHU conditions. *Ortiz v. McBride,* 830 F.3d 649, 655 (2d Cir.2004).

Indeed, after Defendants filed their motion on June 20, 2005, two district courts (including this Court) issued decisions addressing the very issue at hand-whether an inmate has a due process liberty interest in not having his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

sentence of keeplock confinement at one prison "converted" to a sentence of SHU confinement at Upstate C.F ., without receiving a hearing regarding the conversation. Both decisions answered this question in the negative, reasoning that all the process to which the plaintiff was due was afforded through his initial disciplinary hearing (which resulted in the sentence of keeplock confinement). *See Holmes v. Grant,* 03-CV-3426, 2006 U.S. Dist. LEXIS 15743, at *57-63 (S.D.N.Y. March 31, 2006) (inmate had no due process liberty interest in not being transferred from keeplock confinement at Sing Sing C.F. to SHU confinement at Upstate C.F. without a hearing-other than the initial disciplinary hearing that resulted in the sentence of keeplock confinement); *accord, Chavis v. Kienert,* 03-CV-0039, 2005 WL 2452150, at *9-10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (transfer from keeplock confinement at Coxsackie C.F. to SHU confinement at Upstate C.F.).[FN43]

> FN43.*See also McKinnon v. Patterson,* 568 F.2d 930, 936 (2d Cir.1977) ("Obviously keeplock is the mildest form of punitive segregation. Yet, except for the fact that the prisoner is confined to his own cell and retains access to his personal belongings, the deprivations involved in keeplock are essentially the same as those involved in segregation in a special housing unit.").

**\*13** However, even if Plaintiff did have such a protected liberty interest, he would have to show that the state action was arbitrary in the constitutional sense and therefore violative of substantive due process. I find no evidence of such arbitrariness. Rather, the "conversion" appears to have occurred pursuant to an existing regulatory scheme.[FN44]

> FN44.*See* 7 N.Y.C.R.R. § 301.6(a)(2) ("An inmate in ... Upstate Correctional Facility may be housed in a special housing unit for reasons such as, but not limited to, the following: ... for confinement pursuant to a disposition of a disciplinary (Tier II) or superintendent's (Tier III) hearing ....").

**2. Procedural Due Process Claim**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " [FN45] Based upon the record before me, I find that no reasonable fact-finder could conclude that Plaintiff had a protected liberty or property interest in not having his keeplock sentence "converted" to an SHU sentence for the reasons stated above. *See, supra,* Part IV.A.1.

> FN45.*Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

**3. Qualified Immunity**

However, even if Plaintiff had established a viable due process claim, an alternative ground exists for dismissing that claim-qualified immunity. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN46] In determining whether a particular right was *clearly established,* courts in this circuit consider three factors:

> FN46.*Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.[FN47]

> FN47.*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992); *see also Calhoun v. New York*

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

*State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [FN48] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN49] As the Supreme Court explained,

FN48.*See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819);*Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN49.*Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N .Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized. [FN50]

FN50.*Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." [FN51]

FN51.*Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, I find that it was not clearly established in November of 2002 (nor is it clearly established now) that Plaintiff had a federal legal right to not have his sentence of keeplock confinement "converted" to a sentence of SHU confinement at Upstate C.F. without a hearing regarding the conversion, for the reasons stated above in Part IV.A.1. of this Report-Recommendation. Even if that point of law had been clearly established, I find that, at the very least, it is possible that a reasonable person could not have known that Defendants' actions were violating that clearly established right; in other words, it was objectively reasonable for Defendants to believe that their acts did not violate Plaintiff's rights. I base this last finding on the lack of any known controversy surrounding Defendants' interpretation of 7 N.Y.C.R.R. § 301.6(a) (2) as authorizing a "conversion" of Plaintiff's sentence, during the time in question. [FN52]

FN52.*See*7 N.Y.C.R.R. § 301.6(a)(2) ("An inmate in ... Upstate Correctional Facility may be housed in a special housing unit for reasons such as, but not limited to, the following: ... for confinement pursuant to a disposition of a disciplinary (Tier II) or superintendent's (Tier III) hearing ....").

*14 Based on each of these alternative grounds, I recommend that Plaintiff's first cause of action for denial of due process (during the conversion of his disciplinary sentence from one of keeplock confinement to one of SHU confinement) be dismissed.

**B. Whether Plaintiff's Second Cause of Action (Alleging that Defendant Tousignant Was Deliberately Indifferent to Plaintiff's Serious Medical Needs) Should Be Dismissed**

Generally, I agree with the arguments made by Defendants in their memorandum of law (Dkt. No. 67, Part 5 at 13-17

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

[Defs.' Mem. of Law] ), and I reject the arguments made by Plaintiff in his memorandum of law (Dkt. No. 72, Part 2 at 17-22 [Plf.'s Mem. of Law] ).

To prevail on a claim of deliberate indifference to a serious medical need, a plaintiff must show two things: (1) that he had a sufficiently serious medical need; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Here, Plaintiff has adduced no evidence that his asthma condition constituted a serious medical need under the circumstances. For example, it is an undisputed fact that, at the time Plaintiff transferred to Upstate C.F. on November 6, 2002, a medical assessment noted that Plaintiff had "[no] current meds" but was in possession of an "outdated albuteral inhaler," which was "charted for [nurse practitioner] review of need for inhaler." [FN53] It is also an undisputed fact that an additional medical assessment of that date similarly noted that Plaintiff had "[no] current meds" and that the albuteral inhaler was "2 yrs. old." [FN54] While I decline to perform an independent review of the record to find proof of a factual dispute (as I discussed above in Part III of this Report-Recommendation), I note that Plaintiff, in his memorandum of law, has alluded to (but not actually cited) various unidentified medical records from Attica C.F., which he implies create a factual dispute as to the seriousness of his medical condition. [FN55] The only such medical record that I could find from Attica C.F. does not create a factual dispute. [FN56]

FN53. (*Compare* Dkt. No. 67, Part 3, ¶ 8 [Defs.' Rule 7.1 Statement, asserting fact, and citing evidence in support of fact] *with* Dkt. No. 72, ¶ 8 [Plf.'s Rule 7.1 Response, not denying fact or citing evidence controverting fact].)

FN54. (*Compare* Dkt. No. 67, Part 3, ¶ 9 [Defs.' Rule 7.1 Statement, asserting fact, and citing evidence in support of fact] *with* Dkt. No. 72, ¶

9 [Plf.'s Rule 7.1 Response, not denying fact or citing evidence controverting fact].)

FN55. (Dkt. No. 72, Part 2 at 18-21.)

FN56. (*See, e.g.,* Dkt. No. 67, Part 6, Ex. 5 [Defs.' Motion Papers, attaching medical record dated 11/1/02 from Attica C.F., indicating that "no meds" were being prescribed, at the time, for Plaintiff's asthma condition].)

Simply stated, I find that, based upon the current record, no reasonable fact-finder could conclude that Plaintiff's asthma condition was sufficiently serious for purposes of the Eighth Amendment. As the Western District of New York recently held,

The mere fact that an inmate has an asthmatic condition does not necessarily mean that the inmate has a serious medical need, although an actual asthma attack, depending on the severity, may be a serious medical condition.... Significantly, in the instant case, when [plaintiff's] request for permission to bring his asthma medication with him to the city jail was denied, [plaintiff] was not then exhibiting any symptoms of an imminent asthma attack.... Accordingly, the record demonstrates that the objective prong of the deliberate indifference standard has not been met ....

**\*15** *Scott v. DelSignore,* 02-CV-0029, 2005 U.S. Dist. LEXIS 6070, at \*25-27 (W.D.N.Y. Feb. 18, 2005) (granting defendants' cross-motion for summary judgment); *accord, Murphy v. Corr. Med. Servs.,* 04-CV-0071, 2006 U.S. Dist. LEXIS 10775, at \*14-16 (D.Vt. Jan. 30, 2006) (asthma condition not serious medical need under circumstances); *Patterson v. Lilley,* 02-CV-6056, 2003 U.S. Dist. LEXIS 11097, at \*12-13 (S.D.N.Y. June 30, 2003) (asthma condition not serious medical need under circumstances); *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 292-293 (S.D.N.Y.2001) ( asthma condition not serious medical need under circumstances); *Reyes v. Corrections Officer Bay,* 97-CV-6419, 1999 U.S. Dist. LEXIS 13404, at \*5 (S.D.N.Y. Sept. 1, 1999) (asthma condition not serious medical need under circumstances). [FN57]

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

FN57.*See also Bates v. Sullivan,* 6 Fed. Appx. 425, 228 (7th Cir.2001) ("While asthma, depending on its degree, may be a serious medical condition ..., there is no evidence in this record that [plaintiff] was suffering a serious asthmatic attack when [defendant] allegedly refused to give him an inhaler."); *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir.1999) ("[B]reathing problems, chest pains, dizziness, sinus problems, headaches and loss of energy ... are not sufficiently serious to be constitutionally actionable."); *Oliver v. Deen,* 77 F.3d 156, 160-161 (7th Cir.1996) ("mild" asthma condition that "never required outside hospitalization" was not "a medical need sufficiently serious to implicate the Constitution").

**2. Deliberate Indifference**

Moreover, even if I were to assume, for the sake of argument, that Plaintiff's asthma condition was a serious medical need, he has adduced no evidence that Defendant Tousignant was deliberately indifferent to that serious medical need. At most, the evidence indicates that there may have been a difference of opinion between certain members of the medical staff at Upstate C.F. and Plaintiff. For example, Plaintiff refers to the nurse whom he saw on November 9, 2002 as a "know it all nurse." FN58 He goes on to describe how he disagreed with her diagnosis regarding his skin rash. FN59 However, such a difference of opinion is not enough to establish a claim under the Eighth Amendment. FN60 Even if a reasonable fact-finder could somehow construe the record as establishing a hint of *negligence* on the part of certain members of the medical staff at Upstate C.F., such negligence would not be enough to establish a claim under the Eighth Amendment. FN61

FN58. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

FN59. (*Id.*)

FN60.*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere

disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

FN61.*See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Noticeably missing is any evidence of the sort of *criminal recklessness* necessary to establish deliberate indifference on the part of Defendant Tousignant (or any member of the medical staff at Upstate C.F.). Indeed, according to the record evidence (including Plaintiff's own sworn assertions), it appears clear that Plaintiff was given fairly regular medical attention by the medical staff at Upstate C.F. during the relevant time period. FN62 As the Second Circuit has explained,

FN62. (*See, e.g.,* Dkt. No. 1, ¶ 6 [Plf.'s Verified Compl., asserting that he was seen by medical staff at Upstate C.F. on 11/6/02, 11/9/02, 12/9/02]; Dkt. No.72, ¶¶ 14, 16 & Ex. O [Plf.'s "Affidavit in Opposition," asserting that he was seen by medical staff at Upstate C.F. on 1/1/03, 1/11/03, 4/21/03]; Dkt. No. 67, Part 6, Exs. 10, 12 [Defs.' Motion Papers, attaching documents indicating that Plaintiff was seen on, among other dates, 1/8/03, 2/14/03, 4/22/03].)

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves .... The essential test is one of medical necessity and not one simply of desirability.

*16 Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

**3. Personal Involvement**

Finally, even if Plaintiff's asthma condition were a serious medical need, and even if certain members of the medical staff at Upstate C.F. exhibited deliberate indifference to that need, Plaintiff has adduced no evidence that Defendant Tousignant was *personally involved* in that alleged constitutional deprivation. A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in an action under 42 U.S.C. § 1983.FN63 Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.FN64

FN63. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987).

FN64. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); Williams v. Smith, 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Here, the closest Plaintiff comes to establishing the personal involvement of Defendant Tousignant is through the following: (1) his sworn allegation that he copied Defendant Tousignant on his complaint to Defendant LeClaire, submitted at some point between November 9, 2002, and November 20, 2002, regarding his alleged allergy to milk; (2) his argument that, on December 18, 2002, Defendant Tousignant signed a notation on an investigative report, stating, "There has been *NO* letters [sic], etc., rec'd by my office from Inmate Carlisle 98A5948"; and (3) his letter to her dated May 5, 2003, stating that he had experienced the symptoms of a mild asthma condition on April 23, 2003, and requesting that she look into whether he could be issued an inhaler; and her response dated May 16, 2003, advising him, "An inhaler has *not* been deemed medically necessary [at] this time. It does *not* appear as though you have had any respiratory problems in a very long time. If you do experience any-you will be seen on Emergency Sick-Call."FN65

FN65. (Dkt. No. 1, ¶ 6 [Plf.'s Verified Compl., asserting that, at some point between 11/9/02 and 11/20/02, he submitted a complaint about a nurse to Def. LeClaire, copying Def. Tousignant on the complaint]; Dkt. No. 67, Part 3, ¶¶ 19-20 [Defs.' Rule 7.1 Statement, containing factual assertions about the exchange of letters in May of 2003, which assertions were uncontroverted by the corresponding paragraphs of Plaintiff's Rule 7.1 Response]; Dkt. No. 67, Part 6, Ex. 11 [Defs.' Motion Papers, attaching letters dated 5/5/03 and 5/16/03]; Dkt. No. 72, Part 2 at 22-23 [Plf.'s Mem. of Law, arguing that it was Def. Tousignant who signed the investigative report notation of 12/18/02].)

However, this evidence is insufficient to link Defendant Tousignant to the alleged deliberate indifference to Plaintiff's serious medical needs by various subordinate nurses at Upstate C.F. sufficient to impose liability on her for purposes of 42 U.S.C. § 1983. With regard to the first piece of evidence (i.e., regarding the unidentified milk-allergy complaint of November 2002), Plaintiff's sworn allegation about his milk-allergy complaint is too conclusory to create a factual issue.FN66

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

FN66. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); *see, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F .3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

With regard to the second piece of evidence (i.e., regarding Defendant Tousignant's alleged misrepresentation that she never received the milk-allergy complaint), the materiality of this piece of evidence depends on the existence of any evidence indicating that (1) Plaintiff in fact submitted a complaint to Defendant LeClaire, (2) that Plaintiff in fact copied Defendant Tousignant on that complaint, (3) that Defendant Tousignant's office in fact *received* that copy, and (4) that either the copy was read by Defendant Tousignant or was kept and retained in her office files. Because no evidence exists of these facts, the second piece of evidence simply is not material to the issue of whether Defendant Tousignant was personally involved in any constitutional deprivation .FN67

FN67. (*See also* Dkt. No. 67, Part 6, Ex. 12 [Defs.' Motion Papers, attaching Def. Tousignant's response to Plf.'s interrogatories, wherein she objects to Plf.'s suggestion that her duties included answering any formal "complaints" such as those that take the form of grievances].)

**\*17** Finally, with regard to the third piece of evidence (i.e., regarding the exchange of letters between Plaintiff and Defendant Tousignant in May of 2003), this evidence does not in any way indicate that Defendant Tousignant (1) *directly participated* in any constitutional violation, (2) failed to remedy any constitutional violation after *learning* of it through a report or appeal, (3) created, or allowed to continue, a *policy or custom* under which any constitutional violation occurred, (4) was *grossly* negligent in managing subordinates who caused any constitutional violation, or (5) exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that any constitutional violation was occurring.

Based on each of these alternative grounds, I recommend that Plaintiff's second cause of action for deliberate indifference to a serious medical need be dismissed.

**C. Whether Plaintiff's Third Cause of Action (Alleging that Defendant Bouyea Violated Various of Plaintiff's Constitutional Rights by Unlawfully Searching His Cell, Seizing His Legal Papers, and Issuing Him a Misbehavior Report) Should Be Dismissed**

Generally, I agree with the arguments made by Defendants in their memorandum of law (Dkt. No. 67, Part 5 at 17-21 [Defs.' Mem. of Law] ), and I reject the arguments made by Plaintiff in his memorandum of law (Dkt. No. 72, Part 2 at 23-25 [Plf.'s Mem. of Law] ).

**1. Fourth Amendment Search-and-Seizure Claim**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

With respect to Plaintiff's Fourth Amendment search-and-seizure claim, the Fourth Amendment's proscription against unreasonable searches and seizures does not apply within the confines of a prison cell.[FN68] The Court has the power to dismiss Plaintiff's Fourth Amendment claim even though Defendants do not raise an argument concerning the Fourth Amendment in their motion papers (apparently due to their belief that Plaintiff's Complaint does not contain a Fourth Amendment claim). This is because the Court has the power to *sua sponte* dismiss such claims under several legal authorities. *See* 28 U.S.C. § 1915(e)(2)(B)(ii),(iii) ("[T]he court shall dismiss the case at any time if the court determines that ... the action ... is frivolous ... [or] fails to state a claim on which relief may be granted ...."); Fed.R.Civ.P. 12(h)(3) ( "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action.").

FN68.*See* Hudson v. Palmer 468 U.S. 517, 526 (1984); Demaio v. Mann, 877 F.Supp. 89, 95 (N.D.N.Y.), aff'd,122 F.3d 1055 (2d Cir.1995).

**2. First Amendment Denial-of-Access-to-Courts Claim**

With respect to Plaintiff's First Amendment denial-of-access-to-the-courts claim, Defendants are correct that this claim does not plead sufficient facts to give Defendants fair notice of what Plaintiff's claim is and the grounds upon which it rests. (Dkt. No. 67, Part 5 at 1 [Defs.' Mem. of Law].)

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[FN69] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN70] The purpose of this rule is to "facilitate a proper decision on the merits." [FN71] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN72] The Supreme Court has

characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement.[FN73] However, even this liberal notice pleading standard "has its limits." [FN74]

FN69.*See* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-512, 515 (2002).

FN70.*Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U .S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

FN71.*See* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting *Conley,* 355 U.S. at 48).

FN72.*Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996), *aff'd,*113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ); *U.S. v. Casado,* 303 F.3d 440, 449 n. 5 (2d Cir.2002) (citing, for similar purpose, unpublished table opinion of *U.S. v. Terry,* 927 F.2d 593 [2d Cir.1991].)

FN73.*See* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-514 (2002) (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

averments of fraud or mistake.").

FN74. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several other decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

***18** Here, Plaintiff's First Amendment denial-of-access-to-the-courts allegations fail to state a claim, even under this liberal notice-pleading standard.[FN75] Noticeably missing from Plaintiff's Complaint is any allegation that this alleged deprivation of legal materials actually caused him any harm. Plaintiff's conclusory argument in his memorandum of law that the confiscation caused Plaintiff to "drop" a pending legal action[FN76] comes too late in this action to act as a means of amending his denial-of-access-to-the-courts claim in his Complaint; and in any event his argument is too devoid of specifics to state a claim (e.g., what was the legal action, who were the defendants, what was the court, what was the case number, what was the final order dismissing or disposing of the case, etc). Finally, even if Plaintiff's allegations were

sufficient to state a First Amendment claim for denial of access to the courts, he has not adduced any evidence to establish that claim, sufficient to survive Defendants' motion for summary judgment.

FN75. (Dkt. No. 1, ¶ 7, "Third Cause of Action" [Plf.'s Compl., alleging merely that "[m]y right to redress the government for violations of its staff have been denied to me here at Upstate."]; Dkt. No. 1, ¶ 6, "Facts" [Plf.'s Compl., alleging that, on 1/20/03, during a search of Plaintiff's cell, Def. Bouyea asked for, and Plaintiff gave to him, all of Plaintiff's "reading materials," and that, after the search of his cell, Plaintiff noticed that about "50 pages of legal work were missing" from an active case, specifically "1 notice of appeal, 1 Court of Claims claim, 1 motion for summary judgment, 1 notice of motion to amend, 1 court decision for summary judgment motion".)

FN76. (Dkt. No. 72, Part 2 at 24 [Plf.'s Mem. of Law] )

**3. Fifth and/or Fourteenth Amendment Due Process Claim Regarding False-Misbehavior Report**

With respect to Plaintiff's claim that Defendant Bouyea unlawfully issued him a false misbehavior report, "[i]t is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."[FN77] "The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing."[FN78] Based on the current record, I find that no rational fact-finder could conclude that the misbehavior report was "false," or that any "aggravating factors" exist sufficient to confer upon Plaintiff a right to not be issued that report. I note that Plaintiff does not allege that the disciplinary hearing (which resulted from the misbehavior report) was plagued by any due process violations, or was invalidated on appeal.[FN79]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

FN77.*Ciprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) (citations omitted); *see also Hodges v. Jones,* 873 F.Supp. 737, 743-744 (N . D.N.Y.1995) (Chin, J.).

FN78.*Ciprazi,* 2005 WL 3531464, at *13 (citation omitted).

FN79. (Dkt. No. 1, ¶ 6.)

Alternatively, Plaintiff has failed to adduce any evidence that it was Defendant Bouyea's misbehavior report concerning Plaintiff, and not Corrections Officer P. Burgess's misbehavior report concerning Plaintiff (issued earlier that same day), that resulted in Plaintiff's additional 90-day sentence in the Upstate C.F. SHU.[FN80]

FN80. (*See* Dkt. No. 67, Part 5 at 19 [Defs.' Mem. of Law]; compare Dkt. No. 67, Part 6, Ex. 13 [Defs.' Motion Papers, attaching 1/20/03 misbehavior report issued by C.O. Burgess, concerning incident occurring at 9:50 a.m.] *with* Dkt. No. 67, Part 6, Ex. 13 [Defs.' Motion Papers, attaching 1/20/03 misbehavior report issued by Def. Bouyea, concerning incident occurring at 10:10 a.m.].)

In reaching my conclusion that Plaintiff's due process claim lacks merit, I specifically reject two arguments, and legal theories, advanced by Plaintiff. First, I reject Plaintiff's suggestion that Defendant Bouyea's conduct on January 20, 2003 is actionable because it was somehow caused by the earlier due process violation, namely, the conversion of Plaintiff's "keeplock" confinement to SHU confinement.[FN81] Setting aside the fact that I have already concluded that no such earlier due process violation occurred, the connection between the prior alleged due process violation in September and October of 2002 and the subsequent alleged due process violation in January of 2003 is simply too attenuated to support any theory of causation. Indeed, if anything, the allegation that it was the prior alleged due process violation that caused Plaintiff to be sentenced to an additional 90 days of SHU confinement in January of 2003 undercuts Plaintiff's allegation that it

was Defendant Bouyea's alleged misconduct that caused Plaintiff to receive the additional 90-day sentence.

FN81. (Dkt. No. 1, ¶ 7, "Third Cause of Action" [asserting causation theory]; Dkt. No. 72, Part 2 at 1, 24 [Plf.'s Mem. of Law, repeating causation theory].)

**\*19** Second, I reject Plaintiff's suggestion that Defendant Bouyea's alleged "violation of Department guidelines" or "Facility rules" regarding cell searches constitutes a violation of the United States Constitution or federal law sufficient to give rise to a cause of action under 42 U.S.C.1983.[FN82]Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to United States Constitution and *federal* laws.[FN83] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN84] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN85] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN86]

FN82. (Dkt. No. 1, ¶ 6.)

FN83.*See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970) ( "The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth., 847 F.Supp.*

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

FN84.*See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept. 7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN85.*See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN86.*See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. Specifically, in 1995, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes

atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [FN87] Here, however, Plaintiff does not show, or even allege, that Defendant Bouyea's search of his cell imposed on him an atypical and significant hardship in relation to the ordinary incidents of prison life.

FN87.*Sandlin v. Connor,* 515 U.S. 472, 483-484 (1995).

**4. Any First Amendment Retaliation Claim**

With respect to any suggestion by Plaintiff that the misbehavior report was issued as a form of retaliation against him, claims of retaliation find their roots in the First Amendment.[FN88] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN89] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[FN90] As the Second Circuit has noted,

FN88.*See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

FN89.*See Gill,* 389 F.3d at 381-383.

FN90.*See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

**\*20** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendant took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.[FN91] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN92]

> FN91. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U . S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

> FN92. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted)

Here, there is no allegation in Plaintiff's Complaint that he was engaging in protected activity immediately before the events in question, or that Defendant Bouyea was retaliating against Plaintiff for engaging in that protected activity.[FN93] Even if Plaintiff's Complaint could somehow be construed as alleging retaliation, there is no evidence in the record to support such a claim.

> FN93. (Dkt. No. 1, ¶ 7, "Third Cause of Action," ¶ 6, "Statement of Facts" [Plf.'s Verified Compl., not alleging either that Plaintiff had been engaging in protected activity or that Def. Bouyea's search had been in retaliation for that protected activity] .)

I acknowledge that Plaintiff, in his "Affidavit in Opposition," states that Defendant Bouyea searched his cell "in retaliation for Plaintiff complaining about the practice of C.O. Burgess denying Plaintiff his 1 hour recreation."[FN94] However, several problems exist with this assertion: (1) Plaintiff does not assert such a theory of retaliation in his Complaint, and it is too late at this stage of the proceeding for Plaintiff to be allowed, with any fairness to Defendants, to constructively amend the allegations in his Complaint through an affidavit;[FN95] (2) Plaintiff's "Affidavit" is neither notarized nor sworn to pursuant to 28 U.S.C. § 1746 (which requires a declaration that the assertions are made "under penalty of perjury"); and (3) the assertion in question in Plaintiff's "Affidavit" is entirely conclusory, lacking the specifics necessary to constitute evidence sufficient to create an issue of fact (e.g., what "practice of C.O. Burgess denying Plaintiff his 1 hour recreation," and what complain[t] about [that] practice"?).[FN96]

> FN94. (Dkt. No. 72, ¶ 25.)

> FN95. *Chavis v. Kienert,* 03-CV-0039, 2005 WL 2452150, at \*7 (N.D . N.Y. Sept. 30, 2005) (Scullin, C.J.) ("The Court notes that opposition papers are not the proper vehicles for adding new causes of action ....") [citation omitted].

> FN96. *See, supra,* Part III of this Report-Recommendation (discussing conclusory assertions in affidavits). I note that the necessary specific facts in support of a retaliation claim are not provided by Plaintiff even if one were to construe Paragraph 17 of his "Affidavit in Opposition" as referring to the failure of his cell door to open due to "the way C.O. Burgess hits the button to open" that door. (Dkt. No. 72, ¶ 17.)

Based on each of these alternative grounds, I recommend that Plaintiff's third cause of action be dismissed.

**D. Whether Plaintiff Has Shown Cause, Under Fed.R.Civ.P. 56(f), for a Stay of Consideration of Defendants' Motion for Summary Judgment Pending Completion of Further Discovery to Enable Plaintiff to Oppose Defendants' Motion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

Contrary to Plaintiff's repeated insistence to the contrary, there is simply no indication on the docket that Plaintiff's alleged Rule 56(f) motion was filed with the Court, or even submitted to the Court, by Plaintiff on or about July 1, 2005. In any event, I will consider Plaintiff's Rule 56(f) argument now, in response to Defendants' motion for summary judgment.

**\*21** Rule 56(f) of the Federal Rules of Civil Procedure provides:

> **(f) When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

Here, Plaintiff asserts in an affirmation (attached to his papers in opposition to Defendants' motion) the following facts: (1) at some point, he "served on the Defendants ... interrogatories, requests for production of documents & requests to admit"; (2) "the Defendants weren't forthcoming [with regard to this discovery] as required; and (3) the discovery that he has been denied consists of the following: (a) a copy of, and the meaning of, "a document [shown to Plaintiff] by one of the Corrections Counselors that stated *"Converted* Assessment," and a copy of the appellate decisions regarding Plaintiff's September 2002 disciplinary convictions and his subsequent grievances about the enhancement of his disciplinary hearing sentence-all of which Plaintiff asserts are relevant to his **First Cause of Action;** (b) a copy of Plaintiff's medical records from Attica C.F., which Plaintiff asserts are relevant to his **Second Cause of Action** (and the request for which Plaintiff claims he directed to *Defendant Tousignant* ); and (c) a copy of Plaintiff's deposition transcript and medical records, which Plaintiff asserts is relevant to his **Third Cause of Action.**[FN97]

FN97. (Dkt. No. 72, Part 2, "Affirmation in Support," ¶¶ 2, 6, 7, 10, 12, 13 [Plf.'s Papers in Opposition to Defs.' Motion]; *see also* Dkt. No. 72, Part 2 at 20 [Plf.'s Mem. of Law, arguing that he did not receive during discovery the Attica C.F. medical records allegedly referenced by Defendants].)

Several problems exist with Plaintiff's attempted showing of cause for a stay of Defendants' motion for summary judgment, and a reopening of discovery, under Fed. R. Civ. 56(f). First, Plaintiff does not demonstrate that, during this action's ample discovery period,[FN98] Defendants wrongfully denied him the information he now wants, or that he even requested that information from them. For example, conspicuously missing from Plaintiff's affirmation are any exhibits attaching his prior interrogatories, document requests, and requests for admissions, or Defendants' responses to those requests. Also missing is an indication that it is *Defendant Tousignant* (and not, say, the records custodian at Attica C.F.) who is in possession, custody or control of Plaintiff's medical records from Attica C.F. Therefore, based on Plaintiff's affirmation, I cannot conclude that any failure by him to previously obtain the information now requested was not due to his own lack of diligence.

FN98. (*See* Dkt. No. 35 [Order filed on 6/29/04 setting deadline for discovery as 12/30/04]; Dkt. No. 60 [Order filed on 3/10/05 in part granting Plf.'s motion to compel discovery].)

Second, I am suspicious of the relevance of some of the information that is the subject of Plaintiff's proposed requests. For example, Plaintiff does not explain how a copy of his deposition transcript and medical records is relevant to his Third Cause of Action, other than to claim that Defendants cite such evidence in support of their argument for dismissal of Plaintiff's Third Cause of Action (specifically, in their Notice of Motion).[FN99] Contrary to Plaintiff's claim, I find no evidence that Defendants base their argument for dismissal of Plaintiff's Third Cause of Action on any deposition transcript or medical records.[FN100] Even if Defendant had made such an argument, I do not base my recommendation of dismissal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)
(Cite as: 2007 WL 2769566 (N.D.N.Y.))

of Plaintiff's Third Cause of Action on that argument.[FN101]

> FN99. (Dkt. No. 72, Part 2, "Affirmation in Support," ¶ 13 [Plf.'s Papers in Opposition to Defs.' Motion].)

> FN100. (Dkt. No. 67, Part 5 at 17-21 [Defs. Mem. of Law]; Dkt. No. 67, Part 1 [Defs.' Notice of Motion].)

> FN101. (*See, supra,* Part IV.C. of this Report-Recommendation.)

**\*22** Similarly, while there would be some relevance to Plaintiff's medical records from Attica C.F., that relevance would be, in my opinion, minimal and far outweighed by the relevance of Plaintiff's medical records from Upstate C.F., since it is Defendants' position that Plaintiff's asthma condition had improved by the time he arrived at, or after he arrived at, Upstate C.F. Thus, even if Plaintiff's medical records from Attica C.F. indicated that he had a "chronic" condition (as Plaintiff asserts), I am very dubious that the records would create an issue of fact as to whether Plaintiff was suffering from a *severe* medical condition when he was at Upstate C.F.

Third, it is unclear to me, based on Plaintiff's brief and vague assertions, whether the issues concerning the discovery Plaintiff is now requesting were already raised by Plaintiff in his numerous submissions regarding his two previous motions to compel discovery,[FN102] and resolved by Judge Scullin in his Order of March 9, 2005.[FN103]

> FN102. (Dkt.Nos.44, 47, 48, 51, 54, 55, 57, 59.)

> FN103. (Dkt. No. 60.)

Based on each of these alternative grounds, I recommend that the Court deny Plaintiff's request for a stay of consideration of Defendants' motion for summary judgment pending completion of further discovery to enable Plaintiff to oppose Defendants' motion.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 67) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.
Carlisle v. Goord
Not Reported in F.Supp.2d, 2007 WL 2769566 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
George M. CHAVIS, Plaintiff,
v.
G. KIENERT, Deputy of Programs; C.O. Dumas, Shu
(Disciplinary); C.O. Donovan, Shu (Disciplinary); R.
Girdich, Prison Superintendent; A. Boucaud, Deputy of
Administration; D. Selsky, Shu Disciplinary Director; R.
Donaldson, Civilian Grievance Supervisor; Ms. Daggett,
Shu Corrections Counselor; L. Friot, Senior Corrections
Counselor; A. Tousignant, Prison Nurse Administrator;
Ms. Buffman, Medical Staff "PA"; Dr. L.N. Wright,
Chief Medical Officer; C.O. J. Rock, Hearings; J.
Donelli, Deputy (First) Superintendent; Lucien J.
LeClaire, Deputy Commissioner; J. Cromp, Grievance
Officer; C.O. M. White, Shu; C.O. G. Canning,
Hearings; Mr. Johnson, Prison Doctor; C.O. M.
Yuddow, Shu; and Richard D. Roy, Inspector General's
Officer, Defendants.[FN1]

> [FN1.](#) In his complaint, Plaintiff incorrectly refers
> to Defendant "Johnston" as "[Johnson](#)." The
> Court will refer to this Defendant as "Johnston."
> Furthermore, although Plaintiff refers to this
> Defendant as a Doctor, according to Defendant
> Johnston's Declaration, which Defendants
> submitted in support of their motion for summary
> judgment, Defendant Johnston is a Physician's
> Assistant. *See* Dkt. No. 72, P. Johnston Decl., at
> ¶ 1. Plaintiff also incorrectly refers to Defendant
> "Yaddow" as "Yuddow;" the Court will refer to
> this Defendant as Yaddow.

**No. 9:03-CV-0039(FJSRFT).**

Sept. 30, 2005.

George M. Chavis, Southport Correctional Facility, Pine
City, New York, Plaintiff pro se.

The Attorney General of the State of New York, The
Capitol, Albany, New York, for Defendants, Kate H.
Nepveu, AAG, of counsel.

MEMORANDUM-DECISION AND ORDER

[SCULLIN](#), Chief J.

I. INTRODUCTION

**\*1** On January 9, 2003, Plaintiff George M. Chavis filed
his complaint in this civil rights action, pursuant to [42
U.S.C. § 1983](#), against twenty-one Defendants, alleging
that, during the time that he was incarcerated at Upstate
Correctional Facility, Defendants violated his rights under
the First, Eighth, and Fourteenth Amendments. *See* Dkt.
No. 1. Specifically, Plaintiff alleges that Defendants,
collectively and individually, (1) denied him access to the
courts when they confiscated his legal mail, denied him
access to the law library, and refused to file grievances
that he submitted; (2) retaliated against him in various
ways, whether by issuing false misbehavior reports or by
extending his confinement in a Special Housing Unit
("SHU"); (3) violated his due process rights at various
disciplinary hearings; (4) were deliberately indifferent to
his serious medical needs; and (5) housed him in
inhumane living conditions. *See id.*

Currently before the Court is Defendants' motion for
summary judgment pursuant to [Rule 56 of the Federal
Rules of Civil Procedure](#). *See* Dkt. Nos. 72, 78, & 79.
Plaintiff opposes this motion. *See* Dkt. No. 75.[FN2] For the
reasons set forth herein, the Court grants Defendants'
motion and dismisses Plaintiff's complaint in its entirety.

> [FN2.](#) At the outset, the Court notes that Plaintiff's
> opposition papers substantially fail to comply
> with this District's Local Rules in that Plaintiff
> (1) failed to include a Statement of Material
> Facts, (2) included legal arguments in his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

Affidavit, and (3) submitted a legal memorandum, which, at sixty pages, far exceeds the twenty-five page limit. *See* L.R. 7.1(a). Although the Court could have rejected Plaintiff's papers as non-compliant, in light of his *pro se* status, the Court accepts his filings. However, the Court will construe Plaintiff's voluminous response to Defendants' motion, entitled "Affidavit in Testimony," *see* Dkt. No. 75, as a Memorandum of Law in Opposition because this District's Local Rules preclude an affidavit from including legal arguments. *See* L.R. 7.1(a)(2). There is no prejudice to Plaintiff as a result of the Court's recharacterization of his papers because his verified complaint may serve as an affidavit for summary judgment purposes. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing cases and treatises supporting the proposition that a verified complaint may serve as an affidavit for Rule 56 purposes provided the complaint "contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity").

II. BACKGROUND [FN3]

FN3. The Court derives the facts from Defendants' Statement of Material Facts, which they submitted in accordance with L.R. 7.1 and which Plaintiff has not specifically countered and opposed and which the record amply supports. *See* L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

Plaintiff's claims arise from incidents that occurred during the time that he was incarcerated in Upstate Correctional Facility's SHU between July 1 and December 31, 2002. *See generally* Dkt. No. 1. On July 1, 2002, Plaintiff was transferred to Upstate Correctional Facility and was housed in SHU to serve a keeplock sentence imposed at a March 7, 2000 Tier II Disciplinary Hearing held at Coxsackie Correctional Facility. *See* Dkt. No. 72, Kate Nepveu, Esq., Decl., dated December 31, 2004, Exhibit "B," Inmate Disciplinary History, at renumbered p. 3.[FN4] Plaintiff was to serve the keeplock sentence from June 27

to July 27, 2002.[FN5] *See id.; see also* Dkt. No. 72, Defendants' 7.1 Statement at ¶ 1.

FN4. In submitting Exhibits in support of Defendants' motion for summary judgment, Defendants' counsel renumbered the pages of all of the Exhibits. For ease of reference, the Court will refer to the relevant Exhibits using their renumbered designations.

FN5. Plaintiff's disciplinary history since his admission to the custody of New York's Department of Correctional Services ("DOCS") is rather lengthy. Some examples of Plaintiff's vast disciplinary history include the following:

(1) from 1993 to 1996, while housed at Clinton Correctional Facility, Plaintiff was found guilty of various prison rule violations at eight separate disciplinary hearings (two Tier III and six Tier II);

(2) from 1997 to 1998, while housed at Attica Correctional Facility, Plaintiff was found guilty at five separate disciplinary hearings (one Tier III and four Tier II);

(3) from 1998 to 2000, while housed at Wende, Orleans, and Southport Correctional Facilities, Plaintiff was found guilty at five separate disciplinary hearings (two Tier III and three Tier II);

(4) in 2000, while housed at Coxsackie Correctional Facility, Plaintiff was found guilty at six separate disciplinary hearings (four Tier III and two Tier II);

(5) from 2000 to 2002, while housed at Southport Correctional Facility, Plaintiff was found guilty at nine separate disciplinary hearings (two Tier III and seven Tier II); and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

(6) from July through December 2002, while housed at Upstate Correctional Facility, and the focus of some of Plaintiff's claims herein, Plaintiff was found guilty at six separate disciplinary hearings (three Tier III and three Tier II).

*See* Nepveu Decl., Exhibit "B."

The Upstate Medical Staff received information from Southport Correctional Facility indicating that Plaintiff suffered from Hepatitis B, asthma, and chronic seasonal allergies as well as allergies to penicillin and seafood.[FN6]*See* Nepveu Decl., Exhibit "K," Chavis Medical Record, at p. 49. The only medications noted were multi-vitamins. *See id.* Upon admission to Upstate Correctional Facility, Plaintiff completed a medical questionnaire regarding his allergy to seafood. *See id.* at pp. 52-53. Based upon his responses to the medical questionnaire, A. Branch,[FN7] DOCS Registered Dietitian, responded that the facility only served fish, not shellfish, and that the facility would provide Plaintiff with a substitute for fish. *See id.* at pp. 51-52. On October 22, 2002, the facility formally executed a Therapeutic Diet Request Form and Attendance Agreement. *See id.* at p. 50.

> FN6. The report further noted that, although Plaintiff had never been referred to a mental health unit, he had a psychiatric history, including a history of violence. *See* Nepveu Decl., Exhibit "K," at p. 49.

> FN7. Branch is not a Defendant in this action.

On July 3, 2002, while serving the above referenced keeplock sentence, Plaintiff wrote a letter, addressed as "legal mail," to Stephen F. Gawlik, Assistant Attorney General ("AAG"). *See* Defendants' 7.1 Statement at ¶ 3; Nepveu Decl., Exhibit "C," July 26, 2002 Hearing Packet, at p. 6. The letter included language such as

**\*2** neither one of your vindictive KKK clients will get away with it. I'll seek everyone out and put them each under the fucken [sic] dirt w/their devils (illegible). I will

get retribution on everyone [sic] of you because I know that all of you are in this together, but you'll pay for it.

*See id.* at p. 8.

Due to the threatening nature of the letter, AAG Gawlik forwarded it to facility officials for investigation. *See* Nepveu Decl., Exhibit "C," at p. 6. On July 12, 2002, after interviewing Plaintiff, who admitted writing the letter, Defendant G. Canning wrote a misbehavior report charging Plaintiff with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall not harass any person), and 180.11 (correspondence procedures). *See id.* at p. 16.[FN8] Defendant J. Rock, Lieutenant, presided as the hearing officer at a Tier III Superintendent's Hearing regarding this misbehavior report on July 26, 2002. *See* Nepveu Decl., Exhibit "C," at p. 2. Defendant Rock found Plaintiff guilty of violating prison rules regarding harassment and threats and instituted a punishment of twelve months' confinement in SHU with corresponding loss of privileges and further recommended nine months loss of good time.[FN9]*Id.* In his written statement of disposition, Defendant Rock explained that, in light of Plaintiff's lengthy disciplinary history, of which over thirteen disciplinary dispositions had been issued since January 2000 for threats and harassment, and in light of the fact that Plaintiff had exhibited no modification to his behavior, a more severe sentence was warranted. *See id.* at p. 3; *see also supra* note 5. Defendant Rock further noted that Plaintiff had refused assistance from Defendant Daggett, his selected hearing assistant, and had refused to attend the hearing. *See id.; see generally* Nepveu Decl., Exhibit "D," July 26, 2002 Hearing Transcript. The disciplinary disposition, which Defendant Selsky affirmed on appeal, was set to commence on March 4, 2003, and end on March 4, 2004.[FN10]*See* Nepveu Decl., Exhibit "C," at pp. 1-2.

> FN8. Defendants' 7.1 Statement incorrectly states that Defendant Canning's misbehavior report is dated August 26, 2002. *Compare* Defendants' 7.1 Statement at ¶ 8 *with* Nepveu Decl., Exhibit "C," at p. 16.

> FN9. Defendant Rock found Plaintiff not guilty of violating facility correspondence rules

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

because his letter was addressed to the Attorney General's Office and some of its content was legal in nature. *See* Nepveu Decl., Exhibit "C," at p. 2.

FN10. According to Plaintiff's Inmate Disciplinary History, the service dates for this disposition commenced on July 26, 2002, and ended on July 26, 2003. *See* Nepveu Decl., Exhibit "B," at p. 1. The parties have not submitted any reason for the discrepancy in service dates.

On August 21, 2002, Plaintiff wrote a letter to Defendant A. Tousigant, Prison Nurse Administrator, in which he referred to Defendant Nurse Buffman an "ill-minded lesbian dyke of a deeply rooted perverted mentality" and a "KKK staff member ... [who] hand masturbates SHU-inmates through the access door." *See* Nepveu Decl., Exhibit "E," Sept. 5, 2002 Hearing Packet, at pp. 6-8; Defendants' 7.1 Statement at ¶ 7. In response, on August 26, 2002, Defendant Tousignant wrote a misbehavior report charging Plaintiff with violating prison rule 107.11 (harassing employees). *See* Nepveu Decl., Exhibit "E," at p. 5. On September 5, 2002, Defendant Canning presided over a Tier II Disciplinary Hearing regarding this misbehavior report. *See id.* at p. 1. At the close of the hearing, Defendant Canning found Plaintiff guilty and sentenced him to thirty days keeplock and loss of privileges. *See id.* Plaintiff did not appeal this disposition. *See* Nepveu Decl ., Exhibit "," at p. 1.

**\*3** Between September 6, 2002, and November 12, 2002, Plaintiff received misbehavior reports charging him with violating prison rules 102.10 (threats), 106.10 (direct order), and 109.12 (movement violation). *See id.* Two separate Tier III Superintendent's Hearings were held, after which Plaintiff was found guilty and sentenced to sixty days' confinement in SHU with loss of privileges and nine months' confinement in SHU with loss of privileges, respectively. *See id.* The latter punishment included nine months recommended loss of good time. FN11 *Id.;* Defendants' 7.1 Statement at ¶ 10. Plaintiff did not appeal either of these dispositions. *See* Nepveu Decl., Exhibit "B," at p. 1; Defendants' 7.1 Statement at ¶ 11.

FN11. The service dates for these dispositions

were from July 26, 2003, through June 24, 2004. *See* Nepveu Decl. at Exhibit "B."

On September 8, 2002, Plaintiff submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC"), which was filed on September 20, 2002, and designated UST 13378-02. *See* Nepveu Decl ., Exhibit "I," Inmate Grievance Packet-UST 13378-02, at p. 13. In his grievance, Plaintiff complained that on September 5 and 6, 2002, during the morning mail pick-up in SHU, four SHU officers "willfully denied [him] replacement facility envelopes" in exchange for personal envelopes and "further denied [him] other stationary [sic] supplies, *i.e.,* paper and pens," thereby preventing him from filing an appeal of his September 5, 2002 Tier II Hearing. *See id.* at pp. 13-14. On September 25, 2002, the IGRC advised Plaintiff that he needed to specify which officers denied him supplies, to which Plaintiff responded, "the blond haired klan officer." *See id.* at p. 14. Since Plaintiff identified one of the officers as the regular officer on duty, an investigation ensued, pursuant to which it was revealed that Correction Officer ("CO") Manning was the regular officer but was not on duty on those days and that, furthermore, the officers who were on duty did not fit the physical description that Plaintiff had supplied. *See id.* at pp. 1-10. Moreover, according to facility records, Defendants Dumas and Donovan were not working on Plaintiff's gallery on September 5 and 6, 2002. Defendants' 7.1 Statement at ¶ 18; Nepveu Decl., Exhibit "I," at p. 9.

On December 23, 2002, Defendant J. Cromp issued a misbehavior report against Plaintiff due to the harassing nature of a grievance he had submitted regarding Nurse Buffman. *See* Nepveu Decl., Exhibit "G," Jan. 6, 2003 Hearing Packet/December 23, 2002 Misbehavior Report. Plaintiff's grievance, dated December 15, 2002, FN12 described Defendant Buffman as a "despicable piece of trash" and an "ill-minded and vindictively racist character." *See id.* at p. 11. Although the grievance was accepted for filing and designated UST 14452-2, Plaintiff was charged with violating prison rule 107.11 (harassing employees). *See* Nepveu Decl., Exhibit "G," at p. 9; Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14. Subsequently, on December 24, 2002, during sick call, Plaintiff called Defendant Buffman a "bitch," told her to "drop dead" and said, "I'll kill you." *See* Nepveu Decl., Exhibit "H," January 6, 2003 Hearing Packet/December 24, 2002 Misbehavior Report. Defendant Buffman issued

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

Plaintiff a misbehavior report charging him with violating prison rules 102.10 (threats), 107.10 (interference), and 107.11 (harassing employees). *See id.* at p. 10. On January 6, 2003, Lieutenant D. Quinn [FN13] presided as the hearing officer over two Tier II Disciplinary Hearings regarding the December 23 and 24 Misbehavior Reports. *See* Nepveu Decl., Exhibits "G" & "H." Plaintiff was found guilty of all charges and received two consecutive thirty-day sentences of keeplock confinement and corresponding loss of privileges. [FN14]*See* Nepveu Decl., Exhibit "G," at p. 6, Exhibit "H," at p. 7; Defendants' 7.1 Statement at ¶ 17. Both dispositions were affirmed on appeal. *See* Nepveu Decl., Exhibit "B," at p. 1; Exhibit "G," at p. 1; Exhibit "H," at p. 1.

FN12. Plaintiff actually submitted two seemingly identical grievances against Defendant Buffman, one dated December 15, 2002, and the other dated December 16, 2002; it appears that both grievances were accepted and consolidated with another grievance regarding access to medical care. *See* Nepveu Decl., Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14.

FN13. Lieutenant Quinn is not a Defendant in this action.

FN14. The sentences were set to commence on March 1, 2005. *See* Nepveu Decl. at Exhibit "B."

*4 With regard to the grievance that Plaintiff submitted regarding Defendant Buffman, Plaintiff claimed that on December 16, 2002, Defendant Buffman passed over his cell during sick call and did not provide him with his medication refills. *See* Nepveu Decl., Exhibit "J," at p. 4. This grievance was consolidated with another grievance in which Plaintiff complained that he was being denied the right to see a doctor and denied medication refills. *See id.* at pp. 3, 12, & 14. In its recommendation, the IGRC advised Plaintiff to refrain from using derogatory remarks because such remarks were counterproductive to the institution's ability to investigate. *See id.* at p. 5. The IGRC further noted that on December 24, 2002, Defendant Buffman asked Plaintiff what refills he needed, to which he responded, "I'll kill you, drop dead bitch." *See id.* Both the Superintendent and CORC affirmed the

IGRC's determination on appeal. *See id.* at pp. 7, 11. CORC admonished Plaintiff for using offensive and inflammatory language and also noted that Plaintiff had been non-compliant with sick call procedures on December 10, 13, and 20, 2002, as he either remained in bed or was sleeping. *See id.* at p. 11.

During the relevant time period, July 1 through December 31, 2002, the medical staff at Upstate Correctional Facility saw Plaintiff a total of eighty-five times, an average of fourteen visits per month. *See* Nepveu Decl., Exhibit "K," at pp. 18-48. Furthermore, prior to receiving his Therapeutic Diet Request Form on October 22, 2002, Plaintiff never lodged any complaints with any medical staff regarding fish substitutions or any other dietary related problems. [FN15]*See id.*

FN15. On September 30, 2002, there is a notation in the medical record of "No Fish-No Seafood," although it is unclear whether Plaintiff lodged an actual complaint because no further directions follow the notation. *See* Nepveu Decl., Exhibit "K," at p. 32.

On the following dates in 2002, Plaintiff was non-compliant with sick call procedures: July 29 (asleep during scheduled/requested sick call), August 6 (uncooperative and belligerent), August 14 (asleep during scheduled/requested sick call), August 15 (uncooperative and belligerent), August 19 (asleep during scheduled/requested sick call), August 21 (complained of jock itch but refused exam of area), September 25 (asleep during scheduled/requested sick call), October 4 (asleep during scheduled/requested sick call), October 5 (asleep during scheduled/requested sick call), October 6 (asleep during scheduled/requested sick call), October 9 (refused to come to cell door), October 10 (asleep during scheduled/requested sick call), October 11 (asleep during scheduled/requested sick call), December 4 (refused to come to cell door), December 5 (refused to come to cell door), December 7. (asleep during scheduled/requested sick call), December 9 (asleep during scheduled/requested sick call), December 13 (asleep during scheduled/requested sick call), December 15 (uncooperative during exam), December 18 (asleep during scheduled/requested sick call), December 20 (asleep during scheduled/requested sick call), December 22

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

(asleep during scheduled/requested sick call), December 23 (asleep during scheduled/requested sick call), December 24 (belligerent and disrespectful-Misbehavior Report issued), and December 28 (asleep during scheduled/requested sick call). *See* Nepveu Decl., Exhibit "K," at pp. 18-41.

### III. DISCUSSION

### A. Summary Judgment Standard

**\*5** Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c))). "When a party has moved for summary judgment on the basis of asserted facts supported as required by Fed.R.Civ.P. 56(e) and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992) (citation omitted).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts that the movant submitted. Fed.R.Civ.P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." (citation omitted)); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.1994) (citation omitted). To that end, "sworn statements are more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and

should be treated as evidence in deciding a summary judgment motion." *Scott*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995)), and the credibility of such statements is better left to a trier of fact, *see id.* (citing *Vital v. Interfaith Med. Ctr.*, 168 F.2d 615, 621-22 (2d Cir.1999)).

When considering a motion for summary judgment, "the court must 'resolve [ ] all ambiguities and draw [ ] all factual inferences in favor of the nonmoving party." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998) (quoting *Adams,* 143 F.3d at 65). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citation omitted); *accord Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quotation and other citation omitted). Nonetheless, mere conclusory allegations, which the record does not support, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (citations omitted).

### B. Dismissal pursuant to 28 U.S.C. § 1915(g)

**\*6** Defendants ask this Court to dismiss Plaintiff's claims pursuant to 28 U.S.C. § 1915(g) "on the grounds that [such claims are] frivolous, malicious, or fail[ ] to state a claim upon which relief may be granted...." 28 U.S.C. § 1915(g).

Under § 1915, individuals may seek leave of the court to pursue their claims without prepayment of fees and costs and proceed with the litigation as a poor person or *in forma pauperis* ("IFP"). *See* 28 U.S.C. § 1915(a)(1). The IFP statute similarly enables prisoners to apply for this privilege, and indeed, many, if not most, incarcerated individuals bringing suits take advantage of that opportunity. *See* 28 U.S.C. § 1915(a)(2). However, under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

this statute, a court shall dismiss a case if it determines that such action is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

Recognizing the potential for prisoner abuse and seeking to relieve the courts of congestion caused by patently frivolous prisoner suits, Congress enacted the Prisoner Litigation Reform Act of 1996, Pub.L. 104-134, 110 Stat. 1321-66 to 1321-77 ("PLRA"), which imposes several restrictions upon a prisoner's ability to seek redress in the courts at will. One such mechanism is the so-called "three strikes rule," which bars inmates from proceeding IFP after three or more previous actions, in which the court granted the prisoner IFP status, have been dismissed as frivolous, malicious, or for failing to state a claim, unless the prisoner is under imminent danger of serious physical injury. See 28 U.S.C. § 1915(g). Specifically, this section provides, in pertinent part, that

[i]n no event shall a prisoner bring a civil action ... under this section if the prisoner has, on 3 or more prior occasions, while incarcerated ... brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

In recognizing that the PLRA amendments foster legitimate governmental interests, the Second Circuit has stated that

[p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing lawsuits. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' " environment which allows

inmates indiscriminately to file suit at taxpayers' expense.

Nicholas v. Tucker 114 F.3d 17, 20 (2d Cir.1997) (citing Anderson v. Coughlin, 700 F.2d 37, 42 (2d Cir.1983) (quotation omitted)).

*7 The Supreme Court has explained that there are two instances where a dismissal of an action as frivolous is warranted. See Neitzke v. Williams, 490 U.S. 319, 327 (1989) (citations omitted); see also Welch v. Galie, 207 F.3d 130, 131 (2d Cir.2000) (citations omitted). First, when the "factual contentions are clearly baseless," for example, where the allegations are the product of delusion or fantasy, dismissal is warranted. Neitzke, 490 U.S. at 327-28. The second instance is where the claim is "based on an indisputably meritless legal theory...." Id. at 327. "A claim is based on an 'indisputably meritless legal theory' when either the claim lacks an arguable basis in law, Benitez v. Wolff, 907 F.2d 1293, 1295 (2d Cir.1990) (*per curium*), or a dispositive defense clearly exists on the face of the complaint. See Pino v. Ryan, 49 F.3d 51, 53 (2d Cir.1995)." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir.1998).

With these standards in mind, the Court must determine which claims, if any, are subject to dismissal pursuant to 28 U.S.C. § 1915(g).

C. New Claims

As Defendants note in their Reply Memorandum of Law, Plaintiff raises new claims in his opposition to their motion. See, e.g., Dkt. No. 75, Plaintiff's Aff. in Opposition, at pp. 30-32; Dkt. No. 78, Defendants' Reply Memorandum of Law, at 3.

The Court notes that opposition papers are not the proper vehicles for adding new causes of action or for adding new defendants. See In re Private Capital Partners, Inc., 139 B.R. 120, 124-25 (Bankr.S.D.N.Y.1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to the defendants' dispositive motion is in direct contravention of and amounted to an attempt to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)). If Plaintiff had wanted to supplement or amend his complaint in this case, he should have followed the proper procedural mechanisms set forth in the Federal Rules of Civil Procedure and this District's Local Rules. Specifically, he should have made any such request by filing a motion seeking that relief.

Furthermore, "it is well established that arguments in legal memoranda may not in themselves serve to create a triable issue of material fact when unsupported by accompanying affidavits, pleadings, depositions, or stipulations." *Greaves v. State of New York,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2723 at 64 (1996)) (other citation omitted). Therefore, the Court will not construe Plaintiff's current submission as a motion to amend or supplement his complaint; thus, any new claims that he has raised in his opposition papers are not properly before the Court, and the Court will not consider them.

D. Fourteenth Amendment-Due Process

**\*8** Plaintiff asserts that the following Defendants violated his Fourteenth Amendment rights to due process: [FN16]

> [FN16.] Since Plaintiff failed to number all of the paragraphs in his complaint, the Court will make reference to the attached page number. Furthermore, in accordance with the standard of review, the Court has liberally construed Plaintiff's claims to raise the strongest arguments they present. Given the nature and volume of asserted claims, the Court notes that this liberal construction inevitably results in multiple overlapping of claims.

(1) *G. Kiernert,* Deputy of Programs, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached pp. 1-2);

(2) *A. Boucaud,* Deputy of Administration, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition and fabricated/extended SHU confinement (Complaint at attached pp. 2-3);

(3) *R. Girdich,* Prison Superintendent, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 3);

(4) *J. Donelli,* First Deputy Superintendent, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 4);

(5) *Ms. Daggett,* Corrections Counselor, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition and, on July 25, 2002, as a selected Tier III Assistant, failed to complete her duty to assist Chavis at his Hearing (Complaint at attached p. 7);

(6) *J. Rock,* CO Hearings, violated Chavis's due process rights at a Tier III Superintendent's Hearing held on July 26, 2002 (Complaint at attached p. 8);

(7) *G. Canning,* CO Hearings, on July 13, 2002, authored a false misbehavior report (Complaint at attached pp. 8-9);

(8) *L. Friot,* Senior Corrections Counselor, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 9);

(9) *A. Tousignant,* Prison Nurse Administrator, filed a retaliatory misbehavior report on August 26, 2002 (Complaint at attached p. 10);

(10) *Ms. Buffman,* Physician's Assistant (PA), filed a retaliatory misbehavior report on December 25, 2002 (Complaint at attached p. 11);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

(11) *J. Cromp,* Grievance Officer, filed a retaliatory misbehavior report on December 24, 2002 (Complaint at attached p. 13);

(12) *R. Donaldson,* Civilian Grievance Supervisor, on July 10, 2002, failed to file Chavis's grievance (Complaint at attached p. 14);

(13) *D. Selsky,* DOCS SHU Disciplinary Director, from July 1, 2002, to the date of the Complaint, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 15);

(14) *Lucien J. LeClaire,* DOCS Deputy Commissioner, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 16); and

(15) *Richard D. Roy,* Inspector General's Officer, on November 26, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached pp. 16-17).

*1. Illegal SHU Confinement*

**\*9** The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995) (citations omitted). "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 37 F.Supp.2d 162, 167 (N.D.N.Y.1999), *vacated and remanded on other grounds by* 238 F.3d 223 (2d Cir.2001) (citing *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996)). In *Sandin,* the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,*

515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d at 225 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999)). Thus, a prisoner asserting that a defendant denied him due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *Sandin,* 515 U.S. at 484.

Although the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship, *see Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citation omitted); *see also Hanrahan v. Doling,* 331 F.3d 93, 97-98 (2d Cir.2003); in comparison, segregative sentences of 125-288 days are "relatively long" and therefore necessitate " 'specific articulation of ... factual findings' before the district court could properly term the confinement atypical or insignificant...." *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (internal citations omitted).

Plaintiff alleges that, on July 1, 2002, upon his admission to Upstate Correctional Facility, Defendants improperly confined him in SHU with full deprivation of privileges without a proper "disposition warranting" such confinement and deprivation. Plaintiff seeks to hold Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire responsible for violating his due process rights by either subjecting him to, or allowing him to be subjected to, illegal SHU confinement. Plaintiff also claims that, on an unspecified date in August 2002, Defendant Boucaud "fabricated a more severe SHU-Disciplinary keeplock readout sheet" thereby extending Plaintiff's illegal SHU confinement through 2004. *See* Complaint at attached p. 3.

**\*10** According to Plaintiff's Inmate Disciplinary History, on March 7, 2000, while at Coxsackie Correctional Facility, he received a Tier II Disciplinary Hearing resulting in a disciplinary sentence of thirty-days keeplock

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

confinement with loss of package, commissary, and phone privileges. *See* Nepveu Decl., Exhibit "B," at p. 3. The listed service date for this sentence was set for June 27, 2002, through July 27, 2002. First, the sentence imposed was thirty-days and, absent any allegations to the contrary, such a brief disciplinary sentence would not implicate a liberty interest. Notably, Plaintiff has not alleged any circumstances in connection with that sentence that would rise to the level of atypical and significant. Thus, the Court concludes that, in light of all the circumstances, Plaintiff was subjected to normal SHU conditions for thirty-days, which would not implicate a liberty interest.

Also, the Court notes that, upon admission to Upstate Correctional Facility, Plaintiff was confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New York Regulations specifically authorize such confinement. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6(a)(2) (stating that an inmate in Upstate Correctional Facility "may be housed in a special housing unit ... for confinement pursuant to a disposition of a disciplinary (Tier II) ... hearing"). Plaintiff contends that stripping him of his privileges while he was confined in SHU was unwarranted; however, the Coxsackie Correctional Facility Disciplinary Disposition specifically denied him privileges for the thirty-day sentence. *See* Nepveu Decl., Exhibit "B," at p. 3. The Court also notes that, in this action, Plaintiff has not challenged the propriety of that Disciplinary Disposition and has not named any party associated with that Hearing as a Defendant in this action, although that issue is the subject of another action that Plaintiff has commenced in this District. *See Chavis v. Zodlow,* 128 Fed. Appx. 800 (2d Cir.2005) (unpublished decision affirming in part and vacating and remanding in part); Nepveu Decl., Exhibit "O," *Chavis v. Zodlow,* 9:02-CV-637 (N.D.N.Y. Dec. 5, 2003) (Decision and Order, Hood, J., sitting by designation).

In liberally construing Plaintiff's claim based upon his arguments and the exhibits that he has submitted, the Court concludes that Plaintiff is challenging the fact that he lost certain privileges during his confinement in Upstate Correctional Facility's SHU, at least insofar as he claims he already served that portion of his Coxsackie Correctional Facility Disciplinary Sentence from March 7, 2000, through April 6, 2000. *See* Dkt. No. 75 at pp. 4-9A. The records that the parties have submitted to the Court

for its review support Plaintiff's contention that he had already served his thirty-day loss of privileges sentence. *See* Nepveu Decl., Exhibit "B," at p. 3; Dkt. No. 75, at Exhibit "BB," March 7, 2000 Tier II Hearing Disposition. Although it is unclear from the record what the privileges were that Plaintiff was denied during his thirty-days in SHU, the Court is mindful that, in accordance with New York's Regulations, inmates assigned to keeplock status in SHU pursuant to § 301.6 are subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in §§ 302.2(a)-(j). *See* N.Y.Codes R. & Regs. tit. 7, §§ 301.6(c)-(h) & 302.2(a)-(j). Plaintiff has not raised any claim that any deprivations that he suffered were contrary to the above regulations and, in any event, because Plaintiff's allegations amount to normal SHU conditions, the Court finds that no liberty interest is implicated.

**\*11** With regard to Plaintiff's allegation that Defendant Boucaud fabricated a more severe SHU-Disciplinary keeplock readout sheet, Defendant Boucaud avers, in a sworn Declaration, that he did not alter Plaintiff's records; and Plaintiff has not presented any proof demonstrating otherwise. In his complaint, Plaintiff states that Defendant Boucaud falsified the document sometime in August; however, in his opposition papers, which are replete with his incoherent ramblings, Plaintiff argues that Defendants improperly denied him privileges. *Compare* Complaint at attached p. 3 *with* Dkt. No. 75 at pp. 4-9A. This discrepancy is inexplicable; there is no date in August that this Court can discern on which Defendant Boucaud would have had cause to alter Plaintiff's confinement in SHU because, by that time, Plaintiff was serving the twelve-month SHU sentence that Defendant Rock imposed at the July 26, 2002 Tier III Superintendent's Hearing. *See* Nepveu Decl., Exhibit "B," at p. 1; *see infra* Part III.D.3.

Lastly, Plaintiff alleges that Defendant Roy violated his due process rights when he ignored a letter that Plaintiff wrote to him regarding, among other things, his "illegal" SHU confinement. It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *see* McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977) (citations omitted), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694, 98

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). The fact that Plaintiff may have written a letter to Defendant Roy does not automatically render him responsible for any constitutional violations. *See Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, *6 (S.D.N.Y. July 13, 1998)* (citations omitted) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N.Y.1989)* (holding that "the wrong must have been ... capable of mitigation at the time the supervisory official was apprised thereof" (citation omitted)); *Woods v. Goord,* No. 97 CIV. 5143, 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998)* (holding that receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Thus, Plaintiff cannot hold Defendant Roy liable for the alleged violation of his constitutional rights simply because he either responded or, conversely, failed to respond, to a complaint. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). In any event, because the Court has concluded that no violations of Plaintiff's constitutional rights occurred, there is no need for the Court to consider the extent, if any, of Defendant Roy's involvement. The Court further finds that Plaintiff's general allegations against these nine Defendants arising from his July 1, 2002 confinement in SHU, regardless of the actual role or power that these Defendants possessed, are patently frivolous and even borderline malicious. Accordingly, the Court dismisses Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire based upon Plaintiff's confinement to SHU on July 1, 2002, pursuant to 28 U.S.C. § 1915(g).

*2. Retaliatory Misbehavior Reports*

**\*12** Plaintiff alleges that Defendants Tousignant, Cromp, and Buffman filed retaliatory misbehavior reports against him on August 26, December 24, and December 25, 2002, respectively. It is not clear whether Plaintiff challenges the veracity of these reports. However, to the extent that he is claiming that these reports were false, it is well-settled that prisoners have no constitutional right to be free from being falsely accused. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)* (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as prison officials provide the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, " 'the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983.' " *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988)* (quotation omitted); *see also Wolff v. McDonnell,* 418 U.S. 539, 564-66 (1974).

However, before the Court addresses such issues, it must determine whether a liberty interest is implicated. The misbehavior reports at issue resulted in three sentences of thirty-days keeplock and corresponding losses of privileges. *See* Nepveu Decl., Exhibit "B," at p. 1. Even if this Court were to construe the three sentences in the aggregate, the ninety days total that Plaintiff was confined in SHU would not, standing alone, implicate a liberty interest. Moreover, because at the time that Plaintiff filed his complaint he had not yet served these sentences, the Court is unable to determine whether the actual conditions of confinement in SHU were atypical or significant. Accordingly, because no liberty interest is implicated, Plaintiff cannot assert due process violations against Defendants Tousignant, Buffman, and Cromp and, therefore, the Court grants Defendants' motion for summary judgment with regard to these claims.

Notably, however, there are substantive due process rights, rather than procedural, which cannot be obstructed " 'even if undertaken with a full panoply of procedural protections,' " such as the right of access to courts or to be free from retaliation for exercising a constitutional right. *Franco,* 854 F.2d at 589* (citation omitted); *see id.* at 590 ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights." (internal citations omitted)). Thus, if a prisoner alleges that the defendants filed false disciplinary reports against him in retaliation for exercising a valid constitutional right, his claim may survive a dispositive motion if he properly alleges that the defendants violated his substantive due process rights. *See id.* ("If [the plaintiff] can prove his allegation that he was subjected to false disciplinary charges and subsequent punishment for his [exercise of a constitutional right], he is entitled to relief under section 1983.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

**\*13** Plaintiff does assert that the three misbehavior reports that Defendants Tousignant, Buffman, and Cromp filed against him were retaliatory in nature. Thus, the Court will address these claims, together with Plaintiff's claim against Defendant Donaldson for willful failure to file Plaintiff's grievances, below in the context of the standards applicable to substantive due process claims. *See infra* Parts III.E-F.

*3. Disciplinary Hearings*

Finally, Plaintiff claims that Defendants Rock, Daggett, and Canning violated his due process rights in connection with the July 26, 2002 Tier III Superintendent's Hearing. As explained below, since Defendant Rock, as Hearing Officer, recommended a loss of good time credits and that disposition was affirmed on appeal, Plaintiff's due process claims are barred.

In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court held that a § 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction or sentence unless "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486-87. The Supreme Court later extended its *Heck* ruling to situations in which inmates challenge disciplinary proceedings that resulted in a loss of good time credits wherein the validity of a disciplinary or administrative sanction would affect the length of the plaintiff's confinement. *See Edwards v. Balisok,* 520 U.S. 641 (1997). This rule does not impose an exhaustion requirement upon a § 1983 plaintiff, but rather, "den[ies] the existence of a cause of action." *Heck,* 512 U.S. at 489.

In the present case, any resolution of Plaintiff's due process claims would ultimately call into question the validity of his disciplinary conviction. Such claims are, therefore, not cognizable under § 1983 absent a showing that this sentence has been overturned or invalidated. Plaintiff has not made such a showing and, therefore, the

Court grants Defendants' motion for summary judgment and dismisses without prejudice Plaintiff's due process claims against Defendants Rock, Daggett, and Canning.[FN17]

> **FN17.** The Court dismisses Plaintiff's claims without prejudice because such claims would accrue in the event that his sentence is overturned. *Amaker v. Weiner,* 179 F.3d 48, 52 (2d Cir.1999) (holding that "disposition of [a] case on *Heck* grounds ... warrants only dismissal *without* prejudice, because the suit may be reinstituted" in the event the plaintiff's conviction is overturned (citations omitted)).

**E. First and Fourteenth Amendment-Access to Courts**

Plaintiff claims that the following Defendants violated his First and Fourteenth Amendment right to petition the courts for redress:

(1) *G. Kienert,* on September 5, 6, and 30, 2002, as well as October 25, 2002, ordered SHU officers to confiscate Chavis's legal mail and deny access to the law library (Complaint at attached pp. 1-2);

(2) *R. Girdich,* on September 1, 6, and 30, 2002, as well as October 25, 2002, ordered SHU officers to confiscate outgoing legal mail (Complaint at attached p. 3);

(3) *B. Dumas,* CO SHU, on September 5, 6, and 30, 2002, as well as October 25, 2002, confiscated Chavis's legal mail and denied replacement envelopes, and, on September 8, 2002, as well as unspecified dates in November and December 2002, failed to send outgoing legal mail (Complaint at attached p. 5);

**\*14** (4) *M. White,* CO SHU, on unspecified dates in August, September, and October, 2002, ignored Chavis's request slips and denied access to the law library (Complaint at attached p. 5);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

(5) *A. Donovan,* CO SHU, on September 5 and 6, 2002, confiscated Chavis's outgoing legal mail, wherein Chavis was unable to "redo" and mail his administrative appeal and further aided Defendants Kienert, Girdich, and Dumas, presumably, in denying access to the courts. (Complaint at attached p. 6);

(6) *G. Canning,* on July 12, 2002, denied Chavis access to his legal materials despite being directed otherwise (Complaint at attached p. 9);

(7) *R. Donaldson,* on July 10, 2002, and continuing to the date of the Complaint, failed to redress Chavis's grievances of legal mail confiscation against Defendants Donovan, Dumas, Girdich, and Kienert (Complaint at attached p. 14); and

(8) *Richard D. Roy,* on November 26, 2002, ignored the illegal confiscation and censoring of Chavis's legal mail by Defendants Kienert, Girdich, Dumas, Donovan, and Donaldson (Complaint at attached pp. 16-17).

Interference with legal mail implicates an inmate's First and Fourteenth Amendment rights to access to the courts and free speech. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). The Second Circuit has stated that in order to state a claim for denial of access to the courts via interference with legal mail, the plaintiff must show that the defendant caused actual injury, *i.e.,* the defendant " 'took or was responsible for actions that "hindered [a plaintiff's] efforts to pursue a legal claim." ' " *Id.* (quotation omitted); *see also Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, *4 (S.D.N.Y. Mar. 29, 2001)* (holding that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim" (citation omitted)).

Additionally, a prisoner's First Amendment right is implicated when the defendants hinder the "free flow of incoming and outgoing mail...." *Davis,* 320 F.3d at 351 (citations omitted). "Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the

substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." ' *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). When balancing these competing interests, "courts have consistently afforded greater protection to legal mail than to nonlegal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citations omitted). Moreover, when asserting a First Amendment violation resulting from interference with mail, the prisoner must show that the prison officials "regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident." *Cancel v. Goord,* 00 CIV 2042, 2001 WL 303713, *6 (emphasis added) (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)); *see also Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (isolated incident of tampering is insufficient to state a constitutional violation). The Court notes, however, that the Second Circuit has held that as few as two incidents of mail tampering may be sufficiently actionable "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis,* 320 F.3d at 351 (citation omitted). Thus, in cases where the incidents are few and a violation is not patent, the plaintiff should specifically allege invidious intent or actual harm. *See id .* (citing cases). Furthermore, mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y 1995) (citations omitted); *see also Konigsberg v. Lefevre,* 267 F.Supp.2d 255, 261 (N.D.N.Y.2003) (citations omitted).

**\*15** Plaintiff fails to state a claim for denial of access to the courts. First, Plaintiff does not claim that Defendants' alleged confiscation of his outgoing mail, denial of replacement envelopes, denial of access to the law library, and/or denial of access to his legal papers caused him any actual harm. Moreover, the only concrete harm he alleges is the confiscation of his appeal from the September 5, 2002 Hearing disposition. In this regard, Plaintiff claims that, on September 5 and 6, 2002, ostensibly on Defendants Kienert's and Girdich's orders, Defendants Dumas and Donovan confiscated Plaintiff's outgoing mail and refused to supply Plaintiff with replacement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

envelopes. Plaintiff further alleges that, on unspecified dates in August, September, and October, Defendant White ignored his request slips and denied him access to the law library. However, according to the Declarations that Defendants have submitted to the Court, facility records indicate that Defendants Dumas and Donovan were not assigned to Plaintiff's gallery on those days; rather, two other correction officers, whom Plaintiff has not named as Defendants herein, were on duty. *See* Dkt. No. 72, B. Dumas Decl., at ¶ 4; A. Donovan Decl., at ¶ 4. Furthermore, Defendants Dumas and Donovan avow that they "never confiscated, kept, improperly returned, or otherwise improperly interfered with Mr. Chavis's outgoing legal mail[ ]" and Defendant White affirms he never ignored Plaintiff's request slips. *See* Dkt. No. 72, Dumas Decl., at ¶ 5; Donovan Decl., at ¶ 5; M. White Decl., at ¶ 4. Defendants Kienert and Girdich also aver that they "never ordered anyone to confiscate, keep, or interfere with Mr. Chavis's outgoing legal or internal mail" within the parameters of DOCS policy. *See* Dkt. No. 72, G. Kienert Decl., at ¶ 3; R. Girdich Decl., at ¶ 3. Similarly, with regard to Defendant Donaldson's alleged interference with Plaintiff's grievances, Defendant Donaldson avows that he never concealed nor failed to docket any grievance that Plaintiff filed. *See* Dkt. No. 72, Donaldson Decl., at ¶ 3.

Plaintiff further claims that, on July 12, 2002, Defendant Canning denied him access to his legal materials. Defendant Canning specifically controverts this allegation in a sworn Declaration, in which he further explains that he wrote a misbehavior report on July 12, 2002, due to Plaintiff's admission that he had written a harassing letter to an AAG. *See* Dkt. No. 72, G. Canning Decl., at ¶¶ 3-5; *see also* Nepveu Decl., Exhibit "C," at pp. 6-8 (AAG letter, dated July 9, 2002, & attached Chavis letter, dated July 3, 2002).

Plaintiff's final claim that Defendants denied him access to the courts is based upon his allegation that Defendant Roy ignored his letter. The Court dismisses this claim for the reasons stated above regarding personal involvement. *See supra* Part III.D.1. In light of the fact that many of Plaintiff's claims of denial of access to the courts are not only conclusory in nature but are also asserted against individuals who Plaintiff clearly had notice through the grievance process were not even present on the dates in question, the Court finds that such claims are frivolous.

Therefore, the Court dismisses Plaintiff's access-to-the-courts claims against Defendants Kienert, Girdich, Dumas, White, Donovan, Canning, Donaldson and Roy pursuant to 28 U.S.C. § 1915(g).

F. First and Fourteenth Amendment-Retaliation

**\*16** Plaintiff asserts that the following Defendants took retaliatory actions against him:

(1) *A. Tousignant* issued a retaliatory misbehavior report after Chavis filed a grievance against staff on August 28, 2002 (Complaint at attached p. 10);

(2) *R. Girdich,* on October 30, 2002, fabricated a state charge against Chavis in retaliation for a grievance he had filed (Complaint at attached p. 4);

(3) *G. Canning,* on July 13, 2002, filed a retaliatory misbehavior report regarding threats to outside legal sources (Complaint at attached p. 9);

(4) *Ms. Buffman,* on December 25, 2002, filed a retaliatory misbehavior report after Chavis filed two grievances against her, dated December 15 and 16, 2002 (Complaint at attached p. 11); and

(5) *J. Cromp,* on December 24, 2002, filed a retaliatory misbehavior report for a grievance Chavis filed against Nurse Buffman on December 16, 2002 (Complaint at attached p. 13).

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or to be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *See Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). To state a First Amendment claim for retaliation, an inmate must demonstrate (1) that he was engaged in constitutionally protected activity, (2) that the defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

took adverse action against him, and (3) that there was a causal connection between the protected speech and the adverse action in that the alleged adverse action was substantially motivated by the protected activity. *See Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (quotation omitted); *see also Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quotation omitted).

To satisfy the second prong, a prisoner must present evidence to support his claim that the defendants acted with an improper motive. Such evidence includes (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *See Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that the plaintiff met his burden to show retaliatory motive by presenting circumstantial evidence relating to, among other things, the temporal proximity of the allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded (citation omitted)). " 'Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." ' *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d at 493) (other citation omitted). " 'Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." ' Id. (quotation omitted). Furthermore, in satisfying the causal connection requirement, also referred to as temporal proximity, "the allegations must be " 'sufficient to support the inference "that the speech played a substantial part" in the adverse action." ' *Id.* at 492 (quotation omitted).

**\*17** The plaintiff bears the initial burden to show that the defendants' actions were improperly motivated. In situations in which the defendants' actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citation omitted); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d

Cir.1994) (citations omitted); *see also Gayle,* 313 F.3d at 682 (holding that the defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that the plaintiff " 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" ' (quotation and other citation)). Moreover, the Second Circuit has noted that retaliation claims are prone to abuse and that, therefore, courts should examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *Dawes,* 239 F.3d at 491 (holding that "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." (citation omitted); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotation omitted).

Plaintiff claims that Defendants wrote four misbehavior reports against him, in which they charged him with harassment and/or threats, in retaliation for his exercising his constitutional rights. Defendants Canning, Tousignant, Cromp, and Buffman authored these four misbehavior reports on July 12, 2002, August 26, 2002, December 23, 2002, and December 24, 2002, respectively. As explained more fully below, because Plaintiff has failed to meet his burden to show improper motives and because the record demonstrates that Defendants issued all of these reports for valid reasons, the Court concludes that Plaintiff's retaliation claims against these Defendants must fail.

Plaintiff asserts that on July 12, 2002, Defendant Canning wrote a retaliatory misbehavior report against him. The subject of this misbehavior report was the threatening letter, marked as "legal mail," that Plaintiff had written while he was confined in SHU to an AAG. In a subsequent interview, Plaintiff admitted to Defendant Canning that he wrote that letter, prompting Defendant Canning to charge him with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall not harass any person), and 180.11 (correspondence procedures). *See* Nepveu Decl., Exhibit "C," at p. 16. Although it is dubious, given the nature of the letter, whether the activity in which Plaintiff engaged could be classified as protected activity, were this Court to liberally construe this issue in Plaintiff's favor, he would still fail to meet his burden with respect to his retaliation claim against Defendant Canning because he failed to present even a shred of evidence of improper motive on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

Defendant Canning's part. Moreover, Defendant Canning has, under oath, denied any improper motive. *See* Canning Decl. at ¶¶ 5-6. Finally, the Court's review of the letter leads to the inescapable conclusion that the tone and content of the letter is threatening and harassing; and, thus, the Court concludes that Defendant Canning clearly had a proper motive to write the misbehavior report.

**\*18** Next, Plaintiff complains about a misbehavior report, dated August 26, 2002, that Defendant Tousignant authored. The subject of this misbehavior report is the letter that Plaintiff wrote to Defendant Tousignant regarding Nurse Buffman, in which Plaintiff referred to Nurse Buffman as an "ill-minded lesbian dyke of a deeply rooted perverted mentality" and a "KKK staff member [who] hand masturbates SHU-inmates through the access door." *See* Nepveu Decl., Exhibit "E," at p. 6. Again, if the Court liberally construes this claim to find that, in submitting a grievance to a supervisor, Plaintiff may have been engaged in protected activity, he still fails to present any evidence of an improper motive. Under oath, Defendant Tousignant denied any acrimonious motive in writing the report. *See* Dkt. No. 72, Tousignant Decl., at ¶¶ 16-17. Moreover, even if Plaintiff had shown that Defendant Tousignant acted with an improper motive, his claim would still fail because, in light of the obvious harassing and threatening tone of Plaintiff's letter, Defendant Tousignant appropriately issued a misbehavior report against him.

Plaintiff also challenges the misbehavior reports, dated December 23 and 24, 2002, that Defendants Cromp and Buffman authored, respectively. Defendant Cromp's December 23, 2002 misbehavior report, much like those that the Court has already addressed, arose out of a threatening and harassing grievance that Plaintiff wrote regarding Nurse Buffman, in which he called Nurse Buffman a "despicable piece of trash" and an "unprofessional, ill-minded, and vindictive freak." *See* Nepveu Decl., Exhibit "G," at pp. 11-12. Although filing an institutional grievance is clearly protected activity, Plaintiff, yet again, fails to allege that Defendant Cromp possessed any improper motive in authoring the report. Moreover, Defendant Cromp, under oath, has denied any improper motive. *See* Dkt. No. 72, Cromp Decl., at ¶¶ 5-7. Furthermore, Plaintiff's grievance was docketed and addressed at all levels; thus, Plaintiff was not in any way constrained nor encumbered in having this and other

grievances addressed. Lastly, with regard to Defendant Buffman's December 24, 2002 misbehavior report, on that date, Plaintiff told Defendant Buffman, during sick call, that he needed prescriptions refilled. When she asked him which refills he needed, Plaintiff refused to answer and became disrespectful and belligerent, called Defendant Buffman a "bitch," told her to "drop dead," and threatened to kill her. *See* Nepveu Decl., Exhibit "H," at p. 10; Buffman Decl. at ¶ 12. Under these circumstances, Defendant Buffman was clearly justified in filing this misbehavior report against Plaintiff. *See* Dkt. No. 72, Buffman Decl., at ¶¶ 12-13.

Plaintiff's final retaliation claim is against Defendant Girdich for allegedly fabricating a state charge on October 30, 2002. In his Declaration, Defendant Girdich denies bringing any state criminal charges against Plaintiff. *See* Dkt. No. 72, Girdich Decl., at ¶ 10. Since Plaintiff fails to expound on this claim, the Court finds that it is clearly without merit.

**\*19** In light of the fact that at least three of the misbehavior reports were in response to remarks that Plaintiff made in writing with his signature affixed to such writings, the Court finds that these claims of retaliation are entirely without merit and bordering upon harassment. Furthermore, Plaintiff's retaliation claim against Defendant Girdich is completely unsubstantiated because Defendant Girdich never filed any state charges against Plaintiff. Accordingly, the Court concludes that Plaintiff has failed to state retaliation claims against Defendants Canning, Tousignant, Cromp, Buffman and Girdich, and, therefore, grants Defendants' motion for summary judgment with respect to these claims. Alternatively, the Court dismisses Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich as frivolous pursuant to 28 U.S.C. § 1915(g).

### G. Eighth Amendment

Plaintiff alleges that Defendants committed numerous infractions that violated his Eighth Amendment right to be free from cruel and unusual punishment. The crux of his claims centers around the conditions of his confinement in SHU as well as the denial of medical care.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (citation omitted). In this respect, the Eighth Amendment requires that prison officials provide prisoners with humane conditions of confinement including " 'adequate ... medical care[.]" ' *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation and other citation omitted). To prove a violation of the Eighth Amendment, an inmate must show (1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain." ' *Trammell,* 338 F.3d at 161 (citation omitted). Moreover, the Eighth Amendment prohibits punishments that are "grossly disproportionate to the severity of the crime," including unnecessary and wanton inflictions of pain which are " 'totally without penological justification." ' *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quotation and other citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 737 (2002) (citations omitted).

*1. Prison Conditions*

With regard to his complaints about prison conditions, Plaintiff asserts that the following Defendants subjected him to inhumane conditions in violation of the Eighth Amendment:

(1) *G. Kienert,* on July 1, 2002, exhibited deliberate indifference when he subjected Chavis to illegal SHU confinement, and, purportedly on September 5, 6, and 30, 2002, as well as October 25, 2002, Kienert ordered SHU officers to deny Chavis access to hygienic items such as soap, shampoo, and nail clippers, and also directed the officers to tamper with his food trays, including spitting on the food (Complaint at attached pp. 1-2);

**\*20** (2) *A. Boucaud,* on August 2, 2002, exhibited deliberate indifference when he fabricated and wrongfully extended Chavis's confinement in SHU (Complaint at attached pp. 2-3);

(3) *M. White,* on unspecified dates in August, September, and October 2002, exhibited deliberate indifference when he spat in Chavis's food and denied him access to various hygienic supplies resulting in Chavis's inability to shower for two months (Complaint at attached pp. 5-6);

(4) *Ms. Daggett,* on July 1, 2002, exhibited deliberate indifference by subjecting Chavis to illegal SHU confinement (Complaint at attached p. 7);

(5) *J. Rock,* on July 26, 2002, exhibited deliberate indifference when he commenced a Tier III Hearing in Chavis's absence and subjected Chavis to further illegal SHU confinement (Complaint at attached p. 8);

(6) *G. Canning,* on July 13, 2002, authored a false misbehavior report which led to further illegal SHU confinement (Complaint at attached p. 8);

(7) *L. Friot,* on July 1, 2002, exhibited deliberate indifference by continuing and subjecting Chavis to illegal SHU confinement (Complaint at attached p. 9); and

(8) *Lucien J. LeClaire,* on July 1, 2002, allowed Chavis to be subjected to illegal SHU confinement (Complaint at attached p. 16).

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' ... but neither does it permit inhumane ones...." *Farmer,* 511 U.S. at 832 (internal quotation omitted). The prisoner "must show 'extreme deprivations', '[b]ecause routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society...." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (quotation and other citation omitted); *see also Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (holding that, [b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a "conditions-of-confinement" claim." ' (quotation omitted)).

To establish an Eighth Amendment claim based upon his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

conditions of confinement, an inmate must allege that the conditions of his confinement have violated " 'contemporary standards of decency." " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002)). "To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.' " *Davidson,* 371 F.Supp.2d at 370 (quotation and other citation omitted). "[T]he objective element is satisfied 'only when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.' " *Id.* (quotation omitted). Allegations of "overall conditions" will not rise to the level of cruel and unusual punishment without the existence of a "specific deprivation of a single human need...." *Wilson v. Seiter,* 501 U.S. 294, 305 (1991). As to the subjective element, the requisite scienter is that of deliberate indifference to the inmate's health or safety. *See Farmer,* 511 U.S. at 834.

**\*21** Initially, the Court notes that Plaintiff's "deliberate indifference" claims against Defendants Kienert, Daggett, Friot, and LeClaire, stemming from his confinement in SHU on July 1, 2002, are without merit as the sole basis for these claims is the alleged illegality of his confinement to SHU on that date, an issue this Court has already resolved in Defendants' favor. Likewise, the Court has already addressed Plaintiff's claims against Defendants Boucaud (August 2, 2002 extension of SHU confinement), Rock (July 26, 2002 improper hearing subjecting Chavis to illegal SHU confinement), and Canning (July 12, 2002 misbehavior report leading to illegal SHU confinement) and concluded that they lack merit. Thus, Plaintiff's only remaining conditions-of-confinement those based upon his allegations against Defendants Kienert for allegedly ordering SHU officers to deny him hygienic materials and tamper with his food and against Defendant White for carrying out those orders.

The Eighth Amendment does require that prison officials serve prisoners " 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980)); *see also Wilson,* 501 U.S. at 303 (prisoners are guaranteed a nutritionally adequate diet). Moreover, although courts in this Circuit have found claims of unsanitary, spoiled, or contaminated foods to be sufficient to sustain an Eighth Amendment claim, *see Robles,* 725 F.2d at 15-16 (citing cases), Plaintiff's allegations that Defendants spit in his food and "violat[ed][his] bread by making holes in it" are wholly conclusory and unsubstantiated.

Plaintiff also claims the Defendants denied him various toiletry/hygienic items and that these denials "prohibited" him from showering "for a near 'two' month time period." *See* Complaint at attached p. 6. The Court does not understand how the deprivation of such items would lead to the deprivation of showers; what is more probable, however, is that Defendants provided Plaintiff with opportunities to shower, but without shampoo and soap. Defendant White's Declaration adequately supports this possibility; he explains that the SHU showers occur in the inmate's cell and a single switch turns on the water in an entire side for twenty-minutes and that it is not possible to control the shower in a single cell. *See* White Decl. at ¶ 9. Given these facts, which Plaintiff does not dispute, the Court concludes that it is incredulous for Plaintiff to assert that Defendant White, on Defendant Kienert's orders, denied him access to showers for a two-month period.

Further, Plaintiff has failed to show that the alleged denial of toiletries rose to the level of deliberate indifference to his health or safety. Courts, including the Second Circuit, have generally held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell,* 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference." ' (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct.1970)). Accordingly, the Court dismisses all of Plaintiff's Eighth Amendment claims regarding the conditions of his confinement as frivolous under 28 U.S.C. § 1915(g).

*2. Medical-indifference Claims*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

**\*22** Plaintiff asserts that the following Defendants denied him access to medical care in violation of the Eighth Amendment:

(1) *A. Tousignant,* on July 28, 2002, denied proper medical care and further denied twenty-six (26) "medical food trays" to Chavis that were required due to his seafood allergies, resulting in loss of twenty (20) pounds over a three-month period (Complaint at attached pp. 10-11);

(2) *Ms. Buffman,* on July 10, 2002, denied Chavis emergency treatment and denied access to a doctor for treatment of serious allergic reaction and worked in concert with Tousignant in denying Chavis his medical food trays (Complaint at attached pp. 10-11);

(3) *P. Johnston,* PA, on December 17, 2002, denied Chavis access to medical care for severe to mild medical conditions and failed to refill prescriptions. Also, on December 24 and 27, 2002, Johnston failed to provide medical care to Chavis during allergic reactions (Complaint at attached p. 12);

(4) *J. Cromp,* on December 24, 2002, exhibited deliberate indifference when he concealed a valid grievance regarding Nurse Buffman's medical violations and thus sanctioned the medical violations (Complaint at attached p. 13);

(5) *L.N. Wright,* Chief Medical Officer, on unspecified dates in August and December 2002, repeatedly ignored Chavis's letters regarding medical complaints (Complaint at attached p. 13);

(6) *R. Donaldson,* from July 10, 2002, to the date of the Complaint, failed to file Chavis's grievances against medical staff regarding medical care thus allowing the violations to continue (Complaint at attached p. 14);

(7) *M. Yaddow,* CO SHU, on December 27, 2002, removed Chavis's request slip for medical care thus preventing access to adequate care (Complaint at attached p. 15); and

(8) *Richard D. Roy,* on March 26, 2002, ignored Chavis's letters regarding medical care (Complaint at attached pp. 16-17).

To state an Eighth Amendment claim based upon the denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) the defendants' deliberate indifference to that serious medical need. *See Farmer,* 511 U.S. at 834-35 (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). With respect to the "deliberate indifference" prong of this claim, "the plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " " ' *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting [ *Estelle v. Gamble,* 429 U.S. 97,] 102, 105-06, 97 S.Ct. at 290, 291-92).

The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quotation omitted). Among the relevant factors that a court should consider in making this determination are " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Id.* (quotation and other citation omitted).

**\*23** The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson,* 501 U.S. at 301-03; *Hathaway,* 37 F.3d at 66. A plaintiff also must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *See Farmer,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

purpose of causing harm or with knowledge that harm will result." *Id.; see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citation omitted). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quotation omitted).

With respect to his claims against Defendants Wright and Roy, the Court finds that Plaintiff has failed to allege any personal involvement of these Defendants in any constitutional violation and therefore dismisses all Eighth Amendment claims, in addition to the other claims that the Court has dismissed, against these Defendants for the same reasons that the Court dismissed the due process claims against Defendant Roy. *See supra* Part III.D.1. In addition, with respect to Plaintiff's claim against Defendant Cromp, the Court finds that the record clearly belies Plaintiff's claim that Defendant Cromp concealed his grievance against Nurse Buffman because all three administrative levels addressed that particular grievance. The same is true of Plaintiff's allegations against Defendant Donaldson for concealing grievances that Plaintiff filed against medical staff, because, as the record indicates, Plaintiff did file such grievances, which were similarly addressed at all administrative levels. Lastly, with respect to his claim against Defendant Yaddow, Plaintiff asserts that Defendant Yaddow denied him access to medical care by removing his request slip on December 27, 2002. However, according to facility records, on that date, Defendant Yaddow worked from 3 p.m. to 11 p.m. in the C Gallery of Building 9, while Plaintiff was housed in the B Gallery of Building 9. *See* Dkt. No. 72, Yaddow Decl., at ¶¶ 3-4. Obviously, Defendant Yaddow would have had no occasion, nor arguably any opportunity, to conceal or remove any request slip if he was not even in the vicinity of Plaintiff on that date. Thus, the Court dismisses Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow as frivolous pursuant to 28 U.S.C. § 1915(g).

Plaintiff's remaining Eighth Amendment medical-indifference claims are against Defendants

Tousignant, Buffman, and Johnston. With regard to these claims, Plaintiff alleges that he suffered from "mild" or "mild to near serious" hive attacks and scalp bleeding. *See* Complaint at attached pp. 10-12. Such conditions are not sufficiently serious that they would produce death, degradation, or extreme pain. *See Chance,* 143 F.3d at 702. Therefore, with respect to these allegations, the Court finds that Plaintiff cannot satisfy the objective prong of his medical-indifference claim. Moreover, even if this Court were to find that Plaintiff's condition was sufficiently serious, because food allergies can in some cases become life-threatening, his claim would still fail because he has not come forward with any evidence that any of the above-named Defendants acted with deliberate indifference to these serious needs. In fact, Plaintiff's health record reveals that medical staff frequently saw him and that he often would request medical services and yet fail to appear because he was asleep at the designated time. *See* Nepveu Decl., Exhibit "K," at p. 19; Buffman Decl., at ¶ 10; *see also supra* Part II (noting that medical staff saw Plaintiff an average of fourteen times per month and further listing the multiple instances when Plaintiff was asleep during the requested/scheduled sick call times and/or was belligerent and uncooperative with medical staff). The health record also contradicts Plaintiff's contention that Defendant Johnston failed to refill his prescriptions. *See* Nepveu Decl., Exhibit "K," at p. 20. In light of the fact that Plaintiff has failed to allege a sufficiently serious medical condition, coupled with the fact that the record clearly indicates that Defendants did not act with a sufficiently culpable state of mind, the Court grants Defendants' motion for summary judgment with regard to all of Plaintiff's Eighth Amendment medical-indifference claims.

**\*24** Plaintiff's remaining Eighth Amendment claims relate to his allegations that Defendants Tousignant and Buffman denied, or perhaps delayed, his medical food trays. Essentially, Plaintiff complains that he did not receive a Therapeutic Diet Request Form ordering a no-fish diet. In certain circumstances, the denial of a medically-prescribed diet may constitute an Eighth Amendment violation. *See Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citations omitted). *But cf. Ramsey v. Coughlin,* 1 F.Supp.2d 198, 205 (W.D.N.Y.1998) (holding that, under the particular circumstances of that case, the inmate was not constitutionally entitled to vegetarian diet). Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

"Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, ... such a classification [is reserved] for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Freeman v. Strack, 2000 WL 1459782, \*6 (S.D.N.Y. Sep. 29, 2000)* (citations omitted). Only when the official "knows of and disregards an excessive risk to inmate health or safety" will a court find that that official was deliberately indifferent. *Hathaway, 99 F.3d at 553*. In this case, the record indicates that neither Defendant Tousignant nor Defendant Buffman was responsible for filling out such a form or that either of them was even aware of the delay, if such occurred. *See* Tousignant Decl. at ¶¶ 9-10; Buffman Decl ., at ¶¶ 16-18; Nepveu Decl., Exhibit "K," at pp. 48-53; Exhibit "M," July 28, 2002 Memo from Tousignant. Even more telling is that fact that, from July 1, 2002, the date on which Plaintiff was transferred to Upstate Correctional Facility, through October 22, 2002, the date on which the Therapeutic Diet Form was executed, the medical staff saw Plaintiff twenty-five times and not once did he raise this issue with the staff. *See* Tousignant Decl. at ¶ 7; Nepveu Decl., Exhibit "K." Based upon this record, the Court finds that any temporary delay on the part of Defendants in providing Plaintiff with a no-fish diet was not a serious medical need, and in any case, Defendants did not know of and disregard this delay. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claims against Defendants Tousignant and Buffman.

**H. Sanctions**

In his opposition, Plaintiff asserts that, by serving a summary judgment motion in lieu of an answer for Defendant Kienert, AAG Nepveu has violated a court discovery order; and, therefore, the Court should sanction her. *See* Dkt. No. 75 at pp. 2-14. Magistrate Judge Treece issued the relevant discovery order on October 25, 2004. *See* Dkt. No. 65. In ruling on Plaintiff's motion to compel discovery, Magistrate Judge Treece concluded that, because at that time Plaintiff had not yet served Defendant Kienert with process, he could serve a set of interrogatories on Defendant Kienert thirty days after a response to the complaint was filed on behalf of Defendant Kienert. *See id.* at p. 4. Plaintiff served

Defendant Kienert on November 8, 2004. *See* Dkt. No. 68. On November 2, 2004, in response to AAG Nepveu's request, Magistrate Judge Treece set Defendant Kienert's response deadline for December 31, 2004, and extended the motion-filing deadline for all other Defendants to the same date. *See* Dkt. Nos. 66-70. Pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, a defendant may move for summary judgment "at any time." *Fed.R.Civ.P. 56*. Thus, AAG Nepveu asserts that she acted in good faith and with the understanding that no outstanding discovery order was in place and that summary judgment was an appropriate response to the complaint on behalf of Defendant Kienert.

**\*25** *Rule 37(d) of the Federal Rules of Civil Procedure* authorizes a court to impose sanctions for a party's failure "to serve answers or objections to interrogatories ... after proper service of the interrogatories," and further authorizes a court to "make such orders in regard to the failure as are just." *Fed.R.Civ.P. 37(d)*. Under the circumstances of this case, the Court finds that sanctions against AAG Nepveu are not warranted; therefore, the Court denies Plaintiff's request for sanctions.

III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion for summary judgment is GRANTED in its entirety; and the Court further

ORDERS that Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire, based upon Plaintiff's allegations regarding his admission to SHU on July 1, 2002, are DISMISSED AS FRIVOLOUS pursuant to *28 U.S.C. § 1915(g)*; and the Court further

ORDERS that Plaintiff's due process claims against Defendants Rock, Daggett, and Canning are DISMISSED WITHOUT PREJUDICE; and the Court further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)
(Cite as: 2005 WL 2452150 (N.D.N.Y.))

ORDERS that Plaintiff's First and Fourteenth Amendment claims against Defendants Kienert, Girdich, Dumas, White, Donovan, Canning, Donaldson and Roy, based upon his allegations that Defendants denied him access to the courts, are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's Eighth Amendment claims regarding the conditions of his confinement are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's request for sanctions is DENIED; and the Court further

ORDERS that the Clerk of the Court enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

N.D.N.Y.,2005.
Chavis v. Kienert
Not Reported in F.Supp.2d, 2005 WL 2452150 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

☞ Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Brandon HOLMES, Plaintiff,
v.
Correction Officer J. GRANT et al., Defendants.
**No. 03 Civ. 3426 RJH RLE.**

March 31, 2006.

*MEMORANDUM OPINION AND ORDER*

HOLWELL, J.

**\*1** Plaintiff Brandon Holmes, currently incarcerated in Southport Correctional Facility ("Southport"), brings a *pro se* complaint under 42 U.S.C. § 1983 (2000), seeking monetary damages and declaratory and injunctive relief against defendants James Grant et al., corrections officers, staff, and prison superintendents of the New York State Department of Correctional Services ("DOCS"), alleging violation of his constitutional rights. According to a liberal reading of plaintiff's *pro se* pleadings, plaintiff alleges denial of due process, cruel and unusual punishment, malicious prosecution, and retaliation. Defendants William Kivett, A. Baker, J. Smith, Brian Sweeney, Daniel Connolly, Matt Mullin, Kenneth Colao, James Grant, J. Decklbaum, David Miller, Superintendent Eisensmidt, Officer McCreery, and William P. Scott have filed a motion to dismiss all claims or, in the alternative, to transfer any claims not dismissed to the Northern District of New York. On October 25, 2005, Magistrate Judge Ronald L. Ellis issued a Report and Recommendation (the "Report") recommending that this Court grant defendants' motion to dismiss all of plaintiff's claims.

Under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b), this Court is required to undertake a *de novo* review of those portions of the Report to which specific written objections have been made. The Court, in its discretion, may also undertake a *de novo* review of the entire case. *See Pine Run Properties v. Pine Run Ltd.,* 1991 WL 280719, at \*7 (S.D.N.Y. Dec. 26, 1991). Due to the complexity of the action and the number of claims being brought by plaintiff, the Court elects to review the entire case *de novo*. For reasons to be explained below, defendants' motion to dismiss is granted in part and denied in part. [FN1]

FN1. The Report also recommended the dismissal of plaintiff's claims for excessive force and for conspiracy. On the face of the complaint, plaintiff is not bringing either an excessive force claim and or a § 1983 conspiracy claim. Even if plaintiff's complaint was liberally interpreted to be attempting to state a conspiracy claim, he has not made any nonconclusory allegations establishing that there was an *agreement* between multiple state actors to deprive him of his civil rights. *See Brewster v. Nassau County,* 349 F.Supp.2d 540, 547 (citing *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983)) (noting that in order to make out a conspiracy claim, plaintiff must allege (1) an agreement between two or more state actors or between a state actor and a private entity (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal, and causing some harm); *see also Walter v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002)) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983....").

BACKGROUND

Plaintiff has set forth extensive factual allegations in his complaint, which the Court shall accept as true for the purposes of this 12(b)(6) motion. In addition, both parties have submitted a number of exhibits. The Court takes judicial notice of those exhibits that constitute public records. Fed.R.Evid. 201; *see also Chambers v. Time Warner,* 282 F.3d 147, 153 (2d Cir.2002).

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

### 1. *The July 2000 Shawangunk Hearing*

Plaintiff's lengthy story begins on June 29, 2000. While confined at the Shawangunk Correctional Facility ("Shawangunk"), plaintiff was involved in a fight with several correction officers and was administratively charged with, *inter alia,* an assault on six of them, including defendants Ryan, Bertone, Kivett, and McCreery. (Amend.Compl.¶¶ 20, 70.) A disciplinary hearing was scheduled to commence on July 5, 2000. (*Id.* ¶ 21.)

From June 29 to the conclusion of the hearing on July 21, plaintiff was held in the Shawangunk Special Housing Unit ("SHU"). (*Id.* ¶ 46.) On June 29, defendant Connolly ordered that plaintiff be placed in "mechanical restraint," consisting of handcuffs and leg irons, whenever he left his cell, and be placed on exercise deprivation, resulting in plaintiff being confined to his cell for twenty-four hours a day. (*Id.* ¶¶ 23, 63.) In these June 29 orders, Connolly concluded that plaintiff "assault[ed] ... staff resulting in injuries to 2 sergeants and 3 officers." (*Id.* ¶ 23; Pl.'s Aff., Ex. 1.) These orders remained in effect until approximately July 11. (Amend.Compl.¶ 23.)

**\*2** The hearing began on July 5, with Connolly acting as hearing officer. (*Id.* ¶ 21.) Plaintiff objected to Connolly acting as the hearing officer, since he was the same official who had ordered plaintiff's restraints and exercise deprivation and was allegedly predisposed against plaintiff. (*Id.* ¶ 24.) Connolly declined to recuse himself. (*Id.*) Plaintiff alleges that Connolly conducted the hearing in a biased and unfair manner and introduced evidence after the close of the hearing that was used to support his determination of plaintiff's guilt. (*Id.* ¶¶ 25, 42.) Plaintiff also alleges that Connolly "distorted" his mother's testimony (*id.* ¶ 27); did not properly weigh the fact that photos of plaintiff, showing his alleged injuries, were of poor quality (*id.* ¶ 28); and refused to acknowledge a defense of justification (*id.* ¶ 29). Plaintiff further alleges that Connolly refused to allow plaintiff assistance from a prison counselor for a surprise witness that Connolly called (*id.* ¶ 36) and refused to allow plaintiff to call any witnesses, claiming that they would be redundant (*id.* ¶¶ 38, 44).

Because he was confined in the SHU, plaintiff was unable to marshal evidence for his defense. Plaintiff was assisted in his preparations for the hearing by Correction Counselor Chapperino. (*Id.* ¶ 31) According to plaintiff, however, Chapperino provided little to no assistance. Chapperino, *inter alia,* refused to retrieve documents for plaintiff, claiming that they were irrelevant (*id.*) and not only did not interview witnesses on plaintiff's behalf but actively pressured and threatened witnesses not to testify (*id.* ¶ 33).

Plaintiff was ultimately found guilty at the hearing on July 21 and sentenced to five years in the SHU, a $99 restitution fee, and loss of miscellaneous privileges. (*Id.* ¶ 41.)

### 2. *Shawangunk SHU Confinement from June through August 2000*

In the SHU, inmates are confined to their cells for twenty-three to twenty-four hours of the day. (*Id.* ¶ 62.) Plaintiff alleges that SHU confinement is also noisy, unhygienic, and inmates throw feces as weapons. (*Id.*) SHU places a number of substantial restrictions on inmate privileges, including, *inter alia,* visitation with family being conducted behind plexiglass instead of "full-contact" visitation, limited exercise and rehabilitation opportunities, and the denial of televisions, radios and the like. (*Id.* ¶¶ 64-69.)

Plaintiff, first confined to the Shawangunk SHU on June 29 pending the Shawangunk hearing, continued to be confined there following its verdict. (*Id.* ¶ 46.) SHU prisoners are normally given some privileges if they successfully complete thirty days of "good behavior," but plaintiff alleges that Connolly falsified his records to deny him these privileges. (*Id.* ¶ 45.) Frustrated by this, plaintiff, by his own admission, received two inmate misbehavior reports ("IMRs") for incidents on August 10 and August 15. (*Id.* ¶ 45; Defs.' Aff. Ex. A, at 5.) Plaintiff was sentenced to thirty days of SHU confinement and thirty days of "keeplock" confinement as a result of these two IMRs.[FN2] (Defs.' Aff. Ex. A, at 5.) Plaintiff does not deny the bad conduct underlying these two IMRs or claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

that the subsequent disciplinary hearings for these IMRs denied him due process.

> FN2. Plaintiff uses the term "keeplock" to refer to conditions where inmates are confined for twenty-three hours a day in a general population housing unit cell. (Amend.Compl.¶ 149.)

**\*3** On August 30, plaintiff was transferred briefly to the Downstate Correctional Facility ("Downstate") before being transferred to Southport's SHU. (*Id.* ¶ 46.) At Southport, plaintiff was under a "restraint" order, and forced to wear handcuffs and waist chains, including during exercise periods. (*Id.* ¶¶ 48-49.)

### 3. *The August 2000 Shawangunk IMRs*

On September 18, 2000, the sentence arising out of the June 29 Shawangunk incident was reversed and a new hearing was ordered on the grounds that the hearing officer, Connolly, had been involved in "pre-hearing assessment" of plaintiff when he issued the restraint and exercise deprivation orders. (*Id.* ¶¶ 117-18; Pl.'s Aff., Ex. 5.) Plaintiff, however continued to be confined in Southport SHU to begin serving the sentences received for the two August IMRs. (Amend. Compl. ¶ 48; Defs.' Aff. Ex. A, at 5.)

Plaintiff was transferred to the Eastern Correctional Facility ("Eastern") SHU on September 25. (Amend.Compl.¶ 52.) Plaintiff continued to be confined at Eastern until he was transferred on November 1. (*Id.* ¶ 61.) Between November 1 and November 7, plaintiff was confined for some time at both Downstate and Southport. (*Id.* ¶¶ 61, 119.) Sometime during the first week of November, DOCS officials decided to hold a second administrative hearing against plaintiff for the June 29 Shawangunk incident. (*Id* . ¶ 119)

On November 7, 2000, plaintiff was transferred to the Sing Sing Correctional Facility ("Sing Sing"). (*Id.* ¶ 120.) Plaintiff alleges that he was supposed to be released into the general population but was instead kept under keeplock status. (*Id.* ¶ 121.) Prison records show,

however, that this keeplock time was the remainder of the sentence that plaintiff was serving for the August IMRs. (Defs.' Aff. Ex. A, at 5.) Plaintiff complained to a corrections officer and filed a grievance through the DOCS inmate grievance program protesting his keeplock status. (*Id.* ¶ 125.) On November 17, plaintiff was released from keeplock confinement. (*Id.* ¶ 126.) At a grievance hearing, plaintiff claims he was told that he had "pissed somebody off" and that that was the cause for his confinement. (*Id.* ¶ 127.) FN3

> FN3. Plaintiff was sentenced to thirty days SHU time and thirty days keeplock time as a result of the August IMRs. As indicated here, he actually spent more than thirty days in the SHU, from September 18 through October 31. Part of this SHU time was administrative confinement because he had to testify in front of the grand jury for his criminal assault charges. (*See* Amend. Compl. ¶ 104.)

### 4. *The Twenty-Four Hour Lighting in Eastern SHU*

As noted, plaintiff was confined in the Eastern SHU between September 25 and October 31, 2000. (*Id.* ¶ 53.) The Eastern SHU has a policy of leaving cell lights on twenty-four hours a day. (*Id.* ¶ 54.) Plaintiff alleges that he could not sleep and suffered injury as a result of this policy, including fatigue, loss of appetite, migraine headaches, and a "violent aggravation of rashes." (*Id.* ¶ 55.) Plaintiff sought medical treatment for his conditions on October 10. (*Id.* ¶ 56.) Plaintiff complained to correction officers and filed administrative grievances through the DOCS Inmate Grievance Program ("IGP"); the prison superintendent, defendant Miller; and the DOCS Central Office Review Committee ("CORC"), but his requests to have the lights turned off were denied. (*Id.* ¶¶ 54, 61; Pl. Aff., Ex. 8.) These conditions continued for thirty-five days until plaintiff was transferred on November 1, 2000. (Amend.Compl.¶ 61.)

### 5. *The Defendants' Filing of Criminal Assault Charges*

**\*4** On July 8, 2000, the six officers involved in the June 29, 2000 incident at Shawangunk filed a felony complaint

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

for charges of assault in the second degree against plaintiff in Ulster County. (*Id.* ¶ 70; Pl. Aff., Ex. 5(b).) On August 15, 2000, plaintiff was arraigned on six counts of assault in the second degree. (Amend.Compl.¶ 98.) In October 2000, the six officers testified before the grand jury. (*Id.* ¶¶ 99, 109.) Plaintiff alleges that defendants Kivett and McCreery perjured themselves before the grand jury. (*Id.* ¶¶ 71, 99, 111.) Plaintiff does not allege that defendants Ryan and Bertone committed perjury. (*See id.* ¶ 109.) Plaintiff chose to testify before the grand jury on October 12 and October 19, 2000; he was forced to do so while wearing mechanical restraints. (*Id.* ¶ 107.) The grand jury indicted plaintiff for the Ryan and Bertone assaults but dismissed the other four charges of assault. (*Id.* ¶ 100.) Plaintiff alleges that the grand jury was not properly instructed on self-defense and that, had they been so instructed, he would not have been indicted on any counts. (*Id.* ¶ 110.)

**6. *The December 2000 Sing Sing IMR for Mess Hall Violations***

On December 17, 2000, defendant Deckelbaum filed an IMR against plaintiff for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation. (*Id.* ¶ 130.) Plaintiff alleges that this IMR was a false accusation. (*Id.*) Plaintiff admits that he did not have his identification card and acknowledges that he had an extra food ration but maintains that he received it from his neighbor. (*Id.* ¶¶ 127, 134.) On December 22, plaintiff was sentenced to "counsel and reprimand," with no disciplinary sentence, for this IMR. (*Id.* ¶ 132.) Sometime within the week, Deckelbaum warned plaintiff that next time he would not be so "lucky" and that he would "get [his]." (*Id.* ¶ 133.) Plaintiff alleges that he filed a grievance about Deckelbaum in December but that the grievance was never processed. (*Id.* ¶ 135.)

**7. *The March 2001 Sing Sing IMR***

On March 1, 2001, plaintiff was involved in a fight with another inmate named LaFontaine and charged with an IMR (the "Sing Sing IMR"). (*Id.* ¶ 138.) Plaintiff maintains that this was a one-on-one fight but that defendant Grant exaggerated the IMR filed against him, accusing him of "double-teaming" LaFontaine with

another inmate. (*Id.* ¶ 139.) Plaintiff alleges that he asked Grant why he had falsified the IMR, to which Grant replied that plaintiff "pissed some real serious people off." (*Id.* ¶ 142.) At a hearing held on March 7, plaintiff pled guilty to fighting but maintained that he did so one-on-one. (*Id.* ¶ 140.) The hearing official, defendant Colao, found plaintiff guilty of both fighting and the "double-team" assault and sentenced plaintiff to a ninety-day keeplock sentence and the loss of nine months of "good time" credit. (*Id.* ¶¶ 146-47.) Plaintiff alleges that Colao made off-the-record remarks that plaintiff liked "knocking staff around," purportedly in reference to the June 29, 2000 Shawangunk incident. (*Id.* ¶ 148.)

**8. *The March 2001 Conversion of Plaintiff's Keeplock Sentence to SHU Confinement***

**\*5** On March 19, 2001, plaintiff was transferred from the keeplock sentence he was serving at Shawangunk to the Upstate SHU. (*Id.* ¶¶ 144, 149.) Plaintiff alleges that his sentence of keeplock confinement was changed to harsher SHU confinement out of retaliation. (*Id.* ¶¶ 149-52.) At Upstate, plaintiff was confined in his cell with another prisoner for twenty-four hours a day (*Id.* ¶ 149), presumably until he was again transferred on May 17.

Upon his arrival at Upstate, defendant Kivett allegedly came up to plaintiff, asked him how he "beat the ticket" as to the June 2000 Shawangunk incident, and threatened him. (*Id.* ¶¶ 72-73.) Plaintiff's property was held for eight days following plaintiff's transfer to Upstate and, when ultimately returned to plaintiff, was covered in pancake syrup. (*Id.* ¶ 74.) Plaintiff alleges that correction officials implied that this was in retaliation for assaulting Kivett. (*Id.*) Plaintiff states further that, on April 30, 2001, prison officials gave him his meal without the standard veal ration, again in retaliation. (*Id.* ¶¶ 76-77.) Plaintiff alleges that he filed a grievance with the IGP about the food and syrup incidents, linking the two as continued retaliation, but that it was never received by the grievance committee. (*Id.* ¶ 78.)

**9. *The May 2001 Five Points IMR***

On either May 11 or 17, 2001,[FN4] plaintiff was transferred

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

to the Five Points Correctional Facility ("Five Points"). (*Id.* ¶¶ 80, 156.) On May 18, 2001, plaintiff was charged with fighting, again with LaFontaine (the "Five Points IMR"). (*Id.* ¶ 158.) Plaintiff alleges that defendant Sweeney approached him, ostensibly to investigate the allegations, but instead warned plaintiff that he would "get all of [his] time owed here." (*Id.* ¶¶ 159-60.) At the hearing, held on May 21, plaintiff pled not guilty to all charges and intimated that he was the victim of a "set-up." (*Id.* ¶ 162.) Read liberally, plaintiff's complaint alleges that he never fought with LaFontaine the second time at all and that defendants fabricated the charge. (*Id.*) The hearing officer, defendant Rich, did not allow plaintiff to call witnesses or present evidence. (*Id.* ¶ 163.) On May 25, plaintiff was found not guilty of fighting LaFontaine but found guilty of violent conduct. (*Id.* ¶ 164.) Plaintiff was sentenced to ninety-day SHU confinement and the loss of ninety days of "good time" credit. (*Id.* ¶ 166.)

FN4. The date differs in two different paragraphs of the complaint.

Plaintiff alleges that he served nearly sixty days in the SHU as a result of this incident, although it is not clear from the face of the complaint when this SHU sentence began or ended and how much of that time was administrative confinement and how much of it was punitive. (*Id.*) The results of the May 25 hearing were reversed and expunged on July 13, 2001. (*Id.*)

10. *Denial of Access to Courts*

Upon his sentencing for the Five Points IMR, plaintiff requested to return to his general population cell in order to separate his legal material from his cellmate's property. (*Id.* ¶ 170.) Defendant Mullen told plaintiff that he could not return to his cell for any purpose whatsoever. (*Id.* ¶ 171.) As a result, plaintiff's trial transcript for his original murder conviction was lost. (*Id.* ¶ 172.) Plaintiff alleges that he exhausted his grievances as to this matter and filed a complaint with Inmate Claims. (*Id.* ¶ 173.) The trial transcript was never located. (*Id.*)

**\*6** On June 18, 2001, plaintiff began his trial for the Ryan and Bertone assaults stemming from the June 2000

Shawangunk incident. (*Id.* ¶ 80.) Defendant Kivett testified against plaintiff at his trial. (*Id.*) Plaintiff was acquitted of all charges. (*Id.*)

On July 11, 2001, plaintiff was transferred back to Upstate. (*Id.* ¶ 81.) Plaintiff alleges Kivett came up to plaintiff, said that "you beat us again" in reference to plaintiff's successful defense against the assault charges, and intimated there would be further retaliation. (*Id.* ¶ 82.) On July 14, when plaintiff went to receive his property that had been shipped to him from his previous prison, he noticed that some of his legal material was missing. (*Id.* ¶ 83.) Plaintiff therefore refused to sign the prison property inventory forms. (*Id.*) Plaintiff alleges that the same correction officer who was involved in the missing food incident in April 2001 told him that this was "Kivett's problem now," implying that Kivett was the "puppeteer" behind these acts of retaliation. (*Id.* ¶ 85.)

On July 24, 2001, plaintiff was transferred to the Clinton Correctional Facility ("Clinton"). (*Id.* ¶ 89-90.) Upon his departure, plaintiff alleges that defendant Smith asked plaintiff if he believed that Kivett would "miss [him]." (*Id.* ¶ 89.) Plaintiff's property was not distributed to him because he did not sign the inventory forms at Upstate. (*Id.* ¶ 90.) When plaintiff finally received his property one week later, he received only four out of his eight property bags. (*Id.* ¶ 91.) Plaintiff alleges that defendants Kivett, Smith, and Comstock threw away plaintiff's legal material. (*Id.* ¶¶ 83, 86, 93.) Plaintiff identifies the specific legal material that was stolen or destroyed and alleges that the loss of this material prevented him from filing a renewal motion to stop the clock for the purposes of the Antiterrorism and Effective Death Penalty Act in a timely manner, presumably for a habeas petition. (*Id.* ¶ 94.)

Sometime between July 11 and 24, plaintiff was informed that the grievance he filed about the food and syrup incidents was never received by the grievance committee. (*Id.* ¶ 95.) On August 10, 2001, plaintiff re-filed this grievance at Upstate by mail and further grieved the loss and destruction of his property. (*Id.; see also* Pl.'s Aff., Ex. 21 at 4-7.)

On August 30, 2001, plaintiff's grievance was rejected on the grounds that he was no longer a prisoner of Upstate

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

and had to file grievances at his current facility. (Amend. Compl. ¶ 96; *see also* Pl.'s Aff., Ex. 21 at 9.) Plaintiff re-filed this grievance with the Clinton IGP. (Amend. Compl. ¶ 96; *see also* Pl's Aff., Ex. 21 at 10-14.) The grievance committee rejected his claim for the legal papers, directing him to file with Inmate Claims. (Pl.'s Aff., Ex. 21 at 15-17.)

Aside from the specific grievances mentioned above, plaintiff further alleges that he has grieved all incidents and exhausted all of his administrative remedies in a "blanket" grievance allegation. (Amend. Compl. at D.)

DISCUSSION

*7 Plaintiff's numerous claims are addressed below. After resolving the issue of exhaustion, the Court will address the claims in the order laid out in the original complaint.

1. *Exhaustion of Administrative Remedies*

As plaintiff is a prison inmate, he is barred by the Prison Litigation Reform Act ("PLRA") from bringing federal claims "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000). Inmates in New York State are subject to the Inmate Grievance Program instituted by the Department of Correctional Services ("DOCS"). *Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); *see also* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1. Inmates must file any grievance with a Grievance Clerk within fourteen calendar days of the alleged incident, although "mitigating circumstances" may toll the deadline. N.Y. Comp.Codes R. & Regs. tit 7, § 701.7(a)(1). The grievance is then subject to review by an Inmate Grievance Resolution Committee ("IGRC"). *Id.* § 701.7(a)(3)-(4). If unsatisfied with the result, inmates can appeal to the facility superintendent and, subsequently, to the Central Office Review Committee ("CORC") for a final administrative determination. *Id.* § 701.7(b)-(c).

In order for such grievances to constitute an exhaustion of state claims, grievances must be specific, not generalized: "[I]nmates must provide enough information about the conduct of which they complain to allow prison officials

to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). Strict adherence to the DOCS three-tiered system is not required, however, provided that plaintiff has utilized remedies sufficient to put the defendants on notice. *Id.* (citing *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002)) (noting that the purpose of the grievance requirement is to put defendants on notice so that they have an opportunity to address complaints and holding that "[u]ncounseled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading" in filing grievances); *see also* *Braham v. Casey,* 425 F.3d 177, 183 (2d Cir.2005) (citing same).

Exhaustion under the PLRA is not a jurisdictional question; failure to exhaust is an affirmative defense that is waivable. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003); *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). As such, the burden is on the defendant of proving plaintiff's failure to exhaust his administrative remedies. *See, e.g., Hallet v. New York State Dep't of Corr. Svcs.,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000); *Warren v. Purcell,* 2004 WL 1970642, at *5 n. 8 (S.D.N.Y. Sept. 3, 2004) ("It bears emphasis that it is not the plaintiff's burden to plead the elements of exhaustion in the complaint itself, but rather, the defendant's burden to raise and prove failure to exhaust in its answer or motion to dismiss."). Mere conclusory statements by a defendant that an inmate has failed to exhaust his remedies is insufficient to meet this burden. *Hallet,* 109 F.Supp.2d at 197; *see also Gonzales v. Officer in Charge of Barber Shop,* 2000 WL 274184, at *3 (S.D.N.Y. Mar. 13, 2000) (declining to dismiss on grounds of exhaustion because premature at motion to dismiss stage to resolve dispute between parties as to whether exhaustion was necessary and/or achieved); *Nicholson v. Murphy,* 2003 WL 22909876, at *6 (D.Conn. Sept. 19, 2003) ("By characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss. Rather, the defendants must present proof of non-exhaustion."). Furthermore, if a complaint has both exhausted claims and unexhausted claims, only the unexhausted claims should be dismissed. Contrary to defendants' argument, the presence of unexhausted claims does not require the Court to dismiss the complaint in its entirety. *Ortiz v. McBride,* 380 F.3d 649, 663 (2d Cir.2004).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

**\*8** The defendants have moved to dismiss four of plaintiff's claims on the grounds that he has not exhausted administrative remedies: the claim for malicious prosecution, the claims arising out of the August 2000 IMRs, and the claims arising out of the pancake syrup and veal incidents. The defendants have not, however, attached any evidence refuting plaintiff's allegation that he has exhausted all of his administrative remedies. The defendants' conclusory statements, absent more, are insufficient to meet their burden. As such, the Court declines to dismiss any of plaintiff's claims for failure to exhaust.

2. *Denial of Due Process: The July 2000 Shawangunk Hearing*

Plaintiff brings a claim against defendant Connolly for depriving him of liberty without due process of law. Plaintiff alleges that his confinement in the SHU deprived him of a protected liberty interest and that the hearing held from July 5 through July 21, 2000 was so manifestly unfair as to be a deprivation of due process.

*a. Is There a Protected Liberty Interest?*

In analyzing plaintiff's claim, the Court must first examine whether he had any liberty interest in avoiding SHU confinement. Plaintiff has no right to due process unless a liberty interest has been infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998) (per curiam)). A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only when the discipline imposes an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison. *Id.* (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). A plaintiff's administrative and punitive confinement should be

aggregated for the purposes of determining the duration of the disciplinary segregation. *See Sealy v. Giltner,* 197 F.3d 578, 587 (2d Cir.1999).

In general, a prisoner has no protected liberty interest in avoiding normal SHU confinement that lasted less than 101 days. *See id.* at 589-90. If SHU conditions are especially harsh, however, confinement for less than 101 days can implicate a liberty interest. *See Palmer,* 364 F.3d at 64-65 (2d Cir.2004) ("[W]e have explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.") (citing *Ortiz v. McBride,* 323 F.3d at 195 & n .1).

**\*9** Plaintiff was confined in the SHU from June 29 to September 18, 2000 for events related to the July 2000 Shawangunk hearing. Plaintiff's confinement from September 18 onwards was for the separate August 2000 IMRs filed by separate officers. While the Second Circuit has held that SHU confinement can be aggregated, defendant Connolly cannot be held responsible for aggregated SHU time unrelated and subsequent to his actions.[FN5] *See Sealy,* 197 F.3d at 587 ("With regard to the durational aspect of the atypicality issue, we must focus only on the interval during which [the defendant] is responsible, since, on this appeal, it is his alleged denial of procedural due process for which [plaintiff] seeks [damages].") As the sentence attributable to defendant Connolly was only eighty-one days, below the 101-day threshold, this confinement does not implicate a liberty interest, so long as the SHU confinement was "normal."[FN6] *See Ortiz,* 380 F.3d at 655.

> FN5. While plaintiff theoretically has a liberty interest in avoiding the confinement imposed after September 18, 2000, for the separate IMRs he received in August, plaintiff has made no allegations that he was deprived of due process as to those incidents and has not named any of the officers involved with those incidents as defendants in this action.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

FN6. The Second Circuit, without delineating the full scope of what constitutes "normal" SHU conditions, has stated that conditions in which prisoners "are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week" are considered normal. *Ortiz,* 380 F.3d at 655.

Plaintiff has made no cognizable allegations that his confinement from July 11 to September 18, 2000, was not "normal." FN7 He does allege that his confinement from June 29 to July 11, 2000, was abnormal, however, in that he was denied exercise time and confined to his cell for twenty-four hours a day and was forced to wear handcuffs and leg irons whenever he left his cell. (Amend. Compl. ¶¶ 23, 63; Pl. Aff., Ex. 1.) The fact that he was confined in his cell for twenty-four hours a day for thirteen days and forced to wear restraints whenever he left his cell may be sufficient to establish that his confinement was "atypical and significant" and thus implicates a liberty interest. *See Ortiz,* 380 F.3d at 651, 654 (finding that plaintiff's allegation that he was, *inter alia,* confined in his SHU cell for twenty-four hours a day for the first three weeks of a ninety-day confinement, was not permitted an hour of daily exercise, and was denied regular showers stated "a hardship sufficiently 'atypical and significant' to survive a motion to dismiss"); *Palmer,* 364 F.3d at 62, 66 (plaintiff who was confined in the SHU for seventy-seven days and was deprived of personal effects, mechanically restrained whenever he was taken outside of his cell, and not allowed to have family visitations, survived a motion for summary judgment). Absent a further factual record, it cannot be said that the conditions plaintiff was subject to from June 29 to July 11 were not "atypical and significant," and therefore the Court cannot say that there was no infringement of a liberty interest as a matter of law.FN8

FN7. Plaintiff does allege that prisoners confined in the SHU who successfully complete thirty days of "good behavior" usually receive more privileges (Amend.Compl.¶ 45) and that due to falsification of reports by defendant Connolly, plaintiff did not receive these "good behavior" privileges. Even assuming that prisoners generally do get increased SHU privileges after thirty days, these SHU privileges do not constitute a protected liberty interest for the purposes of due process. *Farid v. Ellen,* 2006 WL 59517, at *6 (S.D.N.Y. Jan. 11, 2006).

FN8. While the Second Circuit held that eighteen days of SHU confinement without exercise did not constitute a protected liberty interest in *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998), that case was decided on summary judgment where "[t]he district court ... sufficiently examined the circumstances of Arce's segregation and articulated the facts on which its conclusion was predicated."

*b. Was There a Deprivation of Due Process?*

Even if plaintiff has a protected liberty interest, in order to survive defendant's 12(b)(6) motion, plaintiff must also allege that defendant imposed this sentence without providing due process. *Ortiz,* 380 F.3d at 655. Plaintiff alleges that he was denied due process because: defendant Connolly was a biased officer who had predetermined plaintiff's guilt, plaintiff was denied competent employee assistance in preparing his defense, plaintiff was not allowed to call witnesses, and plaintiff was not allowed to "comment on the evidence."

*10 An inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (per curiam). In situations when an inmate is unable to "marshal evidence and present a defense," however, such as when he is confined to an SHU, he has the right to some assistance. *Id.* (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Such assistance should, at least, include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. *Eng,* 858 F.2d at 898.

Here, plaintiff was confined in the SHU pending his hearing and therefore was entitled to employee assistance. In his complaint, plaintiff alleges that his assistant refused to retrieve documents for him on the grounds that they were irrelevant. Furthermore, not only did his assistant not interview witnesses, plaintiff alleges that his assistant actively pressured and threatened witnesses *not* to testify.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

If true, this certainly falls short of the required level of employee assistance and, as such, implies that plaintiff was denied due process.

An inmate also has a right to call witnesses, and a hearing officer "may not refuse to interview an inmate's requested witness without assigning a valid reason." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (per curiam)). The burden is not on the plaintiff to show that the official's conduct was "arbitrary and capricious" but is on the hearing officer to prove that the denial of witnesses is "logically related to preventing undue hazards to 'institutional safety or correctional goals.'" *Fox,* 893 F.2d at 478. Where, as here, plaintiff allegedly sought to present witnesses to contradict his accusers' account of events, the hearing officer is not permitted to exclude them on grounds of redundancy without an interview and some showing that their testimony would have been redundant. *Id.* As such, the denial of witnesses at plaintiff's hearing may be shown to have violated due process.

It has "long been established" that an inmate has the right to an impartial hearing officer. *Black v. Coughlin,* 76 F.3d 72, 76 (2d Cir.1996). Given the alleged conduct of defendant Connolly during the hearing, coupled with the fact that he was the same officer who had ordered the mechanical restraints and exercise deprivation before the hearing began, there is at least an inference of bias that plaintiff should be given the opportunity to prove.

*c. Is There Qualified Immunity?*

Prison officials performing tasks entrusted to their discretion typically "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Palmer,* 364 F.3d at 67. Whether plaintiff's liberty interest was clearly established depends, in turn, on whether the duration and conditions of plaintiff's confinement in the SHU not only infringed a liberty interest but also were of such a degree that an officer in defendant's position would have known that plaintiff's liberty interests were at stake. *Id.* In analyzing qualified immunity, the Court should look to the sentence initially imposed, regardless of the time actually

served. *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (citing *Saucier v. Katz,* 533 U.S. 194, 207 (2001)).

*11 Here, Connolly originally sentenced plaintiff to a five-year sentence in the SHU. (Amend.Compl.¶ 41.) A five-year sentence clearly triggers due process protection, and Connolly should clearly have known that plaintiff's liberty interests were at stake. *See Palmer,* 364 F.3d at 67 (citing *Hanrahan,* 331 F.3d at 99 (stating that no "credible argument" could be made that it was not "clearly established" that a ten-year solitary confinement disciplinary sentence would trigger due process protections); *Tellier v. Fields,* 280 F.3d 69, 85 (2d Cir.2000) (finding it was objectively unreasonable to confine the plaintiff in SHU for 514 days without providing due process and that officials were therefore not entitled to qualified immunity)). Furthermore, it will be defendant's burden to show the nonexistence of a clearly established right and his entitlement to qualified immunity, *Palmer,* 364 F.3d at 67 (citing *Tellier,* 280 F.3d at 84), so dismissal on this basis would be premature on a motion to dismiss.

*d. Conclusion*

A court may dismiss claims under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ruiz v. E.J. Elec. Co.,* 2005 WL 3071276, at *2 (S.D.N.Y. Nov. 15, 2005). As plaintiff has alleged conditions of his SHU confinement that may give rise to a protected liberty interest and has alleged facts that establish that his disciplinary hearing may have violated due process, plaintiff has made out a cognizable claim. As such, the defendants' motion to dismiss due process claims arising out of the July 2000 Shawangunk hearing is denied.

3. *Cruel and Unusual Punishment: Eastern SHU's Twenty-Four Hour Lighting Policy*

Plaintiff brings claims against defendants David Miller, the superintendent of Eastern, and Two Unknown Officers of Eastern Prison Special Housing Unit, for cruel and unusual punishment inflicted during the thirty-five days he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

was confined at Eastern by the twenty-four hour lighting policy at the Eastern SHU.

In order to prevail on an Eighth Amendment claim due to the conditions of a prisoner's confinement, a plaintiff must show "both an objective element-that the prison officials' transgression was sufficiently serious-and a subjective element-that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety." *Phelps v. Kapnalos,* 308 F.3d 180, 185 (2d Cir.2002) (citations and internal quotation marks omitted). As to the objective element, "states must not deprive prisoners of their basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety. Nor may prison officials expose prisoners to conditions that pose an unreasonable risk of serious damage to [their] future health." *Id.* (citations and internal quotation marks omitted) (denying motion to dismiss plaintiff's cruel and unusual punishment claim where plaintiff claimed he had been fed nutritionally deficient food for fourteen days). As to the subjective element, "[t]his deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 186 (citations and internal quotation marks omitted).

**\*12** Plaintiff here has alleged specific injury resulting directly from Eastern's twenty-four hour lighting policy and the resultant sleep deprivation, namely "fatigue during the day, loss of appetite, vomiting, migraine headaches, anxiety, elevation of blood pressure, and a violent aggravation of rashes all over [his] body." (Amend.Compl.¶ 55.) Plaintiff alleges that he complained numerous times to correction officers and through a grievance that was specifically denied by the Eastern superintendent, defendant David Miller. Plaintiff's allegations, if true, can sustain a claim both that this lighting policy posed an objectively unreasonable risk to his health and that prison officials knew that there was a substantial risk and failed to act. *See Ciaprazi v. Goord,* 2005 WL 3531464, at *2, *10 (N.D.N.Y. Dec. 22, 2005) (adopting magistrate judge's report denying defendant's motion to dismiss plaintiff's Eighth Amendment claim

alleging cruel and unusual conditions in the Upstate SHU including, *inter alia,* exposure to light for nineteen hours per day); *Amaker v. Goord,* 1999 WL 511990, at *7, *8 (S.D.N.Y. July 20, 1999) (holding that a plaintiff's allegations that the lighting conditions in the SHU were poor and that defendants knew about them but failed to fix them would satisfy both the objective and subjective prongs of the cruel and unusual punishment test); *see also LeMaire v. Maass,* 745 F.Supp. 623, 636 (D.Or.1990) ("There is no legitimate penological justification for requiring plaintiff to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."), *vacated* 12 F.3d 1444, 1459 (9th Cir.1993) after, *inter alia,* prison officials agreed to change their lighting policy; *Keenan v. Hall,* 83 F.3d 1083, 1091-92 (9th Cir.1996) (citing *LeMaire* favorably and denying defendant's summary judgment motion with respect to plaintiff's Eighth Amendment claim where plaintiff produced evidence of sleeping problems due to twenty-four hour lighting despite defendant's contrary evidence that such lighting would not cause sleeping problems).

Defendants' motion to dismiss cruel and unusual process claims arising from the Eastern SHU's twenty-four hour lighting policy is therefore denied.

4. *Denial of Access to the Courts*

Plaintiff alleges that defendants Kivett, Smith, and Comstock intentionally destroyed his legal papers in July 2001, thereby preventing him from filing a motion to stop the clock in order to file a timely habeas petition.[FN9]

> **FN9.** Plaintiff's complaint, read liberally, can also be read to bring claims against defendants Mullen and Eisensmidt for denying him access to his cell after he was sentenced to the SHU in May 2001, resulting in the loss of some of his legal papers. Mere negligence resulting in the loss of legal papers, however, does not state an actionable claim; plaintiff "must allege facts demonstrating that defendants *deliberately* and *maliciously* interfered with his access to the courts." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) (emphasis added); *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

Love v. Coughlin, 714 F.2d 207, 208-09 (2d Cir.1983) (per curiam) (holding that a negligent loss of legal documents is not actionable if the state provides an adequate compensatory remedy). As such, the defendants' motion to dismiss any claims arising out of a negligent loss of plaintiff's legal papers is granted, and the Court shall consider only those claims where plaintiff alleges that the defendants *deliberately* stole his legal papers.

Petitioners have a constitutional right of access to the courts, arising from the First Amendment, the Due Process Clause, and the Privileges and Immunities Clause of Article IV. *See, e.g.,* Colon v. Coughlin, 58 F.3d 865 (2d Cir.1995); Morello v. James, 810 F .2d 344, 346 (2d Cir.1987). To prove a violation of that right, a plaintiff must demonstrate that state action hindered his efforts to pursue a nonfrivolous legal claim and that consequently he suffered some actual concrete injury. Lewis v. Casey, 518 U.S. 343, 350 (1996). The "point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Christopher v. Harbury, 536 U.S. 403, 414-15 (2002). The right to access to the courts, therefore, is "ancillary to the underlying claim, without which a plaintiff would suffer no injury from being denied access." Id. at 415. Furthermore, when the access claim "looks backward" (i.e., seeks recompense for a lost opportunity to seek some order of relief), "the complaint must identify a remedy that may be awarded as recompense *but not otherwise available* in some suit that may yet be brought." *Id.* (emphasis added); *see also* Hoard v. Reddy, 175 F.3d 531, 533 (7th Cir.1999) (finding there is no access claim where prisoner has some other route to challenging the validity of his conviction).

**\*13** First, although plaintiff claims he is forever barred from pursuing his habeas petition, an alternative course of action with respect to this claim is to file his habeas petition and request equitable tolling in light of defendants' alleged destruction of his legal materials. *See* Valverde v. Stinson, 224 F.3d 129, 133 (2d Cir.2000) (holding that confiscation of a prisoner's habeas corpus petition "shortly before the filing deadline may justify equitable tolling and permit the filing of a petition after the statute of limitations ordinarily would have run"). Furthermore, in this case the alleged nonfrivolous

underlying cause of action is plaintiff's habeas petition, and the lost remedy of that habeas petition is his release. But plaintiff is not seeking injunctive relief here; rather he is seeking damages under § 1983. This, as defendants argue, implicates *Heck v. Humphrey'* s bar against § 1983 claims for damages on any theory that implies that a conviction is invalid, unless he can "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486-87. Although plaintiff must only establish that his claim is nonfrivolous, or colorable, in order to make out his access to courts claim, this does not avoid the holding of *Heck,* because the remedy in an access to courts claim (where injunctive relief is not sought) are damages to compensate for the loss of the underlying action. Nance v. Vieregge, 147 F.3d 589, 591-92 (7th Cir.1998); Hoard, 175 F.3d at 533-34 (emphasis added) ("If a prisoner whose access to the courts is being blocked in violation of the Constitution *cannot* prove that, had it not been for the blockage, he would have won his case, or at least settled it for more than $0 (the point emphasized in *Lewis* ) *he cannot get damages* but he can get an injunction.").[FN10] In order to be awarded damages, plaintiff will have to prove that he would have prevailed in his habeas petition. An award of damages in plaintiff's access claim, therefore, would necessarily imply the invalidity of plaintiff's underlying conviction, contrary to the rule of *Heck. Cf.* Barnwell v. West, 2006 WL 381944, at *3 n. 3, *4 (adopting unobjected-to portion of a magistrate judge's report and recommendation finding that plaintiff may not pursue compensatory or punitive damages under *Heck* in an access claim where the underlying claim is a habeas petition). Defendants' motion to dismiss plaintiff's access claim is therefore granted.

FN10. As the Seventh Circuit noted in *Hoard,* "[i]n the setting of *Heck,* there is nothing corresponding to a colorable claim; either the conviction was invalid, in which case the defendant suffered a legally cognizable harm, or it is not and he did not." *Id.* at 534.

5. *Malicious Prosecution*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

Plaintiff brings claims against defendants Ryan, Bertone, Kivett, and McCreery for pressing charges and bringing a malicious prosecution against him for assault, on the basis of the June 2000 Shawangunk incident.

To bring a § 1983 claim for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions," along with a "post-arraignment seizure" that implicates the Fourth Amendment. Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir.2003); Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir.1995) (in order to prevail on a § 1983 claim for malicious prosecution, plaintiff must show that "injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment.").

*14 Plaintiff has failed to establish the required post-arraignment seizure necessary for a federal § 1983 claim. As plaintiff was already incarcerated at the time of the assault proceeding, he suffered no new seizure. An inmate already incarcerated has not suffered any unconstitutional deprivation of liberty as a result of being charged with new criminal offenses and being forced to appear in court to defend himself. Wright v. Kelly, 1998 WL 912026, at *3 (W.D.N.Y. Oct. 16, 1998); see also, e.g., Rauso v. Romero, 2005 WL 1320132, at *2 (E.D. Pa. June 2, 2005) ("Here, moreover, plaintiff did not sustain a 'deprivation of liberty consistent with the concept of a seizure' ... since he was already in prison at the time.") (citing Donohue v. Gavin, 280 F.3d 371, 380 (3d Cir.2002)); Turner v. Schultz, 130 F.Supp.2d 1216, 1225 (D.Colo.2001) ("Mr. Turner has cited, and I have found, no clearly established law that states that an already lawfully incarcerated prisoner is seized for Fourth Amendment purposes when he is charged with an additional crime. Because Mr. Turner was already effectively 'seized,' throughout the time period in question, it is doubtful whether the additional prosecution could result in an actionable seizure.") (citing Taylor v. Meacham, 82 F.3d 1556, 1561 n. 5 (10th Cir.1996)).[FN11]

FN11. Plaintiff argues that even if he was not seized for the purposes of the Fourth Amendment, he has a substantive due process

right in remaining free of prosecutions. Substantive due process, however, does not encompass the right to be free from prosecution. Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir.1997) (citing Albright v. Oliver, 510 U.S. 266, 274-75 (1994) (plurality opinion); id. at 281 (Kennedy, J., concurring in the judgment); id. at 288-89 (Souter, J., concurring in the judgment)).

Plaintiff argues that the rule adopted above would basically allow prison officials to initiate all sorts of prosecutions against inmates, confident in the fact that they could not be sued under § 1983 because the prisoners were already "seized." In such an event, however, plaintiff's remedy is a state malicious prosecution claim, which does not have § 1983's requirement of a post-arraignment seizure. (In this case, however, the New York one-year statute of limitations period for a malicious prosecution, N.Y. C.P.L.R. 215(3), has long since passed.)

Plaintiff has not stated a cognizable claim for malicious prosecution under § 1983, and, as such, defendants' motion to dismiss this claim is granted.

6. Retaliation

Plaintiff brings claims against defendants for retaliation, alleging that defendants retaliated against him by: (1) falsifying his behavior report during his August 2000 Shawangunk SHU confinement to justify denying him privileges; (2) filing false IMRs against him in August 2000; (3) filing a false IMR against him in December 2000 for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation; (4) filing a false IMR against him in March 2001 by exaggerating a fight between plaintiff and another inmate, (5) filing a false IMR against him in May 2001, falsely accusing him of fighting with another inmate; (6) destroying his legal material; and (7) confining him in keeplock in Sing Sing in November 2000 beyond his sentence. Plaintiff also brings a general claim of retaliation against the defendants; reading his complaint liberally, plaintiff alleges that the retaliatory acts included (8)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

converting his keeplock sentence to SHU confinement in March 2001; (9) pouring pancake syrup over his belongings; and (10) giving him his evening meal without the veal ration in April 2001. Plaintiff alleges that defendants retaliated against him because plaintiff successfully appealed his July 2000 Shawangunk hearing and challenged, and was ultimately acquitted of, the related criminal assault charges brought by the defendants.

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e .g., Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Courts, however, "must approach prisoner claims of retaliation with skepticism and particular care" because claims are easily fabricated and because these claims may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *see also Gill v. Pidlypchack,* 389 F .3d 39, 385 (2d Cir.2004).

**\*15** To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

It is not disputed plaintiff's appeal of his July 2000 disciplinary conviction and defense against criminal assault charges, is protected conduct.[FN12] As such, plaintiff has met the first prong of the retaliation test.

FN12. Courts have held that *procedural* due process does not mandate that prison officials must provide an appeals procedure for disciplinary hearings. *See, e.g., Hernandez v. Selsky,* 2006 WL 566476, at \*3 (N.D.N.Y. Mar. 7, 2006) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-70 (1974)); *Gates v. Selsky,* 2005 WL 2136914, at \*8 (W.D.N.Y. Sept. 2, 2005). Nonetheless, given that New York State does provide such a procedure, plaintiff has a

*substantive* constitutional right to avail himself of it. *See Franco,* 854 F.2d at 589 (2d Cir.1988) (noting that retaliation that does not implicate procedural due process can nonetheless be unconstitutional if it infringes upon a prisoner's substantive right "to petition government for redress of grievances.") Plaintiff's exercise of the DOCS disciplinary appeal procedure is therefore protected conduct.

Defending oneself against criminal assault charges is protected conduct as well. It goes without saying that plaintiff, like all persons, has a constitutional right to defend himself in court against criminal charges. U.S. Const. amends. V, VI, XIV.

The second prong concerns whether adverse action was taken against plaintiff. For the purposes of retaliation, an adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The test is an objective one that applies even if the plaintiff in question was not himself subjectively deterred. *Id.* (citing *Davis,* 320 F.3d at 353-54). If the action would not deter an individual of ordinary firmness, however, the retaliatory act "is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353.

The final prong is the requirement of a causal connection between the protected conduct and the adverse action. In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N .Y.2002) (citing *Colon,* 58 F.3d at 872-73). At this stage, it is not appropriate to weigh the evidence or decide whether the claimant will ultimately prevail. *Id.* at 728. Even at the motion to dismiss stage, however, plaintiff must offer more than mere conclusory allegations that a causal connection existed between the protected

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

conduct and the adverse action. *Dawes, 239 F.3d at 491-92.*

As a preliminary matter, the Court notes that plaintiff's allegations that defendants poured syrup on his property and once served him a meal without veal are *de minimis*. *See Snyder v. McGinnis, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004)* (granting a motion to dismiss because the denial of food on two occasions is *de minimis* and not actionable). As they would not have deterred a person of ordinary firmness from exercising his constitutional rights, they do not give rise to a cognizable retaliation action. As such, defendants' motion to dismiss any retaliation claims stemming from those incidents is granted. The other alleged actions, however, namely that the defendants filed false IMRs against plaintiff, kept him in keeplock, transferred him to the SHU, and stole his legal papers, are sufficiently serious to constitute adverse actions. *See Franco, 854 F.2d at 589* (filing false misbehavior reports can constitute retaliatory action); *Auleta v. LaFrance, 233 F.Supp.2d 396, 402 (N.D.N.Y.2002)* (placing a prisoner in keeplock for seven and a half days properly construed as an adverse action); *Lashley v. Wakefield, 367 F.Supp.2d 461, 467 (W.D.N.Y.2005)* (finding that keeplock confinement from nine to twenty days sufficiently adverse to support a retaliation claim); *Davis v. Kelly, 160 F.3d 917, 920 (2d Cir.1998)* (noting that prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights, even though a prisoner has no liberty interest in remaining at a particular correctional facility); *Smith v. City of New York, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005)* (noting that theft of legal papers substantial enough to qualify as adverse action for purposes of retaliation claim). The question, therefore, is whether plaintiff has made nonconclusory allegations that give rise to a causal connection between these actions and his protected conduct.

*a. Loss of SHU Privileges*

**\*16** Plaintiff first brings a retaliation claim against defendant Connolly. Plaintiff alleges that Connolly falsified his records in August 2000 to reflect that he "fail[ed] to conform to standards of good behavior" as an excuse to deny him additional privileges out of retaliation for appealing Connolly's disposition of the July 2000

Shawangunk hearing. (Amend.Compl.¶ 45.) Given that this alleged falsification took place only days or weeks after the hearing itself, and given the fact that Connolly issued the pre-hearing confinement orders, acted as the hearing officer at the hearing itself, and oversaw plaintiff's SHU confinement after the hearing, plaintiff's allegations give rise to an inference that there is a causal connection between plaintiff's protected conduct in challenging the hearing and Connolly's alleged retaliatory conduct. As such, this claim withstands a motion to dismiss.

*b. The August 2000 IMRs*

Plaintiff has not satisfied the causation element of his retaliation claim with regard to the August 2000 IMRs. Plaintiff has not alleged any facts in his complaint that could establish a causal connection between the Shawangunk hearing and the IMRs, or any details about the IMRs whatsoever. In fact, in his complaint, plaintiff admits that the IMRs were deserved and that he was indeed misbehaving out of frustration. As plaintiff has not pleaded any causal connection between these IMRs and his protected conduct beyond wholly broad, conclusory statements, defendants' motion to dismiss is granted.

*c. The December 2000 IMR*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the December 2000 IMR issued by defendant Deckelbaum. Plaintiff has not proffered any nonconclusory allegations showing any causal connection between the July 2000 Shawangunk hearing and Deckelbaum's IMR for lack of ID and mess hall violations or that Deckelbaum acted out of retaliation, especially considering that plaintiff admits that he did not have ID and had received an extra ration from another inmate. As such, defendants' motion to dismiss is granted.

*d. The March 2001 IMR and Hearing*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the March 2001 IMR written up by defendant Grant and the resultant hearing presided over by defendant Colao. Plaintiff has not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

proffered any nonconclusory allegations showing a causal connection with the July 2000 Shawangunk hearing and the IMR plaintiff received for fighting, especially considering that plaintiff admits that he was fighting. Even if plaintiff alleges that defendants falsified his IMR to exaggerate the seriousness of the fight, plaintiff has not advanced allegations that would establish that they filed the IMR because of the Shawangunk hearing. As such, defendants' motion to dismiss is granted.

*e. The May 2001 IMR*

Plaintiff has, however, alleged sufficient facts to give rise to an inference of a causal connection with respect to the May 2001 IMR and resultant hearing. Plaintiff alleges that defendants Sweeney, Scott, and Rich falsely accused him of fighting with LaFontaine in order to ensure his return to SHU confinement just days after he was released from his March 2001 sentence. Plaintiff alleges that the May fight with LaFontaine never occurred, and that the defendants fabricated the entire charge. (*See* Amend. Compl. ¶ 165.) This allegation, combined with Sweeney's alleged statement that plaintiff "would get all of [his] time owed here," and the fact that the findings of this hearing were ultimately reversed and expunged, states a colorable claim of retaliation. See *Baskerville*, 224 F.Supp.2d at 732-33.

*f. Destruction of Legal Material*

**\*17** Plaintiff brings a retaliation claim against defendants Kivett, Smith, and Comstock for destroying his legal material in July 2001 in retaliation for successfully defending himself during his criminal trial for assault charges in June. The theft of his legal material took place just weeks after plaintiff was acquitted, giving rise to an inference of causality. See *Smith*, 2005 WL 1026551, at *4. In addition, plaintiff alleges that Kivett came up to plaintiff and said, "you beat us again" and sarcastically stated that he would "make sure [plaintiff] received [his] property" and made comments as a direct response to plaintiff's acquittal at trial. (Amend.Compl.¶ 82.) Plaintiff here has alleged enough nonconclusory facts linking the theft of his legal papers to his constitutionally protected right to defend himself in court to withstand a motion to dismiss. See *Smith*, 2005 WL 1026551, at *4 (finding that defendant's statement "I don't like you, I'm pretty sure you

know why" combined with "highly suspicious timing" of destruction of plaintiff's property was sufficient to defeat defendant's motion for summary judgment).

*g. The November 2000 Keeplock*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the ten days of keeplock that he served from November 7 to November 17, 2000. This time was attributable to the IMRs plaintiff received in August. Plaintiff has offered no nonconclusory allegations to establish that this keeplock time was the result of retaliation. As such, defendants' motion to dismiss is granted.

*h. The March to May 2001 SHU Confinement*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to defendants' conversion of his keeplock status to SHU time in March 2001. Plaintiff has proffered no nonconclusory allegations that could establish a causal connection linking this transfer to any protected conduct sufficient to state a claim for retaliation.

*i. Conclusion*

Plaintiff has alleged sufficient nonconclusory facts to make out a claim for retaliation against defendant Connolly for falsifying his records to deny him SHU privileges in August 2000; against defendants Sweeney, Scott, and Rich for falsely accusing him of fighting in May 2001; and against defendants Kivett, Smith, and Comstock for destroying his legal material out of retaliation. The defendants' motion to dismiss all other claims of retaliation is granted.

*7. Abuse of Process*

Plaintiff brings a claim for abuse of process, alleging that the defendants brought these various criminal and administrative charges against plaintiff for the purpose of abusing the process.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

State law provides the elements of the cause of action for a claim of abuse of process in § 1983 suits. *Brewster v. Nassau County,* 349 F.Supp.2d 540, 550 (E.D.N.Y.2004). Under New York law, abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of process in a perverted manner to obtain a collateral objective. *Curiano v. Suozzi,* 469 N.E.2d 1324, 1326 (N.Y.1984). In order to bring a claim for malicious process, plaintiff must allege "the improper *use* of the process after it has issued." *Id.* (emphasis added). "A malicious motive alone, however, does not give rise to a cause of action for abuse of process." *Id.*

**\*18** Plaintiff has not alleged any facts to sustain a claim for abuse of process. While plaintiff has alleged that the defendants brought criminal assault charges against him in Ulster County and have filed numerous prison administrative charges against him, he does not allege that they did so to abuse the *process.* Even assuming plaintiffs brought these charges out of malice or had other improper motives in bringing these charges, a bad motive alone does not give rise to an abuse of process claim. As a result, defendants' motion to dismiss this cause of action is granted.

8. *Denial of Due Process: The March to May 2001 Upstate SHU Confinement*

Plaintiff alleges that he was deprived of due process stemming from his confinement in the Upstate SHU from March 19 to May 17, 2001. Plaintiff alleges that he was sentenced to ninety days under keeplock as a result of his March 1 fight with inmate LaFontaine, but that his sentence was improperly converted from a keeplock sentence to an SHU sentence.

Defendants originally moved to dismiss this claim on the grounds that it arises out of the March 2001 Sing Sing hearing, which has not been overturned. In support of their motion, defendant argued that plaintiff lost nine months of "good time" credit at the hearing and is therefore barred by *Heck v. Humphrey, supra,* from any claims arising out of that hearing unless and until it is overturned. (Defs.'

Supp. Mem. of Mot. to Dismiss 17.) Plaintiff argues in response (Pl.'s Objections to the Report 9), and defendants concede (Defs.' Mem. In Opp'n to Pl.'s Objections 7), however, that *Heck* does not apply here, as plaintiff is serving a life sentence, and the loss of good time credits therefore has no effect on the length of his sentence. *Gomez v. Kaplan,* 2000 WL 1458804, at \*12 (S.D.N.Y. Sept. 29, 2000) (citing *Jenkins,* 179 F .3d 19); *see also Farid v. Ellen,* 2006 WL 59517, at \*8 & n. 2 (S .N.Y. Jan. 1, 2006). As such, plaintiff's claim is not barred by *Heck.*

Plaintiff's claim, however, is not that the March 2001 Sing Sing hearing lacked due process. Plaintiff maintains instead that he is entitled to *additional* due process before the keeplock sentence he received at the Sing Sing hearing can be properly converted into an SHU sentence, since SHU conditions entail harsher deprivations than keeplock. (*See* Pl.'s Objections to the Report 12.)

To prevail in his due process claim, plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *see also Sealey,* 197 F.3d at 51. Plaintiff alleges that this SHU confinement lasted for fifty-nine days, during which time he was confined to his cell and an adjacent area for twenty-four hours a day. Given that twenty-four hour confinement may be "atypical and significant," *see Ortiz,* 380 F.3d at 655, plaintiff may have a protected liberty interest in avoiding this confinement, despite the fact that it lasted for less than 101 days. *See Palmer,* 364 F.3d at 64-65. The remaining issue is whether plaintiff was entitled to an additional hearing before his transfer to the Upstate SHU.

**\*19** New York prison regulations permit inmates to be confined in the SHU for "disciplinary confinement, administrative segregation, protective custody, detention, *keeplock confinement,* and 'for any other reason, with the approval of the deputy commissioner for facility operations." ' *See, e.g., Gonzales v. Narcato,* 363 F.Supp.2d 486, 493 (E.D.N.Y.2005) (emphasis added) (citing *Trice v.. Clark,* 1996 WL 257578, at \*3 (S.D.N.Y. May 16, 1996)). Admission to SHU pursuant to a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

keeplock sentence is authorized under New York Regulations. *See* N.Y. Comp.Codes. R. & Regs. tit. 7, § 301.6. Section 301.6 is the New York Regulation relating to keeplock admissions and authorizes placement of inmates in SHU "at a medium or minimum security correctional facility *or Upstate Correctional Facility*" "for confinement pursuant to a disposition of a disciplinary (Tier II) or superintendent's (Tier III) [FN13] hearing." *Id.* (emphasis added). Furthermore subparts (c) through (h) of section 301.6 clearly contemplate that inmates sentenced to keeplock status may be assigned to SHU, subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in section 302.2(a)-(j). *Id.; see also Chavis v. Kienert,* 2005 WL 2452150, at *10 (N.D.N.Y. Sept. 30, 2005) (stating that "upon admission to Upstate Correctional Facility, plaintiff was confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New York Regulations specifically authorize such confinement" and further finding that because plaintiff did not raise any claim that deprivations suffered were contrary to section 302.2(a)-(j), no liberty interest was implicated).

FN13. "New York conducts three types of disciplinary hearings for its inmates. Tier I hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier II hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ('SHU'). Tier III hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of 'good time' credits." *Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d. Cir.1998).

While it is "firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement," *Ciaprazi,* 2005 WL 3531464, at *11, plaintiff may only sustain a cause of action to vindicate the infringement of that liberty interest where he has been deprived of due process, *Ortiz,* 380 F.3d at 655. As noted, plaintiff does not allege that the March 2001 Sing Sing hearing denied him due process. Plaintiff has been afforded a full evidentiary hearing on the misconduct underlying the time spent in Sing Sing keeplock and Upstate SHU, cannot point to any regulation entitling him to an additional hearing prior to his transfer to Upstate, and therefore cannot show that he has been deprived of a protected liberty interest without due process. *Cf. Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995) (dismissing plaintiff's due process claim and finding that prisoner not entitled to reclassification hearing when, after being found guilty of major misconduct and placed in punitive detention for thirty days, he was released into administrative segregation instead of to the general prison population, since the subsequent reclassification to administrative segregation was based upon findings of guilt at a full evidentiary hearing).

**\*20** Defendants' motion to dismiss plaintiff's due process claim with respect to the conversion of his keeplock sentence into SHU time is therefore granted.

9. *Cruel and Unusual Punishment: Upstate SHU's Twenty-Four Hour Double-Celling Policy*

Plaintiff brings an Eighth Amendment claim alleging that Upstate SHU's practice of confining two prisoners in a single SHU cell for twenty-four hours a day constitutes cruel and unusual punishment.

To establish a claim for cruel and unusual punishment, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps,* 308 F.3d at 185. While the Eighth Amendment bars prison officials from depriving prisoners of their "basic human needs" and prohibits exposing them to conditions that "pose an unreasonable risk of serious damage to [their] future health," it "does not mandate comfortable prisons." *Id.* Furthermore, to bring a claim for cruel and unusual punishment, plaintiff must allege that the defendants acted with "deliberate indifference," i.e. that they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.*

Unlike his claim for the twenty-four hour lighting in Eastern SHU, plaintiff has not alleged facts that would support either the objective or the subjective prong for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))

Upstate's double-celling policy. While he has alleged specific health problems resulting from his exposure to the lighting, plaintiff here has not alleged that double-celling poses an unreasonable risk, or any risk at all, to his health. Furthermore, while plaintiff alleged that he complained about the 24-hour lighting policy to his guards and filed grievances with the IGP, the prison superintendent, and the CORC, plaintiff has not alleged that he filed any grievances or complained about the double-celling to anyone sufficient to put the defendants on notice that a substantial risk of serious harm exists. As plaintiff has not made out a cognizable claim for cruel and unusual punishment due to Upstate's double-celling policy, the defendants' motion to dismiss is granted.

10. *Venue*

Defendants have moved to dismiss plaintiff's action on the grounds of improper venue or, in the alternative, to transfer the action to the Northern District of New York. A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b).

**\*21** Once a proper venue objection has been raised, the burden is on the plaintiff to show that venue is proper, and he must show that venue is proper as to each claim against each defendant. *See, e.g., Degrafinreid v. Ricks,* 2004 WL 2793168, at \*6 (S.D.N.Y. Dec. 6, 2004). For the purposes of venue, state officers "reside" in the district where they perform their official duties. *Amaker v. Haponik,* 198 F.R.D. 386, 391 (S.D.N.Y.2000); *Baker v. Coughlin,* 1993 WL 356852, at \*2 (S.D.N.Y. Sept. 9, 1993). If a case is improperly venued, the district court may either dismiss the case or, in the interest of justice, transfer it to a district in which venue is proper. 28 U.S.C. § 1406(a).

None of plaintiff's surviving claims are properly venued in the Southern District. All of the remaining defendants are DOCS officials who work in the Northern or Western Districts. Furthermore, all of the incidents for which there are cognizable claims occurred at Shawangunk, Eastern, and Upstate, all of which are in the Northern District, and Five Points, which is in the Western District. Plaintiff has not made a showing that "a substantial part of the events or omissions giving rise" to any cognizable claim arose in the Southern District.

In addition, even if venue were proper in the Southern District, the Court may transfer claims "for the convenience of the parties, in the interest of justice." 28 U.S.C. § 1404(a). As plaintiff could have brought his claims in the Northern District, the majority of the events arose there, and the majority of defendants reside there, it would be in the interests of justice to transfer this case even if venue were proper here. *See, e.g., Shariff v. Goord,* 2005 WL 2087840, at \*7 (S.D.N.Y. Aug. 26, 2005). Furthermore, as plaintiff resides in the Western District and has already brought this action outside his home district, he has already demonstrated that laying venue elsewhere in the state is not unduly burdensome. *See Madison v. Mazzuca,* 2004 WL 3037730, at \*15 (S.D.N.Y. Dec. 30, 2004).

Plaintiff's surviving claims shall be transferred to the Northern District of New York pursuant to 28 U.S.C. § 1406(a) or, in the alternative, 28 U.S.C. § 1404(a).

CONCLUSION

Defendants' motion to dismiss [25] plaintiff's claims against (I) defendant Connolly for denial of due process arising out of his July 2000 Shawangunk hearing; (2) defendants Miller and Two Unknown Officers of Eastern Prison Special Housing Unit for cruel and unusual punishment arising out of the 24-hour lighting policy at Eastern; (3) defendant Connolly for retaliation (by falsifying plaintiff's SHU records to deny him privileges in August 2000); (4) defendants Sweeney, Scott, and Rich for retaliation for falsely filing an IMR against him in May 2001 and sentencing him to the SHU; and (5) defendants Kivett, Smith, and Comstock for retaliation for stealing his legal material in July 2001 is DENIED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)
(Cite as: 2006 WL 851753 (S.D.N.Y.))


Defendants' motion to dismiss [25] all of plaintiff's remaining claims is GRANTED. Furthermore, defendants' motion to transfer venue is hereby GRANTED. The Clerk of this Court is directed forthwith to take all steps necessary to transfer the remainder of this case to the Northern District of New York.


**\*22** SO ORDERED.


S.D.N.Y.,2006.
Holmes v. Grant
Not Reported in F.Supp.2d, 2006 WL 851753 (S.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Dashon [FN1] HALLOWAY, Plaintiff,

FN1. Upon information and belief, the correct spelling of Plaintiff's name is "Deshon" as reflected in both his Complaint, Dkt. No. 1, and the Department of Correctional Services' Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny .us.

v.
Glenn S. GOORD, et al, Defendants.
**No. 9:03-CV-1524 (LEK/RFT).**

Sept. 24, 2007.

Deshon Holloway, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, New York State Department of Law, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 87). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the

objections by Plaintiff Deshon Halloway, which were filed on September 14, 2007. Objection (Dkt. No. 88).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that the defendants motion for summary judgment (Dkt. No. 80) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED;** it is further **ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Deshon Holloway brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging the above named Defendants violated his due process rights pursuant to the Fourteenth Amendment when he was transferred from Elmira Correctional Facility to Upstate Correctional Facility without first receiving a hearing. According to Plaintiff, when he was housed at Elmira, he was serving a keeplock disciplinary sentence in his cell, whereas upon

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

his transfer to Upstate, he served the remainder of that sentence in a Special Housing Unit (SHU). *See generally* Dkt. No. 1, Compl.

Presently before the Court is Defendants' Motion for Summary Judgment, to which, despite being granted multiple extensions of time, Plaintiff has failed to respond. Dkt. Nos. 80, Defs.' Mot. Summ. J., filed on Jan. 17, 2007; 81, Order, dated June 5, 2007 (*sua sponte* extending Plaintiff's time to respond to July 9, 2007); 83, Order, dated July 3, 2007 (granting Plaintiff's request and extending his response time to July 31, 2007).

Instead of submitting opposition to the Motion, Plaintiff filed a letter, dated July 15, 2007, seeking permission to withdraw his action. Dkt. No. 84. Court staff inquired whether Defendants would consent to Plaintiff's voluntary withdrawal, to which Defendants tendered consent only upon the proviso that such dismissal be with prejudice. Dkt. Nos. 85, Notice to Defs.' Counsel, dated July 20, 2007; 86, Defs.' Resp., dated Aug. 21, 2007. In light of the ample passage of time since the initiation of this lawsuit and the filing of Defendants' Motion, and in light of the Defendants' posture to withhold any consent to discontinue lest it be on the merits, the Court finds it prudent to address Defendants' Motion on the merits.

## I. FACTS

### A. Effect of Plaintiff's Failure to Respond

**\*2** Defendants filed their Motion for Summary Judgment on January 17, 2007, setting Plaintiff's response deadline for February 12, 2007. Dkt. No. 80. In accordance with the Local Rules of Practice for the Northern District of New York, Defendants provided Plaintiff with notice of the consequences that may befall him should he elect not to respond to such Motion.[FN2] Dkt. No. 80; N.D.N.Y.L.R. 56.2. Approximately six months later, on June 5, 2007, this Court, in view of the fact that Plaintiff had not filed a response, *sua sponte* extended his time to respond and further emphasized the consequences of his failure to do so.[FN3]

FN2. Specifically, Defendants included in their Notice of Motion the following warning:

PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in the moving parties' affidavits will be accepted by the Magistrate-Judge as being true unless you submit affidavits or other documentary evidence contradicting defendants' assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

Dkt. No. 80 (emphasis in original).

FN3. Specifically, the Court issued an Order stating:

*Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.* See N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). *Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which there will be no trial.* See N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

as the case may be, unless good cause is
shown.").

Dkt. No. 81 at pp. 1-2 (emphasis in original).

Pursuant to this District's Local Rules, "[w]here a properly
filed motion is unopposed and the Court determines that
the moving party has met its burden to demonstrate
entitlement to the relief requested therein, the non-moving
party's failure to file to serve any papers ... shall be
deemed as consent to the granting or denial of the motion,
as the case may be, unless good cause is shown ."
N.D.N.Y.L.R. 7.1(b)(3); *see also* Douglas v. New York
State Div. of Parole, 1998 WL 59459, at *1 (N.D.N.Y.
Feb. 10, 1998) (noting that plaintiff's failure to oppose
defendants' dispositive motion, and his failure to show
good cause for the omission, may alone justify granting
the motion). "The fact that there has been no response to
a summary judgment motion does not, of course, mean
that the motion is to be granted automatically." *Champion
v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the
absence of a response, Defendants are entitled to summary
judgment only if the material facts demonstrate their
entitlement to judgment as a matter of law. *Id.;* FED. R.
CIV. P. 56(c); N.D.N.Y.L.R. 7.1(b)(3). Because Plaintiff
has failed to raise any question of material fact, the Court
will accept the facts as set forth in Defendants' Rule 7.1
Statement of Facts, supplemented by Plaintiffs' verified
Complaint, as true. *See* Dkt. Nos. 1, Compl.; 80-9, Defs.'
7.1 Statement; *see also* Lopez v. Reynolds, 998 F.Supp.
252, 256 (W.D.N.Y.1997).

**B. Uncontested Facts**

At all times relevant to the Complaint, Plaintiff was an
inmate in the custody of the New York State Department
of Correctional Services (DOCS). On January 5, 2001,
Holloway was transferred from Elmira Correctional
Facility, a maximum security prison, to Upstate
Correctional Facility, a maximum security prison. Defs.'
7.1 Statement at ¶ 2; Dkt. No. 80-2, Donald Selsky Decl.,
dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History). This
transfer is the subject of his civil rights claims.

As indicated on Holloway's Transfer History Report, the

reason for Plaintiff's transfer was his "unsuitable
behavior." Selsky Decl., Ex. B. This is not the first time
Plaintiff was transferred to another facility due to his
unsuitable behavior.FN4 In fact, Plaintiff's transfer to
Elmira from Southport Correctional Facility was also due
to his unsuitable behavior. *Id.* (Transfer, dated November
28, 2000). Upon his arrival at Elmira, Plaintiff had an
aggregate disciplinary keeplock sentence of approximately
270 days, stemming from six Disciplinary Hearings
Plaintiff previously received during a span of six months.
Defs.' 7.1 Statement at ¶ 6. These disciplinary sentences
were based on various Misbehavior Reports Plaintiff
received while incarcerated at Marcy Correctional Facility
and Mid-State Correctional Facility. *Id.* at ¶¶ 7-10. For
each of the six Misbehavior Reports issued, Plaintiff
received a separate Disciplinary Hearing resulting in six
separate guilty determinations, each with its own separate
sentence. *Id.* Plaintiff only filed appeals in three of these
Hearings, all of which were affirmed. *Id.* at ¶¶ 8 & 11-12.
FN5 Plaintiff makes no allegations as to the inadequacy of
any of these Hearings and none of the Hearing Officers
who presided over the six Disciplinary Hearings is named
as a Defendant.

FN4. In reviewing Plaintiff's Transfer History, we
note at least four transfers due to his
"unsuitable behavior" between May 1998 and
December 2000. Dkt. No. 80-2, Donald Selsky
Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer
History).

FN5. Indeed Plaintiff's Disciplinary History is
startling and certainly is not confined to the six
instances noted above. Focusing only on the
disciplinary sentences to be served upon his
arrival at Upstate, we offer the following
synopsis. Two of the sentences stem from
Misbehavior Reports Plaintiff was issued while
at Marcy, dated April 15, 1999, and May 14,
1999. Defs.' 7.1 Statement at ¶ 7; Selsky Decl.,
Ex. A (Holloway Disciplinary History). The
Hearing determinations for these two Reports,
which included, *inter alia,* an aggregate keeplock
sentence of 180 days, were affirmed on appeal.
Defs.' 7.1 Statement at ¶ 8. While at Mid-State,
and again as relevant to the aggregate sentence to
be served at Upstate, Plaintiff received four
separate Misbehavior Reports on August 15,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

1999, September 2, 1999, October 12, 1999, and October 22, 1999. *Id.* at ¶ 9. On each, he was provided a Hearing, found guilty, and received a sentence of, *inter alia,* thirty days keeplock (per infraction); he only appealed the Hearing determination regarding the October 12th Misbehavior Report, and such was affirmed on appeal. *Id.* at ¶¶ 10-12.

**\*3** Prior to his transfer to Upstate, Holloway was held in long-term keeplock at Elmira for approximately one month and eight days. *Id .* at ¶ 14. The cell Plaintiff was confined in could also be used for a general population inmate or an inmate transitioning to general population from SHU. Dkt. No. 80-5, Dan Kress Decl., dated Jan. 11, 2007, at ¶ 2. Under the keeplock confinement, Plaintiff was locked in his cell for twenty-three hours a day. Dkt. No. 80-6, James Thompson Decl., dated Jan. 10, 2007, at ¶ 3. A cell-confined inmate in this circumstance requires additional services by prison staff such as meal delivery and cell visitation by medical staff. *Id.* Though use of a general population cell for such restricted confinement is feasible on a short-term basis, "[a]s a long-term proposition, ... it [is] an inefficient use of the department's resources[.]" *Id.* On the other hand, Upstate is a prison specially designed to handle cell-confined inmates and, given the length of Plaintiff's keeplock sentence of approximately 240 days, it was more practical for Plaintiff to be transferred to Upstate to serve out the remainder of that keeplock sentence. *Id.* at ¶ 4. For these reasons, on December 27, 2000, Defendant Dan Kress, Corrections Counselor at Elmira, recommended that Holloway be transferred to Upstate to serve his 240-day keeplock sentence. Defs. 7.1 Statement at ¶ 16. This recommendation was approved by Defendant James Thompson, Senior Counselor at Elmira and by John Carvill [FN6] in DOCS' Office of Classification and Movement, who issued the order that Plaintiff be transferred to Upstate from Elmira; as aforementioned, such transfer took place on January 5, 2001. *Id.* at ¶ 17. Defendants Glenn Goord, then-Commissioner of DOCS, Floyd Bennett, then-Superintendent of Elmira, Thomas Ricks, then-Superintendent of Upstate, and John Glasheen, then-Assistant Director of the Office of Classification and Movement, were not involved in the decision to transfer Plaintiff to Upstate. *Id.* at ¶ 33.

    FN6. John Carvill is not a Defendant in this action.

While serving his sentence at Upstate, Plaintiff was treated the same as any other inmate sentenced to keeplock confinement at Upstate. *Id.* at ¶ 27. After his arrival at Upstate, Plaintiff incurred, in just four months, over a year's worth of additional keeplock for disciplinary violations. *Id.* at ¶ 18. He also accumulated seventy-four months of SHU time for more serious violations involving violent conduct on staff and an unhygienic act. *Id.* at ¶ 19. Pursuant to Department Regulations, Plaintiff began serving all of this additional SHU time at Upstate on May 5, 2001. *Id.* at ¶ 20.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000) (quoting FED. R. CIV. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**\*4** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

More specifically, this District's Local Rules provide that *"[a]ny facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 2002 WL 368534, at \*2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 2001 WL 237218, at \*1 (N.D.N.Y. Mar. 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on

that basis. *Id.* at 470-71.

In this case, as previously discussed, Holloway did not file a response to the Defendants' Motion for Summary Judgment. Consequently, this Court has accepted the properly supported facts contained in the Defendants' 7.1 Statement as true for purposes of this Motion. With this standard in mind, the Court now addresses the sufficiency of Holloway's claims.

### B. Due Process and Plaintiff's Intrastate Prison Transfer

Holloway asserts he should have received a hearing prior to his transfer to Upstate and in the absence of such hearing, his due process rights were violated. Defendants Kress and Thompson were directly involved in the decision to transfer Plaintiff, thus we consider Plaintiff's due process claim to be asserted against them. Plaintiff's claim, however, is wholly without merit.

**\*5** To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

It is well-settled that an inmate has no right under the Due Process clause to be incarcerated in any particular correctional facility, and transfers among facilities do not need to be preceded by any particular due process procedure. *See Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 224-25 (1976)) (noting that the Constitution does not "guarantee that [a] convicted prisoner will be placed in any particular prison" nor does "the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[ ]"); *see also Fox v. Brown,* 2007 WL 586724, at *9-10 (N.D.N.Y. Feb. 21, 2007). Though Holloway complains that his restrictions at Upstate were much greater than that experienced at Elmira, the fact that "life in one prison is much more disagreeable than in another does not itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano,* 427 U.S. at 225;*see also Olim v. Wakinekona,* 461 U.S. 238, 244-45 (1983) (citing, *inter alia, Meachum v. Fano,* 427 U.S. 215 (1976) & *Monyanye v. Haymes,* 427 U.S. 236 (1976) for the proposition that inmates have no constitutional right to be housed in a particular prison or a particular dormitory within a prison). Thus, the Due Process Clause itself clearly does not afford Holloway the protection sought.

Our inquiry does not end there, however, since liberty interests may also arise under state statutes and regulations. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U.S. at 460). To assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Connor,* 515 U.S. at 484,*and* (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regardless of whether Plaintiff can establish that he was subjected to an atypical and significant hardship, it is patently clear that New York has **not** created, by regulation or statute, any liberty interest in remaining at one particular prison. Indeed, it is the DOCS who possesses sole discretion to determine "where a [state] inmate will be housed." *Grullon v. Reid,* 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999) (citing *United States v. Williams,* 65 F.3d 301,

307 (2d Cir.1995)); *see also Smolen v. Lanier,* 2007 WL 2027841, at *2 (W.D.N.Y. July 11, 2007). Furthermore, not only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same property, visiting, package, commissary, telephone, and correspondence limitations typically experienced in SHU confinement. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2.

**\*6** Thus, regardless of whether Plaintiff alleges his due process rights were violated when he was transferred to another institution or when he was forced to serve his keeplock sentence in SHU, since Holloway had no liberty interest in remaining at one specific facility to serve his keeplock sentence or to remain in cell confinement to serve such sentence, there was no need to provide him with a hearing prior to his transfer to another prison and into SHU. Accordingly, this Court recommends **granting** Defendants' Motion for Summary Judgment and **dismissing** Defendants Kress and Thompson from this action.

**B. Personal Involvement**

As to the remaining Defendants, Plaintiff alleges that 1) Defendant Goord failed to stop Plaintiff's transfer to Upstate and knew of or should have known of his subordinates' acts, yet failed to take action, Compl. at ¶¶ 48-50; 2) Defendant Glasheen approved the transfer and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 51-53; 3) Defendant Bennett failed to stop Plaintiff's transfer to Upstate and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 54-57; and 4) Defendant Ricks failed to transfer Plaintiff from Upstate back to Elmira and failed to provide Plaintiff with a hearing prior to keeping him confined at Upstate, Compl. at ¶¶ 58-60.

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

658 (1978)); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

Despite Plaintiff's allegations to the contrary, and in light of his failure to oppose Defendants' Motion, it is uncontested that Defendants Goord, Glasheen, Bennett, and Ricks played no part in the decision to transfer Plaintiff. To the extent Plaintiff seeks to hold any one of these Defendants liable on the basis of supervisory liability,[FN7] such claim similarly fails since, as explained above, Plaintiff's transfer to Upstate without a hearing did not violate his due process rights. Therefore, this Court recommends **dismissing** these Defendants as well.

> FN7. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 80) be **GRANTED** and the entire Complaint **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.****Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Halloway v. Goord
Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Franklin GRULLON, Plaintiff,
v.
Delano REID, James Haridopolos, John Doe # 1, aka
"Bradley," John Doe # 2 aka "Junior," Edward
Delatorre, Edward Piraglia and Nicholas Witkowich,
Defendants.
**No. 97 CIV. 7616(RWS).**

June 24, 1999.

Franklin Grullon, Federal Correctional Institute
Petersberg, Petersberg, VA, for Plaintiff Pro Se.

Honorable Mary Jo White, United States Attorney for the
Southern District of New York, New York, By Sarah
Thomas, Assistant U.S. Attorney, Of Counsel, for Federal
Defendants.

Honorable Michael D. Hess, Corporation Counsel of the
City of New York, New York, By Laura Eberstein,
Assistant Corporation Counsel, Of Counsel, for City
Defendants.

Ronald Berman, Esq., New York, for Defendant Nicholas
Witkowich.

OPINION

SWEET, D.J.

**\*1** Defendants Special Agent Delano A. Reid ("Agent
Reid"), Special Agent James S. Haridopolos ("Agent
Haridopolos") and Special Agent John F. Bradley, Jr.
("Agent Bradley") (collectively the "Federal

Defendants"), all employees of the Bureau of Alcohol,
Tobacco and Firearms ("ATF") (collectively the "Federal
Defendants"), Defendants Police Officer Edward
Delatorre, and Police Officer Edward Peraglia ("Officer
Peraglia") (the "City Defendants"), and Defendant New
York City Housing Authority Captain Nicholas Witkowich
("Captain Witkowich") (collectively the "Defendants")
have moved for summary judgment dismissing the
amended complaint of Franklin Grullon, *pro se*
("Grullon"), pursuant to Rule 56 of the Federal Rules of
Civil Procedure. Grullon has moved for a preliminary
injunction to bar his transfer from Low Security
Correctional Institution, Allenwood ("Allenwood").
Grullon has also moved to amend his complaint.

On the facts and conclusions set forth below, the
Defendants' motions are granted, and Grullon's motion for
injunctive relief is denied.

*Prior Proceedings*

Grullon commenced this proceeding on July 7, 1997 when
he gave his papers consisting of a Rule 31(e) motion
seeking a return of property to the authorities to the Pro Se
Office. Although the motion was stamped "received" by
the Pro Se Clerk's Office on July 27, 1997, it was not
docketed as a civil petition until October 15, 1997, and the
government was not directed to respond prior to an order
dated October 20, 1997.

Grullon's attorney, Marvin Schechter, retrieved some of
the property that had been held by the government as
evidence. The government released all remaining property
to Grullon's mother, Antonia Estrella, on February 24,
1998, with the exception of photographs depicting Grullon
and his associates holding guns and two address books
that are being retained by the United States Attorney's
Office as evidence in the event of a *habeas corpus* action.

On February 18, 1998, an amended complaint was filed
converting this action from one seeking return of the
property to one seeking damages against the named
defendants in their individual capacities pursuant to *Bivens*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

*v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971), 42 U.S.C. § 1983, 28 U.S .C. § 1331 and Rule 41(e) of the Federal Rules of Criminal Procedure. Grullon has alleged that the Defendants violated his rights under the Fourteenth Amendment by conspiring to seize evidence from his place of business and "neglecting" to provide him with documents that would have assisted in the defense of his criminal case; violated his due process rights under the Fifth Amendment by "intentionally" "neglecting" to provide him with evidence seized from his place of business; violated his rights under the Fourth Amendment to be free from unlawful search and seizure by conducting a search of his place of business without a warrant; and violated his equal protection rights under the Fourteenth Amendment by selecting "a young hispanic male, to gain a narcotics conviction against him, where Defendants did not possess the evidence required to establish that he was distributing narcotics from his business."

**2** Grullon moved for declaratory judgment on August 13, 1998 and a preliminary injunction barring his transfer from Allenwood on September 18, 1998. The Federal Defendants sought and obtained adjournments to respond to Grullon's application and on October 1, 1998, the Federal Defendants moved for summary judgment as did the City Defendants and Captain Witkowich. Grullon sought and obtained additional time to respond. On April 22, 1999, Grullon moved to amend and file an amended complaint.

The motions for summary judgment and preliminary injunction were marked submitted on March 31, 1999. The motion to amend the complaint was marked submitted on May 19, 1999.

*The Facts*

1. *The Criminal Investigation*

On December 27, 1993, Agent Reid received information from a confidential informant that Grullon and others were engaged in armed narcotics trafficking with deliveries of the drugs sent by a car service. Further investigations by Agent Reid and others over the next six months led to an organization known as "New York One" that operated out of a radio base located at 970 Prospect Avenue, Apartment C, Bronx, New York. Agent Reid acted undercover during the investigation to purchase cocaine from the car service drivers.

Based on the information gathered during the investigations, the government obtained a search warrant for 970 Prospect Avenue and seven arrest warrants for individuals involved in the narcotics trafficking. On August 4, 1994, Agent Reid, along with Agent Bradley, Agent Haridopolos, and other ATF agents and officers from the New York City Housing Authority Policy ("NYHP"), executed the search warrant and arrest warrants.

During the execution of the search warrant, Agent Reid monitored conversations being conducted over the radio. Even though the agents had shut down the radio dispatch unit at 970 Prospect Avenue pursuant to execution of the search warrant, they continued to hear radio conversations indicating that New York One was operating from a second location, subsequently identified by one of the drivers who was arrested as being at Zerega and Westchester Avenues, Bronx; New York.

Some agents went to the Zerega Avenue location to attempt to locate additional individuals for whom the agents had arrest warrants. When they arrived, they discovered a store that appeared to be a livery car service with a sign on the front door stating, "New York One Car Service." The agents discovered a silver automatic .45 pistol lying in the street under a car parked in front of the store. Earlier that day when executing the search warrant at 970 Prospect Avenue, the agents had found a photograph of Grullon holding what appeared to be a silver pistol.

The agents entered the store to try to effect the remaining arrest warrants. They saw a list of individuals in the store's dispatch area that contained names of some of the subjects of the arrest warrants and a list of cars that included cars from which Agent Reid had previously purchased cocaine. Past the dispatch area was a door with a sign saying, "Office" and "Franklin Grullon, President."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

**\*3** The agents secured the Zerega Avenue location and radioed Agent Reid with this information. Agent Reid personally verified the information. With the assistance of Assistant United States Attorney Marjorie B. Feinzig, Agent Reid then applied for a search warrant for the Zerega Avenue location on the basis that there was probable cause to believe that contraband was concealed there. Agent Bradley accompanied Agent Reid when he was applying for the search warrant.

While Agents Reid and Bradley were in the process of applying for the search warrant, other agents went to Grullon's residence at 747 Riverside Drive to attempt to arrest him.

The search warrant for the Zerega Avenue location was obtained at 11:10 p.m. and executed immediately thereafter at 11:25 p.m. In addition to seizing the non-drug, non-contraband evidence that is listed on the search warrant returns, ATF seized over 50 grams of cocaine from one of the car service drivers, several firearms, approximately $6,000 in United States currency from the Zerega Avenue location and miscellaneous drug records.

One week later, on the morning of August 11, 1994, Agent Reid assisted the NYHP, NYPD and New York City Taxi and Limousine Commission ("TLC") by making several calls to the New York One Car Service. During these telephone calls in his undercover capacity, Agent Reid ordered drugs to be delivered to specific locations. When the cars arrived, the NYHP, NYPD and TLC officers made the arrests. Later that morning, Grullon surrendered at the 43rd Precinct Station of the NYPD. Agent Reid returned to the 43rd Precinct Station and spent the remainder of August 11, 1994 processing Grullon's arrest. Neither Agent Reid, Agent Bradley nor Agent Haridopolos personally participated in a search of the New York One premises conducted by the NYHP, NYPD and TLC on August 11, 1994.

2. *The Criminal Actions*

On November 16, 1994, an 86-count indictment was unsealed charging Grullon and others with numerous acts of violence under the RICO statute for participation in a violent gang known as the Head Crackers/Willis Avenue Lynch Mob. *See United States v. Grullon,* 1996 WL 437956 *1 (S.D.N.Y. Aug. 5, 1996),* aff'd sub nom *United States v. Torres,* 129 F.3d 710 (2d Cir.1997). On January 6, 1995, a separate one-count indictment was filed against Grullon charging him with conspiracy to sell cocaine arising out of the New York One investigation. On June 26, 1995, Agent Reid testified at a suppression hearing before this Court regarding the admissibility of evidence seized at the Zerega Avenue location.

At that hearing, Grullon argued that ATF Agents had removed evidence from the Zerega Avenue location on August 4, 1994 prior to the government obtaining the search warrant. After hearing testimony from several witnesses, Grullon's suppression motion was denied.

On August 30, 1995, Grullon pleaded guilty to conspiracy to commit robbery involving assault with a dangerous weapon, and to using the telephone to converse with a co-conspirator about the distribution of cocaine. *See United States v. Grullon,* 1996 WL 437956 *1. Pursuant to the August 30, 1995 plea agreement, the district court dismissed the one-count narcotics indictment arising out of the New York One investigation, as well as the remaining counts of the RICO indictment. The plea was the result of a global settlement with the government. *See id.* Grullon's subsequent attempts to withdraw his guilty plea were rejected by the district court and the Court of Appeals for the Second Circuit. The Second Circuit stated that it declined to address Grullon's ineffective assistance of counsel argument given his subsequent knowing and voluntary guilty plea. *See United States v. Torres,* 129 F.3d at 715.

**\*4** After commencing this proceeding, Grullon was transferred pursuant to a Bureau of Prisons policy that attempts to provide a maximum number of beds to deportable alien inmates in need of hearings before Immigration and Naturalization Service ("INS") judges at facilities where such hearings are available. The INS issued a final order of deportation against Grullon on August 4, 1998. Under the Bureau of Prisons policy, Grullon was moved to a "INS Release Site" to make room at the "INS Hearing Site" for an inmate who has not yet received a deportation hearing. He was transferred on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

September 16, 1998.

*Discussion*

I.  *The Court Lacks Subject Matter Jurisdiction Over
Claims Brought Against The Defendants*

A.  *The Bivens Claims and* Section 1983 *Claims Are
Barred by the Statute of Limitations*

Congress has not designated a federal statute of limitations
for *Bivens* actions. When there is no federal statute of
limitations, a federal court should adopt a local time
limitation. *See Wilson v.. Garcia,* 471 U.S. 261 (1985).
The Second Circuit has held that section 214(5) of the
New York Civil Practice Law and Rules is the applicable
statute of limitations for *Bivens* actions brought in federal
court in New York State. *See Chin v. Bowen,* 833 F.2d 21
(2d Cir.1987); *United States ex rel. Farmer v. Kaufman,*
750 F.Supp. 106, 110 (S.D.N.Y.1990). New York Civil
Practice Law and Rules section 214(5) states that an action
to recover damages for personal injury must be
commenced within three years. N.Y.C.P.L.R. § 214(5)
(McKinney 1990). The same limitations period applies to
actions commenced pursuant to 42 U.S.C. § 1983. *See,
Day v. Morgenthau,* 909 F.2d 75, 78 (2d Cir.1990).

Under federal law, a cause of action arises when petitioner
knows or has reason to know of the alleged injury. *See
Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993); *Stone
v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992). The
statute of limitations is not tolled for plaintiffs who are *pro
se* or incarcerated. *See, McNeil v. United States,* 508 U.S.
106, 113 (1993) ( "procedural rules in ordinary civil
litigation should [not] be interpreted so as to excuse
mistakes by those who proceed without counsel");
*Edwards v. Immigration and Naturalization Serv.,* 59 F.3d
5, 8 (2d Cir.1995). Grullon claims his injuries were
sustained when his property was seized on either August
4, 1994 or August 11, 1994. He did not, however, file his
complaint until February 19, 1998, more than six months
after the statute of limitations had passed. Therefore, all
claims allegedly arising under *Bivens* and section 1983 are
time-barred and are dismissed for lack of subject matter
jurisdiction.[FN1]

FN1.  To the extent Grullon alleges claims
against the Federal Defendants under section
1983, he must establish that the Federal
Defendants were acting under color of state law.
Here they were conducting an investigation into
violations of federal firearms laws and narcotics
laws and had obtained and executed federal
search warrants. The Federal Defendants derived
their authority from Federal law, 18 U.S.C. §§
921-930, 3105, 26 U.S.C. § 7608. It is
well-settled that section 1983 is not cognizable
against federal officers acting under color of
federal law. *See Pou v. United States Drug
Enforcement Admin.,* 923 F.Supp. 573, 579
(S.D.N.Y.1996), *aff'd,*107 F.3d 3 (2d Cir.1997).
Therefore, all section 1983 claims against the
Federal Defendants should be dismissed for lack
of subject matter jurisdiction.

To the extent Grullon alleges violations of the
Fourteenth Amendment, those claims are not
applicable to the Federal Defendants, since the
Fourteenth Amendment is applicable only to
the states and state actions. *See District of
Columbia v. Carter,* 409 U.S. 418, 424 (1973).

To the extent Grullon seeks to sue the Federal
Defendants in their official, rather than
individual capacities, the claims are dismissed.
Any lawsuit against an officer of the United
States in his official capacity is, in essence, an
action against the United States. *See Kentucky
v. Graham,* 473 U.S. 159, 165-66 (1985).
Suits against the United States for
constitutional torts "are properly dismissed for
want of subject matter jurisdiction" because
"such suits are ... barred from the doctrine of
sovereign immunity." *Robinson v. Overseas
Military Sales Corp.,* 21 F.3d 502, 510 (2d
Cir.1994).

In responding to the Defendants' statute of limitations
argument, Grullon has sought to rely upon Rule 15,
Fed.R.Civ.P. However, the issue under Rule 15 is not
whether plaintiff was allowed to file an amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

complaint, but whether the amended complaint he filed, naming entirely new parties and requesting relief not sought in the original pleading, will relate back to the date the original pleading was filed. Consideration of relation back is required because plaintiff's original pleading, consisting not of a complaint but of a Rule 41(e) motion for return of seized property, was filed on July 7, 1997, less than one month prior to expiration of the three-year statute of limitations. The Amended Complaint was filed on February 19, 1998, more than six months after expiration of the statute of limitations. Thus, Grullon's action against the individual defendants is time-barred unless it relates back to the July 7, 1997 date the Rule 41(e) motion was filed.

**\*5** Pursuant to Rule 15(c), an amendment of a pleading relates back when:

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c); *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 468-69 (2d Cir.1995) (discussing the standard for relation back of a new party by reason of mistake), *modified,* 74 F.3d 1366 (2d Cir.1996) (per curiam); *see also Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 35 (2d Cir.1996) (same).

It is questionable whether a civil complaint for damages may properly relate back to a motion under Rule 41(e) of the Federal Rules of Criminal Procedure for the return of

seized property. In general, only "pleadings" as defined in Rule 7(a) may be amended and a motion is not a pleading. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2, 1475. While Grullon captioned his complaint as "amended," in fact there is no original "complaint." *But see United States v. David,* 131 F.3d 55, 61 (2d Cir.1997) (post-conviction Rule 41(e) motion is deemed a civil complaint for equitable relief).

In any case, Grullon's original Rule 41(e) motion named the United States as the sole defendant. His Amended Complaint, however, names various officers in their individual capacities. Because the amendment thus changes the parties, Grullon has failed to meet the three requirements of Rule 15(c)(3): 1) the claim arose out of the same conduct; 2) the new parties received notice of the action within the time period for service provided by Rule 4(m), so they will not be prejudiced in defending the claims; and 3) the new parties knew or should have known that plaintiff failed to name them in the original pleading due only to a mistake concerning the identity of the proper party. Fed.R.Civ.P. 15(c)(3).

Grullon has not established that the original Rule 41(e) motion placed the Defendants on notice that, but for a mistake, they were the intended defendants.[FN2] The Rule 41(e) motion sought return of property only. Grullon did not seek monetary damages or allege that his constitutional rights had been violated by the Defendants. The only party that could return the seized property to him was the government itself, not the individual defendants. Thus, the individual defendants did not know that Grullon sought to pursue any claim against them individually until he filed the Amended Complaint, more than six months after the three-year statute of limitations for *Bivens* and section 1983 actions had passed.

FN2. It is also highly questionable whether plaintiff could satisfy the additional requirements that he show: a) that the Amended Complaint arose out of the conduct described in the Rule 41(e) motion, and b) that the Defendants had notice of the action within the time provided for service by Rule 4(m).

**\*6** This case is distinguishable from *Soto v. Brooklyn*

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

*Correctional Facility,* where an inmate filed a section 1983 action against the institution where he was incarcerated, seeking monetary damages for alleged constitutional violations arising out of the institution's failure to protect him from other inmates. *Soto,* 80 F.3d at 35. The Second Circuit determined that Soto had made a mistake in naming the institution because he did not claim that the alleged unconstitutional conduct was "part of any institutional custom or policy" that would have given rise to institutional liability and had instead intended to name the individual officers who had failed to protect him. *Id.* at 36. Here, Grullon's initial pleading was a petition pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure against the government, seeking only return of seized property, relief that could not have been granted as against any individual defendant. Although Grullon listed section 1983, among other statutes, as a ground for jurisdiction in his original motion, he did not request monetary damages. Thus, the Federal Defendants, the City Defendants and Captain Witkowich were not on notice that "but for a mistake concerning the identity of the property party, the action would have been brought against the [Defendants personally]." Fed.R.Civ.P. 15(c)(3)(B).

Grullon has also suggested that the statute of limitations did not begin to run until October 1998, when he received invoices from the New York City Police Department for property that was seized on August 11, 1994 by the New York City Police. Indeed, by filing the Amended Complaint on February 19, 1998, Grullon himself demonstrated that any claims against the Defendants arose substantially before October 1998. Accordingly, the Amended Complaint should be dismissed for lack of jurisdiction because the claims against the Defendants are barred by the statute of limitations.

B. *Collateral Estoppel Bars a Challenge to the Validity of the August 4, 1994 Search*

Even if Grullon's claims were considered to be timely, many of them are barred by the doctrine of collateral estoppel. The doctrine of collateral estoppel bars relitigation of issues that have been fully litigated in another forum. For collateral estoppel to apply, the court must find that (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding as to which estoppel is sought was actually litigated and decided, (3)

there was a full and fair opportunity for litigation of that issue in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *See Montana v. United States,* 440 U.S. 147, 153 (1979); *Allen v. McCurry,* 449 U.S. 90, 94 (1980); *Gelb v. Royal Globe In. Co.,* 798 F.2d 38, 44 (2d Cir.1986); *Lavin v. Thornton,* 959 F.Supp. 181, 185 (S.D.N.Y.1997).

In this action, Grullon has alleged that agents seized evidence from the Zerega Avenue location in the afternoon of August 4, 1994 prior to issuance of the search warrant. Grullon previously litigated the legality of the August 4, 1994 search and seizures at the Zerega Avenue location through a suppression motion in the criminal action, challenging the government's probable cause to obtain the warrant and alleging that agents seized evidence in the afternoon of August 4, 1994 prior to issuance of the search warrant at 11:10 p.m. Grullon's motion to suppress the evidence was denied, the Court finding that the government did not seize any evidence prior to obtaining the search warrant and had probable cause to obtain the warrant. Thus, the issues as to the August 4, 1994 search and seizures raised in the suppression hearing are identical to those raised in this proceeding, they were litigated in a forum which provided Grullon with a full and fair opportunity for litigation, and they were necessary to support a final judgment on the merits. Accordingly, the doctrine of collateral estoppel applies to bar relitigation of the validity of the August 4, 1994 search and seizure in this action. *See, e.g., McCarthy v. United States,* 394 U.S. 459, 466 (1969); *Hayle v. United States,* 815 F.2d 879, 881 (2d Cir.1987); *United States v. Podell,* 572 F.2d 31, 35 (2d Cir.1978); *Berman v. Turecki,* 885 F.Supp. 528, 533 (S.D.N.Y.1995).

*7 Grullon cannot avoid the estoppel effect of the suppression hearing by alleging that the criminal action arising out of the New York One investigation was not fully litigated since his guilty plea was a global resolution of both criminal actions. One criminal case charged multiple racketeering counts of robbery and murder, while the second criminal case charged a single narcotics trafficking count arising out of delivery of the drugs via plaintiff's car service. *Id.* at 713. The superseding indictment to which Grullon pleaded guilty contained one racketeering count and one narcotics count, thus incorporating the elements of the two separate criminal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

actions. *Id.* at 713-14. *See also United States v. Grullon,* 1996 WL 437956 at *1 (guilty plea would be in satisfaction of the charges pending against him in both cases).

By pleading guilty to the federal robbery and telephone narcotics trafficking communication charges, Grullon not only admitted his guilt but also conceded the lawfulness of his arrest and the search of his business. *See Berman,* 885 F.Supp. at 533 ("guilty plea is not just an admission of unlawful conduct, it is a waiver of all the constitutional rights embodied in the right to a jury trial"); *United States v. Arango,* 966 F.2d 64, 66 (2d Cir.1992) (guilty plea determined issue of lawfulness of search); *Reese v. York,* 571 F.Supp. 1046, 1048 (N.D.Tex.1983) (guilty plea "disposes of any issue pertaining to the constitutionality of Plaintiff's arrest, interrogation, search and prosecution"). Accordingly, since Grullon chose to plead guilty, he cannot now challenge the adequacy of the August 4, 1994 search warrant or search and all claims against the Defendants arising out of the August 4, 1994 search should be dismissed.

Grullon directly challenges the outcome of the June 26, 1995 suppression hearing by once again attacking the effectiveness of his counsel and the voluntariness of his plea. These issues have been fully litigated in numerous motions in the criminal cases and Grullon has exhausted his appeals of those motions. *See Torres,* 129 F.3d at 715-16 (denial of Grullon's motions to withdraw his guilty plea affirmed).[FN3]

> [FN3.] Indeed, the Second Circuit, in rejecting plaintiff's first motion to withdraw his guilty plea, specifically declined to address his "argument that his counsel was constitutionally ineffective by failing to interview and call certain witnesses at a pretrial suppression hearing," based on the general rule that defenses are waived by a guilty plea. *Torres,* 129 F.3d at 715.

Finally, Grullon claims that Defendants did not provide him with documentation which would have allowed him to establish a defense, must be dismissed. As a preliminary matter, it is unclear what Grullon is claiming here.

However, to the extent that he is claiming that a conspiracy subverted his defense, which thereby lead to his guilty plea, he appears to challenge his incarceration. Grullon may not make a claim in a § 1983 setting that would have the effect of undermining the basis for his incarceration (plea or conviction). *See Heck v. Humphrey,* 512 U.S. ____ (1994).

C. *The Amended Complaint Fails to Allege the Personal Participation of the Federal Defendants*

All claims against the Federal Defendants arising out of the August 11, 1994 search must be dismissed because Grullon has failed to meet the burden of establishing in a *Bivens* action, as to each defendant, specific facts that show the defendants' personal participation in the alleged constitutional violation. *See Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985); *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986) (Second Circuit requires "direct and personal responsibility" on the part of *Bivens* defendants), *aff'd,* 812 F.2d 712 (2d Cir.1987). Absent such specific allegations, the amended complaint is insufficient as a matter of law and must be dismissed. *See Barbera v. Smith,* 836 F .2d 96, 99 (2d Cir.1987) (dismissing *Bivens* complaint in part because it did "not allege any personal involvement" by defendant).

**\*8** Grullon has alleged only that Agents Reid and Bradley "were ... participants" in an August 11, 1994 "raid" on his place of business in which unnamed defendants seized property from the premises without a warrant. He has not alleged that Reid or Bradley personally searched the business or seized any property on August 11, 1994. These conclusory allegations, without more specific instances of alleged misconduct, are insufficient to withstand a motion for summary judgment.[FN4]

> [FN4.] In fact, neither Agent Reid nor Agent Bradley nor Agent Haridopolos conducted any search of the New York One premises on August 11, 1998.

Grullon further alleges that the Federal Defendants conspired together "and intentionally neglected to produce any documentation to Grullon in connection with the

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

events that occurred when they conducted a search [of the Zerega Avenue location] on August 4 at approximately3:30 p.m.; and August 11 at approximately 10:00 a.m." These vague and conclusory allegations of conspiracy are insufficient to withstand a motion for summary judgment. *See Leon,* 998 F.2d at 310; *Lewal v. Dow,* 1994 WL 263521 at *3 (S.D .N.Y.1994). Grullon's claims that the Federal Defendants refused to turn over the seized property are also too vague to support a *Bivens* action. Moreover, virtually all of the property has now been returned, within a reasonable time after Grullon's criminal appeals were resolved on November 17, 1997. *United States v. David,* 131 F.3d 55, 58 (2d Cir.1997) (post-seizure delay in returning property did not violate due process). Grullon has not articulated any way in which the named defendants personally participated in the alleged delay or how the delay in returning his property prejudiced him.

D. *The Federal Defendants are Entitled To Qualified Immunity*

The Supreme Court has recognized a limited waiver of immunity for claims of constitutional violations brought against federal employees in their individual, rather than official, capacities. *See Bivens,* 403 U.S. at ____. *Bivens* allows suits from damages against a federal official only if the official personally violated a well-established constitutional right of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Butz v. Economou,* 438 U.S. 478, 507 (1978).

Even where they have violated a constitutional right, government officials are protected from suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Hunter v. Bryant,* 502 U.S. 224, 229 (1991); *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the

scope of the established prohibition." *In re State Police Litig.,* 88 F.3d 111, 123 (2d Cir.1996). The question to be answered is whether the "defendant acted reasonably under settled law in the circumstances, not whether another reasonable or more reasonable, interpretation of the events can be construed ... after the fact." *Hunter,* 502 U.S. at 229.

**\*9** The qualified immunity defense is "an immunity from suit rather than a mere defense from liability." *Mitchell,* 472 U.S. at 526. In recognition of this, the Supreme Court has repeatedly stressed the desirability of resolving the qualified immunity issues at the earliest stage of litigation. *See Hunter,* 502 U.S. at 227;*Mitchell,* 472 U.S. at 526. Once the individual defendants raise qualified immunity, a plaintiff cannot maintain a *Bivens* action against them unless he can prove that each defendant violated a clearly established constitutional right. *See Siegert,* 500 U.S. at 232. In this case, Grullon cannot establish that the Defendants have violated a constitutional right, much less a clearly established one.

The Defendants were acting reasonably on August 4, 1994 when they were executing duly issued federal search warrants and arrest warrants as part of an investigation into armed narcotics trafficking. *See Pou,* 923 F.Supp. at 580. It was well within their rights to visit various locations to try to find individuals for whom arrest warrants had been issued. Further, the Federal Defendants did not violate Grullon's constitutional rights by securing the Zerega Avenue location until they could obtain a search warrant.[FN5] Accordingly, they are entitled to qualified immunity for all actions arising out of their execution of the search and arrest warrants.[FN6]

FN5. Moreover, Grullon does not have standing to object to the alleged warrantless search of his sister's apartment. *See United States v. Modica,* 663 f.2d 1173, 1177 (2d Cir.1981) (finding plaintiff lacked standing to object to the search of a bag that he conceded was not his).

FN6. Although the complaint primarily alleges constitutional violations based on the government's failure to return and/or delay in returning his personal property, it appears that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

Grullon also seeks to overturn his conviction by challenging the constitutionality of the underlying search based on violations of the Fourth, Fifth and Fourteenth Amendments. As the Supreme Court held in *Heck,* 512 U.S. __, a section 1983 plaintiff must show that his underlying conviction was terminated in his favor in order to succeed on a constitutional tort claim. As the Second Circuit has held, a "claim for damages based on a conviction or sentence that has not been invalidated as described [in *Heck* ] is not cognizable under [*Bivens* ]". *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995). Grullon cannot show that his conviction has been overturned, since he has exhausted his appeals without success. *See United States v. Torres,* 129 F.3d at 715). Therefore, his *Bivens* claims, to the extent they challenge his underlying conviction, must be dismissed under *Heck.*

The amended complaint and the record is devoid of any other allegations of specific actions on the part of the Defendants.[FN7] Thus, Grullon has alleged no action on the part of the Defendants that would make them ineligible for qualified immunity. On the contrary, all of the Federal Defendants' actions described in the amended complaint were reasonable for federal law enforcement agents investigating criminal activity. Accordingly, the Federal Defendants are entitled to qualified immunity dismissing al of Grullon's claims.

FN7. Grullon does allege that Agent Reid made false statements at a suppression hearing. However, Agent Reid is absolutely immune from liability for his testimony in court. *Briscoe v. Lahue,* 460 U.S. 325 (1983); *See Daloia v. Rose,* 849 F.2d 74 (2d Cir.1988) (immunity extends to testimony at pretrial hearing).

E. *The Failure to Return Property Claim is Dismissed*

Grullon appears to allege that certain property seized during the course of the August 4 and 11, 1994 searches is being improperly withheld from him, although the facts set forth above establish otherwise. City Defendants make

two observations with respect to this issue. First, it is not entirely clear as to which defendant (Federal, City, or Housing Authority), that this claim (or for that matter, the "property" which Grullon alludes to in asserting this claim) is directed.

But more importantly, even assuming that Grullon is directing this allegation of improperly seized property to City Defendants, he has an adequate post-deprivation remedy in state court, and thus has no due process claim. *See Parratt v. Taylor,* 451 U.S. 527, 543-44, 68 L.Ed.2d 420, 101 S.Ct. 1908 (1981), *reversed on other grounds, Daniels v. Williams,* 474 U.S. 327, 88 (1986); *Davidson v. Cannon,* 474 U.S. 344, 88 L.Ed.2d 677, 106 S.Ct. 668 (1986). In *Parratt,* the Court recognized that post-deprivation remedies made available by the state can satisfy the Due Process Clause. *Id* . at 538.

**\*10** Once all criminal proceedings involving confiscated property have terminated and a demand for the property has been made, a property clerk must turn over to a claimant any such property that is not "per se contraband." *Lipscomb v. Property Clerk,* 592 N.Y.S.2d 96 (3d Dep't 1992) (quoting *United States v. Farrell,* 606 F.2d 1341, 1344 (D.C.Cir.1979)). Because an individual seeking to retrieve his property has recourse to state court remedies, there is no due process violation, and therefore no viable § 1983 claim. This claim, therefore, is dismissed as well.

II. *Grullon is not Entitled to a Preliminary Injunction*

Grullon has alleged that his transfer from Allenwood to another facility within the Bureau of Prisons was "made solely for purpose of relation [sic] for his exercise of a constitutional right ... access to the courts." Motion at ¶ 6, (*citing Meriweather v. Coughlin,* 879 F.2d 1037, 1045-48 (2d Cir.1989)). He further states that he wants to be detained at Allenwood "where he has available legal assistance with fellow inmates whom are familiar with his case."

A court may issue a preliminary injunction to preserve the status quo and prevent irreparable harm to the movant until an underlying motion for injunctive relief may be resolved. *See, e.g., Warner Bros. Inc. v. Dae Rim Trading,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

*Inc.,* 877 F.2d 1120, 1124-25 (2d Cir.1989); Fed.R.Civ.P. 65. Such relief, however, may only be granted where the movant establishes (a) irreparable harm absent an injunction, and (b) either (1) a likelihood of success on the merits of his claims or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party." *Jackson v. Johnson,* 962 F.Supp. 391, 392 (S.D.N.Y.1997) (prisoner not entitled to a preliminary injunction assigning him to specific prison); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Here, Grullon has shown no likelihood of success on the merits of his claim.

Grullon has made no showing whatsoever that he will be denied adequate access to legal materials in his new prison. It is well settled that a prisoner has no constitutional right to serve a sentence in any particular institution, or to be transferred or not transferred from one facility to another. *See Olim v. Wakinekona,* 461 U.S. 238, 249-50 (1983), *Meacham v. Fano,* 427 U.S. 215, 224-25 (1976); *Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1997). The Bureau of Prisons has "sole discretion" to determine where a federal inmate will be housed. *United States v. Williams,* 65 F.3d 301, 307 (2d Cir.1995), (*citing* 18 U.S.C. § 3621). Only in the rare instance where a transfer is made solely in retaliation for the exercise of a constitutional right will the transfer violate a prisoner's constitutional rights. *See Meriweather v. Coughlin,* 879 F.2d at 1045-46.

III. *The Motion to Amend the Complaint is Denied as Futile*

**\*11** Rule 15(a) of the Federal Rules of Civil Procedure provides in pertinent part that:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Civ.P. 15(a). Leave to amend a complaint should be freely granted when justice so requires, but is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Jones v. New York State Div. of Military and Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999); *Hunt v. Alliance North American Government Income Trust, Inc.,* 159 F.3d 723, 728 (2d Cir.1998).

The amendment of a complaint is futile where, as here, the statute of limitations has run on the plaintiff's claims. *See Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1198 (2d Cir.1989); *Corcoran v. Sinclair,* No. 97 Civ. 9286, 1999 WL 177444 (S.D.N.Y. March 30, 1999); *Sealey v. Fishkin,* No. 97 Civ. 6303, 1998 WL 1021470 (E.D.N.Y. Dec. 2, 1998). In *Corcoran,* the three year statute of limitations for actions brought pursuant to section 1983 had expired. 1999 WL 177444 at *10. Because any additional claims filed by the plaintiff's estate against the individual defendants would have been barred by the statute of limitations, leave to amend was denied as futile. *Id.* at *13.

In an attempt to avoid the jurisdictional bar of the statute of limitations, the plaintiff in *Corcoran* argued that the claims related back to an earlier complaint filed against corporate defendants and should therefore be considered timely. *Id.* at *10. Because the amended complaint added new parties, relation back was not permitted under rule 15(c) of the Federal Rules of Civil Procedure. *Id.*

The proposed second amendment of the complaint in this action is similarly futile because Grullon's claims against the individual Defendants are barred by the statute of limitations. As set forth above, Grullon's claims are subject to the same three-year statute of limitations applied in *Corcoran. Chin v. Bowen,* 833 F.2d at 24.

Accordingly, the amended complaint does not relate back to the motion for return of seized property and the claims against the individual defendants are barred by the statute of limitations.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)
(Cite as: 1999 WL 436457 (S.D.N.Y.))

*Conclusion*

For the reasons set forth above, the Defendants' motion to dismiss the complaint is granted and Grullon's motions for preliminary injunction and to file an amended complaint are denied.

Settle judgment on notice.

It is so ordered.

S.D.N.Y.,1999.
Grullon v. Reid
Not Reported in F.Supp.2d, 1999 WL 436457 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



655 F.Supp.2d 235
(Cite as: 655 F.Supp.2d 235)

United States District Court,
W.D. New York.
Robert RIVERA, Plaintiff,
v.
Brian FISCHER, Lucien J. Leclaire, James Conway,
Donald K. Mc Clellan, Gary J. Pritchard, Leonard R.
Janora, Timothy J. Ebert, individually and in their
official capacities, Defendants.
No. 08-CV-6505L.

Sept. 18, 2009.

**Background:** Inmate brought § 1983 action against state
Department of Correctional Services commissioner and
deputy commissioner, and superintendent of correctional
facility. The defendants moved for dismissal.

**Holdings:** The District Court, David G. Larimer, J., held
that:
(1) inmate failed to allege facts plausibly showing that
commissioner and deputy commissioner were personally
involved in alleged violations of his constitutional rights,
and
(2) inmate sufficiently alleged facts plausibly showing that
superintendent was personally involved in the alleged
violations.

Motion granted in part and denied in part.

West Headnotes

**[1] Civil Rights 78** ☞ **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

**Civil Rights 78** ☞ **1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and jails; probation
and parole. Most Cited Cases
Inmate failed to allege facts plausibly showing that
commissioner and deputy commissioner of state
Department of Correctional Services were personally
involved in the alleged violations of his constitutional
rights at correctional facility, as required to state a § 1983
claim against them upon which relief could be granted;
facts alleged in complaint did not indicate that
commissioner or deputy commissioner was personally
involved in alleged constitutional violations, and
complaint indicated that when inmate sent letters to
commissioner, he consistently referred them to deputy
commissioner, who passed them on to his staff or
correctional facility superintendent, and deputy
commissioner would then respond to inmate based on
report from person to whom matter had been referred. 42
U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.

**[2] Civil Rights 78** ☞ **1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat
superior in general; supervisory liability in general. Most
Cited Cases

**Civil Rights 78** ☞ **1394**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1394 k. Complaint in general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

655 F.Supp.2d 235
(Cite as: 655 F.Supp.2d 235)

Cases

A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation, and that requirement may be satisfied by alleging facts showing that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberated indifference to others' rights by failing to act on information indicated that constitutional acts were occurring. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78** 🔑 **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
The general rule is that if a supervisory official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter, for purposes of liability of the official under § 1983; if however, the official does personally look into the matters raised in the letter, or otherwise acts on the inmate's complaint or request, the official may be found to be personally involved. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78** 🔑 **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

**Civil Rights 78** 🔑 **1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and jails; probation and parole. Most Cited Cases
Inmate sufficiently alleged facts plausibly showing that superintendent of correctional facility was personally involved in the alleged violations of inmate's constitutional rights at correctional facility, as required to state a § 1983 claim against superintendent upon which relief could be granted; the allegations of the complaint indicated that superintendent took some steps to look into inmate's various complaints, based on letters that he received either from inmate directly or that were passed on to him by deputy commissioner of state Department of Correctional Services. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Civil Rights 78** 🔑 **1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Most Cited Cases
The doctrine of qualified immunity shields government officials from liability for damages resulting from the performance of discretionary official functions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*236 Robert Rivera, Dannemora, NY, pro se.

Emil J. Bove, Jr., Office of New York State Attorney General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

655 F.Supp.2d 235
(Cite as: 655 F.Supp.2d 235)

Plaintiff, Robert Rivera, appearing *pro se,* commenced this action pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), has sued seven DOCS officials and employees, alleging that defendants violated plaintiff's constitutional rights in a number of respects during 2008, while plaintiff was confined at Attica Correctional Facility.

Three of the defendants-DOCS Commissioner Brian Fischer, Deputy Commissioner Lucien Leclaire, Jr., and Attica Superintendent James Conway (collectively "the moving defendants")-have moved to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, *237 defendants' motion is granted in part and denied in part.

**DISCUSSION**

**I. Motions to Dismiss under Rule 12(b)(6)**

Rule 12(b)(6) motions are now analyzed under a slightly different standard than they were prior to the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Prior to *Twombly,* courts would generally deny a motion to dismiss if there was "any set of facts" consistent with the allegations of the complaint that would entitle the plaintiff to relief. *See, e.g., Hill v. City of New York,* 45 F.3d 653, 657 (2d Cir.1995); *Gilmore v. University of Rochester,* 410 F.Supp.2d 127, 131 (W.D.N.Y.2006).

In *Twombly,* however, the Supreme Court declared that the "any set of facts" standard had "earned its retirement." 550 U.S. at 563, 127 S.Ct. 1955. The Court explained that to defeat a motion to dismiss, "a plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 127 S.Ct. 1955 (citations omitted).

Thus, where a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his]

complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955. A "plausible" entitlement to relief exists, then, when the allegations in the complaint move the plaintiff's claims across the line separating the "conclusory" from the "factual," and the "factually neutral" from the "factually suggestive." *Id.* at 557 n. 5, 127 S.Ct. 1955.

"[T]his plausibility standard governs claims brought even by *pro se* litigants." *Robles v. Bleau,* No. 9:07-CV-0464, 2008 WL 4693153, at *5 (N.D.N.Y. Oct. 22, 2008) (citing *Jacobs v. Mostow,* 271 Fed.Appx. 85, 87 (2d Cir.2008), and *Boykin v. KeyCorp,* 521 F.3d 202, 215-16 (2d Cir.2008)). At the same time, however, the Court is mindful that even after *Twombly,* a "document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin,* 521 F.3d at 214. Nevertheless, all pleadings, *pro se* or otherwise, must contain enough factual allegations to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)) (additional internal quotation marks omitted). With these standards in mind, I turn to the claims asserted in the complaint and to defendants' motion.

**II. Personal Involvement**

[1] The moving defendants contend that the claims against them should be dismissed because the complaint does not allege facts plausibly showing that they were personally involved in the alleged constitutional violations.

[2] A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001); *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). That requirement may be satisfied by alleging facts showing that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy *238 or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

655 F.Supp.2d 235
(Cite as: 655 F.Supp.2d 235)

custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberated indifference to others' rights by failing to act on information indicated that constitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

In the case at bar, plaintiff does not appear to allege that any of the moving defendants personally participated in the alleged violations. Rather, he alleges that they were made aware of those violations, mostly through letters from plaintiff, and that they ignored or failed to remedy the underlying wrongs.

"Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim." *Candelaria v. Higley,* No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (citing cases). That does not necessarily mean, however, that a plaintiff can never establish a defendant's personal involvement based on the fact that the plaintiff wrote to that defendant about the alleged violations. There may be situations in which a supervisory official's receipt and review of a letter of complaint will, in combination with other factors, give rise to the official's personal involvement in the matters complained of.

[3] The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). If, however, the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved. *See, e.g., Charles v. New York State DOCS,* No. 07-CV-1274, 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) ("Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor ... often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself"); *Anderson v. Ford,* No. 06CV 1968, 2007 WL

3025292, at *7 (D.Conn. Oct. 16, 2007) ("Personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews or responds to a prisoner's complaint"); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action").

In the case at bar, the facts alleged in the complaint do not indicate that Commissioner Fischer or Deputy Commissioner Leclaire was personally involved in any of the alleged constitutional violations. The complaint, and its accompanying exhibits, indicate that when plaintiff sent letters to Fischer, Fischer consistently referred them to Deputy Commissioner Leclaire, who passed them on to his staff or to Superintendent Conway. Leclaire would then respond to plaintiff based on the report that had been given to Leclaire by the person to whom the matter had been referred. *See* Complaint Exs. G, M. [FN1]

> FN1. In deciding a motion to dismiss under Rule 12(b)(6), the court may consider not only the complaint itself, but also any documents attached to the complaint. *Livecchi v. United States,* 574 F.Supp.2d 321, 323 (W.D.N.Y.2008) (citing *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996)).

*239 Such allegations are insufficient to establish the personal involvement of Fischer or Leclaire. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (stating that facility superintendent's act of "referring [plaintiff's] letters to staff for investigation is not sufficient to establish [his] personal involvement," and dismissing plaintiff's claims against superintendent "due to Plaintiff's failure to allege facts plausibly suggesting" superintendent's personal involvement in the alleged constitutional violations) (footnote omitted); *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

655 F.Supp.2d 235
(Cite as: 655 F.Supp.2d 235)

[4] As to Conway, however, the allegations of the complaint indicate that he did take some steps to look into plaintiff's various complaints, based on letters that he received either from plaintiff directly or that were passed on to him by Leclaire. Although I make no finding at this point concerning whether plaintiff will ultimately be able to establish Conway's personal involvement, I conclude that he has alleged enough at this stage to at least survive a motion to dismiss. *See Charles,* 2009 WL 890548, at *6-*7 (denying motion to dismiss claims against supervisory officials where plaintiff alleged that officials actually investigated matters raised by plaintiff in his letters to the officials, and that they responded to plaintiff based on results of their investigations).

**III. Qualified Immunity**

[5] The moving defendants also argue, in the alternative, that plaintiff's claims against them should be dismissed on the ground of qualified immunity. "The doctrine of qualified immunity shields government officials from liability for damages resulting from the performance of discretionary official functions if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Turner v. Grant,* No. 98-CV-706, 2000 WL 362032, at *6 (W.D.N.Y.2000) (quoting *Ayers v. Ryan,* 152 F.3d 77, 82 (2d Cir.1998)).

My finding that plaintiff's claims against Fischer and Leclaire should be dismissed for lack of personal involvement renders it unnecessary for the Court to address their arguments concerning qualified immunity. As to Conway, however, I conclude that he is not entitled to dismissal on qualified immunity grounds at this time.

"Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage." *Charles,* 2009 WL 890548, at *10 (citing *McKenna v. Wright,* 386 F.3d 432, 436-37 (2d Cir.2004)). "The defense must be based on facts appearing on the face of the complaint." *Charles,* 2009 WL 890548, at *10 (citing *Benzman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008)). *See also Bernstein v. City of New York,* No. 06 Civ. 895, 2007 WL 1573910, at *9 (S.D.N.Y.2007)

("[b]ecause the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6)' ") (quoting *Walker v. Mendoza,* No. 00 Civ. 93, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000)).

In the case at bar, the allegations of the complaint do not demonstrate as a matter **\*240** of law that Conway is entitled to qualified immunity from suit. Depending on what evidence is adduced through discovery, dismissal of plaintiff's claims against Conway may be warranted on a properly supported motion for summary judgment, but at this point, dismissal on this basis as to Conway is premature.

**CONCLUSION**

The motion to dismiss by defendants Brian Fischer, Lucien Leclaire, Jr., and James Conway (Dkt. # 10) is granted in part and denied in part. The motion is granted as to defendants Fischer and Leclaire, and plaintiff's claims against those two defendants are dismissed. In all other respects, the motion is denied.

IT IS SO ORDERED.

W.D.N.Y.,2009.
Rivera v. Fischer
655 F.Supp.2d 235

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Harold CHARLES, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.
**No. 9:07-CV-1274.**

March 31, 2009.

West KeySummary
Civil Rights 78 🔑 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

**Civil Rights 78 🔑 1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases
Prisoner's Americans with Disabilities Act (ADA)
complaint could continue because it was only suing prison
officials in their "official capacity." Prisoner brought a
claim against prison officials for not allowing him to have
his motorized wheelchair in prison. Prison officials argued
that a claim could not be brought against them in their
"individual capacity." However, the complaint was being
brought against prison officials in their "official capacity"
not in their "individual capacity." Americans with
Disabilities Act of 1990, § 201(1)(A), 42 U.S.C.A. §
12131(1)(A).

Troutman, Sanders Law Firm-NY Office, Aaron H.
Mendelsohn, Esq., Amanda R. Gaynor, Esq., of Counsel,
New York, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to 42
U.S.C. § 1983. On March 9, 2009, the Honorable Gustave
J. DiBianco, United States Magistrate Judge, advised, by
Report-Recommendation, that defendants' motion to
dismiss be granted in part and denied in part. No
objections to the Report-Recommendation were filed.

Based upon a careful review of entire file and the
recommendations of the Magistrate Judge, the
Report-Recommendation is accepted in whole. *See* 28
U.S.C. 636(b)(1). Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED only to the
extent that the complaint can be read to allege an ADA or
RA claim in defendants' "individual capacities;"

2. Defendants' motion to dismiss is DENIED in all other
respects; and

3. Defendants file and serve an Answer to the Complaint
on or before April 14, 2009.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

IT IS SO ORDERED.

## REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments of the United States Constitution when they refused to allow him to use his personal, medically prescribed, motorized wheelchair during his incarceration at Mohawk Correctional Facility (Mohawk). Amended Complaint (AC) (Dkt. No. 10). Plaintiff seeks declaratory, injunctive and monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 11). Plaintiff has opposed defendants' motion. (Dkt. No. 14). For the following reasons, this court will recommend granting defendants' motion in part and denying the motion in part.

## DISCUSSION

### 1. Motion to Dismiss

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir.2008) (quoting inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007)). See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Id. (citing Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted).

### 2. Facts

Plaintiff is a paraplegic inmate, who also has an injury to his left wrist, a "Stage IV sacral decubitus ulcer on his coccyx," and severe ulcers on his left hip. AC ¶ 19. Plaintiff states that because of his disabilities, he is dependent on a motorized wheelchair and must frequently shift his weight to relieve pressure from sores on his lower body. Id. Plaintiff alleges that this condition causes him considerable pain. Id. Plaintiff states that he personally owns a specially constructed, motorized wheelchair that was prescribed for him in 2004 by his physician, prior to plaintiff's incarceration. AC ¶ 21. The wheelchair was prescribed for plaintiff based both on his inability to walk as well as his other severe conditions. Id. These conditions prevent plaintiff from operating a manual wheelchair without "extreme discomfort and pain." Id. Plaintiff states that his motorized wheelchair also contains special lumbar cushioning to support his spine and enable him to shift his weight to relieve the pressure from his decubitus ulcer. Id.

*2 Plaintiff states that when he was first incarcerated in the New York State Department of Corrections (DOCS) in April of 2004, he brought his motorized wheelchair with him and was allowed to use it from 2004 until 2006, while he was incarcerated at Rikers Island Correctional Facility. AC ¶¶ 22-23. In May of 2006, plaintiff was transferred to Mohawk and was forced to leave his wheelchair behind. AC ¶ 23. Plaintiff states that he has told defendants that he is experiencing a great deal of pain because he is unable to operate a manual wheelchair, and the defendants have refused to provide plaintiff with "an accommodation" for his disability. AC ¶¶ 27-28.

In April of 2007, plaintiff requested permission to bring his motorized wheelchair to Mohawk. AC ¶ 29. Defendants Dr. Berdick and Richard Harding, the Deputy

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

Superintendent of Programs at Mohawk acknowledged that plaintiff needed a wheelchair, but instead of allowing him to obtain his motorized chair, they told him that someone at the facility would assist him if he could not operate the manual wheelchair. *Id.* Plaintiff claims that in April of 2007, he "alerted" defendants Berdick, Sharma, Harding, Payant, Rabideau, Wright, Raymond, and the Mohawk Reasonable Accommodation Committee that plaintiff wished to obtain his wheelchair, but these individuals and the Committee notified plaintiff that he would not be allowed to do so. AC ¶ 30.

Plaintiff states that he has been provided with a "standard" wheelchair in lieu of allowing him to bring his own wheelchair to Mohawk. AC ¶ 32. Plaintiff states that the wheelchair must be operated manually, and he cannot do so because of his injured wrist. *Id.* Additionally, it is difficult for plaintiff to maneuver his body and to adjust and reposition his body in the standard wheelchair. *Id.* He must perform these movements in order to relieve the pressure from his sacral decubitus ulcer and bedsores. *Id.* Because he has been unable to obtain his motorized wheelchair, and the standard wheelchair causes him extreme pain, he has been unable to participate in many prison programs, and he has suffered pain on many occasions. AC ¶ 33.

Plaintiff states that Mohawk personnel, including defendants Payant, Harding, Rabideau, Antonsen, Sharma, and Berdick, have failed to reasonably accommodate plaintiff's disability. AC ¶ 37. Plaintiff states that on many occasions, he has been unable to go to the cafeteria, the visiting room, the commissary, the general library, and the law library in the manual wheelchair. *Id.* Plaintiff alleges that his requests for assistance in pushing the manual wheelchair have been denied, and thus, he had been denied access to programs and facilities that are available to non-disabled inmates.

Plaintiff states that since April of 2007, he has filed multiple complaints with defendants Annucci, Wright, Diaz, Raymond, Payant, Harding, Rabideau, Sharma, and Berdick regarding his pain and lack of medical treatment. AC ¶ 38. In May of 2007, defendant Rabideau denied plaintiff the authorization to use his medically prescribed wheelchair. AC ¶ 39. Plaintiff states that in a May 2007 memorandum, defendant Rabideau "misled" other officials

by informing them that "personal motorized wheelchairs were not allowed at Mohawk." AC ¶ 35. Plaintiff states, however, that other inmates have been allowed to use motorized wheelchairs. *Id.* In June of 2007, plaintiff sent a "reasonable accommodation" request to defendant Harding, who instructed facility personnel to conduct a hearing. AC ¶ 40. Plaintiff states that he believes that defendants and other Mohawk personnel held a reasonable accommodation hearing regarding plaintiff's requests, but denied his request for the motorized wheelchair, despite plaintiff's complaints of "extreme pain and suffering." AC ¶ 41.

**\*3** The amended complaint then discusses letters and complaints that plaintiff states he has written to various defendants. AC ¶¶ 42-47. Plaintiff states that between August and November 2007, he wrote letters to, or received letters from, defendants Payant, Annucci, Antonsen, Sharma, Raymond, and Wright. *Id.* Plaintiff states that on August 31, 2007, defendant Payant wrote to plaintiff, advising him to tell his doctor about the pain plaintiff was experiencing from using the manual wheelchair. AC ¶ 42. On August 27, 2007, defendant Annucci wrote to plaintiff, telling him that he had been assigned an assistant to push the manual wheelchair, however, on September 26, 2007, defendant Annucci told plaintiff that his complaints were "outside of the jurisdiction of [Annucci's] office." AC ¶ 43. On October 4, 2007, defendant Annucci told plaintiff that his "needs were being met." *Id.*

On September 20, 2007, defendant Antonsen wrote to plaintiff stating that she had investigated plaintiff's complaint, and he should discuss his problems with his doctor "because the nursing staff denied any wrongdoing." AC ¶ 44. Although plaintiff states that he asked for reconsideration of Antonsen's findings, she did not respond. *Id.* Plaintiff states that in October and November, he wrote to defendant Sharma, who responded by telling plaintiff that he had abused his privileges and "recommended that he direct his concerns to his healthcare provider." AC ¶ 45. On October 1, 2007, defendant Raymond wrote to plaintiff telling him that Raymond could not help. AC ¶ 46. In September of 2007, plaintiff wrote to defendant Wright, however, defendant Diaz responded to the letter, stating that defendant Wright, the facility physician, and the medical director had investigated the matter and determined that the motorized

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

wheelchair was not a necessity. AC ¶ 47.

Plaintiff claims that he was barred from participation in programs because of animus or ill will toward his disabilities. AC ¶ 49. Plaintiff claims that the defendants displayed marked hostility and medically inappropriate behavior toward plaintiff in his efforts to obtain and use his motorized wheelchair. AC ¶ 53. Plaintiff also claims that the defendants failed to properly investigate his allegations, despite their awareness of the constitutional violations.

Plaintiff's amended complaint contains two causes of action. The first cause of action is under the ADA and the RA against defendants DOCS; Payant; FN1 Rabideau; FN2 Harding; FN3 Wright; FN4 Sharma; FN5 Antonsen; FN6 Anthony Annucci; FN7 Diaz; FN8 and Raymond.FN9 AC ¶¶ 56-61. Plaintiff's second cause of action alleges that defendants Payant; Rabideau; Harding; Wright; Sharma; Antonsen; Annucci; Diaz; and Raymond violated plaintiff's right to constitutionally adequate medical care by being deliberately indifferent to plaintiff's serious medical needs. FN10 AC ¶¶ 62-64.

FN1. Leo E. Payant, Superintendent of Mohawk Correctional Facility

FN2. Ann Rabideau, Deputy Superintendent of Health at Mohawk.

FN3. Richard H. Harding, Deputy Superintendent for Programs at Mohawk.

FN4. Lester Wright, Deputy Commissioner and Chief Medical Officer of DOCS.

FN5. Yogemdra D. Sharma, Facility Health Services Director.

FN6. Judi Antonsen, Director of Nursing at Mohawk.

FN7. Anthony Annucci, Deputy Commissioner and Counsel of DOCS.

FN8. Pedro Diaz, Regional Health Services Administrator of DOCS.

FN9. Robert Raymond, ADA Coordinator of DOCS.

FN10. The court notes that neither Cause of Action mentions defendant Dr. Berdick. He is apparently a physician at Mohawk, although his first name is unknown. He is mentioned in the amended complaint along with Dr. Sharma. *See e.g.* AC ¶¶ 34, 36-38. Defense counsel has clearly appeared on Dr. Berdick's behalf.

### 3. ADA and Rehabilitation Act

**\*4** The ADA and section 504 of the Rehabilitation Act are applicable to inmates in state correctional facilities. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005). In order to state a claim under section 504 of the Rehabilitation Act, the plaintiff must show that he (1) has a disability for purposes of the Act; (2) that he was "otherwise qualified" for a benefit that he was denied; (3) that he was denied the benefit solely because of his disability; and (4) that the benefit is part of a program or activity that receives federal financial assistance. *Romano v. SLS Residential, Inc.* 246 F.R.D. 432, 440 (S.D.N.Y.2007).

Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d at 274. The standards for determining whether plaintiff states a claim under the ADA and the RA are almost identical. The only difference in the statutes is that the RA applies to entities receiving federal financial assistance, and Title II of the ADA applies to all public entities. *Messier v. Southbury Training Sch. .,* 562 F.Supp.2d 294, 320 & n. 13

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

(D.Conn.2008).

In this case, defendants concede that the statutes apply. However, defendants' first argument is that the individual defendants must be dismissed from the ADA and RA claims because individuals may not be sued under these statutes. Plaintiff argues that the individuals are being sued in their "official capacities" and thus, may be maintained in the case as named. It appears that both sides are making the same argument, but the court will clarify the issue.

The State of New York is a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131(1)(A). Naming a state defendant in his or her "official capacity" is tantamount to naming the State. _Henrietta D. v. Bloomberg,_ 331 F.3d 261, 288 (2d Cir.2003), _cert. denied,_ 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004). In _Henrietta D.,_ the Second Circuit held that a valid ADA claim may be stated against a state official in his or her official capacity. _Id._ at 288-89. The ADA does _not,_ however, provide for "individual capacity" suits against state officials. _Garcia v. S.U.N.Y. Health Science Center of Brooklyn,_ 280 F.3d 98, 107 (2d Cir.2001).

In this case, in plaintiff's response to defendants' motion to dismiss the "individual capacity" suit against the defendants, plaintiff spends a great deal of the memorandum citing _Henrietta_ and arguing that the "individuals" may be sued in their "official capacity." Plaintiff's argument is correct, but defendants are arguing that to the extent that plaintiff is suing the defendants in their "individual capacity," not as individuals in their "official capacity," the ADA and RA claims may be dismissed. Defendants' argument is also correct. Thus, both sides are correct, and it appears that plaintiff is only suing the individual officers in their "official capacity." As such, the ADA and RA claims may continue. To the extent that the amended complaint could be interpreted as suing these DOCS officials in their "individual capacity," any ADA or RA claims should be dismissed. However, the ADA and RA claims may proceed as against the State and the individuals in their "official capacity."

**4.** _**Personal Involvement**_

**\*5** In contrast, plaintiff also has a 42 U.S.C. § 1983 claim against the defendants in their "individual capacities" for Eighth and Fourteenth Amendment violations regarding plaintiff's medical care. The state itself cannot be sued under section 1983. _Komlosi v. New York State OMRDD,_ 64 F.3d 810, 815 (2d Cir.1995) (citing _Will v. Michigan Department of Police,_ 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Thus, the individual defendants may only be sued for money damages under section 1983 in their "individual capacities." _See Kentucky v. Graham,_ 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (discussing the distinction between "individual" or "personal" capacity actions and "official" capacity actions).

However, in order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. _Farrell v. Burke,_ 449 F.3d 470, 484 (2d Cir.2006); _Williams v. Smith,_ 781 F.2d 319, 323 (2d Cir.1986). In _Williams,_ the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. 781 F.2d at 323-24. A supervisory official is said to have been personally involved if that official directly participated in the infraction. _Id._ Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. _Id._ Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. _Id._ Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. _Id._

In _Farrell,_ however, the Second Circuit specifically stated that personal involvement is a generally a question of fact. 449 F.3d at 484. As stated above, in a motion to dismiss, all the facts alleged in the complaint are accepted as true. _Erickson v. Pardus,_ 127 S.Ct. at 2200. The plaintiff must satisfy a "flexible plausibility standard," and once a plaintiff has stated his claim adequately, then it may be supported by any set of facts that are consistent with the allegations in the complaint. _Bell Atlantic v. Twombly,_ 550 U.S. at 563. Thus the court will consider whether plaintiff has adequately stated the personal involvement of the individual defendants.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

**A. Defendants Annucci; Raymond; Diaz; Wright; Payant; and Antonsen**

Defendants argue that plaintiff has not alleged sufficient personal responsibility of these five defendants because plaintiff claims only that he wrote them various letters and received "some brief letters in response." Def. Mem. at 3. (Dkt. No. 11). The issue of personal involvement relates only to the section 1983 claim that defendants were deliberately indifferent to plaintiff's serious medical needs.[FN11] Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). *Sealey* does not, however, stand for the proposition that a letter or letters to a supervisory official is insufficient as a matter of law to create personal responsibility. The court in *Sealey* was considering a motion for ***summary judgment*** and had the opportunity to see the content and character of the letters that were sent to the supervisor. *Id.*

> FN11. This is true because the ADA claim is against defendants in their official capacities, not in their individual capacities.

\*6 Additionally, simply affirming the denial of a grievance is generally insufficient to confer personal responsibility on a defendant. *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007) (finding no personal involvement where plaintiff alleged only that the defendant denied his grievance). However, courts in this circuit have held that when a supervisory official ***receives and acts on*** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citing cases).

In *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), the court found that the plaintiff's statements regarding a letter of complaint were insufficient to raise an issue of fact, however, the court made this finding on ***summary judgment*** and after stating that because contents of the letter were not specified, the court could not tell whether

it would have prompted the superior officer to investigate. *Id.* In *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004), the court held that when allegations of denied medical care come to the attention of the supervisor of a medical program, his adjudicating role in denying a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his responsibility.

Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor or based on a grievance handled by a supervisory official often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself. *See also Rivera v. Pataki,* 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, \*79-81 (S.D.N.Y. Feb. 4, 2005) (discussing situations in which personal involvement may be found based on letters of complaint). Defendants in this case cite *Rivera* for the proposition that writing to a supervisory official does not create personal involvement, however, *Rivera* also stands for the proposition that the contents of the letter and the action of the supervisor may be the determining factor in this analysis. *Id.*

Finally, although the motion in *Rivera* was initially one to dismiss, the parties submitted exhibits, and the court considered the motion as one for summary judgment. *Id.* at \*1-2. The court was given the opportunity to see the letters that plaintiff wrote to the supervisory officials and make the appropriate determination. *Id.* at \* 80. Thus, with this standard in mind, the court may turn to the allegations in this amended complaint to determine whether plaintiff has stated a claim as against the supervisory officials.

The amended complaint states that plaintiff wrote to defendant Annucci, and this defendant responded by stating that plaintiff had been "assigned an assistant to push his manual chair because of his disabilities." AC ¶ 43. Although plaintiff states that one letter from defendant Annucci informed plaintiff that plaintiff's complaints were "outside his jurisdiction," plaintiff claims that in another letter defendant Annucci told plaintiff that "his needs were being met." *Id.* Based on the fact that the court does not know the contents of the letters, this court cannot say that plaintiff has failed to show personal involvement of this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

defendant. The amended complaint states that this defendant actually investigated the complaint and responded based on that investigation. Without more information, this court cannot recommend dismissal against defendant Annucci on that basis.

**\*7** The claim against defendant Raymond also states that she wrote to plaintiff, telling him that she "had investigated his complaint." AC ¶ 44. Plaintiff also states that he wrote to defendant Raymond in September of 2007, and she responded by stating that she "could not help [plaintiff]." AC ¶ 46. Plaintiff claims that he has filed "multiple complaints" with defendants regarding his continuing pain, suffering and inadequate medical treatment. AC ¶ 38. Plaintiff alleges that in September of 2007, plaintiff sent several complaints to defendant Antonsen, regarding the nursing staff refusing to help plaintiff move his wheelchair and complaining about the pain he was experiencing. AC ¶ 44. Plaintiff claims that defendant Antonsen responded by stating that *she* had investigated the issue, and that plaintiff should discuss the problem with his doctor because "the nursing staff denied any wrongdoing." *Id.* The court makes no findings regarding the merits of plaintiff's allegations, however, at this stage of the proceedings, the court finds that it cannot recommend dismissal of the constitutional claims as against defendants Annucci, Raymond, or Antonsen based upon a lack of personal responsibility.

Plaintiff claims that in response to a letter to defendant Wright, plaintiff received a letter from defendant Diaz. AC ¶ 47. Plaintiff claims that the letter from defendant Diaz "stated that defendant Wright, along with the facility physician and medical director, had investigated the matter and had determined that his wheelchair was not a necessity." *Id.* In their argument, defendants mix personal involvement with deliberate indifference in stating that a medical judgment regarding necessity of the wheelchair does not constitute deliberate indifference. Def. Mem. at 5. The plaintiff, however, alleged that the letter from Diaz, specifically states that defendant Wright and others investigated the plaintiff's complaint. Regardless of whether the ultimate decision results in liability for deliberate indifference, the allegation that defendant Wright was personally involved in the investigation is sufficient at this stage to allege personal involvement by both defendants Diaz and Wright.

Plaintiff states that he filed grievances regarding the denial of his wheelchair, and the grievances were denied by defendants, including defendant Payant. AC ¶ 31. As stated above, without the ability to see what the extent of the supervisory official's involvement was in the investigation or denial of the grievance, the court cannot make a proper decision with respect to personal involvement. In a footnote, plaintiff argues that the pleadings sufficiently show that defendant Payant was aware of the discriminatory treatment because of the grievances filed by plaintiff. Pl. Mem. at 12 n. 5. (Dkt. No. 14). In the same footnote, plaintiff states that, at a later point in the litigation, a review of those grievances and complaints will illustrate defendant Payant's awareness of plaintiff's complaints and his actions regarding those complaints. *Id.* On a motion to dismiss, the court must accept the statements made by plaintiff in the complaint as true. *Erickson v. Pardus, supra.* Thus, the court will not recommend dismissing the action against defendant Payant for failure to allege the requisite personal involvement.

**B. Defendant Rabideau**

**\*8** Defendant Rabideau is the Deputy Superintendent of Health at Mohawk Correctional Facility. Plaintiff claims that defendant Rabideau answered plaintiff's letter by stating that Mohawk did not authorize the use of motorized wheelchairs for "safety and security reasons." AC ¶ 55. Plaintiff also alleges that in May of 2007 defendant Rabideau specifically denied plaintiff the use of his wheelchair. AC ¶ 39. Defendants argue that this involvement is insufficient. This court disagrees. Based on the facts as alleged by plaintiff, it appears that defendant Rabideau is expressing a "policy" that does not allow motorized wheelchairs under any circumstances since the letter refers to "safety and security." Plaintiff also claims that other individuals have been allowed to use motorized wheelchairs at Mohawk. AC ¶ 35. If this ultimately is found to be an unconstitutional policy,[FN12] defendant Rabideau's endorsement of that policy is sufficient personal involvement in plaintiff's claim. *Wright, supra* (discussing personal involvement based on the supervisor allowing a policy under which constitutional violations are allowed to occur).

FN12. This court must emphasize again that it makes no findings regarding the ultimate merits

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

of plaintiff's complaint, merely, that plaintiff has alleged sufficient personal involvement in his complaint.

### C. Defendant Harding

Defendant Harding is the Superintendent of Programs at Mohawk. Plaintiff claims that he sent letters of complaint as well as a reasonable accommodation request to defendant Harding. AC ¶¶ 34, 40. It is unclear what the "complaint" letters contained, and plaintiff alleges that in response to the "reasonable accommodation" request, defendant Harding merely instructed SCC Hulihan to conduct a hearing regarding plaintiff's request. The fact that defendant Harding ordered a subordinate to hold a hearing regarding reasonable accommodation, in itself would be insufficient to allege the requisite personal involvement, but since plaintiff claims that there were other letters of complaint, and the court cannot determine what was in those letters or whether they would have alerted defendant Harding to the need for some sort of action, this court cannot recommend dismissal based on lack of personal involvement.

### E. Defendants Sharma and Berdick

Defendant Sharma is the Facility Health Services Director at Mohawk. Dr. Berdick is a physician at Mohawk. Plaintiff states that defendant Sharma personally denied plaintiff's wheelchair request and further refused to adequately respond to plaintiff's complaints. Pl. Mem. at 15. See e.g. AC ¶ 36. Plaintiff states that Dr. Sharma and defendant Berdick specifically denied plaintiff the permission to bring his wheelchair to the facility. Thus, plaintiff has stated sufficient personal involvement to survive a motion to dismiss. A review of the defendants' arguments, however, show that instead of arguing that they were not personally involved in plaintiff's claims, they argue that they were not "deliberately indifferent" to his serious medical needs and that the amended complaint should be dismissed on this basis. [FN13] Def. Mem. at 4-5.

FN13. This is true, notwithstanding the fact that this argument is contained in a section of defendants' memorandum of law that is dedicated

to "personal involvement." Defendants' memorandum of law contains two arguments, one relates to the ADA and RA and the second to "personal involvement." It is unclear where the argument on the merits fits into a lack of personal involvement, however, this court has addressed the Eighth and Fourteenth Amendment issue in any event.

*9 Again, defendants are confusing lack of personal involvement with the ultimate question of whether someone who was personally involved with plaintiff should be held liable for deliberate indifference. In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

It is also true that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

While it may be true in the end, that the two doctors in this case, made a medical decision that did not amount to deliberate indifference, this court cannot make that determination in this case based on the pleadings alone. Thus, this court finds that defendants' motion to dismiss based on lack of personal involvement should be denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)
(Cite as: 2009 WL 890548 (N.D.N.Y.))

### 5. *Qualified Immunity*

Defendants also allege that they are entitled to qualified immunity. Although defendants do not specify the claim to which this immunity would apply, it is clear that this defense would apply *only* to the section 1983 claim because it is a "personal" defense that may only be asserted by the official who is being sued in his "individual capacity." *See Kentucky v. Graham,* 473 U.S. at 166-67. The first step in determining whether an defendant is entitle to qualified immunity is to determine whether the defendant violated plaintiff's constitutional rights, and if so, whether that right was clearly established at the time. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). A defendant will be entitled to qualified immunity if his or her actions did not violate clearly established law or if it was "objectively reasonable" for the defendant to believe that his or her actions did not violate clearly established law. *Id.* (citing *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

**\*10** Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage. *McKenna v. Wright,* 386 F.3d at 436-37. The defense must be based on facts appearing on the face of the complaint. *Bezman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008). Defendants in this case have not really made an argument regarding the Eighth Amendment claim, and instead focused their motion to dismiss on the personal involvement issue. Since this court has determined that plaintiff has stated sufficient personal involvement to survive a motion to dismiss, it is impossible to determine without more, whether the defendants would be entitled to qualified immunity. Thus, this court will not recommend dismissal of the section 1983 claims based on the defense of qualified immunity at this time.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **GRANTED** only to the extent that the complaint can be read to allege an ADA or RA claim in defendants' "individual capacities," and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.
Charles v. New York State Dept. of Correctional Services
Slip Copy, 2009 WL 890548 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.